1  LEE. L. KAPLAN
   Admitted Pro Hac Vice
2  lkaplan@skv.com
   SMYSER KAPLAN & VESELKA, L.L.P.
3  700 Louisiana St., Suite 2300
   Houston, Texas 77002
4  Telephone: (713) 221-2323
   Facsimile: (713) 221-2320

5  ATTORNEYS FOR PLAINTIFF
   SOFTWARE RIGHTS ARCHIVE, LLC
6

7

8

9              **UNITED STATES DISTRICT COURT**

10            **NORTHERN DISTRICT OF CALIFORNIA**

11                **SAN JOSE DIVISION**

12 | **SOFTWARE RIGHTS ARCHIVE, LLC,** | **Case No. CV09-80004 MISC** |

13 | **Plaintiff** | **Case No. 2:07-cv-511 (CE)** |
   |  | **EASTERN DISTRICT OF TEXAS** |
14 | v. |  |

15 | **GOOGLE, INC., YAHOO!, INC., IAC** | **DECLARATION OF LEE L. KAPLAN TO** |
   | **SEARCH & MEDIA, INC., AOL LLC, and** | **SOFTWARE RIGHTS ARCHIVE LLC'S** |
16 | **LYCOS, INC.,** | **AND DANIEL EGGER'S POST-** |
   |  | **HEARING BRIEF CONCERNING** |
17 | **Defendants.** | **PRIVILEGED PATENT FILES** |

18

19

20        I, Lee L. Kaplan, declare as follows:

21        1.      I am an attorney licensed to practice in the State of Texas and admitted pro hac

22 vice before this Court. I am a partner with the law firm of Smyser Kaplan & Veselka, L.L.P.,

23 counsel for Software Rights Archive, LLC ("SRA") in this matter. The following facts are

24 within my personal knowledge, and, if called upon to do so, I could and would testify

25 competently thereto.

26

27

28 LEE L. KAPLAN'S DECLARATION TO RESPONDENTS' OPPOSITION TO MOTION TO COMPEL COMPLIANCE WITH YAHOO!'S
SUBPOENA ON MURRAY & MURRAY
CASE NO. CV09-80004 MISC

1

1

2.      Exhibit A to this declaration is a true and correct copy of the September 16, 1998

2 Bill of Sale, Assignment and License Agreement.

3

3.      Exhibit B to this declaration is a true and correct copy of portions of the

4 September 30, 2008 Deposition of Jeffrey Ait.

5

I declare under penalty of perjury under the laws of the United States and California that

6

the foregoing is true and correct and that this Declaration is executed on April 23, 2009 in

7

Houston, Texas.

8

9 Date: April 23, 2009                      SMYSER KAPLAN & VESELKA, L.L.P.

10

11

12                                          Lee L. Kaplan
Attorney for Plaintiff

13                                          Software Rights Archive, LLC

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LEE L. KAPLAN'S DECLARATION TO RESPONDENTS' OPPOSITION TO MOTION TO COMPEL COMPLIANCE WITH YAHOO!'S
SUBPOENA ON MURRAY & MURRAY
CASE NO. CV09-80004 MISC

2

SOFTWARE RIGHTS ARCHIVE LLC'S AND DANIEL EGGER'S POST-HEARING
BRIEF CONCERNING PRIVILEGED PATENT FILES

# Exhibit A

## Bill of Sale, Assignment and License Agreement

This Bill of Sale, Assignment, and License Agreement is made this _16th_ day of September, 1998 (the "Effective Date"), by and between Site Technologies, Inc., a Corporation doing business in California ("Seller"), and Daniel Egger, a resident of the State of North Carolina ("Buyer").

WHEREAS Seller has agreed to sell and assign to Buyer and Buyer has agreed to purchase and accept from Seller, certain intellectual property, software, databases, and physical assets, defined below, for the consideration and terms set forth herein; and

WHEREAS Seller has in addition agreed to license certain software, defined below, as to which Seller desires to retain ownership but is willing to grant Buyer a perpetual, nonexclusive license, for the consideration and terms set forth herein;

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is hereby agreed as follows:

1.  <u>Purchased Assets</u>. The "Purchased Assets" shall include the following:

    (a)    PATENTS: U.S. Patent Number 5,544,352, filed June 14, 1993 (i.e., the "V-Search Patent"), and any additions, continuations, continuations in part, divisions, or extensions, reissues, renewals, or substitutions of such patent (including the "Aha Patent"), and any foreign counterpart of any of the foregoing, as well as all related documents and diagrams in the files of patent counsel;

    (b)    TRADEMARKS and COPYRIGHTS: All Seller's rights in "V-Search," "Aha," "Libertech," and any terms used in or associated with the "V-Search Publisher's Toolkit," as well as all logos and marketing and promotional material incorporating such marks;

    (c)    SOFTWARE and DATABASES:  all software, whether source code or compiled, and all databases, associated with the V-Search data-visualization system or the Aha technology, including but not limited to all files contained on Drive D of the computer being conveyed as part of the sale (and reproduced in a separate set of tape backups), and enumerated in the memo prepared by Ron Sauers entitled "HIGH-LEVEL SUMMARY OF THE FILES CONTAINED ON DRIVE D:," attached hereto as Exhibit B and hereby incorporated by reference into this document;

    (d)    THIRD-PARTY LICENSES: rights to all license agreements, including the Folio Infobase license, obtained to generate and use the SOFTWARE and DATABASES enumerated above;

    (e)    PHYSICAL ASSETS: Extant copies of CD-ROMs and disks prepared for demonstrations of the V-Search technology, extant copies of the V-Search Publisher's Toolkit, extant

CONFIDENTIAL

EXHIBIT
A-E 13
9 30 0

STI_0007201

marketing materials, sales notebooks, etc., relating exclusively to the V-Search and Aha technologies - as well as the computer and backup tapes upon which the SOFTWARE and DATABASES enumerated above reside, and

        (f)     GOODWILL and CLAIMS: Any and all goodwill, and all claims and potential claims, relating to the Purchased Assets described above.

