# EXHIBIT Q

1

```
 1                  UNITED STATES BANKRUPTCY COURT
 2                  NORTHERN DISTRICT OF CALIFORNIA
 3                        (SAN JOSE DIVISION)
 4
 5   In re:
 6   SITE TECHNOLOGIES, INC.,         Case No. 99-50736-RLE
 7                                    Chapter 11
 8                                    San Jose, California
                                      December 17, 2008
 9                                    1:11 p.m.
              Debtor.
10   _____/
11
                        TRANSCRIPT OF PROCEEDINGS
12        a) MOTION TO (I) REOPEN CLOSED CASE PURSUANT TO
          11 U.S.C. SECTION 350(b) AND RULE 5010 IN ORDER TO
13         PROTECT AND AUCTION PATENTS HELD IN CUSTODIA LEGIS,
         (II) TO APPOINT A TRUSTEE, (III) FOR A STATUS CONFERENCE
14        PURSUANT TO SECTION 105(d) TO ARRANGE FOR PROTECTIVE
           ORDERS AND CONFIRMATION OF THE CONTINUING STAY AND
15      (IV) FOR OTHER RELIEF BY SHERWOOD FINANCE (DELAWARE), LLC

16        b) JOINDER IN MOTION TO REOPEN CASE AND FOR RELATED
                  RELIEF BY IAC SEARCH & MEDIA, INC.
17
18            BEFORE THE HONORABLE ROGER L. EFREMSKY
                  UNITED STATES BANKRUPTCY JUDGE
19
20   APPEARANCES:
21
     For the Debtor:          HENSHAW & CULVERSON
22                            BY: JOE D'HOPE, ESQ.
23
24
25
```

```
 1  APPEARANCES (CONTINUED):

 2
    For Sherwood Finance:     LAW OFFICES OF MORRISON AND
 3                            FOERSTER
                              BY: LARRY ENGEL, ESQ.
 4                                    -and-
                                  VINCE NOVAK, ESQ.
 5                            425 Market Street
                              San Francisco, California 94105
 6

 7
    For Google, Inc.:         BIALSON, BERGEN AND SCHWAB
 8                            BY: PATRICK M. COSTELLO, ESQ.
                              2600 El Camino Real #300
 9                            Palo Alto, California 94306

10

11  For IAC Search & Media:   QUINN, EMANUEL, URQUHART, OLIVER
                              AND HEDGES
12                            BY: JOSH SOHN, ESQ.
                                        -and-
13                                SCOTT C. SHELLEY, ESQ.
                                  (Appearing Telephonically)
14                            50 California Street, 22$^{nd}$ Floor
                              San Francisco, California 94111
15

16  For Software Rights:      SCHNADER, HARRISON, SEGAL AND
                              LEWIS
17                            BY: GREGORY C. NUTI, ESQ.
                                        -and-
18                                LEE KAPLAN, ESQ.
                                  (Appearing Telephonically)
19                            One Montgomery Street, #2200
                              San Francisco, California 94104
20

21
    For the U.S. Trustee:     OFFICE OF THE U.S. TRUSTEE
22                            BY: JOHN WESOLOWSKI, ESQ.
                              280 South First Street
23                            San Jose, California 95113

24

25
```

```
 1   APPEARANCES (CONTINUED):

 2

 3
     Court Recorder:         NORMA ORTIZ
 4                           UNITED STATES BANKRUPTCY COURT
                             280 South First Street
 5                           San Jose, California 95113

 6

 7   Transcription Service:  Jo McCall
                             Electronic Court
 8                           Recording/Transcribing
                             2868 E. Clifton Court
 9                           Gilbert, Arizona 85295
                             Telephone: (480) 361-3790
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                  P R O C E E D I N G S
 2   December 17, 2008                          1:11 p.m.
 3                        -oOo-
```

4        THE CLERK: Item 9, <u>Site Technologies.</u>

5        THE COURT: Appearances, please.  Mr. Engel, thank
6   you.  I apologize for the delay.

7        MR. ENGEL: Not a problem, Your Honor.  Larry
8   Engel of Morrison and Foerster for Sherwood Finance.

9        MR. COSTELLO: Good afternoon, Your Honor, Patrick
10  Costello, Bialson, Bergen and Schwab for Google, Inc.

11       MR. SOHN: Good afternoon, Your Honor, Josh Sohn,
12  Quinn, Emanuel, Urquhart, Oliver and Hedges for IAC Search
13  and Media, a Plan beneficiary.

