# EXHIBIT B
# PART 2

Dockets.Justia.com

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | | |
|---|---|---|
| **SOFTWARE RIGHTS ARCHIVE, LLC,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | **Civil Action No. 2:07-cv-511-TJW** |
| **v.** | § | |
| | § | |
| **GOOGLE INC., YAHOO! INC.,** | § | |
| **IAC SEARCH & MEDIA, INC., AOL LLC,** | § | **JURY TRIAL DEMANDED** |
| **and LYCOS, INC.,** | § | |
| | § | |
| **Defendants.** | § | |

## DECLARATION OF LEE L. KAPLAN

I, Lee L. Kaplan, under penalty of perjury, hereby make the following declaration:

"1.     My name is Lee L. Kaplan.  I am over eighteen (18) years of age and am fully competent to make this Declaration.  I have personal knowledge of the facts herein and they are true and correct.

2.     I am an attorney representing Plaintiff Software Rights Archive, LLC in this matter.

3.     Exhibit 1 to this declaration is a true and correct copy of the August 6, 1996 5,554,352 Patent.

4.     Exhibit 2 to this declaration is a true and correct copy of the November 9, 1993 Assignment of the Method and Apparatus for Indexing, Searching and Displaying data from Egger to Libertech.

5.     Exhibit 3 to this declaration are true and correct copies of patent 5,832,494, dated November 3, 1998 and patent number 6,233,571 dated May 15, 2001.

6.     Exhibit 4 to this declaration is a true and correct copy of the June 18, 1996 Assignment from Egger/Cannon/Sauers to Site/Tech.

7.     Exhibit 5 to this declaration is a true and correct copy of the August 22, 1996 Name Change from "Libertech, Inc." to "Site/Technologies/Inc."

8.     Exhibit 6 to this declaration is a true and correct copy of the July 3, 1997 Email from Mendel to Egger et al.

9.    Exhibit 7 to this declaration is a true and correct copy of the August 18, 2008 Declaration of Jeffrey Franklin Ait.

10.    Exhibit 8 to this declaration is a true and correct copy of the Noncompetition Agreement entered into in connection with the July 1997 acquisition.

11.    Exhibit 9 to this declaration is a true and correct copy of the July 8, 1997 Special Telephonic Meeting of the Board of Directors of Site/Technologies/Inc. amending the Certificate of Incorporation.

12.    Exhibit 10 to this declaration is a true and correct copy of the July 11, 1997 Site/Tech Certificate of Amendment of the Certificate of Incorporation with a copy of the Restated Certificate of Incorporation of Libertech Inc.

13.    Exhibit 11 to this declaration is a true and correct copy of the July 1997 Stock Exchange Agreement.

14.    Exhibit 12 to this declaration is a true and correct copy of the July 11, 1997 Site Technologies Inc. 8-K/A.

15.    Exhibit 13 to this declaration is a true and correct copy of the September 29, 1997 Site Technologies Inc. SB-2/A.

16.    Exhibit 14 to this declaration is a true and correct copy of the October 1, 1997 Site Technologies Inc. SB-2/A.

17.    Exhibit 15 to this declaration is a true and correct copy of the October 2, 1997 Site Technologies Inc. SB-2/A.

18.    Exhibit 16 to this declaration is a true and correct copy of the October 8, 1997 Site Technologies Inc. 424B1

19.    Exhibit 17 to this declaration is a true and correct copy of the September 30, 1998 Site Technologies Inc. 10QSB.

20.    Exhibit 18 to this declaration is a true and correct copy of the January 19, 1998 Site Technologies, Inc. 8-K.

21.    Exhibit 19 to this declaration is a true and correct copy of the December 31, 1998 North Carolina Annual Report for Site/Technologies/Inc.

22.    Exhibit 20 to this declaration is a true and correct copy of the Site/Technologies/Inc. 1998 tax return.

23.    Exhibit 21 to this declaration is a true and correct copy of the July Site/technologies/inc. Amended Certificate of Incorporation.

24. Exhibit 22 to this declaration is a true and correct copy of the July 11, 1997 Action by Unanimous Written Consent of the Board of Directors of Site/technologies/inc. board meeting amending Certificate of Incorporation.

25. Exhibit 23 to this declaration is a true and correct copy of the October 24, 1997 Minutes of the Regular Board Meeting of the Board of Directors of DeltaPoint, Inc. changing the Company's name from DeltaPoint, Inc. to Site Technologies, Inc.

26. Exhibit 24 to this declaration is a true and correct copy of the September 1998 Bill of Sale, Assignment and License Agreement.

27. Exhibit 25 to this declaration is a true and correct copy of the June 4, 2008 Sky Technologies Order.

28. Exhibit 26 to this declaration is a true and correct copy of the Form 7. Statement of Financial Affairs filed February 18, 2000.

29. Exhibit 27 to this declaration is a true and correct copy of the April 25, 2000 Debtor's First Amended Plan of Reorganization.

30. Exhibit 28 to this declaration is a true and correct copy of the July 11, 1997 Written Consent of the Sole Stockholder of Site/technologies/inc. of the Removal and Appointment of directors.

31. Exhibit 29 to this declaration is a true and correct copy of the December 21, 2000 Action by Written Consent of the Sole Director and Stockholder of Site Technologies, Inc. of the Resolution merging Site Technologies, Inc. with site/technologies/inc.

32. Exhibit 30 to this declaration is a true and correct copy of the December 21, 2000 Certificate of Ownership merging Site/Technologies/Inc. into Site Technologies, Inc.

33. Exhibit 31 to this declaration is a true and correct copy of the December 29, 2000 Certificate of Ownership and Merger merging Site/Technologies/Inc. into Site Technologies, Inc.

34. Exhibit 32 to this declaration is a true and correct copy of the August 19, 2008 Declaration of J. Christopher Lynch.

35. Exhibit 33 to this declaration is a true and correct copy of the July 11, 1997 Site Disclosure Schedule.

36. Exhibit 34 to this declaration is a true and correct copy of the April 25, 2000 Debtor's First Amended Disclosure Statement.

37. Exhibit 35 to this declaration is a true and correct copy of the February 18, 1999 Declaration concerning Debtor's Schedules, along with Schedules F –H.

38.     Exhibit 36 to this declaration is a true and correct copy of the February 11, 1999 Notice of Motion and Motion to Sell Assets Out of the Ordinary Course of Business (11 U.S.C. § 363(b)) and Free and Clear of Liens, Claims, Encumbrances and Interests (11 U.S.C. § 363(f)).

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

Lee L. Kaplan
Executed on August 25, 2008
Houston, Texas

# EXHIBIT 1

US005544352A

# United States Patent [19]

**Egger**

[11] Patent Number: **5,544,352**

[45] Date of Patent: **Aug. 6, 1996**

[54] **METHOD AND APPARATUS FOR INDEXING, SEARCHING AND DISPLAYING DATA**

[75] Inventor: **Daniel Egger**, Washington, D.C.

[73] Assignee: **Libertech, Inc.**, Durham, N.C.

[21] Appl. No.: **76,658**

[22] Filed: **Jun. 14, 1993**

[51] Int. Cl.[6] .................................................. G06F 17/30
[52] U.S. Cl. ............. 395/600; 364/419.19; 364/DIG. 1;
364/282.1; 364/283.3
[58] Field of Search ....................... 395/600; 364/419.19,
364/419.13

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,839,853 | 6/1989 | Deerwester et al. | 395/600 |
| 4,945,476 | 7/1990 | Bodick et al. | 364/413.02 |
| 5,122,951 | 6/1992 | Kamiya | 364/419.13 |
| 5,157,783 | 10/1992 | Anderson et al. | 395/600 |
| 5,206,949 | 4/1993 | Cochran et al. | 395/600 |
| 5,241,671 | 8/1993 | Reed et al. | 395/600 |
| 5,243,655 | 9/1993 | Wang | 380/51 |
| 5,301,109 | 4/1994 | Landauer et al. | 364/419.19 |
| 5,325,298 | 6/1994 | Gallant | 364/419.19 |
| 5,418,948 | 5/1995 | Turtle | 395/600 |

### OTHER PUBLICATIONS

Agosti, et al., "A Two–Level Hypertext Retrieval Model for Legal Data," SIGIR '91 (1991).
Fowler, et al., "Integrating Query, Thesaurus and Documents Through a Comm Visual Representation," SIGIR '91 (1991).
Rose & Belew, "Legal Information Retrieval: a Hybrid Approach," ICAIL '89 (1989).
Belew, Richard, "A Connectionist Approach to Conceptual Information Retrieval," ICAIL '87 (1987).