      2.     Seller warrants that it hereby transfers good and marketable title to the Purchased Assets, free and clear of all liabilities, mortgages, liens, pledges, charges, security interests, encumbrances or title retention agreements of any kind or nature.

      3.     Except for the foregoing warranty of title, THE PURCHASED ASSETS AND THE LICENSED SOFTWARE ARE PROVIDED "AS IS - WHERE IS" AND WITHOUT ANY WARRANTY OF ANY NATURE WHATSOEVER, IT BEING EXPRESSLY UNDERSTOOD AND AGREED THAT SELLER DISCLAIMS ALL OTHER WARRANTIES INCLUDING, BUT NOT LIMITED TO, WARRANTIES OF MERCHANTABILITY, NONINFRINGEMENT AND FITNESS FOR A PARTICULAR PURPOSE.

      4.     Buyer assumes no liabilities of Seller associated with the Purchased Assets or Licensed Software or the operation of the businesses related thereto prior to the Effective Date. Seller agrees to defend, indemnify, and hold Buyer harmless against any and all liabilities associated with the Purchased Assets or Licensed Software that arise prior to the Closing that may be asserted against Buyer after the Effective Date, provided (i) Buyer notifies Seller promptly in writing of such claim, (ii) Seller has sole control of the defense and all related settlement negotiations, and (iii) Buyer provides Seller with all reasonably necessary assistance to perform the foregoing. In no event shall Seller be liable under the foregoing for a claim based on modifications, adaptations or changes to the Licensed Software not made by Seller or for combinations of the Licensed Software with materials not furnished by Seller if such infringement would have been avoided but for such combination. Buyer agrees to defend, indemnify, and hold Seller harmless against any and all liabilities associated with the Purchased Assets that arise after the Effective Date, provided (i) Seller notifies Buyer promptly in writing of such claim, (ii) Buyer has sole control of the defense and all related settlement negotiations, and (iii) Seller provides Buyer with all reasonably necessary assistance to perform the foregoing.

      5.     IN NO EVENT SHALL THE MAXIMUM LIABILITY OF EITHER PARTY ARISING UNDER THIS AGREEMENT EXCEED THE AMOUNT PAID BY BUYER HEREUNDER. IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY LOST DATA OR CONTENT, LOST PROFITS OR FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL, EXEMPLARY OR PUNITIVE DAMAGES ARISING OUT OF OR RELATING TO THE PURCHASED ASSETS OR LICENSED SOFTWARE PROVIDED HEREUNDER, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, AND NOTWITHSTANDING THE FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY.

      6.     <u>Purchase Price</u>. In consideration of the Purchased Assets and the Licensed Software provided hereunder, Buyer shall pay Seller $100,000, payable in full on the Effective Date hereof.

CONFIDENTIAL

STI_0007202

7.     Licensed Software.  Buyer and Seller are aware that several components of Seller's software known as "SiteSweeper" are shared with the Purchased Assets.

Seller hereby grants Buyer a perpetual, worldwide, fully paid, nonexclusive license to copy, display, perform, create derivative works, distribute and otherwise use the Licensed Software, in source code form, solely in conjunction with the Purchased Assets. "Licensed Software" shall mean:

(a)     The "crawler" used to build Aha databases;

(b)     HTML Reporter - the reporter engine plus ISAPI extension; and

(c)     Miscellaneous utility files used by V-Search and/or Aha and also found in SiteSweeper.

Seller shall retain ownership of all copyrights and other rights in the Licensed Software, except that, although the Licensed Software is used in certain of the Purchased Assets, Seller shall have no ownership interest in such Purchased Assets.

8.     Further Assurances.

(a)     Seller agrees to instruct patent counsel, Dorsey and Whitney of Washington, D.C., that Seller has assigned to Buyer all such patent rights described above and such counsel is authorized and directed to make available and/or to deliver to Buyer all Seller's records relating to such patent rights.  Buyer may provide a copy of this Agreement to such counsel and this Agreement shall constitute Seller's authorization to release such files to Buyer.

(b)     Seller agrees from time to time, upon the request of the Buyer, to execute, acknowledge, and deliver all such further instruments, or perform such further acts, as may be necessary, in the opinion of the Buyer, in connection with the sale, assignment, conveyance, transfer and delivery of the Purchased Assets or the Licensed Software.

9.     Termination.  Either party may terminate this Agreement in the event of any material breach of the terms and conditions of this Agreement by the other party, which default continues in effect after the defaulting party has been provided with written notice of default and thirty (30) days to cure such default. Sections 1, 3, 4, 5, 6, 9 and 10 shall survive any termination of this Agreement.