14       MR. NOVAK: Good afternoon, Your Honor, Vince
15  Novak of Morrison and Foerster also for Sherwood Finance.

16       MR. SOHN: And my colleague, Scott Shelley, also
17  representing IAC.  He should be participating
18  telephonically I think.

19       THE COURT: Do we have Mr. Shelley on the phone?

20       MR. SHELLEY: Yes, Your Honor.  I'm here, thank
21  you.

22       THE COURT: All right.  Good afternoon.

23       MR. NUTI: Good afternoon, Your Honor, Greg Nuti,
24  Schnader, Harrison, Segal and Lewis, for Software Rights.

25       THE COURT: Nice to see you, Mr. Nuti.

1           MR. D'HOPE: Your Honor, I'm Joe D'Hope.  I'm with
2  Henshaw and Culvertson.  I don't represent a party to this
3  proceeding, but Murray and Murray was counsel for Site
4  Technologies earlier in the bankruptcy.  They don't
5  represent anybody now.  We've been asked to assist them and
6  responded to discovery on various positions on that, and we
7  just want to make it clear so there's no misunderstanding,
8  Murray and Murray is not representing anyone here.  They
9  take no position in this motion as to whether this case
10 should be reopened or how it should proceed.  But we do
11 have a definite interest in getting guidance from the Court
12 in an order as to the proper procedure so that the
13 appropriate privileges can be protected.
14          THE COURT: Okay.
15          MR. D'HOPE: Thank you.
16          THE COURT: Thank you.
17          MR. WESOLOWSKI: John Wesolowski for the U.S.
18 Trustee and interested observer, Your Honor.
19          THE COURT: All right.
20          MR. NUTI: Your Honor, also on the phone is my co-
21 counsel, Lee Kaplan.
22          MR. KAPLAN: Hello, Your Honor.
23          THE COURT: All right.  Mr. Kaplan, I think I
24 signed off on your application, pro hac vice application,
25 this morning.

13

1 Legis.

2 So nothing that's happened here can be sufficient
3 to remove these assets from the estate and our process and
4 what our status conference asked was a scheduling process
5 in this court that can resolve the issues of who acts for
6 this estate.  You know, does Mr. Ait have any power or is
7 everything he's done been a nullity as well as a violation
8 of his duties and the stay and that's our position.

9 Once we know how the estate is going to be
10 represented and spoken for, we can then have alliances with
11 the people that have the money to fight this fight and
12 bring the patents into our estate clearly free of this
13 claim by the plaintiffs in Texas and then we can have them
14 sold and we can get on with life.  You know, we're not
15 interested in punishing people for the wrongdoing, you
16 know, we just want to get the patents.

17 THE COURT: Okay.

18 MR. NUTI: Thank you, Your Honor.  Your Honor,
19 counsel has made lots of allegations.  He jumps to the
20 conclusion that these patents are property of the estate.
21 I think that's an issue that needs to be addressed
22 undoubtedly.  I'll just back up for a minute.  The genesis
23 of my client's title to these patents was a pre-petition
24 transfer to Mr. Egger in 1998, ten years ago.  Subsequent
25 to that transaction, Site Tech filed for bankruptcy,