Gelbart & Smith, "Beyond Boolean Search: FLEXICON, A Legal Text–Based Intelligent System," ICAIL '91 (1991).
Lin, "A Self–Organizing Semantic Map for Information Retrieval," SIGIR '91 (1991).
Turtle & Croft, "Inference Networks for Document Retrieval," SIGIR '90 (1990).

*Primary Examiner*—Thomas G. Black
*Assistant Examiner*—Wayne Amsbury
*Attorney, Agent, or Firm*—Dorsey & Whitney PLLP

[57] **ABSTRACT**

A computer research tool for indexing, searching and displaying data is disclosed. Specifically, a computer research tool for performing computerized research of data including textual objects in a database and for providing a user interface that significantly enhances data presentation is described. Textual objects and other data in a database are indexed by creating a numerical representation of the data. The indexing technique called proximity indexing generates a quick-reference of the relations, patterns and similarity found among the data in the database. Proximity indexing indexes the data by using statistical techniques and empirically developed algorithms. Using this proximity index, an efficient search for pools of data having a particular relation, pattern or characteristic can be effectuated. The Computer Search program, called the Computer Search Program for Data represented in Matrices (CSPDM), provides efficient computer search methods. The CSPDM rank orders data in accordance with the data's relationship to time, a paradigm datum, or any similar reference. The user interface program, called the Graphical User Interface (GUI), provides a user friendly method of interacting with the CSPDM program and prepares and presents a visual graphical display. The graphical display provides the user with a two dimensional spatial orientation of the data.

**52 Claims, 24 Drawing Sheets**



EXHIBIT 1

# EXHIBIT 2

## ASSIGNMENT

WHEREAS, I, Daniel Egger, 2027 West Club Boulevard, Durham, North Carolina 27705, have invented certain new and useful improvements in a METHOD AND APPARATUS FOR INDEXING, SEARCHING AND DISPLAYING DATA, for which an application for Letters Patent of the United States was filed, which may be identified in the United States Patent and Trademark Office by Serial No. 08/076,658 filed June 14, 1993; and

WHEREAS, Libertech, Inc. ("Libertech"), a corporation organized and existing under the laws of the District of Columbia, and having a business address at 2027 West Club Boulevard, Durham, North Carolina 27705, is desirous of acquiring the entire right, title and interest in and to said invention, said application and in, to and under any and all Letters Patent to be obtained therefor;

NOW, THEREFORE, for and in consideration of One Dollar ($1.00) and other good and valuable consideration to me in hand paid by the said Libertech, the receipt of which is hereby acknowledged, I have sold, assigned and transferred, and by these presents do hereby sell, assign and transfer unto said Libertech, its successors and assigns, my entire right, title and interest in and to said invention, said application and the Letters Patent, both foreign and domestic, that may or shall issue, including all of my entire rights under the International Convention, and I do hereby authorize and request the Commissioner of Patents to issue said Letters Patent to the above mentioned assignee in accordance herewith:

I hereby authorize said assignee, its successors and assigns, or anyone it may properly designate, to apply for Letters Patent, in its own name if desired, in any and all foreign countries, and additionally to claim the filing date of said United States application and/or otherwise take advantage of the provisions of the International Convention.

Upon said Consideration, I do hereby covenant and agree with the said Assignee, its successors and assigns, that I will not execute any writing or do any act whatsoever conflicting with these presents, and that I or my executors or administrators will at any time upon request, without further consideration, but at the expense of said Assignee, its successors or assigns, execute such additional writings and do such additional acts as said Assignee, its successors or assigns, may deem necessary or desirable to perfect the Assignee's enjoyment of this grant, and render all necessary assistance in making application for and obtaining original, divisional, reissued or extended Letters Patent of the United States, or of any and all foreign countries on said invention, and in enforcing any rights occurring as a result

1

REEL 0680 FRAME 0166

EXHIBIT 2

of such applications or patents, by giving testimony in any proceedings or transactions involving such applications or patents.

IN WITNESS WHEREOF, I, Daniel Egger, have signed and delivered this Assignment on the dates set forth below.

_____11/9/93_____

Date

Daniel Egger

STATE OF NORTH CAROLINA )
                                      ) ss.

COUNTY OF ORANGE )

On this 9 day of Nov., 1993, before me a Notary Public, personally appeared Daniel Egger, known to me to be the person who executed the foregoing Assignment and acknowledged that he executed the same as his free act and deed.

SEAL

Notary Public

My Commission expires: Sept 28, 1998

RECORDED
PATENT & TRADEMARK OFFICE

DEC 15 93

2

REEL 6800 FRAME 0167

# EXHIBIT 3

US005832494A

# United States Patent [19]

## Egger et al.

[11] **Patent Number:** 5,832,494

[45] **Date of Patent:** Nov. 3, 1998

[54] **METHOD AND APPARATUS FOR INDEXING, SEARCHING AND DISPLAYING DATA**

[75] Inventors: **Daniel Egger**, Durham; **Shawn Cannon**, Hillsborough; **Ronald D. Sauers**, Mebane, all of N.C.

[73] Assignee: **Libertech, Inc.**, Durham, N.C.

[21] Appl. No.: **649,304**

[22] Filed: **May 17, 1996**

## Related U.S. Application Data

[63] Continuation-in-part of Ser. No. 76,658, Jun. 14, 1993, Pat. No. 5,544,352.

[51] Int. Cl.$^6$ ............................................... G06F 17/30
[52] U.S. Cl. .............................. 707/102; 707/104; 707/5
[58] Field of Search .......................... 707/102, 104, 707/5

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,868,733 | 9/1989 | Fujisawa et al. | 707/5 |
| 5,265,065 | 11/1993 | Turtle | 395/600 |
| 5,287,493 | 2/1994 | Jacopi | 707/4 |
| 5,386,556 | 1/1995 | Hedin et al. | 707/4 |
| 5,471,611 | 11/1995 | McGregor | 707/4 |
| 5,544,352 | 8/1996 | Egger | 707/5 |
| 5,546,517 | 8/1996 | Marks et al. | 707/501 |
| 5,586,311 | 12/1996 | Davies et al. | 707/1 |
| 5,630,120 | 5/1997 | Vachey | 707/2 |
| 5,649,193 | 7/1997 | Sumita et al. | 707/103 |

### OTHER PUBLICATIONS

Agosti, et al., "a Two-level Hypertext Retrieval Model for Legal Data," SIGIR '91 (1991).

Fowler, et al., "Integrating Query, Thesaurus and Documents Through a Common Visual Representation, " SIGIR '91 (1991).

Rose & Belew, "Legal Information Retrieval: A Hybrid Approach," ICAIL '89 (1989).

Belew, Richard, "A Connectionist Approach to Conceptual Information Retrieval," ICAIL '87 (1987).

Gelbart & Smith, "Beyond Boolean Search: Flexicon, A Legal Text–Based Intelligent System," ICAIL '91 (1991).

Lin, "A Self–Organizing Semantic Map for Information Retrieval," SIGIR '91 (1991).

Turtle & Croft, "Interference Networks for Document Retrieval," SIGIR '90 (1990).

Uzzi, V–Search Integration Toolkit for Folio Views, User's Manual, 6 Dec. 1995.

Uzzi, V–Search Publisher's Toolkit, Beta Release 2.0, User's Manual, Dec. 8, 1995.