10.     This Agreement, including the exhibits attached hereto, constitute the entire agreement and understanding of the parties with respect to the subject matter contained herein and supersede or cancel all prior agreements respecting such subject matter.  This Agreement may be amended only by a written instrument executed by all the parties or their successors or assigns.  This Agreement shall inure to the benefit of and be binding upon the parties hereto and their successors and assigns.  In the event any provision of this Agreement shall be held to be invalid, the remaining provisions of this Agreement shall be unimpaired and the parties will substitute a new enforceable provision of like economic intent and effect.  This Agreement may be executed in one or more counterparts and each counterpart deemed an original.  This Agreement may also be executed and

CONFIDENTIAL

STI_0007203

delivered in counterparts executed and delivered via facsimile transmission, and any such counterpart shall be deemed an original for all intents and purposes.

IN WITNESS HEREOF, the parties have caused this Agreement to be executed as of the Effective Date:

Buyer: _____     Seller: _____
Daniel Egger                          Site Technologies
                                      Jeff Ait, Chief Executive Officer

Date: Sept 16 '98                     Date: Sept 15, 1998

CONFIDENTIAL

STI_0007204

State of _____California_____ )

                                    SS:

County of _Santa Cruz_ )

    I, the undersigned Notary Public, do hereby certify that ___Jeffrey F. Wit___
personally appeared before me this day and acknowledged that he/she is ___Ceo___
of SITE TECHNOLOGIES, INC., a corporation, and that by authority duly given and as the act of
the corporation the foregoing instrument was signed by its ___CEO___ , sealed
with its corporate seal and attested by its ___Secretary___ .

    WITNESS my hand and notarial seal this _15_ day of ~~August~~ September 1998.

                                            _Chris Rehn_
                                                Notary Public

My Commission Expires:

_July 9, 2002_

CHRIS REHN
Comm. # 1189423
NOTARY PUBLIC-CALIFORNIA
Santa Cruz County
My Comm. Expires July 9, 2002

CONFIDENTIAL

STI_0007205

EXHIBIT A

ASSIGNMENT OF PATENT

WHEREAS the undersigned SITE TECHNOLOGIES, INC., a California corporation ("Assignor"), is the sole owner of Patent number 5,544,352, issued August 6, 1996;

WHEREAS DANIEL EGGER, a resident of the State of North Carolina having his principal residence at 2027 W. Club Boulevard, Durham, NC 27705 ("Assignee"), is desirous of obtaining the entire right, title and interest in, to and under the said Patent;

NOW THEREFORE, in consideration of the sum of One Dollar ($1.00) to the undersigned in hand paid, and other good and valuable consideration, the receipt of which is hereby acknowledged, the undersigned, the said Assignor, has sold, assigned, transferred and set over, and by these presents does hereby sell, assign, transfer and set over, unto the said Assignee, its successors, legal representatives and assigns, the entire right, title and interest in, to and under the said Patent, and all divisions, renewals and continuations thereof, and all issues and extensions thereof, and all applications for industrial property protection, including, without limitation, all applications for patents, utility models, and designs which may hereafter be filed for the invention(s) claimed in such Patent in any country or countries foreign to the United States, together with the right to file such applications and the right to claim for the same the priority rights derived from said United States Patent under the Patent Laws of the United States, the International Convention for the Protection of Industrial Property, or any other international agreement or the domestic laws of the country in which any such application is filed, as may be applicable; and all forms of industrial property protection, including, without limitation, patents, utility models, inventors' certificates and designs which may be granted for said inventions in any country or countries foreign to the United States and all extensions, renewals and reissues thereof;

AND THE UNDERSIGNED HEREBY authorizes and requests the Commissioner of Patents and Trademarks of the United States, and any Official of any country or countries foreign to the United States, whose duty is to issue patents or other evidence or forms of industrial property protection on applications as aforesaid, to issue the same to the said Assignee, its successors, legal representatives and assigns, in accordance with the terms of this instrument;

AND THE UNDERSIGNED HEREBY covenants and agrees that it has full right to convey the entire interest herein assigned, and that it has not executed, and will not execute, any agreement in conflict herewith;

AND THE UNDERSIGNED HEREBY further covenants and agrees that it will com-
and assigns any facts known.

ATTEST:

CONFIDENTIAL

_Sharon S. Figett_
_____ Secretary

CONFIDENTIAL     STI_0007207

**EXHIBIT B**

**The following is a high-level summary of the files contained on Drive D:**

D:\Libertech – Libertech projects and source code.

D:\Libertech\Aha – The Aha Project. DemoDatabase.mdb is the demonstration database installed on this computer, containing merged data from all of the sample databases (HTML, Automotive, Fly Fishing, etc.).

D:\Libertech\Aha\Client – The Aha client. Aha.exe runs Netscape and attaches the Aha menu. Aha.dll implements the Aha menu item. Aha.sly is the client database tracking information about last-viewed dates. AhaMarks.htm contains bookmarks for interesting Aha pages.

D:\Libertech\Aha\CrawlData – Sample databases. Astronomy, Automotive, Beer, Buddhism, Bugs, Fly Fishing, HTML.

D:\Libertech\Aha\Crawler – The crawler executable, miscellaneous utilities used during construction of a sample database, and instructions documenting the production process.

D:\Libertech\Aha\IslaySite – The Islay web site. These are the installed scripts driving the Islay site on this machine, accessed via http://aha.sitetech.com/. (This computer has an entry in its hosts file that makes it think that it is aha.sitetech.com.)

D:\Libertech\Aha\Sources – A snapshot of the source code, as it existed on Sept. 22, 1996. Contains all of the soirce files, including those that belong to V-Search. The more interesting Aha-specific source files are described below.