Case5:08-cv-03172-RMW   Document126-17   Filed07/24/09   Page8 of 17

14

1  disclosed the transaction in the Disclosure Statement,
2  disclosed the transaction in the schedules, that it sold to
3  an insider -- I believe it was an insider -- these patents.
4           Nobody made an issue of it until now.  The Plan
5  was confirmed.  Assets of both the sub, Site Tech/ were
6  sold on behalf of the Debtor's estate with nobody claiming,
7  wait a minute, the Debtor can't sell those because those
8  are the sub's assets.  None of those issues were raised.
9  The Plan was confirmed; it was consummated; everybody went
10 home.
11          Ten years later, my client is suing Google,
12 Yahoo, AOL, all the rest, for patent infringement, because
13 they own these patents that are Mr. Egger's.  Only now do
14 these defendants say, wait a minute, there may be a problem
15 in title, as a litigation tactic to defend themselves in
16 Texas.  They've raised this standing issue on the title in
17 the patents in the Texas Court, in the Northern District
18 here in front of Judge White, and now this court -- all the
19 same issues; this is bankruptcy estate assets; there's a
20 break in the chain of title; they had no standing to sue
21 for patent infringement.
22          So there is no determination yet that this is
23 property of this estate, so I think the first issue is, we
24 have three courts of jurisdiction right now.  Which is the
25 proper one?  I didn't suggest that this court shouldn't

1   take it without having a full -- everybody having full
2   briefing and have an analysis of what may or may not be the
3   proper court.  It's our position Texas is the proper court.
4   We litigated this in Texas for the last six months.  All
5   these binders here are the motions on that.  There's been
6   discovery in Texas.  There's been depositions in Texas.  I
7   don't see how which court decides the issue of the title to
8   the patents would make a difference.
9           So, we're not going to get to the bottom of all
10  the disputed legal issues, all the disputed factual issues,
11  but I think the first issue to decide is, will this court
12  retain jurisdiction or let another court make the initial
13  determination on patents.  We can brief that in our
14  arguments about that.  Next, Your Honor, would be the issue
15  of, okay, if it's in this court, what's the schedule for
16  briefing on finding out who truly owns these patents and
17  what was the effect of the 1998 transaction.  Only then we
18  get a decision on whether these are patents of this
19  bankruptcy estate.  Then we can talk about how to sell
20  them; who's entitled to them; and what rights flow from
21  that.  But we can't jump to the conclusion -- the Court
22  shouldn't come to the conclusion that what these people did
23  was wrong or that these were actual assets of the estate
24  because no court has made that determination yet.
25          THE COURT:  Yes.  When was the action filed in

1  it seems to me -- it seems to us that this is the
2  appropriate place for that explanation to take place.
3           MR. ENGEL: And the explanation, Your Honor, that
4  Mr. Kaplan offered which is that, you know, he engaged in
5  avoidable transfers to correct a pre-petition mistake, that
6  is not a legal justification for a fiduciary who's only
7  been a -- whose only duty is to the Plan beneficiaries.  He
8  doesn't have a duty to Mr. Egger.  His duty is to the Plan
9  beneficiaries, which means he has to get them assets.  I
10 mean, the choice is does Mr. Egger and therefore SRA the
11 troll that he created a week after they closed this case,
12 do they get this windfall or is the value of this set of
13 patents going to belong to the Plan beneficiaries?  I mean
14 it's as simple as that.
15          And so here what you have is Mr. Ait whose legal
16 duty is to the Plan beneficiaries exclusively in accordance
17 with the Plan and in accordance with law, siding with the
18 adversaries, hiring their lawyer, you know, doing transfers
19 to Mr. Egger.  I mean how can he justify that?
20          MR. KAPLAN: Well, actually, Your Honor, let me
21 return to what Mr. Nuti said at the beginning, and of
22 course Mr. Ait explained this too as people who attended
23 the deposition know, Mr. Ait said, you know, we sold other
24 assets that funded this bankruptcy, as Mr. Nuti pointed
25 out.  Nobody complained about that at the time.  Everyone

```
 1  got paid, and it's under the same theory and announcements
 2  of who owned what and who did what.  Nobody complained at
 3  the time.  Mr. Ait said, and he explained all of the post-
 4  confirmation activities as being nothing more than
 5  confirming what he did originally.  We sold these patents
 6  to Daniel Egger for $100,000.  We did it because we needed
 7  the money at the time to keep the company going.
 8           The exact same kinds of legal theories underpin
 9  the assets that remained in the bankrupt that Site
10  Technologies, the parent, sold and that funded payment to
11  all these creditors.  So I'm listening to people having
12  their cake -- seeking to have their cake and eat it too
13  after the fact, and I guess what I would say is, every one
14  of these arguments has been available to defendants, and
15  all I can tell you is they have breached the bankruptcy law
16  fairly extensively in the reply brief they filed in
17  response to our brief that discussed the doctrine such as
18  after-acquired title.
19           So all I can say is I don't think defendants were
20  caught napping anywhere in the Eastern District of Texas.
21  I think that if they've read all this, they're just hoping
22  that somewhere else they can argue about things that
23  happened in 2005 or 2008 and make that into a jury argument
24  to overturn the res judicata that applies in the
25  bankruptcy.  And all this is already briefed.  We have a
```