*Primary Examiner*—Wayne Amsbury
*Attorney, Agent, or Firm*—Dorsey & Whitney LLP

[57] **ABSTRACT**

A computer research tool for indexing, searching and displaying data is disclosed. Specifically, a computer research tool for performing computerized research of data including textual objects in a database or a network and for providing a user interface that significantly enhances data presentation is described. Textual objects and other data in a database or network is indexed by creating a numerical representation of the data. The indexing technique called proximity indexing generates a quick-reference of the relations, patterns and similarity found among the data in the database. Proximity indexing indexes the data by using statistical techniques and empirically developed algorithms. Using this proximity index, an efficient search for pools of data having a particular relation, pattern or characteristic can be effectuated. The Computer Search program, called the Computer Search Program for Data represented in Matrices (CSPDM), provides efficient computer search methods. The CSPDM rank orders data in accordance with the data's relationship to time, a paradigm datum, or any similar reference. An alternative embodiment of the invention employs a cluster link generation algorithm which uses links and nodes to index and search a database or network. The algorithm searches for direct and indirect links to a search node and retrieves the nodes which are most closely related to the search node. The user interface program, called the Graphical User Interface (GUI), provides a user friendly method of interacting with the CSPDM program and prepares and presents a visual graphical display. The graphical display provides the user with a two or three dimensional spatial orientation of the data.

**33 Claims, 56 Drawing Sheets**



EXHIBIT 3



US006233571B1

(12) **United States Patent**
Egger et al.

(10) Patent No.: **US 6,233,571 B1**
(45) Date of Patent: **May 15, 2001**

(54) METHOD AND APPARATUS FOR INDEXING, SEARCHING AND DISPLAYING DATA

(75) Inventors: **Daniel Egger**, 2027 W. Club Blvd., Durham, NC (US) 27705; **Shawn Cannon**, Hillsborough; **Ronald D. Sauers**, Mebane, both of NC (US)

(73) Assignee: **Daniel Egger**, Peachtree City, GA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/071,120**

(22) Filed: **May 4, 1998**

**Related U.S. Application Data**

(60) Division of application No. 08/649,304, filed on May 17, 1996, now Pat. No. 5,832,494, which is a continuation-in-part of application No. 08/076,658, filed on Jun. 14, 1993, now Pat. No. 5,544,352.

(51) Int. Cl.[7] ............................................. G06F 7/00
(52) U.S. Cl. ........................... 707/2; 707/3; 707/4; 707/5; 707/530
(58) Field of Search ............................ 707/2–5, 530

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 5,265,065 | 11/1993 | Turtle . |
| 5,341,293 * | 8/1994 | Vertelney et al. .................. 709/205 |
| 5,446,842 * | 8/1995 | Schaeffer et al. ................. 709/205 |
| 5,530,852 * | 6/1996 | Meske, Jr. et al. ............... 707/102 |
| 5,542,024 * | 7/1996 | Balint et al. ..................... 345/356 |

(List continued on next page.)

OTHER PUBLICATIONS

a) Agosti, et al., "A Two-Level Hypertext Retrieval Model for Legal Data," SIGIR '91 (1991).
b) Fowler, et al., "Integrating Query, Thesaurus and Documents Through a Common Visual Representation," SIGIR '91 (1991).

c) Rose & Belew, "Legal Information Retrieval: A Hybrid Approach," ICAIL '89 (1989).
d) Belew, Richard, "A Connectionist Approach to Conceptual Information Retrieval," ICAIL '87 (1987).

(List continued on next page.)

*Primary Examiner*—Wayne Amsbury
(74) *Attorney, Agent, or Firm*—Dorsey & Whitney LLP

(57) **ABSTRACT**

A computer research tool for indexing, searching and displaying data is disclosed. Specifically, a computer research tool for performing computerized research of data including textual objects in a database or a network and for providing a user interface that significantly enhances data presentation is described. Textual objects and other data in a database or network is indexed by creating a numerical representation of the data. The indexing technique called proximity indexing generates a quick-reference of the relations, patterns and similarity found among the data in the database. Proximity indexing indexes the data by using statistical techniques and empirically developed algorithms. Using this proximity index, an efficient search for pools of data having a particular relation, pattern or characteristic can be effectuated. The Computer Search program, called the Computer Search Program for Data represented in Matrices (CSPDM), provides efficient computer search methods. The CSPDM rank orders data in accordance with the data's relationship to time, a paradigm datum, or any similar reference. An alternative embodiment of the invention employs a cluster link generation algorithm which uses links and nodes to index and search a database or network. The algorithm searches for direct and indirect links to a search node and retrieves the nodes which are most closely related to the search node. The user interface program, called the Graphical User Interface (GUI), provides a user friendly method of interacting with the CSPDM program and prepares and presents a visual graphical display. The graphical display provides the user with a two or three dimensional spatial orientation of the data.

**22 Claims, 56 Drawing Sheets**



# EXHIBIT 4

## ASSIGNMENT

WHEREAS, we, Daniel Egger, of 2027 West Club Boulevard, Durham, NC 27705, Shawn Cannon of 2429 Mandy Lane, Hillsborough, NC 27278, and Ronald D. Sauers of 3330 Tranquil Trail, Mebane, NC 27302 have invented certain new and useful improvements in a METHOD AND APPARATUS FOR INDEXING, SEARCHING AND DISPLAYING DATA, for which an application for Letters Patent of the United States has been filed, which may be identified in the United States Patent and Trademark Office by Serial No. 08/649,304, filed May 17 , 1996; and

WHEREAS, Libertech, Inc. ("Libertech"), a corporation organized and existing under the laws of the ~~District of Columbia~~, and having a business address of 2200 West Main Street, Suite 230 B, Durham, North Carolina 27705, is desirous of acquiring the entire right, title and interest in and to said invention, said application and in, to and under any and all Letters Patent to be obtained therefor;

NOW, THEREFORE, for and in consideration of One Dollar ($1.00), other good and valuable consideration to us in hand paid by the said Libertech, the receipt of which is hereby acknowledged, we have sold, assigned and transferred, and by this writing, do hereby sell, assign and transfer unto said Libertech, its successors and assigns, our entire right, title and interest in and to said invention, said application and the Letters Patent, both foreign and domestic, that may or shall issue, including all of our entire rights under International Conventions, and we do hereby authorize and request the Commissioner of Patents to issue said Letters Patent to the above mentioned Assignee in accordance herewith.

We hereby authorize said Assignee, its successors and assigns, or anyone it may properly designate, to apply for Letters Patent, in its own name if desired, in any and all foreign countries, and additionally to claim the filing date of said United States application and/or otherwise take advantage of the provisions of International Conventions.

Upon Said Consideration, we do hereby covenant and agree with the said Assignee, its successors and assigns, that we will not execute any writing or do any act whatsoever conflicting with these presents, and that we or our executors or administrators will at any time upon request, without further consideration, but at the expense of said Assignee, its successors or assigns, execute such additional writings and do such additional acts as said Assignee, its successors or assigns, may deem necessary or desirable to perfect the Assignee's enjoyment of this grant, and render all necessary assistance in making application for and obtaining original, divisional, reissued, continuation, continuation-in-part, or extended Letters Patent of the United States, or of any and all foreign countries on said invention, and in

1

PATENT
REEL: 8035 FRAME: 0472

EXHIBIT 4

enforcing any rights occurring as a result of such applications or patents, by giving testimony in any proceedings or transactions involving such applications or patents.

IN WITNESS WHEREOF, we, Daniel Egger, Shawn Cannon, and Ronald D. Sauers have signed and delivered this Assignment on the dates set forth below

Date: _June 18 96_        _____
                             Daniel Egger

Date: _June 18, 1996_       _____
                             Shawn Cannon

Date: _June 18, 1996_       _____
                             Ronald D. Sauers

STATE OF             )
                        ) ss.
COUNTY OF          )

On this _18th_ day of _June_, 1996, before me a Notary Public, personally appeared Daniel Egger, known to me to be the person who executed the foregoing Assignment and acknowledged that he executed the same as his free act and deed.

_____
Notary Public

y Commission Expires _Oct. 29, 2000_

RENEE B. ELLIS
NOTARY
SEAL
PUBLIC
DURHAM COUNTY, NC

2

# EXHIBIT 5



PAGE 1

*The First State*

I, HARRIET SMITH WINDSOR, SECRETARY OF STATE OF THE STATE OF
DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT
COPY OF THE CERTIFICATE OF AMENDMENT OF "LIBERTECH INC.",
CHANGING ITS NAME FROM "LIBERTECH INC." TO
"SITE/TECHNOLOGIES/INC.", FILED IN THIS OFFICE ON THE
TWENTY-SECOND DAY OF AUGUST, A.D. 1996, AT 4:15 O'CLOCK P.M.