D:\Libertech\Aha\Sources\Cluster – Clustering library. Sources originally used by V-Search alone re-organized and packaged into a more re-usable form. Shared by V-Search and the client-server Aha clustering demo engine.

D:\Libertech\Aha\Sources\Documentation\Islay – Documentation on the various Islay components, including the big document describing what it would take to turn this stuff into a commercial search service.

D:\Libertech\Aha\Sources\Documentation\V-Crawl – Documentation on the crawler and the corresponding database schema.

D:\Libertech\Aha\Sources\Islay – Sources for Islay proper.

D:\Libertech\Aha\Sources\Islay\Client – Sources for the Islay client.

D:\Libertech\Aha\Sources\Islay\Client\IslayDBTool – Sources for the Islay database tool (which is used to manage the Islay.sly file on the client computer).

D:\Libertech\Aha\Sources\Islay\Client\IslayDll – Sources for the Isplay client DLL.

D:\Libertech\Aha\Sources\Islay\Cluster – The Islay clustering project.

D:\Libertech\Aha\Sources\Islay\Cluster\ClusterController – The Islay cluster controller, which manages and coordinates multiple clustering engines running on multiple computers.

D:\Libertech\Aha\Sources\Islay\Cluster\Clusterer – The Islay clustering engine.

D:\Libertech\Aha\Sources\Islay\Cluster\Terminal – Interface for Islay clustering engine.

D:\Libertech\Aha\Sources\Islay\Server – The Islay server scripts.

D:\Libertech\Aha\Sources\Monitor – URL monitor library, used by the crawler.

D:\Libertech\Aha\Sources\RdeRtx – Islay script interpreter.

D:\Libertech\Aha\Sources\RTX – HTML Reporter library.  One of the key components shared by Aha and SiteSweeper.

D:\Libertech\Aha\Sources\Vcrawl – The crawler library.  One of the key components shared by Aha and SiteSweeper.

D:\Libertech\Aha\Sources\VcrwlApp – The stand-alone crawler application.

D:\Libertech\Aha\Sources\VCrwlDll – DLL version of the crawler.

D:\Libertech\Aha\StaticPages – Static versions of Islay demo pages.

D:\Libertech\Georgia – Working version of production scripts for LCP Georgia V-Search database project.  (This is what Greg was originally hired for.)

D:\Libertech\IETF Demo – IETF Demonstration project.

D:\Libertech\IETF Demo\CD-ROM – The CD-Rom image for the IETF demo.

D:\Libertech\IETF Demo\Sources – Soure files for the IETF demonstration.

D:\Libertech\IETF Demo\Sources\InternetExplorer – V-Search viewer extension for Microsoft Internet Explorer.

D:\Libertech\IETF Demo\Sources\NetscapeExtension – V-Search viewer extension for Netscape Navigator.

D:\Libertech\IETF Demo\Sources\Random Depth – Utility program for IETF demo that generates random text lengths used to display the document box depths.

D:\Libertech\IETF Demo\Sources\RFC – Downloaded source files from which the IETF demo database was built.

CONFIDENTIAL

STI_0007209

D:\Libertech\V-Search\Sources\Setup\VSDevTK\DB\Graphics – Standard graphics shipped with V-Search Developer's Toolkit.

D:\Libertech\V-Search\Sources\Setup\VSDevTK\DB\Styles – Standard style definitions shipped with V-Search Developer's Toolkit, including library of swatch bitmaps.

D:\Libertech\V-Search\Sources\Setup\VSFVTK – Misc. Folio Views Integration Toolkit.

D:\Libertech\V-Search\Sources\SRCH – V-Search Map (Search Screen) Library. Includes layout algorithm, etc.

D:\Libertech\V-Search\Sources\TestDB – Miscellaneous test databases, including the style browser database.

D:\Libertech\V-Search\Sources\UtilApp – Utility Application library. Used by V-Search development tools (inverse link generator, cluster link generator, etc.)

D:\Libertech\V-Search\Sources\VSClsLnk – V-Search Cluster Link generator.

D:\Libertech\V-Search\Sources\VSDbComp – V-Search Database Compiler.

D:\Libertech\V-Search\Sources\VSDBTOOL – V-Search Database Editor.

D:\Libertech\V-Search\Sources\VSDocs – Source files for V-Search documentation.

D:\Libertech\V-Search\Sources\VSEDIT – Stand-alone V-Search Viewer.

D:\Libertech\V-Search\Sources\VSFVCITE – Source files for VSFVJump.exe, the small program used to launch V-Search Maps from within Folio VIEWS Infobase Text.

D:\Libertech\V-Search\Sources\VSInvLnk – V-Search Inverse Link Generator.

D:\Libertech\V-Search\Sources\VSRCHFVE – V-Search Viewer for Folio VIEWS.

D:\Libertech\V-Search\VSDevTK – Installed version of V-Search Developer's Toolkit.

D:\Libertech\V-Search\VSFVTK – Installed version of V-Search Integration Toolkit for Folio VIEWS.

D:\Libertech\V-Search Conference Materials – Presentation materials for V-Search training conference.

D:\Libertech\Wines of the World – Wines Of the World demonstration database.

D:\Programs\Views31 – Folio VIEWS 3.1. The runtime software and developer tools.

CONFIDENTIAL

D:\Programs\VIEWS31.PDK – Folio VIEWS Infobase Production Kit. Allows you to create "Bound" versions of Folio Infobases that are licensed for sale.