1  competent court that they chose to raise this issue in and
2  we briefed it fully after discovery.  So frankly, I can
3  fight a three-front war if forced to do so, but I regard it
4  as vexatious litigation.
5              THE COURT: Excuse me.  Ms. Barnill, can you hang
6  on for another ten minutes or do you want to take a break?
7  Okay.  All right.  Go ahead.
8              MR. ENGEL: Your Honor, just briefly, and I
9  appreciate your patience.  This is a very important matter
10 for the beneficiaries, and again Mr. Kaplan is mixing up
11 the parties because the Plan beneficiaries are not in
12 Texas.  The question I would ask Mr. Ait if I had an
13 opportunity to, which I haven't, is a simple basic one,
14 which is, if Mr. Egger and Mr. Ait were so confident that
15 their transfer worked from the parent that didn't own the
16 patents to Mr. Egger in '98, why did they do all this
17 secret mysterious stuff after the Plan was confirmed, after
18 the case was closed?  I mean, these are not normal things.
19 You look at the docket in this case, and there are rules by
20 the way that Mr. Kaplan isn't paying any attention to as
21 well as the language of the Plan itself, which wasn't being
22 obeyed, that there's nothing -- the case is closed; there's
23 nothing.
24             If Mr. Ait wanted to do an honest thing, he would
25 have come to this court in 2005 and he would have come to

```
 1  this court in 2007, some other time, and said, you know,
 2  hey, I think I need instructions because there's this
 3  issue.  The fact is that no one said anything until we had
 4  figured this out the hard way by digging into the documents
 5  out of the Federal Depository.  They didn't come forward
 6  with any of this.  They hid it.  And an honest person
 7  doesn't hide things.  A Plan fiduciary doesn't hide things.
 8  He comes to the court and he reopens the case and he lays
 9  the issues in front of them, and the fact that they didn't
10  do that is an admission of wrongdoing.
11            THE COURT:  Okay.  Anything else, Mr. Nuti?
12            MR. KAPLAN:  Yes, Your Honor, if I can respond.
13  Number one, there's no mystery to any of this.  It was all
14  provided in discovery.  Number two, we were the ones who
15  were surprised by the motion and had to go to the
16  Bankruptcy Court to get the documents that demonstrated
17  that all this was disclosed at the time, something that
18  defendants, had they followed the Rule 11 obligations,
19  probably should have done at the beginning.
20            If there's a question for Mr. Ait as to why he
21  did these things, I can provide one of the answers that was
22  given, which is, I didn't want anybody to come back and sue
23  over the other things we did that everybody agreed to and
24  helped to fund the bankruptcy in getting the creditors
25  paid.  He said, look -- I mean Mr. Ait knew nothing of
```

35

1  this.  He was selling real estate in 2008 when the
2  defendants filed their motion and at some point around
3  then, they had called him up and leaned on him and scared
4  the dickens out of him really, and he just said look, I
5  sold, you know, on behalf of the company.  I sold these
6  patents to Daniel Egger.  We were trying to raise money.
7  And he said and I feel that anything I can do to stand up
8  and make it clear that that is what happened in 1998 is
9  what I should do.  I owe that to all the people who were
10 involved with the company as well as Mr. Egger.  That's
11 just a matter of business ethics and what is right.
12          So the idea that Mr. Ait has somehow done
13 something terrible to defraud the beneficiaries of the Plan
14 is precisely 180 degrees wrong.  And he's testified to
15 that.  If people had questions they wanted to ask him, the
16 Morrison and Foerster, the Quinn Emanuel, and Fish and
17 Richardson firms were there to ask those questions.  And he
18 was quite competently examined and thoroughly examined in
19 his deposition.
20          THE COURT: All right.  Thank you, Mr. Kaplan.
21 Mr. Nuti?
22          MR. NUTI: Your Honor, I'll come back to where I
23 started.  We're not going to get to the bottom of this
24 today.
25          THE COURT: I understand.