Harriet Smith Windsor
Harriet Smith Windsor, Secretary of State

2300985  8100
050040896

AUTHENTICATION: 3622997

DATE: 01-18-05

PATENT
REEL: 015612 FRAME: 0398

EXHIBIT 5

+4154964086     WILSON SONSINI        F-712 T-596 P-002     AUG 22 '96 12:58

## CERTIFICATE OF AMENDMENT OF

## ARTICLES OF INCORPORATION OF

## LIBERTECH INC.

Daniel Egger certifies that:

1    He is the president and the secretary, of Libertech Inc., a Delaware Corporation

2    Article I of the Articles of Incorporation of this corporation is amended to read as follows:

" Article I

The name of this corporation is Site/Technologies/Inc "

3    The foregoing amendment of Articles of Incorporation has been duly approved by the board of directors.

4    The foregoing amendment of Articles of Incorporation has been duly approved by the required vote of stockholders in accordance with Section 242 of the Delaware Corporation Code. The number of shares voting in favor of the amendment equaled or exceeded the vote required. The percentage vote required was more than 50%. The total number of outstanding shares of the corporation is 3,829,296.

We further declare under penalty of perjury under the laws of the State of Delaware that the matters set forth in this certificate are true and correct of our own knowledge.

DATE: August 22, 1996

Daniel Egger, President and Secretary

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 04:15 PM 08/22/1996
960246086 - 2300985

WPCB1XU\W6224018.01
14006.000

PATENT
REEL: 015612 FRAME: 0399

RECORDED: 01/27/2005

# EXHIBIT 6

**Helen and Daniel Egger**

| | |
|---|---|
| **From:** | SFMendel@aol.com |
| **Sent:** | Thursday, July 03, 1997 6:16 PM |
| **To:** | DJatChrysalis@compuserve.com; degger@sitetech.com; DFCobb@aol.com; MEGellert@aol.com; sfingerhood@dlc.com |
| **Cc:** | sskaer@gcounsel.com |
| **Subject:** | DeltaPoint |

We have now received first drafts of the Stock Exchange Agreement, Registration Rights Agreement and Non-Competition Agreement. Susan, Ron and I have gone over them and provided initial comments back to counsel for DeltaPoint.

The transaction must be structured as a stock exchange, rather than a merger, to make it taxable. This will require an amendment to the company's articles to make it absolutely clear that an exchange is a liquidation. The Stock Exchange Agreement includes a provision that DeltaPoint will pay our deal related expenses up to an amount, which we have suggested should be $40,000. We have approximately $50,000 on hand, so we should be able to use that amount for operations and the retirement of non-deal related liabilities. It looks as if DeltaPoint will also assume existing liabilities on the balance sheet as of the closing. We are therefore adding to our balance sheet foregone salary for Ron and Shawn beyond the six month agreed to term with the hope/expectation that DeltaPoint will pick them up. By adding them at this point we are not agreeing among ourselves that this sum is a liability of SiteTech's shareholders (Ron understands this). There is no holdback or escrow for indemnification purposes and we have asked that all proposed representations and warranties of the shareholders as individuals be deleted (I think they will agree to that). The indemnification for breach of the company's representations and warranties by shareholders is for one year and has a $25,000 basket, i.e., the first $25,000 of losses from such a breach are forgiven if the amount never gets any higher. For administrative purposes after the closing, we will probably need to designate someone as the shareholders' representative. Who do we think that should be (not me, if that was on any one's mind)?

The Registration Rights Agreement is pretty straight forward. It provides for the lock up on the DeltaPoint shares to release 50% after nine months and the remaining 50% to after 12 months. The stock will be registered prior to those unlock dates, but will be subject to a 180 day market standoff after registration if the underwriter requires it.

We have been told that Ron, Shawn, Anil and Dan will be asked to sign the Non-Competition Agreement. We are trying to convince them that Dan need not sign such an agreement. I am hopeful that we'll succeed in that regard. The restriction is for one year after termination of employment or two years from the closing, whichever is later.

We expect the next set of drafts to arrive over the weekend and we will distribute them to the Board for everyone's review and approval at a telephonic meeting to be scheduled on Tuesday. In that regard, could I ask that Vicki set up that telephonic meeting and to include Susan Skaer in it (415-237-7227). We're trying to move this along as quickly as we can. David, you had mentioned that you had counsel standing by as part of

**EXHIBIT 6**

# EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| SOFTWARE RIGHTS ARCHIVE, LLC | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 2:07-cv-511-TJW |
| | § | |
| GOOGLE INC., YAHOO! INC., | § | |
| IAC SEARCH & MEDIA, INC., AOL LLC, | § | |
| and LYCOS, INC. | § | JURY TRIAL DEMANDED |
| | § | |
| Defendants. | § | |

## DECLARATION OF JEFFREY FRANKLIN AIT

I, Jeffrey Franklin Ait, under penalty of perjury, hereby make the following declaration. All facts set forth herein are true and correct, and I make this declaration based upon my personal knowledge and upon review of corporate records:

1.  I became the Chief Executive Officer of DeltaPoint, Inc./Site Technologies, Inc. ("Site Tech") on March 24, 1997. I also served as Chief Financial Officer and Director of Site Tech since September 2, 1997. I was also the President and Chief Executive Officer and Secretary of the corporate shell of the Delaware corporation, Site/Technologies/Inc. ("Site/Tech"), from the time that Site Tech acquired its stock and assets until its remaining corporate shell was merged with Site Tech in 2000. I was also at times the sole director of Site/Tech as well as the official "responsible person" in the bankruptcy of Site Tech.

2.  On July 11, 1997, Site Tech acquired Site/Tech from Daniel Egger and other stockholders. At that time, Site Tech's name was Deltapoint, Inc. The purpose of this transaction was to merge the business of Site/Tech into Deltapoint, Inc. In this transaction,

EXHIBIT 7

Deltapoint directly acquired all outstanding stock of Site/Tech and all of the then-existing assets of the company, including its patents and trademarks. Deltapoint adopted the name of "Site Technologies, Inc." from Site/Tech and began conducting business under Site/Tech's trademarks, which were directly acquired in the transaction as assets of Site Tech, and continued developing the products which were the former business of Site/Tech. All former operations of Site/Tech became operations of Site Tech and the former employees of Site/Tech became the employees of Site Tech to the extent that these employees remained in the organization. Site Tech adopted and employed Site/Tech's website, email addresses, and other property as its own, and represented that it owned them. After the July 11, 1997 acquisition, Site/Tech lacked any substantial independent operation or business from that of Site Tech. It did not design, produce, market, or sell anything, and it had no significant independent costs or revenues. Further, Site Tech conducted Site/Tech's few remaining business affairs on Site/Tech's behalf. Site Tech prepared consolidated financial statements for the companies, and Site Tech maintained Site/Tech's tax records.

3.     Site/Tech did not observe corporate formalities. Site/Tech held no director meetings or shareholder meetings. Site/Tech made no decisions, and took no actions, separate from Site Tech. Site/Tech maintained no bank account separate from Site Tech's bank account. Site/Tech did not segregate any assets from Site Tech's assets; instead, Site Tech represented that it acquired all of Site/Tech's assets on July 11, 1997, including its patents. Site/Tech did not segregate its corporate records from those of Site Tech. In fact, Site/Tech maintained no separate corporate records.

4.     My understanding of the corporate records is that on July 8, 1997, the change of control provision of the Certificate of Incorporation of Site/Tech was amended in connection

2

with the acquisition to invoke the liquidation provisions of the Certificate of Incorporation upon execution of an agreement that sold substantially all the stock of the company. Attached is a true and correct copy of the amendment to the Certificate of Incorporation. The assets, including the patents, were transferred to Site Tech and assets were in fact held by Site Tech after the acquisition.

     5.    On September 16, 1998, Site Tech sold and assigned, among other things, U.S. Patent No. 5,544,352, and related applications and future patents (which include U.S. Patent Nos. 5,832,494 and 6,233,571) to Daniel Egger (the "Patents"). Daniel Egger paid $100,000 for the Patents.