D:\Libertech\Infobase 95 Conference Materials – Presentation materials and demo from Infobase 95, prior to the development of the V-Search Publisher's Toolkit.

D:\Libertech\Medical Informatics – The Medical Informatics Demo. Includes database and viewer with generalized link types, supplemental HTML source files for use with Netscape V-Search extension, etc.

D:\Libertech\Privacy – The Privacy Demo.

D:\Libertech\Privacy\CD-ROM – The CD-ROM image for the Privacy demo.

D:\Libertech\Privacy\Production – Production files and scripts for the demo.

D:\Libertech\Privacy\Sources – Source files for privacy demo text.

D:\Libertech\Privacy\Sources\DOCS – Word documents.

D:\Libertech\Privacy\Sources\FFF – Folio Flat Files

D:\Libertech\Privacy\Sources\NFO – Folio Infobases

D:\Libertech\Privacy\Sources\SGML – SGML sources.

D:\Libertech\SHEPARDS – The Shepard's NC Demo. Includes NC.mdb source database, compiled NC.vvw viewer file, etc.

D:\Libertech\SHEPARDS\styles – Custom V-Search styles for Shepard's Demo.

D:\Libertech\SHEPARDS\Working – Working files used during production of the Shepard's Demo database. These are from Steve's working directory. There is much more material on tape, including previous versions of the database, working copies at various intermediate stages, etc. ... too much stuff to fit on the hard drive.

D:\Libertech\SourceSafe – The SourceSafe repository. SourceSafe has been installed on this machine and configured to use this repository. Can be used to extract a snapshot of any of the V-Search or Aha source files at any point from 12/19/95 to 9/22/96.

D:\Libertech\Taxdemo – The Tax Demo (26 U.S.C. § 83(b)).

D:\Libertech\Technology Demonstration – The Libertech Technology Demonstration from February 1995.

D:\Libertech\V-Search – The V-Search Project.

CONFIDENTIAL                    STI_0007211

D:\Libertech\V-Search\Post-1.0 Changes – A snapshot of the V-Search sources as they existed on March 19, 1996. Includes changes for generalized link types; day-level granularity on the timeline axis; bug fixes for Privacy demo; early development work for browser-like navigation model.

D:\Libertech\V-Search\Post-1.0 Changes\Base\INC – Includes HistList.h, part of browser navigation model source code.

D:\Libertech\V-Search\Post-1.0 Changes\Base\UTIL – Includes HistList.cpp, part of browser navigation model source code.

D:\Libertech\V-Search\Post-1.0 Changes\DBLIB – Includes changes for generalized link types, day-level granularity on timeline axis.

D:\Libertech\V-Search\Post-1.0 Changes\FolioVWS – Includes changes for generalized link types.

D:\Libertech\V-Search\Post-1.0 Changes\SRCH – Includes changes for generalized link types, day-level granularity on timeline axis.

D:\Libertech\V-Search\Post-1.0 Changes\VSEDIT – Includes changes for generalized link types.

D:\Libertech\V-Search\Post-1.0 Changes\VSRCHFVE – Includes changes for generalized link types.

D:\Libertech\V-Search\Post-1.0 Changes\VSView – Includes changes for generalized link types.

D:\Libertech\V-Search\Post-1.0 Changes\VSView 16 – Includes changes for generalized link types.

D:\Libertech\V-Search\Sources – A snapshot of the source code as it existed on the date the gold master for the V-Search Publisher's Toolkit and Folio Views Integration Toolkit was stamped. Key components described below.

D:\Libertech\V-Search\Sources\Base – Library of general C++ utility functions.

D:\Libertech\V-Search\Sources\DBLIB – V-Search Database library. Contains code for manipulation of V-Search database files and compiled viewer files.

D:\Libertech\V-Search\Sources\ExtStub – General V-Search extension library.

D:\Libertech\V-Search\Sources\FolioVWS – V-Search extension for Folio VIEWS.

D:\Libertech\V-Search\Sources\FVTbComp – V-Search Textbase compiler.

D:\Libertech\V-Search\Sources\MESSAGES – String resources.

D:\Libertech\V-Search\Sources\Setup\VSDevTK – Misc. V-Search Developer's Toolkit.

SOFTWARE RIGHTS ARCHIVE LLC'S AND DANIEL EGGER'S POST-HEARING
BRIEF CONCERNING PRIVILEGED PATENT FILES

# Exhibit B

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE EASTERN DISTRICT OF TEXAS

3    MARSHALL DIVISION

4         - - - -

5  ------------------------------------x
   SOFTWARE RIGHTS ARCHIVE, LLC.,        :
6                                        :
                  Plaintiff,             :
7                                        :  Civil Action No.
            -vs-                         :  2:07-cv-511 (CE)
8                                        :
   GOOGLE INC., YAHOO! INC., IAC SEARCH  :
9  & MEDIA, INC., AOL, LLC., and LYCOS,  :
   INC.,                                 :
10                                       :
                  Defendants.            :
11 ------------------------------------x

12            - - - -

13

14     Videotaped deposition of JEFFREY FRANKLIN AIT, the

15 witness herein, called for the purpose of Discovery

16 Examination by the Defendants, pursuant to Federal

17 Rules of Civil Procedure, taken before Rita Rodriguez,

18 a Notary Public for South Carolina, at the Hilton

19 Myrtle Beach Resort, 10000 Beach Club Drive, Myrtle

20 Beach, South Carolina, on Tuesday, September 30, 2008,

21 commencing at 9:45 a.m.