1       MR. NUTI:  I think Your Honor now appreciates we
2  have three -- we have one dispute basically in three
3  different courts right now.
4       THE COURT:  Right.
5       MR. NUTI:  Eastern District of Texas, Northern
6  District and before Your Honor.  I think the very first
7  decision the Court needs to make is who is best to decide
8  this issue.  Is it here?  Are we going to leave it in the
9  Eastern District of Texas or somewhere else.  Only after
10 that decision is made can we then decide what else to do.
11      THE COURT:  All right.  The Court has jurisdiction
12 only if this is an asset of the estate.  If it's not an
13 asset of the estate, this Court doesn't have jurisdiction
14 over this.  And I may be reading through things that Mr.
15 Engel is getting at and maybe I'm just dull and this is my
16 way of articulating it.  You seem to be concerned, Mr.
17 Engel, that there might be things that the Bankruptcy Court
18 who deals with these issues, compliance with the Plan,
19 certain equitable issues that the Bankruptcy Court would be
20 more familiar with than a District Court judge.  I don't
21 necessarily disagree with you on that.
22      I can see that with one of the defenses that if
23 in fact the parent didn't have -- didn't own the patents at
24 the time they sold them, and as Mr. Kaplan says -- and I
25 have no reason to doubt it -- that Mr. Ait maybe out of

1  ignorance assuming that when he was trying to clean things
2  up after the fact, maybe didn't have standing to do what he
3  did, one; two, didn't appreciate that if he did have
4  standing, the manner in which he went about it with all the
5  best intentions, may not have been appropriate and may have
6  been a nullity.
7         In that to the extent the District Court might
8  have to look at what transpired, especially post-petition
9  or post-confirmation, will the District Court get it,
10 because if the Court's going to rely upon some of those
11 things, and if Mr. Engel is correct either that Mr. Ait
12 didn't -- assuming they need it, because it's a possibility
13 that the parent corporation as far as I know had owned the
14 patents, I don't know the answer for sure, but I'm just
15 saying, if they did, it's not an issue.  But if they
16 didn't, then when they tried to clean it up after the fact
17 because it was the right thing to do as Mr. Kaplan says,
18 either again Mr. Ait may not have had standing, may not
19 have gone about it in the best manner, may have needed to
20 come back to this court, I'm not so sure that the District
21 Court in Texas can't look at those issues and deal with it.
22         I think at this juncture, what I'm inclined to
23 do is, put this off for further status conference.  I'd
24 like to see what -- even if the court in Texas, if they
25 grant the motion, I think Mr. Engel will be happy.  If the

```
 1  court doesn't grant it there, then some of these issues can
 2  be -- if they haven't been raised and there's a dispute by
 3  Mr. Kaplan and Mr. Engel whether they have or haven't, or
 4  at least adequately been raised, they can then be raised in
 5  the District Court action.  Also, there may be a motion --
 6              MR. ENGEL: That District Court or the --
 7              THE COURT: In the Texas Court action.  I'm just
 8  saying it may come up; it may not.  But my point at this
 9  time -- what I'm inclined to do is simply continue this
10  without taking any action until early April to see if
11  there's a ruling out of Texas and/or what happens with the
12  California District Court action.  I'm just not at this
13  juncture, based on this record, because really all I have
14  is what Mr. Engel has put before me, he raises some
15  interesting arguments, not only the Custodia Legis
16  argument, but the issue that on this after-acquired title,
17  the defense that's being put forth, that if they didn't
18  have title, was this an executory contract.  And by terms
19  of the confirmed Plan, if it wasn't specifically assumed,
20  it was rejected, and then there would have been a
21  requirement for the damaged party, apparently the --
22  whoever held the patents at that point or the party who
23  thought they bought them would have had to file a claim
24  within I think 30 days of the effective date of the Plan.
25              MR. ENGEL: Right.
```