     6.    I was the chief corporate officer of both Site Tech entities that controlled and later sold all of the assets on behalf of both Site Tech entities in several transactions with different parties that were originally acquired from Daniel Egger and his investors. At the time of the execution of the 1998 Bill of Sale and Assignment that assigned the Patents to Daniel Egger, I was the CEO of both Site Tech and Site/Tech and was fully authorized by both companies to assign the Patents to Daniel Egger. It was my intent, as well as the intent of all the Site Tech entities, to transfer the Patents to Daniel Egger through the 1998 Bill of Sale and Assignment. After the sale, neither Site Tech entity carried the Patents on their books and both recognized the validity of the 1998 Bill of Sale and Assignment and that the Patents had been transferred to Daniel Egger through these contracts. I also delivered the other V-Search products and code due under the 1998 Bill of Sale to Daniel Egger on behalf of the Site Tech entities. To the extent that there is any question as to whether the Patents were assigned to Daniel Egger, the Site Tech entities do not claim any title to the Patents and have long disclaimed any ownership in favor of Daniel Egger. This includes Site/Tech, which ratified the 1998 Bill of Sale and Assignment and

Site Tech's authority and right to transfer the patents in those documents on behalf of all Site Tech entities a long time ago.

7.  The Site Tech entities further approve of and ratify the previous 1998 Assignments and the 2005 Assignment to Daniel Egger filed on behalf of Site/Tech by Daniel Egger.

8.  The 2005 assignment was within the intent of all the parties to the transaction and fairly represented the transaction.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 18, 2008
Myrtle Beach, South Carolina

4

# EXHIBIT 8

## NONCOMPETITION AGREEMENT

This NONCOMPETITION AGREEMENT, dated July __, 1997 (the "Agreement") is made by and between DeltaPoint, Inc., a California corporation ("DeltaPoint"), and _____ (the "Stockholder").

### BACKGROUND

This Agreement is entered into in connection with and is a condition to the Stock Exchange Agreement dated as of the date hereof (the "Stock Exchange Agreement") between DeltaPoint and Site/technologies/inc., a Delaware corporation ("Site"), pursuant to which DeltaPoint has acquired Site on the date hereof (the "Effective Date").

Stockholder is or was an [employee, founder, stockholder and executive] of Site and has been actively involved in the development and marketing of Site's products. DeltaPoint intends to continue the business of Site after the date hereof and integrate such business into DeltaPoint's ongoing business. To preserve and protect the assets of Site, including Site's goodwill, customers and trade secrets of which Stockholder has[, and will, in his role as an employee of Site and/or DeltaPoint, have knowledge,] and to preserve and protect DeltaPoint's goodwill and business interests going forward, and in consideration for DeltaPoint's entering into and performing under the Stock Exchange Agreement, Stockholder has agreed to enter into this Agreement.

Stockholder and DeltaPoint believe the limitations as to time, geographical area and scope of activity contained in this Agreement hereof are reasonably necessary to, and no greater than that required to, protect the goodwill and business interests purchased by DeltaPoint.

1.     Noncompete. For two years following the Effective Date, or one year from the termination of employment of Stockholder by DeltaPoint and/or Site, whichever is longer, Stockholder shall not either for himself or on behalf of any other person, partnership, firm, association or corporation in any territory in which Site or DeltaPoint is actively engaged in business (1) open or operate a business which is in competition with any business of Site or DeltaPoint operated or contemplated by Site as of the date of this Agreement, (2) act as an employee, agent, advisor or consultant of any then existing competitor of Site or DeltaPoint with respect to any business which had been operated or contemplated by Site immediately prior to the date hereof, (3) solicit or accept business from any of DeltaPoint's or Site's competitors with respect to any business operated by Site immediately prior to the date hereof, unless authorized by DeltaPoint, in advance and in writing, (4) take any action to or do anything reasonably intended to divert business from DeltaPoint or Site or influence or attempt to influence any existing customers of DeltaPoint or Site to cease doing business with DeltaPoint or Site or to alter its then existing business relationship with DeltaPoint or Site, in each case with respect to any business operated or contemplated by Site immediately prior to

TUL:ODMA\PCDOCS\SQL\RB93379\1

EXHIBIT 8

# EXHIBIT 9

## SPECIAL TELEPHONIC MEETING
### OF THE BOARD OF DIRECTORS
### OF SITE/TECHNOLOGIES/INC.

A special meeting of the Board of Directors of Site/technologies/inc., a Delaware corporation (the "Corporation"), was held at 10:30 a.m. (Pacific time), on July 8, 1997 via telephonic conference call upon notice duly made and given. Directors Douglas Cobb, Daniel Egger, Steven L. Fingerhood, David A. Jones and Stephen F. Mendel were present by telephone. Mr. Michael Gellert, Mr. Bill Strench, counsel to certain stockholders, and Ms. Susan J. Skaer, counsel to the Corporation, were also present by telephone. Ms. Skaer kept the minutes of the meeting. Mr. Egger asked if all directors could hear each other and they responded that they could and Mr. Egger called the meeting to order.

<u>Approval of the Stock Exchange Agreement</u>

Mr. Mendel requested that the Board consider the offer by DeltaPoint to exchange all outstanding shares of this Corporation's stock for shares of DeltaPoint Common Stock and royalties on SiteSweeper. Ms. Skaer next discussed in detail the provisions contained in the Stock Exchange Agreement and the Registration Rights Agreement. The directors asked many detailed questions including questions regarding the aggregate value of the transaction and the effect of the aggregate liquidation preference of the Preferred Stock on the other stockholders. An extended discussion ensued. Upon motion duly made and seconded, it was decided:

> **WHEREAS**, the Board of Directors of the Corporation believes it to be in the best interests of the Corporation and its stockholders that the Corporation approve the proposed Stock Exchange Agreement (the "Agreement") by and between the Corporation and DeltaPoint, Inc., a California corporation, and for purposes of indemnification certain Preferred Stockholders of the Corporation.

> **WHEREAS**, the Board has considered the offer including the value of all consideration from DeltaPoint and the fact that the aggregate liquidation preference of the Preferred Stock is greater than the value of the 550,000 shares of DeltaPoint Common Stock and the possible aggregate amount of the 5% net royalty on sales of SiteSweeper for one year after first commercial shipment.

**EXHIBIT 9**

**WHEREAS**, the Agreement contemplates the negotiation, execution and delivery by the Corporation of certain additional agreements and documents (the "Related Agreements"), including, but not limited to, the Registration Rights Agreement, the Noncompetition Agreements and the Releases.

**RESOLVED**, that the Agreement and the transactions contemplated thereby in substantially the form attached hereto as **Exhibit A** is hereby approved, with such changes, if any, as the officers of the Corporation shall deem necessary and appropriate and shall approve, with such approval to be conclusively evidenced by such officer's signature thereon.

**RESOLVED FURTHER**, that the execution and delivery of any amendments to the Agreement and of any of the Related Agreements in such form as the officer of the Corporation by his signature thereon shall approve is hereby approved.

**RESOLVED FURTHER**, that the officers of the Corporation are hereby authorized and empowered in the name and on behalf of Corporation to execute and deliver the Agreement and any amendments thereto, the Related Agreements and all other documents, instruments and certificates as they may deem necessary or advisable in connection therewith and to take all such other actions as they may deem necessary or advisable for the purpose of effecting the transactions contemplated in the Agreement or the Related Agreements or in connection therewith.

Amended Certificate of Incorporation

Mr. Mendel requested that the Board approve a clarification to the Corporation's Restated Certificate of Incorporation. Ms. Skaer next discussed in detail the change to the Restated Certificate of Incorporation. The directors asked questions and a discussion ensued.

Upon motion duly made and seconded, it was decided:

**RESOLVED**, that Section 2(d) of this Corporation's Certificate of Incorporation shall be amended to in its entirety to read as follows:

"(d)    Events Deemed a Liquidation.    In the event of (i) a merger or consolidation of the corporation with or into any other corporation or any other person or entity, other than a wholly-owned subsidiary of the corporation, (ii) any other corporate reorganization, or (iii) a sale of all or substantially all of the assets or the stock of the corporation, unless stockholders of the corporation immediately prior to such a subsection (i), (ii) or (iii) transaction are holders of at least a majority of the voting securities of the surviving or acquiring corporation

G WP SITETECH MINUTES JULY 8 97

==immediately thereafter, such event shall be treated as a liquidation, dissolution or winding up within the meaning of this Section 2."==

**RESOLVED FURTHER,** that the Certificate of Amendment to Certificate of Incorporation (the "Certificate") which restates in its entirety Section 2(d) of this Corporation's Certificate of Incorporation is approved for filing with the Delaware Secretary of State, subject to such changes as may be agreed by the officers in consultation with counsel.