22            - - - - -

23

24

25

1      shell entity? If you told me I didn't get it.
2   A.   A shell entity basically is a corporation that
3      has no assets.
4   Q.   But we know from looking at the 1998 tax return
5      that in fact Slash had assets in 1998, don't we,
6      sir?
7   A.   Desks, chairs and computers, yes.
8   Q.   So you would agree under your own definition of
9      shell entity, under the definition that you just
10     told me, and I mean this respectfully, Slash was
11     not a shell entity at least in 1998, you would
12     agree with that; right, and the same in 1999;
13     correct?
14   A.   Okay.
15   Q.   I'm going to get through some stuff here that I
16     don't want to ask you. Give me a second here.
17     I'm going to cut some stuff here.
18     V-Search technology, Mr. Ait, you have
19     talked about that being the technology that you
20     intended to sell to Mr. Egger; correct?
21   A.   Yes.
22   Q.   Did you ever try to sell the V-Search technology
23     to anyone other than Mr. Egger?
24   A.   No.
25   Q.   When we say the V-Search technology, do you know

1      personally what patents, if any, would have been
2      included in the V-Search technology sale?
3   A.   I mean, the document that was the bill of sale
4      had patent numbers on it and it's been such a
5      long time ago I can't tell you what those patent
6      numbers are.
7   Q.   But whatever is on the bill of sale, that's what
8      you intended?
9   A.   Yes.
10   Q.   Do you know if, at the time of the sale of the
11     V-Search technology, the attempted sale, because
12     we certainly dispute it on the defendants' side,
13     so when I say that I'm just telling you from our
14     perspective, that's why I'm using the word
15     attempted sale. But do you know if there were
16     any patents or patent applications that Site
17     owned at the first attempted sale in 1998 to Mr.
18     Egger?
19     MR. KAPLAN: Can you repeat that,
20     please.
21   Q.   That was a pretty bad question. Let's ask it
22     again.
23     MR. WALSH: I'm just making sure you're
24     awake over there. I say that with a smile on my
25     face.

1   Q.   Let's see if I can't say it better.
2      MR. KAPLAN: Tell me what you really
3      want to know and I'm sure he'll tell you.
4      MR. WALSH: I'm just trying to phrase
5      it carefully and accurately.
6   Q.   In 1998, do you recall that it was 1998 when this
7      bill of sale that you were just referencing
8      occurred to Mr. Egger?
9   A.   Based on information I have seen here I believe
10     it's an accurate time frame.
11   Q.   Let's just pull it out. That's probably the
12     easiest thing.
13     - - - - -
14     (Thereupon, Ait Exhibit No. 18
15     was marked)
16     - - - - -
17   Q.   You talked about a bill of sale a minute ago, Mr.
18     Ait?
19   A.   Right.
20   Q.   Is this the one that you were talking about?
21   A.   I believe so.
22   Q.   Were you the point man on this bill of sale for
23     Site?
24   A.   I was contacted by Daniel Egger and asked to sell
25     the technology if I was interested in selling the

1      technology, yes.
2   Q.   Let's pull out that e-mail first. Let me try to
3      keep it chronological here.
4      - - - - -
5      (Thereupon, Ait Exhibit No. 19
6      was marked)
7      - - - - -
8   Q.   Mr. Ait, I have now handed you Exhibit 19. We'll
9      come back to Exhibit 18 in a minute, but taking a
10     moment to briefly review that.
11     Do you see that's an e-mail from Mr. Egger
12     to you, July 10, 1998, making an inquiry or
13     following up on a phone conversation with his
14     interest, Mr. Egger's interest in buying
15     V-Search?
16   A.   I do.
17   Q.   That was just a butchered question. Let me say
18     it cleanly.
19     You recognize that Exhibit 19 as an e-mail
20     from Mr. Egger to you on July 10, 1998 expressing
21     written interest into buying the V-Search
22     technology?
23   A.   I do.
24     MR. KAPLAN: Actually, the second, and
25     my copy of Exhibit 19, these are two things put

29 (Pages 110 to 113)

**114**

1 together and this is how they were produced, but
2 the second page is a different e-mail.
3     MR. WALSH: Correct. And I was only
4 talking about the first page.
5     MR. KAPLAN: Do you want the whole
6 thing to be the exhibit or just Page 1?
7     MR. WALSH: What's funny is it's got
8 Page 1 and Page 3. I don't know what happened to
9 Page 2. I guess that was how it was produced to
10 us.
11     MR. KAPLAN: That's what existed. It's
12 your call.
13     MR. WALSH: I would like to leave them
14 both in there. Exhibit 19 is a two-page
15 document. I'm talking about the first page right
16 now.
17 Q.  It appears that the second page, which has got a
18 number 3 at the bottom of Exhibit 19, this was an
19 e-mail sent later in time from Ron Sauers to
20 Daniel Egger CCing you, right, Mr. Ait?
21 A.  Yes, at my request.
22 Q.  So let's go back to the front page of Exhibit 19.
23     First of all, this was produced by Mr.
24 Egger, okay?
25 A.  Yes.