**RESOLVED FURTHER,** that the officers of this corporation are hereby authorized and directed to solicit stockholder approval of the Certificate and, upon receipt of such approval, to cause the Certificate to be filed with the Secretary of State of the State of Delaware.

<u>Approving Amendment of 1994 Stock Option Plan.</u>

Mr. Mendel requested that the Board approve a clarification to the Corporation's 1994 Stock Option Plan. Ms. Skaer next discussed in detail the change to the Corporation's 1994 Stock Option Plan. The directors asked questions and a discussion ensued. Upon motion duly made and seconded, it was decided:

**RESOLVED,** that Section 11(c) of this Corporation's 1994 Stock Option Plan shall be amended in its entirety to read as follows:

"(c)   <u>Merger, Asset or Stock Sale.</u>  In the event of a merger of the Company with or into another corporation, or the sale of substantially all of the assets or stock of the Company, each outstanding Option shall be assumed or an equivalent option or right shall be substituted by the successor corporation or a Parent or Subsidiary of the successor corporation. The Administrator may, in lieu of such assumption or substitution, provide for the Optionee to have the right to exercise the Option as to all or a portion of the Optioned Stock, including Shares as to which it would not otherwise be exercisable. If the Administrator makes an Option exercisable in lieu of assumption or substitution in the event of a merger or sale of stock or assets, the Administrator shall notify the Optionee that the Option shall be fully exercisable for a period of fifteen (15) days  from the date of such notice, and the Option will terminate upon the expiration of such period.  For the purposes of this paragraph, the Option shall be considered assumed if, following the merger or sale of stock or assets, the option or right confers the right to purchase, for each Share of Optioned Stock subject to the Option immediately prior to the merger or sale of stock or assets, the consideration (whether stock, cash, or other securities or property) received in the merger or sale of stock or assets by holders of Common Stock for each Share held on the effective date of the transaction (and if holders were offered a choice of consideration, the type of

# EXHIBIT 10

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 09:00 AM 07/11/1997
971231423 - 2300985

# CERTIFICATE OF AMENDMENT

## OF

## CERTIFICATE OF INCORPORATION

SITE/TECHNOLOGIES/INC. ., a corporation organized and existing under and by virtue of the General Corporation Law of the State of Delaware, DOES HEREBY CERTIFY:

FIRST: That at a meeting of the Board of Directors of Site\technologies\inc. held on July 8, 1997, the Board of Directors duly adopted resolutions setting forth a proposed amendment of the Certificate of Incorporation of said corporation, declaring said amendment to be advisable and authorizing and directing the officers and directors of the corporation to solicit the consent of the stockholders of said corporation for consideration thereof. The resolution setting forth said amendment is as follows:

RESOLVED: That the Certificate of Incorporation of this corporation be amended by changing Section B.2(d) of Article IV thereof so that, as amended said paragraph shall be and read as follows:

"(d)    Events Deemed a Liquidation.    In the event of (i) a merger or consolidation of the corporation with or into any other corporation or any other person or entity, other than a wholly-owned subsidiary of the corporation, (ii) any other corporate reorganization, or (iii) a sale of all or substantially all of the assets or the stock of the corporation, unless stockholders of the corporation immediately prior to such a subsection (i), (ii) or (iii) transaction are holders of at least a majority of the voting securities of the surviving or acquiring corporation immediately thereafter, such event shall be treated as a liquidation, dissolution or winding up within the meaning of this Section 2."

SECOND: That thereafter, the necessary number of shares of this corporation's capital stock as required by Section 228 of the General Corporation Law of Delaware consented by written consent in lieu of a meeting in favor of the amendment.

THIRD: That said amendment was duly adopted in accordance with the provisions of Section 242 of the General Corporation Law of the State of Delaware.

**EXHIBIT 10**

IN WITNESS WHEREOF, SITE/TECHNOLOGIES/INC., has caused this certificate to be signed by Ron Sauers, its President, and Daniel Egger, its Secretary, this __11__ day of July, 1997.

BY: _____
      Ron Sauers, President

ATTEST: _____
      Daniel Egger, Secretary

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 12:30 PM 04/03/1995
950073174 - 2300985

**RESTATED
CERTIFICATE OF INCORPORATION
OF
LIBERTECH INC.**

Libertech Inc., a corporation organized and existing under the laws of the State of Delaware, does hereby certify:

1.   The name of the corporation is Libertech, Inc.  The original Certificate of Incorporation was filed with the Secretary of State of the State of Delaware on June 15, 1992.

2.   The amendment and restatement herein set forth has been duly approved by the Board of Directors of the corporation and by the stockholders of the corporation pursuant to Section 242 of the General Corporation Law of the State of Delaware ("Delaware Law").

3.   The amendment and restatement herein set forth has been duly adopted pursuant to Section 245 of the Delaware Law.  This Restated Certificate of Incorporation restates and integrates and further amends the provision of the corporation's Certificate of Incorporation as heretofore amended.

4.   The text of the Certificate of Incorporation is hereby restated and amended to read in its entirety as follows:

## ARTICLE I

The name of the corporation is Libertech Inc.

## ARTICLE II

The address of the registered office of the corporation in the State of Delaware is Corporation Trust Center, 1209 Orange Street, in the City of Wilmington, County of New Castle.  The name of its registered agent at such address is The Corporation Trust Company.

## ARTICLE III

The purpose of the corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of Delaware.

are not declared or paid with respect to any fiscal year of the corporation. No undeclared or unpaid dividends shall bear or accrue interest.

(b) <u>Dividend Rights of Common Stock</u>. Dividends may be declared and paid upon Common Stock in any fiscal year of the corporation if dividends shall have been paid or declared and set apart upon all shares of Series A Preferred Stock and Series B Preferred Stock at the annual rates set forth in Section 1(a) above for each quarter of such fiscal year of the corporation, including the fiscal quarter in which such dividends upon Common Stock are declared; provided, however, that if dividends are declared on Common Stock, dividends must likewise be declared at the same rate (assuming, for such purpose, the conversion of all outstanding shares of Series A Preferred Stock and Series B Preferred Stock into Common Stock as provided in Section 3 hereof) with respect to the outstanding Series A Preferred Stock and Series B Preferred Stock, and payment of any such dividends shall be made contemporaneously to the holders of Series A Preferred Stock, Series B Preferred Stock and Common Stock.

(c) <u>Consent</u>. Each holder of an outstanding share of Preferred shall be deemed to have consented to any distributions made by the corporation in connection with the repurchase of shares of Common issued to or held by officers, directors, employees or consultants of the corporation or its subsidiaries upon termination of their employment or services pursuant to agreements or as otherwise set forth in the Bylaws of the corporation providing for the right of said repurchase between the corporation and such persons.

2. <u>Liquidation Preference</u>. In the event of any liquidation, dissolution, or winding up of the corporation (or the deemed occurrence of such event pursuant to subsection (d) below), either voluntary or involuntary, distributions to the shareholders of the corporation shall be made in the following manner:

(a) <u>Amount of Liquidation Preference</u>. The holders of the Series A Preferred Stock and Series B Preferred Stock shall be entitled to receive, prior and in preference to any distribution of any of the assets or surplus funds of the corporation to the holders of the Common Stock by reason of their ownership of such stock, the amount of $1.00 per share for each share of Series A Preferred Stock then held by them and the amount of $2.283906 for each share of Series B Preferred Stock then held by them, adjusted for any combinations, consolidations, or stock distributions or dividends with respect to such shares and, in addition, an amount equal to all accrued but unpaid dividends on the Series A Preferred Stock and Series B Preferred Stock, respectively.