**115**

1 Q.  Because it's got the EGG at the bottom. That
2 means egg for Egger. That's the number, the
3 Bates label we are using. So this is a Mr. Egger
4 document, as I understand it?
5 A.  Yes.
6 Q.  The question I have for you, Mr. Ait, or a couple
7 of questions, but do you see where he BCC'd Mr.
8 Sauers?
9 A.  I do.
10 Q.  Are you aware that Mr. Sauers was BCC'd on this
11 e-mail?
12 A.  I was.
13 Q.  Have you seen this e-mail recently?
14 A.  No.
15 Q.  And you and Mr. Sauers were working at the same
16 place; right?
17 A.  We were.
18 Q.  Do you know why Mr. Egger would have BCC'd Mr
19 Sauers as opposed to CCing him?
20 A.  No.
21 Q.  How would you be aware that he was BCC'd,
22 presumably a BCC, you would not have seen the
23 BCC?
24 A.  A part of our whole conversations was around
25 Ron's time, et cetera, which I told him that I

**116**

1 would commit to doing upon doing the acquisition
2 of it. So I'm sure that he BCC'd Ron simply
3 because he mentions Ron's commitment of time in
4 there.
5     Ron was the vice president of engineering
6 and chief technology officer so as a courtesy,
7 since he worked with Ron, I'm sure he just BCC'd
8 him just so he know what Daniel and I talked
9 about.
10 Q.  You don't have a problem with him being BCC'd as
11 opposed to CC'd?
12 A.  No, Ron was my chief technology officer and I
13 would not have sold the technology without his
14 approval.
15 Q.  Do you see where he says I would pay 80,000 cash
16 on delivery, he says for the preSite sweeper
17 stuff?
18 A.  Okay.
19 Q.  That was his conceptual offer at the time from
20 Mr. Egger to you; correct?
21 A.  It is.
22 Q.  And did you then consult with Ron Sauers to
23 determine that the stuff that was in Exhibit 18
24 being sold did not implicate Site Sweeper?
25 A.  I did.

**117**

1 Q.  And you see that in Exhibit 18 the bill of sale
2 is going from Site to Mr. Egger; correct?
3     In Exhibit 19, excuse me. Excuse me,
4 Exhibit 18.
5 A.  I do.
6 Q.  Now, this the sale price. If you go down to Page
7 2 of Exhibit 18, Mr. Ait. Purchase Price, do
8 you see that at the very bottom?
9 A.  Uh-huh.
10 Q.  It says, "In consideration of the purchased
11 assets and the license software provided
12 hereunder, buyer shall pay seller $100,000,
13 payable in full on the effective date hereof."
14     You understand that this purported sale
15 that's Exhibit 18, would have included the
16 patents that were listed or at least the one
17 patent that was listed; correct?
18 A.  Yes.
19 Q.  How did you come up with this $100,000 price?
20 A.  I don't remember.
21 Q.  Is it fair to say you thought it was a fair price
22 at the time or you wouldn't have done it?
23 A.  Yes.
24 Q.  Is it fair say that you thought the $100,000 was
25 a fair price between a willing buyer and a

30 (Pages 114 to 117)

**118**

1  willing seller?
2  A.  It was.
3  Q.  In other words, there was no -- this is 1998.
4      There is no, this was not a distress sale, Mr.
5      Egger was interested in it and so you guys were
6      willing to sell it from Site for $100,000?  You
7      thought that was a fair price; correct?
8  A.  It was.
9  Q.  Were you the person that approved the final price
10     of $100,000?
11 A.  I was.  It would have had to go to Board review
12     though.
13 Q.  So you thought the price of $100,000 was fair but
14     the Board for Site had to think it was fair to
15     approve it?
16 A.  Yes.
17 Q.  I have seen some documents, and I can dig them
18     out if you need me to, I have seen some documents
19     that indicate even though $100,000 was the price
20     that was in Exhibit 18, that Mr. Egger in fact
21     only paid 80,000, which is similar to the number
22     he paid on Exhibit 19 or at least offered to pay.
23         Do you need me to pull those documents out
24     or do you recall that he in fact paid $80,000
25     cash?

**119**

1  A.  I believe if the bill of sale states that he paid
2      the $100,000, then he paid the $100,000.  The
3      best place to find that would be in whatever the
4      SEC documents were that we recorded.  So if we
5      have the SEC 8-K filing of September 30th, then
6      that should actually reflect what the asset
7      amount was.
8  Q.  I don't have an SEC document but I have a
9      bankruptcy document that I can show you.  And let
10     me have it marked.
11         - - - - -
12         (Thereupon, Ait Exhibit No. 20
13         was marked)
14         - - - - -
15 Q.  Mr. Ait, this is a document by it's title called
16     Statement of Financial Affairs filed in the
17     United States Bankruptcy Court in the Northern
18     District of California for Site's bankruptcy.
19         Do you see that?
20 A.  I do.
21 Q.  You would have had to approve this document
22     before it was filed as the Responsible Person;
23     right?
24 A.  Yes.
25 Q.  See at the top where it has these pages?  Page 10

**120**

1      of 18, could you go to that.  At the top.
2          That's your signature, right, Mr. Ait?
3  A.  Yes.
4  Q.  Go to the page that's got 5 of 18 at the top if
5      you wouldn't mind.
6  A.  Okay.
7  Q.  It says, "Other transfers.  List all other
8      property other than the property transferred in
9      the ordinary course of business or financial
10     affairs of the debtor transferred either
11     absolutely or as security within one year
12     immediately proceeding the commencement of this
13     case."
14         Do you see that Mr. Ait.
15 A.  Okay.
16 Q.  Do you we see where Daniel Egger is listed for
17     V-Search technology as having been transferred
18     and the price listed as $80,000.
19 A.  Okay.
20 Q.  Do you see the date is 9/15/98?
21 A.  Okay.
22 Q.  If you look back on Exhibit 18, do you see the
23     bill of sale is 9/16?
24 A.  I do.
25 Q.  So those are a day apart.  You have no reason to