If the assets and funds thus available for distribution among the holders of the Series A Preferred Stock and the Series B Preferred Stock shall be insufficient to permit the payment to such holders of their full aforesaid preferential amount, then the entire amount of the assets and funds of the corporation legally available for distribution shall be distributed ratably among the holders of the Series A Preferred Stock and Series B Preferred Stock in such a manner that the amount to be distributed to each holder of Series A Preferred Stock and Series B Preferred Stock

shall equal the amount obtained by multiplying the entire assets and funds of the corporation legally available for distribution hereunder by a fraction, the numerator of which shall be the sum of the products obtained by multiplying the number of shares of Series A Preferred Stock and Series B Preferred Stock then held by the holder by the respective liquidation preference of the Series A Preferred Stock and Series B Preferred Stock, and the denominator of which shall be the sum of the products obtained by multiplying the total number of shares of Series A Preferred Stock and Series B Preferred Stock then outstanding by the respective liquidation preference of the Series A Preferred Stock and the Series B Preferred Stock.

        (b)     Distribution after Payment of Liquidation Preference. After payment has been made to the holders of the Series A Preferred Stock and the Series B Preferred Stock of the full preferential amount set forth in Section 2(a) above, the entire remaining assets and funds of the corporation legally available for distribution, if any, shall be distributed ratably among the holders of the Series A Preferred Stock and Series B Preferred Stock, subject to the limitations set forth below, and the holders of Common Stock in a manner such that the amount distributed to each holder of the corporation's capital stock shall equal the amount obtained by multiplying the entire assets and funds of the corporation legally available for distribution pursuant to this Section 2(b) by a fraction, the numerator of which shall be the sum of the number of shares of Common Stock then held by the holder and the number of shares of Common Stock issuable upon conversion of the shares of the Series A Preferred Stock and Series B Preferred Stock then held by the holder, and the denominator of which shall be the sum of the total number of shares of Common Stock then outstanding and the total number of shares of Common Stock issuable upon conversion of the total number of shares of the Series A Preferred Stock and Series B Preferred Stock then outstanding; provided, however, that at such time as the distribution of liquidation preferences pursuant to this Article IV, Section 2 (including subsections (a) and (b) hereof) shall equal (i) $2.00 per share of Series A Preferred Stock or (ii) $4.567812 per share of Series B Preferred Stock, such holders of Series A Preferred Stock and Series B Preferred Stock, as the case may be, shall not be entitled to any further distribution pursuant to this subsection 2(b) with respect to shares of Series A Preferred Stock or Series B Preferred Stock, as the case may be. Thereafter, any remaining assets and funds legally available for distribution hereunder shall be distributed solely to the holders of the Common Stock in a manner such that the remaining amount distributed to each holder of Common Stock shall equal the amount obtained by multiplying the entire assets and funds of the corporation legally available for distribution hereunder by a fraction, the numerator of which shall be the number of shares of Common Stock then held by such holder, and the denominator of which shall be the total number of shares of Common Stock then outstanding.

        (c)     Shares not Treated as Both Preferred Stock and Common Stock in any Distribution. Shares of Preferred Stock shall not be entitled to be converted into shares of Common Stock in order to participate in any distribution, or series of distributions, as shares of Common Stock, without first foregoing participation in the distribution, or series of distributions, as shares of Preferred Stock.

NMG05K.W42(5P3)
03/28/95

-4-

(d)     <u>Events Deemed a Liquidation</u>. In the event of (i) a merger or consolidation of the corporation with or into any other corporation or any other person or entity, other than a wholly-owned subsidiary of the corporation, (ii) any other corporate reorganization, or (iii) a sale of all or substantially all of the assets of the corporation, unless shareholders of the corporation immediately prior to such a subsection (i), (ii) or (iii) transaction are holders of at least a majority of the voting securities of the surviving or acquiring corporation immediately thereafter, such event shall be treated as a liquidation, dissolution or winding up within the meaning of this Section 2.

    3.     <u>Conversion</u>. The holders of the Series A Preferred Stock and Series B Preferred Stock shall have conversion rights as follows:

    (a)     <u>Right to Convert and Automatic Conversion</u>.

    (i)     The Series A Preferred Stock shall be convertible, at the option of the respective holders thereof, at any time at the office of this corporation or any transfer agent for such shares, into fully paid and non-assessable shares of Common Stock (calculated to the nearest one-hundredth of a share, fractions of less than one-hundredth of a share being disregarded) of this corporation, based upon the applicable Series A Conversion Price (as defined below) in effect at the time of conversion. The number of shares of Common Stock into which each share of Series A Preferred Stock may be converted shall be equal to $1.00 divided by the then current Series A Conversion Price. The price at which each share of Common Stock shall be deliverable upon conversion of the Series A Preferred Stock (herein sometimes referred to as the "**Series A Conversion Price**") shall initially be $1.00. Such initial Series A Conversion Price shall be subject to adjustment from time to time in certain instances, as hereinafter provided in this Section 3. This corporation shall make no payment or adjustment on account of any declared but unpaid dividends on the shares of the Series A Preferred Stock surrendered for conversion.

    (ii)     The Series B Preferred Stock shall be convertible, at the option of the respective holders thereof, at any time at the office of this corporation or any transfer agent for such shares, into fully paid and non-assessable shares of Common Stock (calculated to the nearest one-hundredth of a share, fractions of less than one-hundredth of a share being disregarded) of this corporation, based upon the applicable Series B Conversion Price (as defined below) in effect at the time of conversion. The number of shares of Common Stock into which each share of Series B Preferred Stock may be converted shall be equal to $2.283906 divided by the then current Series B Conversion Price. The price at which each share of Common Stock shall be deliverable upon conversion of the Series B Preferred Stock (herein sometimes referred to as the "**Series B Conversion Price**") shall initially be $2.283906. Such initial Series B Conversion Price shall be subject to adjustment from time to time in certain instances, as hereinafter provided in this Section 3. This corporation shall make no payment or adjustment on account of any declared but unpaid dividends on the shares of the Series B

# EXHIBIT 11

[8-JUL-97 3:34p]

# STOCK EXCHANGE AGREEMENT

This STOCK EXCHANGE AGREEMENT (this "Agreement") is made and entered into as of July ___, 1997 among (i) DeltaPoint, Inc., a California corporation ("DeltaPoint"), (ii) Site/technologies/inc., a Delaware corporation ("Site"), (iii), only for the purpose of Articles I, VI and VII of this Agreement, those persons or entities listed on the signature pages hereof under the caption Principal Site Stockholders (the "Principal Site Stockholders"), and (iv), only for the purpose of agreeing to the terms of Articles I and VII of this Agreement, those persons or entities listed on the signature pages hereof under the caption Other Site Stockholders (the "Other Site Stockholders").

## RECITALS

A.    The Boards of Directors of each of Site and DeltaPoint believe it is in the best interests of each company and their respective stockholders that DeltaPoint acquire all of the capital stock of Site on the terms set forth herein (the "Acquisition") and, in furtherance thereof, have approved the Acquisition.

B.    The stockholders of Site have approved the Acquisition.

C.    Pursuant to the Acquisition, among other things, and subject to the terms and conditions of this Agreement, all of the issued and outstanding shares of capital stock of Site shall be converted into the right to receive certain shares of voting Common Stock of DeltaPoint ("DeltaPoint Common Stock") and certain cash.

D.    Site, DeltaPoint and the Principal Site Stockholders desire to make certain representations and warranties and other agreements in connection with the Acquisition.

NOW, THEREFORE, in consideration of the covenants, promises and representations set forth herein, and for other good and valuable consideration, intending to be legally bound hereby the parties agree as follows:

## ARTICLE I
## THE ACQUISITION

1.1    Effect on Capital Stock.  Subject to the terms and conditions of this Agreement, by virtue of the Acquisition and without any action on the part of Site or the holder of any shares of Site Common Stock, the following shall occur upon the signing of this Agreement by all of the parties hereto:

(a)    Conversion of Site Series B Preferred Stock.  Each share of Series B Preferred Stock of Site (collectively, the "Site Series B Stock") issued and outstanding immediately at such time will be canceled and extinguished and be converted automatically into the right to receive (i) that number of shares of DeltaPoint Common Stock equal to the Series B Exchange Ratio (as defined below in this Section 1.1), upon surrender of the certificate representing such share of Site Series B Stock in the manner provided in Section 1.2 and (ii) that amount of cash (payable by check) equal to $100 divided by the Aggregate Series B Number (as defined below in this Section 1.1).