**121**

1      think that the $80,000 that's being referenced in
2      exhibit -- what are we at, 20?
3  A.  20.
4  Q.  Exhibit 20.  You have no reason to believe that
5      the $80,000 in Exhibit 20 is not corresponding to
6      the purported sale of Exhibit 18, do you?
7  A.  I have no reason to believe that.
8  Q.  Does this refresh your recollection, Mr. Ait, as
9      the person that signed Exhibit 20, that in fact
10     Mr. Egger only paid $80,000 instead of $100,000
11     for the V-Search technology?
12 A.  I have no recollection of the transaction other
13     than what I'm reading here, so I can only go by
14     the bill of sale that says it was for 100,000.
15     But I don't remember any Delta difference.
16 Q.  But looking at Exhibit 20, wouldn't you have to
17     go on that, something you filed with the
18     Bankruptcy Court, that in fact it was only
19     $80,000 that was paid, Mr. Ait?
20 A.  I mean, I don't have any recollection or
21     remembrance of it so, I mean, I assume that,
22     based on this, that it was 80,000.  I don't know.
23     I'd feel better if I saw the SEC documents based
24     on what he did in the transaction.
25 Q.  I'm not hiding them from you, Mr. Ait.  I don't

**122**

1  think we have those with us. We don't have
2  those so I can't put anything else in front of
3  you. This is what I have got?
4  A. Okay.
5  Q. Let's look back at Exhibit 18, Mr. Ait, please.
6  A. Okay.
7  Q. Let's see what was being transferred for this
8  $80,000 or this $100,000.
9      If you look under Purchased Assets on Page
10  1 on Exhibit 18, the very first page. You see
11  where it says purchased assets right there under
12  number one?
13  A. Right.
14  Q. Will include the following patents, 5,444,352;
15  correct?
16  A. Yes.
17  Q. Also trademarks and copyrights?
18  A. Yes.
19  Q. Also software and databases?
20  A. Yes.
21  Q. Also third-party licenses?
22  A. Yes.
23  Q. Do you know what third-party licenses there were?
24  A. No. I mean, this has been a long time ago.
25  Q. Sure. I'm not complaining. I just wanted to ask

**123**

1  you the question, Mr. Ait.
2      The next question was physical assets. It
3  says physical assets. There is CD-ROMS and
4  disks. There is also, if you go to the top of
5  Page 2, a computer and backup tapes; correct?
6  A. Yes.
7  Q. So all these things were supposed to be included
8  in the $100,000 or the $80,000 that was paid;
9  right?
10  A. Yes.
11  Q. In other words, it wasn't just the patent;
12  correct?
13  A. It was the complete set of assets.
14  Q. Right. So you would agree with me it was just
15  1-A, the patent; correct?
16  A. Yes, the patent would be worthless without the
17  technology.
18  Q. Now, as we go to Page 4, Mr. Egger -- excuse me
19  I'm sorry. I looked at Mr. Egger's signature
20  again, Mr. Ait. I'm not trying to do that on
21  purpose, but he signed the same page as you.
22      Mr. Egger signed it and you signed it as
23  CEO of Site; correct?
24  A. Yes.
25  Q. This is Exhibit 18 we are talking about, for the

**124**

1  reported; correct?
2  A. Yes.
3  Q. Then if you go back a couple pages -- you
4  actually go back a couple more pages to Exhibit
5  A, Assignment of Patent. Do you see that?
6  A. Okay.
7  Q. Still in Exhibit 18. You see where it says
8  attest at the bottom?
9  A. Yes.
10  Q. If you go to the top of the next page it was
11  Sharon Fugitt that attested to it; correct?
12  A. Yes.
13  Q. Do you see where it appears that there are some
14  word missing here. I'm just going to, if you
15  don't mind, sir.
16      Do you see where it says "that it will
17  com" dash and then there is nothing else after
18  that, do you see that?
19      "And the undersigned hereby further
20  covenants and agrees that it will com" dash and
21  then there is a blank after that?
22  A. Okay.
23  Q. Do you know what words, if any, used to be there?
24  A. No.
25  Q. Do you where, see where someone wrote DE at the

**125**

1  bottom and an initial right past that blank line?
2  A. Yes.
3  Q. Do you know if DE, those would at least be the
4  initials for Daniel Egger; right?
5  A. Okay.
6  Q. You would agree with that, wouldn't you?
7  A. I mean, that's one possible answer. I don't know
8  what that is.
9  Q. Do you have any idea of anyone else involved in
10  this bill of sale that has the initials DE
11  besides Daniel Egger?
12  A. No.
13  Q. Who else would have been involved in the sale of
14  the purported sale from Exhibit 18 to Daniel
15  Egger besides you and Mr. Egger and Mr. Sauers?
16  A. There would be a lot of people involved in
17  drawing up the documents and doing all of that.
18  Q. I'm not talking about the mechanics of drawing up
19  the document. You said you and Mr. Sauers and I
20  guess you said the sale would have also been
21  approved by the Board of Directors?
22  A. Sure.
23  Q. Would those have been all of the people on your
24  side of the equation of this purported sale that
25  would have been involved in the actual --

Doerner & Goldberg New York * A Veritext Company
1350 Broadway * New York, NY 10018 * 212-564-8808