(b)    Conversion of Site Series A Preferred Stock.  Each share of Series A Preferred Stock of Site (collectively, the "Site Series A Stock") issued and outstanding immediately at such time will be canceled and extinguished and be converted automatically into the right to receive (i) that number of shares

EXHIBIT 11

8-JUL-97 3:34p

DeltaPoint Common Stock to be issued hereunder in accordance with the terms of this Agreement, such shares shall be duly authorized, validly issued, fully paid and non-assessable by DeltaPoint and not subject to preemptive rights created by statute, DeltaPoint's Articles of Incorporation or Bylaws or any agreement to which DeltaPoint is a party or by which it is bound.

## ARTICLE V
## COVENANTS

5.1     Expenses. All fees and expenses incurred in connection with the Acquisition, including without limitation, all legal, accounting, financial advisory, consulting and all other fees and expenses of third parties ("Third Party Expenses") incurred by DeltaPoint or Site (but not its stockholders) other than as to be satisfied pursuant to the terms of Section 5.8 hereof shall be the obligation of DeltaPoint; provided, however, that DeltaPoint shall not be responsible for reasonable Third Party Expenses for actual billed time and expenses of Site exceeding $[0 to 40,000][3]. The Principal Site Stockholders shall be responsible for, pro rata with respect to their relative ownership of Site capital stock immediately prior to the Acquisition, all other Third Party Expenses.

5.2     Noncompetition Agreements. Concurrent with the execution and delivery of this Agreement, DeltaPoint and each of Ron Sauers, Shawn Cannon and Anil Peres-Da-Silva are entering into a Noncompetition Agreement substantially in the form of Exhibit C hereto.

5.3     Registration Rights Agreement. Concurrent with the execution and delivery of this Agreement, DeltaPoint, Allan Kaplan Investments, Ron Sauers, Shawn Cannon, Anil Peres-Da-Silva and each of those other persons or entities who or which were preferred stockholders of Site immediately prior to the Acquisition shall enter into a Registration Rights Agreement substantially in the form of Exhibit D hereto.

5.4     Employment of Site Employees. Concurrent with the execution and delivery of this Agreement, DeltaPoint agrees to enter into employment agreements with Ron Sauers, Shawn Cannon and Anil Peres-Da-Silva (the "Employees") on terms mutually satisfactory to such Employees and DeltaPoint. Such employment agreements shall provide that DeltaPoint will provide office space located in or about Raleigh, North Carolina for such Employees that remain in Site's or DeltaPoint's employ and fund Site's operations in such location sufficiently to permit the employment of such employees that remain in Site's or DeltaPoint's employ until the later of (i) the first anniversary of this Agreement or (ii) the date occurring three months after DeltaPoint gives written notice to such Employees of its intent to re-locate the place of their employment.

5.5     Appointment to DeltaPoint Board. Concurrent with the execution and delivery of this Agreement, Stephen Mendel is being appointed to serve as a member of the Board of Directors of DeltaPoint until his successor is elected and qualified.

---

[3]     Open issue - proposed by Site to be $40,000.

KS2::ODMA\PCDOCS\SQL2\08978\5        -16-

5.6   Royalty.

(a)   DeltaPoint agrees that for the first 12 months after First Customer Shipment (as defined below) of SiteSweeper 2 by DeltaPoint or Site, it or Site will pay to those who receive shares of DeltaPoint Common Stock pursuant to this Agreement (the "Holders") aggregate royalties calculated at the rate of 5% of net revenues, if any, received by DeltaPoint for units of SiteSweeper 2 or successor products sold, licensed, sublicensed or distributed by DeltaPoint, Site or any of their related or affiliated entities to unaffiliated third parties. Such royalties shall be paid to the Holders pro rata in accordance with the respective number of shares of DeltaPoint Common Stock received by the Holders pursuant to this Agreement. For purpose of this Section 5.6, the term "First Customer Shipment" shall mean the first commercial shipment of SiteSweeper 2 by DeltaPoint or its agents or customers to any retail distributor or other customer that is: (i) paying a license fee or purchase price therefor, (ii) not an alpha or beta site evaluation customer of such product and (iii) not a purchaser of the product through sales over the Internet or from DeltaPoint's web site. For the purpose of this Section 5.6, the term "net revenues" shall mean actual cash receipts less taxes, duties, excises, other governmental charges and fees of any kind, refunds, credits and returns.

(b)   Within forty-five (45) days after the end of each fiscal quarter during the twelve months after the First Customer Shipment of SiteSweeper 2, DeltaPoint or Site will provide each of the Holders with a statement of net revenues and the royalties due to the Holders calculated at a rate of 5% of such net revenues, if any, received by DeltaPoint for units of SiteSweeper 2 or successor products sold, licensed, sublicensed or distributed by DeltaPoint, Site or any of their related or affiliated entities to unaffiliated third parties, during the first year after First Customer Shipment of SiteSweeper 2 (the "Royalty Statement"). In conjunction with any such Royalty Statement, DeltaPoint or Site will pay such each Holder the royalties determined to be due as a result of such sales in cash or check by wire transfer. The Holders shall have the right, at their cost, to have an independent auditor of the Holders' choice perform an audit of the books and financial records of DeltaPoint, Site or any of their related or affiliated entities to verify the accuracy and completeness of payments pursuant to this Section 5.6 on reasonable notice to DeltaPoint during DeltaPoint's business hours at the expense of the Holders, provided that such audit shall occur not later than 180 days following the end of the first anniversary of the date of First Customer Shipment of SiteSweeper 2. If such audit determines that there has been an underpayment to the Holders, DeltaPoint shall remit such amount pro-rata to the Holders and if such amount is greater than 10% of the royalties originally paid, then DeltaPoint shall reimburse the Holders for the reasonable cost of the audit.

(c)   The payments made under this Section 5.6 to Ron Sauers, Shawn Cannon and Anil Peres-Da-Silva are being made in satisfaction of certain salary amounts owed to such persons and shall be subject to and conditioned upon proper withholding of taxes for such payments, which withholdings shall be (i) paid by such respective persons to Site and/or DeltaPoint or (ii) deducted from other amounts to be paid to such respective persons by Site and/or DeltaPoint.

5.7   Officers and Directors. Effective upon the signing and delivery of this of the Agreement, the officers and directors of Site, pursuant to resignations and appointments accomplished by Site prior to but effective upon such time, shall be identical to the officers and directors of DeltaPoint then in office.

5.8   Certain Fees. Upon the signing and delivery of this of the Agreement and in full satisfaction of any finder's fees, financial advisory fees or other fees due to Allan Kaplan Investments in connection with the transactions contemplated by this Agreement, DeltaPoint shall, subject to Allan Kaplan Investments

# EXHIBIT 12

## NOTES TO UNAUDITED PRO FORMA CONDENSED FINANCIAL STATEMENTS

1. On July 11, 1997, the Company acquired the shares of Site/technologies/inc. ("Site") for an aggregate purchase price of $638,000. The purchase price was comprised of a cash payment of $60,000, issuance of 550,029 shares of the Company's Common Stock valued at $721,913 less 30% applicable to the shares to account for the fact that they will be restricted for a period of time and assumed debt/liabilities of $73,000. In exchange the Company's received all outstanding assets of Site. The Company will record the expense related to purchased in-process technology of approximately $500,000 during the third quarter of 1997. This amount has been excluded from the pro forma statements of operations due to its non-recurring nature.

2. The pro forma condensed balance sheet reflects the effects of the acquisition of Site based upon the fair market value of the acquired assets and liabilities on July 11, 1997 as if it had been consummated on June 30, 1997:

a. Decrease in Cash

| | |
|---|---|
| Cash acquired from Site | $ 36,000 |
| Acquisition costs | (60,000) |
| Net decrease in cash | $(24,000) |

b. Increase in Accounts Receivable is equal to Site's accounts receivable of $8,000 at 7/11/97 which DeltaPoint acquired.

c. Increase in Property and Equipment is equal to Site's property and equipment of $67,000 at 7/11/97 which DeltaPoint acquired.

d. Increase in Deposits and Other Assets

| | |
|---|---|
| Developed Technology | $14,000 |
| Goodwill | 5,000 |
| Assembled Workforce | 6,000 |
| | $25,000 |

e. Increase in Accounts Payable and Accrued Liabilities is equal to Site's liabilities which DeltaPoint acquired at 7/11/97.

f. Increase in Common Stock is equal to the 550,029 shares of DeltaPoint's common stock issued at a fair market value of $1.31

EXHIBIT 12