# EXHIBIT B
# PART 6

Dockets.Justia.com

# EXHIBIT 25

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| SKY TECHNOLOGIES LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 2:06-CV-440 (DF) |
| | § | |
| SAP AG, SAP AMERICA, INC. and | § | |
| ORACLE CORPORATION, | § | |
| | § | |
| Defendants. | § | |

## ORDER

Currently before the Court is Defendants' Rule 12(b)(1) Motion to Dismiss for Lack of Standing (Dkt. No. 132) and related briefing (Dkt. Nos. 147, 155, 171, 186, 189). The Court held a hearing regarding this matter on February 28, 2008. Dkt. No. 187. In a March 20, 2008 Order (the "March Order"), the Court requested additional briefing on this matter. Dkt. No. 193 at 19. Thus, currently before the Court is Sky's supplemental brief (Dkt. No. 198) and related briefing (Dkt. Nos. 200, 204, and 206). After considering the arguments and the briefing, the Court **DENIES** Defendants' Rule 12(b)(1) Motion to Dismiss for Lack of Standing (Dkt. No. 132).

## I.    BACKGROUND

### A.    Factual Background[1]

On October 17, 2006, Plaintiff Sky filed a claim for infringement of U.S. Patent Nos. 6,141,653 (the "'653 Patent"), 6,336,105 (the "'105 Patent"), and 6,338,050 (the "'050 Patent").

---

[1] This background was taken from this Court's previous March 20, 2008 Order. Dkt. No. 193 at 1-4.

1

EXHIBIT 25

Complaint, Dkt. No. 1. Jeffrey Conklin ("Conklin"), David Foucher, and Daniel Foucher are the named inventors of these patents. United States Patent Nos. 7,162,458 (the "'458 Patent") and 7,149,724 (the "'724 Patent") were later added. Second Amended Complaint, Dkt. No. 44. Conklin, David Foucher, Daniel Foucher, and William J. Flanagan are listed as the inventors of these two patents.

The inventors of all the above five patents-in-suit assigned their rights to TradeAccess, Inc. ("TradeAccess"). Dkt. No. 132 at 7[2] (citing Dkt. No. 132, Exhibits B-F); Dkt. No. 147 (citing Dkt. No. 132, Exhibits B-F). Each of these assignments was filed in the United States Patent & Trademark Office ("USPTO"). Dkt. No. 132 at 8. TradeAccess was formed by Conklin. Dkt. No. 132 at 8; Dkt. No. 147 at 2. On April 2, 2001, an Intellectual Property Security Agreement was made between TradeAccess and Silicon Valley Bank where a loan was secured interests to TradeAccess's intellectual property. Dkt. No. 132 at 8 (citing Dkt. No. 132, Exh. G (the "SVB Agreement"); Dkt. No. 147 (citing Dkt. No. 132, Exh. G). The agreement contained a clause stating that the IP Agreement would be "governed by and construed in accordance with the laws of the Commonwealth of Massachusetts." SVB Agreement at 7. On April 3, 2001, an Intellectual Property Security Agreement was made between TradeAccess and Cross Atlantic Capital Partners, Inc. ("XACP"), as agent for Cross Atlantic Technology Fund, L.P. ("XATF"), The Co-Investment 2000 Fund, L.P. ("CI 2000"), and 3i Technology Partners L.P. ("3i"). Dkt No. 132 at 8; Dkt. No. 147 at 3; Dkt. No. 132, Exh. H (the "XACP Agreement"). XATF, CI 2000 and 3i received first priority in TradeAccess's intellectual property, except as to liens and security interests granted to SVB. Dkt. No. 132, Exh. H at 2.

---

[2]All page numbers refer to the document header page numbers.

This second agreement also had a Massachusetts choice of law clause. XACP Agreement at 8. These documents were filed with the USPTO. Dkt. No. 132 at 8.

TradeAccess changed its name to Ozro on May 3, 2001 by filing papers with the State of Delaware Office of the Secretary of State. Dkt. No. 132 at 8 (citing Dkt. No. 132, Exh. L). On December 5, 2002, XATF and CI 2000 "entered into a Purchase Agreement with 3i, wherein 3i assigned all rights in its agreements with Ozro, including the Intellectual Property Security Agreement. Dkt. No. 147 at 3. On December 18, 2002, Silicon Valley Bank entered into a Non-Recourse Assignment with XATF and CI 2000, as tenants in common with 2/3 undivided interest to XATF and 1/3 undivided interest to CI 2000, wherein Silicon Valley Bank transferred its rights to the secured loan agreement with Ozro. Dkt. No. 147 (citing Dkt. No. 132, Exh. I at 1). Thus, at this point, the interest was consolidated to XATF and CI 2000.

Under a Settlement Agreement, effective as of June 4, 2003, XACP, CI 2000, and XATF sought to sell to Conklin "certain intellectual property and assets of Ozro, Inc. (f/k/a/ Trade Access, Inc.)." Dkt. No. 132 at 8; Dkt. No. 147 at 4; Dkt. No. 132, Exh. M. The Agreement specified that the Intellectual Property would be purchased by the new entity "Newco" created by Conklin. Dkt. No. 132, Exh. M at 7. The Agreement stated:

> Public Auction. The XACP Entities [XACP, CI 2000, and XATF] shall use their best efforts to obtain title to the Intellectual Property for purposes of a transfer from the XACP Entities to Newco, by selling all of the XACP Entities' rights in and to the Secured Intellectual Property by Public Auction within sixty (60) days after the Effective Date. The XACP Entities shall provide Conklin with the opportunity to review and approve the terms and notices relating to the Public Auction prior to their release. At the Public Auction, the XACP entities, or their designee, will credit bid up to $4,031,844, as may be required to purchase the Intellectual Property, including but not limited to the right to sue for past infringement or misappropriation of the Patents, covered by security interests held by the XACP Entities. . . .

3

Dkt. No. 132, Exh. M at 7-8. The $4,031,844 was the "amount owed by Ozro to XACP." Dkt.

No. 132 at 8.

On July 14, 2003, a public auction was held regarding the Ozro Intellectual Property.

According to the auctioneer:

> The intellectual property assets were offered for sale in two offerings. The first
> sale was to foreclose on the security interest originally held by Silicon Valley
> Bank that was subsequently assigned to Cross Atlantic. Cross Atlantic foreclosed
> on this first priority security interest as assignee of this interest. The second sale
> was to foreclose on the security interest originally held by Cross Atlantic. Cross
> Atlantic was the only bidder and it, through its representative Craig Vaughn,
> purchased the assets for $100,000.

Dkt. No. 132, Exh. N (letter from Atlantic Auctions to counsel for Ozro).

Therefore, XACP foreclosed on both of the security interests. Defendants state that

despite this sale, there was no written instrument assigning the Ozro patents to XACP. Dkt. No.

132 at 9. On July 23, 2003 a written assignment was made by XACP to Whitelight Technology,

LLC, a predecessor to Sky, for the rights to multiple patents, including the '653 Patent, the '050

Patent, the '105 Patent, as well as, U.S. Application No. 09/702,128, which would later become

the '458 Patent, and U.S. Application No. 09/702,062, which would later become the '724

Patent. Dkt. No. 132, Exh. O at 1. This assignment had a choice of law clause for the

assignment to be construed pursuant to the laws of the Commonwealth of Pennsylvania. *Id.* at 3.

On November 1, 2007, Ozro, Inc. submitted a Certificate of Dissolution to the State of Delaware,

which was authorized on April 24, 2007 by Conklin. Dkt. No. 132, Ex. P.

**B.      Procedural Background**

Now before the Court, Defendants contest the assignment made on July 22, 2003 from

XACP to Whitelight Technology, LLP as improper because Defendants aver that Ozro never

4

assigned the patents-in-suit to XACP in any instrument in writing after the July 14, 2003 foreclosure. Sky argues that the security agreements and their subsequent recording in the USPTO served as assignments. Ozro has filed a motion to intervene (Dkt. No. 146) in order to resolve the standing issue.

The primary disagreement between Sky and the Defendants was whether the April 2001 Security Agreements, which were recorded and later foreclosed, were sufficient to satisfy Section 261. Defendants had argued that Ozro was obligated to transfer title, after the July 14, 2003 foreclosure, through a written assignment pursuant to Section 261. *See* Dkt. No. 132 at 9. The Court distinguished conflicting cases proffered by the parties. Sky relied on the Supreme Court decision in *Waterman v. Mackenzie* for the proposition that the recording of a security interest "operates as delivery of title to satisfy § 261." Dkt. No. 147 at 5. Defendants relied on *In re Cybernetic* for the proposition that security interests do not qualify as assignments under Section 261." Dkt. No. 132 at 12. In the previous March Order, this Court held that the Ninth Circuit in *In re Cybernetic* merely held that Section 261 only requires the recording of ownership interests in a patent and that *Waterman* does not broadly stand for the proposition that a security interest recorded with the USPTO effectively transfers title to the secured lender under Section 261. Dkt. No. 193 at 14-17.

The Court requested further briefing, asking the parties to address: (1) the effect of any evidence after the foreclosure; (2) whether the provisions of the Security Agreement granted substantial rights as to effect a transfer of title; and (3) the effect of a security agreement that contains provisions to transfer of title but is not effective unless defaulted upon. Dkt. No. 193 at 18.

5

## II.    LEGAL PRINCIPLES

"The burden of demonstrating standing falls to [Plaintiff], as '[i]t is well established . . .

that before a federal court can consider the merits of a legal claim, the person seeking to invoke

the jurisdiction of the court must establish the requisite standing to sue.'" *Ortho Pharm. Corp. v.

Genetics Inst., Inc.*, 52 F.3d 1026 (Fed. Cir. 1995) (quoting *Whitmore v. Arkansas*, 495 U.S. 149,

154 (1990); citing *Sicom Sys., Ltd. v. Agilent Tech., Inc.*, 427 F.3d 971, 975-76 (Fed. Cir. 2005)).

One seeking damages for infringement of a patent must hold legal title to that patent.

*See, e.g., Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538 (Fed. Cir. 1995); *Speedplay, Inc. v.

Bebop*, 211 F.3d 1245, 1249-50 (Fed. Cir. 2000) (citing 35 U.S.C. §§ 100(d), 261, 281).  Under

Section 261:

> Applications for patent, patents, or any interest therein, shall be assignable in law
> by an instrument in writing. The applicant, patentee, or his assigns or legal
> representatives may in like manner grant and convey an exclusive right under his
> application for patent, or patents, to the whole or any specified part of the United
> States. . . .
> An assignment, grant or conveyance shall be void as against any subsequent
> purchaser or mortgagee for a valuable consideration, without notice, unless it is
> recorded in the Patent and Trademark Office within three months from its date or
> prior to the date of such subsequent purchase or mortgage.

A party without title has no standing to bring suit.  *Filmtec Corp. v. Allied-Signal Inc.*, 939 F.2d

1568 (Fed. Cir.1991); *Abbott Labs. v. Diamedix Corp.*, 47 F.3d 1128, 1131 (Fed. Cir. 1995)

("The right to sue for infringement is ordinarily an incident of legal title to the patent.").

"Further, all co-owners must, ordinarily, consent to join as plaintiffs in an infringement suit."

*DDB Techs., LLC v. MLB Advanced Media, LP*, 465 F. Supp. 2d 657, 661 (W.D. Tex. 2006).

Legal title, which confers standing, must be held at the inception of the lawsuit. *Paradise

Creations*, 315 F.3d at 1308 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 570 n.5, 119 L.

6

Ed. 2d 351, 112 S. Ct. 2130 (1992) (plurality opinion)); *Gaia Technologies*, 93 F.3d at 777. "The party asserting that it has all substantial rights in the patent 'must produce . . . written instruments documenting the transfer of proprietary rights.'" *Mentor H/S, Inc.*, 240 F.3d at 1017 (quoting *Speedplay*, 211 F.3d at 1250). Section 100(d) provides that a "'patentee' includes not only the patentee to whom the patent was issued but also the successor in title to the patentee." Therefore, the chain of title must be followed in order to determine the party holding legal title to the patent. *See Enzo*, 134 F.3d at 1093; *Gaia Technologies*, 93 F.3d at 777.

"In examining a Rule 12(b)(1) motion, the Court is empowered to consider matters of fact which may be in dispute." *Id.* A court may not grant dismissal "unless it appears certain that the plaintiffs cannot prove any set of facts in support of their claim which would entitle them to relief," and a court "must take as true all of the allegations of the complaint and the facts as set out by the [plaintiffs]." *Saraw Partnership v. U.S.*, 67 F.3d 567, 569 (5th Cir. 1995).

## III.    MOTION TO DISMISS

Sky has offered several theories in defense against the motion to dismiss. Sky initially argued that a security interest that is recorded in the PTO effects transfer of title. Dkt. No. 147 at 1. Sky stated that the Agreements transferred a title and the rights were slowly consolidated through various assignment agreements. *Id.* at 3. However, as explained above, the Court rejected this argument, stating that the *Waterman* case cited by Sky related to a dispute regarding a subsequent purchase or mortgagee. March Order at 17.

Sky now argues that transfer of title to the patents does not require a written assignment. Dkt. No. 204 at 1. Moreover, Sky states that if a written assignment was required, the Security Agreements are written assignments that are actually conditional assignments that become

effective upon default. Dkt. No. 198 at 3. Therefore, Sky argues that the transfer of title occurred at the foreclosure. *Id.* at 5.

The first issue the Court addresses is whether a transfer may be effected through an operation of law.

### A.    Transfer by Operation of Law and Choice of Law

#### 1.    Parties' Positions

Defendants cite to a recently issued Federal Circuit authority, *Akazawa v. New Link Technology International, Inc.*, 520 F.3d 1354 (Fed. Cir. 2008), arguing that the Federal Circuit affirmed the "requirement that transfer by assignment under § 261 'be in writing'." Dkt. No. 200 at 14 n.46. Defendants state that the question of automatic assignment is a matter of federal and not state law. Dkt. No. 200 at 14 (citing *DDB Techs. L.L.C. v. MLB Advanced Media, L.P.*, 517 F.3d 1284, 1290 (Fed. Cir. 2008)). Defendants further argue that a debtor must "convey written title or written title must be ordered conveyed by a duly-authorized court." *Id.* at 14 (citing *Ager v. Murray*, 105 U.S. 126, 131 (1881)).

Sky argues that new Federal Circuit authority, *Akazawa*, provides that title to patents can pass by operation of law and no written assignment under § 261 is necessary. Dkt. No. 204 at 1 (citing *Akazawa*, 520 F.3d at 1356-57). Sky contends that Defendants argue that federal law applies in order to advance *Ager*. Dkt. No. 204 at 4. Sky believes that *Ager* is inapplicable and distinguishable because *Ager* was decided before the creation and adoption of the Uniform Commercial Code ("UCC"). *Id.* at 4-5.

Defendants reply that Section 261 requires that assignments be in writing. Dkt. No. 206

8

at 8. Defendants contend that courts have long recognized that state probate law automatically vests legal title in a patentee's heirs and interprets the holding in *Akazawa* to be limited to extending those decisions to allow the probate law of another nation to similarly vest legal title in an heir without a written assignment. *Id.* at 8 (citing *Akazawa*, 520 F.3d at 1357-58; *H.M. Stickle v. Heublein, Inc.*, 716 F.2d 1550, 1558 (Fed. Cir. 1983); *Winkler v Studebaker Bros. Mfg. Co.*, 105 F. 190, 190-91 (C.C.S.D.N.Y. 1900)). Defendants clarify that they do "not contend, as Sky represents, 'that the *only* means by which title to patents transfers is an assignment in writing or court Order compelling assignment'" rather that "where–as here following XACP's purported foreclosure on Ozro's patents–no state law operates to vest legal title to the patents, a plaintiff must obtain a written assignment pursuant to Section 261 in order to establish its legal title and therefore standing to pursue any claim for patent infringement." *Id.* at 8-9.

### 2. Analysis

Defendants and Sky fundamentally agree on the general holding of *Akazawa* that "there is nothing that limits assignment as the only means for transferring patent ownership. Indeed, the case law illustrates that ownership of a patent may be changed by operation of law." *Akazawa*, 520 F.3d at 1356. The primary difference between Defendants and Sky's argument is that Defendants presume that there is no state law that operates to vest legal title to the patents and Defendants conclude that legal title must therefore be established through a written assignment pursuant to Section 261 or a Court order. *See* Dkt. No. 206 at 9.

In *Akazawa*, the defendant challenged the standing of the plaintiff. The inventor of the patent in interest, U.S. Patent No. 5,615,761 ("the '716 patent"), had died intestate, and the heirs, the inventors' wife and two daughters, consolidated their rights to a single daughter through an

9

"Inheritance Agreement," and the daughter in turn assigned the rights under the patent to the plaintiff. *Akazawa*, 520 F.3d at 1355. The defendant argued that Section 261 "mandates a writing where there is a transfer upon death in order for there to be a proper assignment between two entities." *Id.* Like in this case, the defendant stated that the plaintiff did not own the patent because "there was never a writing transferring the '716 patent from the estate of [the inventor] to [the inventors' heirs], the inheritance agreement between [the inventors' heirs] and the assignment between [the daughter] and [the plaintiff] notwithstanding." *Id.* The Federal Circuit held that "ownership of a patent may be changed by operation of law." *Id.* at 1356.

Likewise, the Court determines that ownership of a patent may be changed by operation of law, and thus, the Court must determine whether the Security Agreement and subsequent foreclosure transferred the patent by operation of law.

Defendants argue that federal law, not state law, applies in automatic assignments, and argue that because there was no written assignment, federal law, as posited by *Ager,* requires a Court order. *See* Dkt. No. 200 at 14. Defendants rely on *DDB Technologies* for the proposition that federal law would apply in this case. *Id.* In *DDB Technologies*, the defendant had obtained a license to the patents-in-suit from the former employer of one of the inventors, who helped to form the plaintiff company. *DDB Technologies*, 517 F.3d at 1288. The district court had to evaluate whether, under the employment agreement between the former employer and the employee/inventor, there was an automatic assignment of the inventor's rights. *Id.* The Federal Circuit first determined that "[a]lthough state law governs the interpretation of contracts generally, the question of whether a patent assignment clause creates an automatic assignment or merely an obligation to assign is intimately bound up with the question of standing in patent

10

cases" and concluded that this was a matter of federal law. *Id.* at 1289-90.

On the other hand, Judge Newman's dissent stated that the panel majority was overreaching and contrary to law and precedent and Judge Newman narrowly stated the majority's holding as relating to "interpretation of employment contracts, including clauses establishing employer-employee obligations with respect to inventions and patents." *Id.* at 1296. Here, there is not an employment contract, but rather a security agreement. As explained above, the *Akazawa* case addressed the analogous question of whether there was a break in the chain of title due to the lack of written assignment pursuant to Section 261. In *Akazawa*, the Federal Circuit held that the "case law is clear that state law, not federal law, typically governs patent ownership." *Akazawa*, 520 F.3d at 1357 (citing *Jim Arnold Corp. v. Hydrotech Sys., Inc.*, 109 F.3d 1567, 1572 (Fed. Cir. 1997). The Federal Circuit determined that resolution of the issues required an interpretation of Japanese intestacy law. *Id.* at 1358.

The Court determines that state law, not federal law, should govern this case. Here, both Security Agreements stated that Massachusetts choice of law would apply. SVB Agreement at 7; XACP Agreement at 8. Therefore, the Court applies Massachusetts law, specifically the Massachusetts UCC (i.e. Mass. Ann. Laws ch. 106 Art. 9), to determine whether there was a transfer of title by operation of law.

### B. Transfer of Title

#### 1. Parties' Positions

Sky argues that "numerous courts have observed the passing of title to intellectual property upon a debtor's default." Dkt. No. 198 at 4 (citing *Haymaker Sports, Inc. v. Turian*,

581 F.2d 257, 261 (C.C.P.A. 1978); *Health Discovery Corp. v. Ciphergen Biosystems, Inc.*, No. 2:06-cv-260, 2007 WL 128283, at *1 (E.D. Tex. Jan. 11, 2007); *digiGan, Inc. v. iValidate, Inc.*, No. 02 Civ. 420, 2004 WL 203010, at *3 (S.D.N.Y. Feb. 3, 2004)). Sky contends that "full title to the patents-in-suit passed to XACP when Ozro defaulted and XACP foreclosed." *Id.* at 5. Sky states that both Security Agreements provide that the lenders had all "rights and remedies of a secured creditor under the Massachusetts Uniform Commercial Code." *Id.* at 6 (citing SVB Agreement at 6; XACP Agreement at 6-7). Sky avers that under Massachusetts UCC a default transfers all of the debtor's rights in the collateral, including the rights to sell, lease, license, or dispose of the property. *Id.* (citing MASS. GEN. LAWS ch. 106 at §§ 9-617 & 9-610). Sky emphasizes that under Massachusetts law, "a secured creditor is not required to bring an action to compel assignment to foreclose on intellectual property interests or execute any additional instrument upon foreclosure," citing that Massachusetts UCC does not contain a provision requiring additional action after foreclosure on intellectual property. *Id.* at 9 (citing MASS. GEN. LAWS ch. 106 at Art. 9). Sky argues that the Security Agreements were conditional assignments that were duly recorded with the PTO, thus fulfilling Section 261. *Id.* at 7.

Defendants respond that the security interests are not "conditional assignments." Dkt. No. 200 at 6. Defendants reiterate that an assignment must transfer all substantial rights while a security interest is an agreement for a future assignment and not a "present ownership right in the patent." *Id.* at 8-9 (citing *Aspex Eyewear, Inc. v. Miracle Optics, Inc.*, 434 F.3d 1336, 1341 (Fed. Cir. 2006); *Trimarchi v. Together Dev. Corp.*, 255 B.R. 606, 611 (D. Mass. 2000); quoting *City Bank and Trust Co. v. Otto Fabric, Inc.*, 83 B.R. 780, 782 (D.Kan. 1988)). Defendants note that the language of the contract does not provide for an automatic assignment, but rather, the grant

12

clause and other provisions repeatedly provides for a security interest. *Id.* at 10-12 (citing SVB Agreement ¶¶ 1, 3(c), 3(I), 3(k), 6(a), 8; XACP Agreement ¶¶ 1, 3(c), 3(h), 3(I), 3(k), 6(a); *DDB Tech.*, 517 F.3d at 1290).

Defendants state that a security interest does not convey title and is not an assignment. Dkt. No. 200 at 11-12 (citing *Holt v. United States*, 13 U.C.C. Rep. Servs. 336, 1973 WL 614, at *1 (D.D.C. 1973)). Defendants note that the article that Sky relies upon for its assignment theory recognizes a security interest to be a "lesser interest in the collateral." *Id.* (citing Thomas L. Bahrick, *Security Interests in Intellectual Property*, 15 A.I.P.L.A. Q.J. 30, 40 (1987)).

Defendants further provide that the default did not transfer substantial rights. Dkt. No. 200 at 14. Defendants argue that federal law should apply and that "[e]ven where the language in the underlying loan documents provides the creditor 'an entitlement to an immediate assignment of all right, title, and interests to the patents, with the right and power to execute and record an assignment of the patents as attorney-in-fact on behalf of the debtor after notice of default,' courts have held that 'no actual assignment of the patents occurred.'" *Id.* at 15 (quoting *In re Tower Tech, Inc.*, 67 Fed. Appx. 521, 524 (10th Cir. 2003)).

Defendants alternatively argue that even if Massachusetts law applied, the courts are "clear that 'an event of default does not automatically transfer possession to the creditor.'" Dkt. No. 200 at 15 (quoting *McDonald v. Rockland Trust Co.*, 798 N.E.2d 323, 327 (Mass. App. 2003)). Defendants cite that Massachusetts states that after foreclosure, if the debtor refuses to sign a written transfer of title, the creditor may file a "transfer statement." *Id.* at 15-16 (M.G.L.A. 106 § 9-619 Comment 2). Defendants assert that a creditor may alternatively seek a court order compelling a written assignment or appointing a receiver to issue a written

13

assignment, which Ozro failed to do in its transfer to XACP. *Id.* at 16 (citing *Barton v. White*, 144 Mass. 281, 284 (Mass. 1887); *Wilson v. Martin-Wilson Automatic Fire-Alarm Co.*, 151 Mass. 515 (Mass. 1890); *McCann v. Randall*, 147 Mass. 81 (Mass. 1888)).

Sky responds that the *McDonald* case cited by Defendants is correct in stating that "an event of default does not automatically transfer possession to the creditor, [but] *McDonald* does not stand for the broader principle that title cannot pass by operation of law." Dkt. No. 204 at 5. Sky states that a creditor has several options, including forbearing the enforcement of its security agreement, and in this situation "XACP elected to foreclose and purchase the patents." *Id.* Sky contends that, contrary to Defendants' assertion, § 9-619 does not require that XACP execute a "transfer statement," which is a non-mandatory statement that is used "to address procedural problems that can arise when a secured party effects a non-volitional transfer, and the 'transfer statement' assists the secured party in recording its interest." *Id.* at 6 (citing MASS. GEN. LAWS ch. 106 § 9-619 Author's Note).

Defendants counter that "unless state law specifically vests legal title to a patent, a written assignment is required to vest legal title." Dkt. No. 206 at 9 (citing *Ager v. Murray*, 105 U.S. 126, 131 (1881)). Defendants contend that Massachusetts law does not operate to vest legal title to patents following a default. *Id.* at 10. Defendants argue that in *In re Roman Cleanser Co.*, 43 B.R. 940, 948 n.4 (Bank. Mich. 1984), aff'd 802 F.2d 207 (6th Cir. 1986), the court held that a security interest in a trademark was not an assignment upon default, and even after a creditor enforces the security interest, the creditor was still required to comply with the written assignment provision of the Lanham Act. *Id.* at 10 n.17. Otherwise, Defendants assert a court of equity could appoint a trustee to make the assignment, and in this situation Defendants argue that

14

XACP could have executed a written assignment to itself as it was Ozro's "attorney in fact." *Id.* at 10 (citing *Wilson v. Martin-Wilson Automatic Fire-Alarm Co.*, 151 Mass. 515, 516-17, 519-20 (Mass. 1890); XACP Agreement at 6).

Defendants distinguish the probate cases cited in *Akazawa* and argue that unlike those cases, Massachusetts UCC § 9-610 "does not provide that legal title to a patent 'shall vest immediately' or 'vests by operation of law' in a creditor upon default or foreclosure." Dkt. No. 206 at 11 (citing *H.M. Stickle*, 716 F.2d at 1558; *Winkler*, 105 F. at 190-91). Defendants reiterate that the Tenth Circuit in *In re Tower Tech* rejected an automatic transfer of title. *Id.* Regarding the "transfer statement," Defendants aver that it is not required but is one mechanism to obtain title after default without a court order; however, Defendants note that this mechanism would not be needed if title to the patent vested automatically as Sky claims. *Id.* at 11-12 (citing Thomas M. Ward, *Intellectual Property in Commerce* § 3:70 (2007)). Defendants state that the cases cited by Sky support Defendants' position that an affirmative act had to be made after foreclosure. *Id.* at 12 (citing *Health Discovery*, 2007 WL 128283, at *1; *digiGan*, 2005 WL 2254464, at *3).

### 2.    Analysis

From the briefing, the Defendants and Sky appear to agree on two preliminary issues of law. Defendants have conceded that a patent may pass by operation of law and a written assignment is not the only method to transfer a patent. Defendants' Sur-Reply, Dkt. No. 206 at 8. Likewise, Sky has conceded that a default of a security interest does not automatically transfer possession to the creditor. Sky's Reply, Dkt. No. 204 at 5 (citing *McDonald*, 798 N.E.2d at 327 (stating "an event of default does not automatically transfer possession to the

15

creditor")). Defendants assert that there is no state law that automatically vests legal title upon

foreclosure, whereas Sky argues that it is the foreclosure and purchase of the patents that

effected the transfer. *See* Dkt. No. 206 at 9; Dkt. No. 204 at 5. Therefore, the point of

contention between the parties, and the issue that the Court must resolve, is whether there was a

transfer of the patents from Ozro to XACP through an operation of law, specifically whether a

foreclosure sale and purchase, under Massachusetts UCC, is sufficient to transfer title by

operation of law.

The Security Agreements provide the following remedies upon a default:

> 8.  Remedies.  Upon the occurrence and continuance of an Event of
> Default, Lender shall have the right to exercise all the remedies of a secured party
> under the Massachusetts Uniform Commercial Code, including without limitation
> the right to require Grantor to assemble the Intellectual Property Collateral and
> any tangible property in which Lender has a security interest and to make it
> available to Lender at a place reasonably designated by Lender . . . .

SVB Agreement at 6.

> 8.  Remedies. (a) Upon the occurrence and continuance of an Event of
> Default, Agent shall have the right to exercise all the remedies of a secured party
> upon such default under the Massachusetts Uniform Commercial Code (the
> "UCC") (or other applicable Federal or other law), in addition to which, Agent
> shall have the following rights and remedies: (I) to take possession of all or any
> portion of the Intellectual Property Collateral, (ii) to sell, lease, or otherwise
> dispose of any or all of the Intellectual Property Collateral, in its then condition or
> following such preparation or processing as the Agent deems advisable and with
> or without the taking of possession of any of the Intellectual Property Collateral,
> and (iii) to exercise all or any of the rights, remedies, powers, privileges, and
> discretions under all or any of the documents relating to the Secured Obligations.

XACP Agreement at 6-7.

Sky argues that the mere foreclosure results in the transfer of title.  Defendants rely

16

significantly on *In re Tower Tech*, an unpublished Tenth Circuit opinion that found that a notice of default did not provide for an actual assignment of secured patents, even though the promissory note contained the provision that, in the event of default, the lender "shall receive an immediate assignment of all right, title and interest to the patents specified as collateral."[3] *In re Tower Tech.*, 67 Fed. Appx. at 523-24. The Court notes that unlike the foreclosure sale that occurred here, in *Tower Tech*, the debtor only gave a notice of default and acted no further. *In re Tower Tech.*, 67 Fed. Appx. at 524. Defendants cite to the treatise Intellectual Property in Commerce for the proposition that there is a need for a "post-default document that reflects transfer of ownership out of the debtor." Dkt. No. 206 at 11 (citing Thomas J. Ward, *Intellectual Property in Commerce* § 3:70). Specifically the treatise stated:

> Because the federal forms of intellectual property are subject to a system of "title" registration or recording, it is important for the secure party to be able to have a recordable post-default document that reflects transfer of ownership out of the debtor. The record transferee might be the foreclosure sale buyer, assignee or exclusive licensee. The record transferee might also be the secured party, either permanently, in the case of a strict foreclosure, or temporarily, in anticipation of disposition to a subsequent party. The security agreement can be supplemented by the attachment of such a recordable ownership document along with the debtor's power of attorney authorizing the secured party's nominee to complete and execute the form on default. If such a document is not provided for in advance, and the debtor is not willing to cooperate after default, the secure party can go to court to either force the debtor to execute the necessary papers or to obtain a recordable document prepared by the court itself.

Thomas J. Ward, *Intellectual Property in Commerce* § 3:70

In support of this proposition, the treatise cites to *Tower Tech*, stating:

---

[3] This is consistent with the Federal Circuit case cited by Defendants, *IpVenture, Inc. v. Prostar Computer, Inc.*, 503 F.3d 1324, 1327 (Fed. Cir. 2007), holding that an agreement stating "agree to assign" was a future assignment, not a present assignment.

Although the court in *Tower Tech* does not expressly say that the lender could
have taken good title to the patent collateral on default without following the
provisions for either "acceptance of collateral" or "disposition" in Article Nine, it
seems to suggest as much. While a secure party should be entitled to execute the
necessary post-default transfer documents under a proper power-of-attorney,
these documents must be executed in furtherance of an otherwise reasonable
disposition of the collateral (U.C.C. [Revised] §§ 9-610 to 9-617) or a properly
proposed "acceptance in satisfaction" (U.C.C. [Revised] §§ 9-620 to 9-621).

Thomas J. Ward, *Intellectual Property in Commerce* § 3:70 n.1.

Taking these two sections together, the Court first notes that the treatise presumes a need

for a "post-default document that reflects transfer of ownership," presumably out of the writing

assignment requirements of the various intellectual property acts. *See* 35 U.S.C. § 261 (patent);

15 U.S.C. § 1060 (trademark); 17 U.S.C. § 204 (copyright). However, as already explained

above, the Federal Circuit held in *Akazawa* that a writing is not required to transfer title, rather,

title may pass by operation of law. *Akazawa*, 520 F.3d at 1356. This finding is also consistent

with *Tower Tech* and other Michigan cases finding that a mere default or notice of default was

insufficient to transfer title. The treatise suggests that a subsequent action was required, either

through a disposition under UCC § 9-610 or an acceptance in satisfaction under UCC § 9-620,

dealing with a strict foreclosure. Alternatively, a court order or a transfer statement pursuant to

UCC § 9-619 would be acceptable.

Massachusetts Annotated Laws ch. 106 § 9-610(a) provides: "After default, a secured

party may sell, lease, license, or otherwise dispose of any or all of the collateral in its present

condition or following any commercially reasonable preparation or processing." Massachusetts

Annotated Laws ch. 106 § 9-610(c) provides: "A secured party may purchase collateral: (1) at a

public disposition; or (2) at a private disposition only if the collateral is of a kind that is

customarily sold on a recognized market or the subject of widely distributed standard price

18

quotations." Further, as explained in Massachusetts Annotated Laws ch. 106 § 9-617(a) a "secured party's disposition of collateral after default: (1) transfers to a transferee for value all of the debtor's rights in the collateral," and comment 2 states "Title Taken by Good-Faith Transferee. Subsection(a) sets forth the rights acquired by persons who qualify under subsection (b) - transferees who act in good faith. Such a person is a 'transferee,' inasmuch as a buyer at a foreclosure sale does not meet the definition of 'purchaser' in Section 1-201 . . . ."

Here, the patents were placed at a "public" auction. XACP foreclosed on both of the security interests and Ozro was later notified of the sale. *See* Dkt. No. 132, Exh. N. Thus, unlike the debtor in *Tower Tech*, XACP acted beyond merely noticing the default and actively foreclosed on the property, pursuant to §§ 9-610 and 9-617. Therefore, the point at which title transferred was on the date of the foreclosure, July 14, 2003. The transfer to Whitelight Technologies, predecessor to Sky, occurred on July 22, 2003. Dkt. No. 132, Exh.O. Thus, the chain-of-title was not broken and Sky has proper title to the patents-in-suit. Moreover, Defendants had previously stated that Ozro had executed Terminal Disclaimers on June 4 and 5, 2001 and June 3, 2003 as well as a license on November 19, 2001. *See* Dkt. No. 198 at 8. However, the transfer of title on July 22, 2003 is consistent with Ozro's actions prior to this time, as it held title while the other entities merely held a security interest.

## III.    CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendants' Rule 12(b)(1) Motion to Dismiss for Lack of Standing (Dkt. No. 132).

Accordingly, the Court **DISMISSES** Ozro's Motion to Intervene (Dkt. No. 146) as **MOOT**.

19

It is so **ORDERED**.

**SIGNED this 4th day of June, 2008.**

_____

DAVID FOLSOM
UNITED STATES DISTRICT JUDGE

# EXHIBIT 26

FORM 7
(Rev. 12/94)

# FORM 7.  STATEMENT OF FINANCIAL AFFAIRS

### UNITED STATES BANKRUPTCY COURT
### NORTHERN  DISTRICT OF  CALIFORNIA

In Re: SITE TECHNOLOGIES,  INC. _____         Case No. 99-50736-jrgcz
              (Name)                                                                                      (if known)

                                          Debtor      FEB 1 8 2000

## STATEMENT OF FINANCIAL AFFAIRS

          This statement is to be completed by every debtor. Spouses filing a joint petition may file a single statement on which
the information for both spouses is combined. If the case is filed under chapter 12 or chapter 13, a married debtor must furnish
information for both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.
An individual debtor engaged in business as a sole proprietor, partner, family farmer, or self-employed professional, should provide
the information requested on this statement concerning all such activities as well as the individual's personal affairs.

          Questions 1 – 15 are to be completed by all debtors. Debtors that are or have been in business, as defined below, also
must complete Questions 16 – 21. If the answer to any question is "None," or the question is not applicable, mark the box
labeled "None." If additional space is needed for the answer to any question, use and attach a separate sheet properly identified
with the case name, case number (if known), and the number of the question.

---

### DEFINITIONS

          "In business." A debtor is "in business" for the purpose of this form if the debtor is a corporation or partnership. An
individual debtor is "in business" for the purpose of this form if the debtor is or has been, within the two years immediately
preceding the filing of this bankruptcy case, any of the following: an officer, director, managing executive, or person in control
of a corporation; a partner, other than a limited partner, of a partnership; a sole proprietor or self-employed.

          "Insider." The term "insider" includes but is not limited to: relatives of the debtor; general partners of the debtor and their
relatives; corporations of which the debtor is an officer, director, or a person in control; officers, directors, and any person in control
of a corporate debtor and their relatives; affiliates of the debtor and insiders of such affiliates; any managing agent of the debtor.
11 U.S.C. § 101(30).

---

1.    **Income from employment or operation of business**

None          State the gross amount of income the debtor has received from employment, trade, or profession, or from operation
☐             of the debtor's business from the beginning of this calendar year to the date this case was commenced. State also the gross
              amounts received during the two years immediately preceding this calendar year. (A debtor that maintains, or has maintained,
              financial records on the basis of a fiscal rather than a calendar year may report fiscal year income. Identify the beginning.
              and ending dates of the debtor's fiscal year.) If a joint petition is filed, state income for each spouse separately. (Married
              debtors filing under chapter 12 or chapter 13 must state income of both spouses whether or not a joint petition is filed,
              unless the spouses are separated and a joint petition is not filed.)

          **AMOUNT**                                    **SOURCE**  (if more than one)
1999            -0-
1998         $305,747
1997       $1,827,000

ORIGINAL

**EXHIBIT 26**

### 10. Other transfers

None ☐    a. List all other property, other than property transferred in the ordinary course of business or financial affairs of the debtor, transferred either absolutely or as security within **one year** immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include transfers by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF TRANSFEREE, RELATIONSHIP TO DEBTOR | DATE | DESCRIBE PROPERTY TRANSFERRED AND VALUE RECEIVED |
|---|---|---|
| Savoir Technology Group, Inc.<br>254 Hacienda Avenue<br>Campbell, CA 95008 | 12/28/98  $150,000<br>1/29/99  $ 50,000 | Security interest in all assets |
| Daniel Egger<br>2027 W. Club Blvd.<br>Durham, NC 27705 | 9/15/98  $80,000 | V-Search Technology |

### 11. Closed financial accounts

None ☐    List all financial accounts and instruments held in the name of the debtor or for the benefit of the debtor which were closed, sold, or otherwise transferred within **one year** immediately preceding the commencement of this case. Include checking, savings, or other financial accounts, certificates of deposit, or other instruments; shares and share accounts held in banks, credit unions, pension funds, cooperatives, associations, brokerage houses and other financial institutions. (Married debtors filing under chapter 12 or chapter 13 must include information concerning accounts or instruments held by or for either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF INSTITUTION | TYPE AND NUMBER OF ACCOUNT AND AMOUNT OF FINAL BALANCE | AMOUNT AND DATE OF SALE OR CLOSING |
|---|---|---|
| See Attached | | |

### 12. Safe deposit boxes

None ☒    List each safe deposit or other box or depository in which the debtor has or had securities, cash, or other valuables within **one year** immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include boxes or depositories of either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF BANK OR OTHER DEPOSITORY | NAMES AND ADDRESSES OF THOSE WITH ACCESS TO THE BOX OR DEPOSITORY | DESCRIPTION OF CONTENTS | DATE OR TRANSFER OR SURRENDER, IF ANY |
|---|---|---|---|
| | | | |

[1](Insofar as Savoir's first financing statement was filed approximately 28 days after disbursing funds, Savoir's lien with respect to its initial advance is in bona fide dispute if the Debtor was insolvent in January 1999.)

# EXHIBIT 27

1  CRAIG M. PRIM   (077820)
   JANICE M. MURRAY (099996)
2  STEPHEN T. O'NEILL (115132)
   MURRAY & MURRAY
3  A Professional Corporation
   3030 Hansen Way, Suite 200
4  Palo Alto, CA 94304-1009
   (650) 852-9000
5
   Attorneys for Debtor
6

**FILED**

APR 2 5 2000

KEENAN G. ... SARA, CLERK
United States Bankruptcy Court
San Jose, California

8                  UNITED STATES BANKRUPTCY COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10                        SAN JOSE DIVISION

11  In re:                              )   Case No.  99-50736-JRG-11
                                        )
12  Site Technologies, Inc.,            )   Chapter 11
    dba DeltaPoint, Inc.,               )
13                                      )
                           Debtor.      )
14                                      )
    EIN No.: 77-0212760                 )
15                                      )
16

17

18           **DEBTOR'S FIRST AMENDED PLAN OF REORGANIZATION**

19                        **Dated April 25, 2000**

20

21

22

23

24

25

26

27

28

JMM:slb-08
I:\DAILY\JMM\SITE\plan-reorg.pl-1.wpd

COPY

**EXHIBIT B**

EXHIBIT 27

1    Debtor subject to the terms and conditions of this Plan. All property of the Debtor, except as

2    otherwise provided in this Plan, shall be free and clear of any liens, encumbrances, Claims of

3    Creditors and Interests of Equity Security Holders.

4        14.3   Discharge. Due to the liquidating nature of this Plan and pursuant to

5    Bankruptcy Code 1141(d)(3), the entry of the Confirmation Order shall not act as a discharge of

6    any debt of the Debtor that arose prior to Confirmation, except to the extent that such debt is paid

7    under the Plan.

8    **15.  CHAPTER 11 POST-CONFIRMATION REPORTS AND FINAL DECREE**

9        15.1   Post-Confirmation Reports. Not later than 90 days after entry of the

10   Confirmation Order, the Debtor shall file a post-Confirmation status report, the purpose of which

11   is to explain the progress made toward substantial consummation of the confirmed Plan.  The

12   report shall include a statement of receipts and disbursements, with the ending cash balance, for

13   the entire 90 day period.  The report shall also include information sufficiently comprehensive to

14   enable the Court to determine (1) whether the Confirmation Order has become final; (2) whether

15   deposits, if any, required by the Plan have been distributed; (3) whether any property proposed by

16   the Plan to be transferred has been transferred; (4) whether the Debtor under the Plan has

17   assumed the business or the management of the property dealt with by the Plan; (5) whether the

18   payments under the Plan have commenced; (6) whether accrued fees due to the U.S. Trustee

19   under 28 U.S.C. §1930(a)(6) have been paid; and (7) whether all motions, contested matters and

20   adversary proceedings have been finally resolved.  Further reports must be filed every 90 days

21   thereafter until entry of a final decree, unless otherwise ordered by the Court.

22       15.2   Service of Reports. A copy of each report shall be served, no later than the day

23   upon which it is filed with the Court, upon the U.S. Trustee and such other persons or entities as

24   may request such reports in writing by special notice filed with the Court.

25       15.3   Final Decree. After the Bankruptcy Estate is fully administered, the Debtor

26   shall file an application for a final decree, and shall serve the application on the U.S. Trustee,

27   together with a proposed final decree.  The U.S. Trustee shall have twenty (20) days within

28   which to object or otherwise comment upon the Court's entry of the final decree.

MURRAY & MURRAY
A Professional Corporation
3030 Hansen Way, Suite 200
Palo Alto, Ca. 94304-1009
TELEPHONE (650) 852-9000 FACSIMILE (650) 852-9244
E-MAIL mail@murraylaw.com

# EXHIBIT 28

# WRITTEN CONSENT OF

# THE SOLE STOCKHOLDER OF

### Site/technologies/inc.

July 11, 1997

Pursuant to Section 228 of the Delaware General Corporation Law and the Bylaws of Site/technologies/inc. ( the "Company"), the undersigned, being the sole stockholder of the Company, hereby consents to the adoption of the following resolutions by Written Consent without a meeting.

**Removal and Appointment of Directors**

RESOLVED: That all of the current directors of the Company are hereby removed from office, effective immediately, and the following individuals are elected to serve as directors of the Company: Jeffrey Ait, Joe Marengi, Patrick Grady, John Hummer, Don Witmer, Stephen Mendel.

The undersigned hereby directs that this Written Consent, which may be executed in counterparts, be filed with the minutes of the proceedings of the stockholders of the Company.  This Written Consent is effective as of July 11, 1997.

DeltaPoint, Inc.

By: _____
Jeffrey F. Ait
Chief Executive Officer

::ODMA\PCDOCS\SQL2\399618\1

**EXHIBIT 28**

# EXHIBIT 29

# ACTION BY WRITTEN CONSENT OF THE SOLE DIRECTOR AND STOCKHOLDER

## OF

## SITE TECHNOLOGIES, INC.

### DECEMBER 21, 2000

In accordance with the California Corporations Code and the Bylaws of Site Technologies, Inc., a California corporation (the "*Company*"), the undersigned, being the sole stockholder and member of the Board of Directors of the Company, hereby takes the following actions and adopts the following resolutions by written consent without a meeting, effective for all purposes as of the date set forth above.

**Merger of site/technologies/inc. into the Company**

RESOLVED, that Site Technologies, Inc. (the "*Company*"), the sole stockholder, director and parent corporation of site/technologies/inc. merge, and hereby does merge into itself site/technologies/inc., and assumes all its obligations;

RESOLVED FURTHER, that the merger shall be effective upon the date of filing of the Certificate of Ownership and Merger attached hereto as Exhibit A with the Secretary of State of Delaware, and the Certificate of Ownership and Officer's Certificate, attached hereto as Exhibit B and Exhibit C respectively, with the Secretary of State of California; and

RESOLVED FURTHER, that the sole officer and director of the Company be and is hereby directed to make, execute and file in the name of an on behalf of the Company said Certificate of Ownership and Merger in the State of Delaware setting forth a copy of the resolutions to merge site/technologies/inc. to assume its liabilities and obligations, and the date of adoption thereof, and to cause the same to be filed with the applicable Secretary of State and to do all acts and things whatsoever, whether within or without the State of Delaware, which may be in anyway necessary or proper to effect such merger.

RESOLVED FURTHER, that the sole officer and director of the Company be and is hereby directed to make, execute and file in the name of an on behalf of the Company said Certificate of Ownership and Officer's Certificate in the State of California setting forth a copy of the resolutions to merge site/technologies/inc. to assume its liabilities and obligations, and the date of adoption thereof, and to cause the same to be filed with the applicable Secretary of State and to do all acts and things

C:\WINDOWS\TEMP\ATT50316.doc (4718)

EXHIBIT 29

# EXHIBIT 30

A0557391

1632789 SURV

CERTIFICATE OF OWNERSHIP

MERGING

SITE/TECHNOLOGIES/INC.

INTO

SITE TECHNOLOGIES. INC.

**FILED** ₵ℓℬ

In the Office of the Secretary of State
of the State of California

DEC 2 9 2000

*Bill Jones*

BILL JONES, Secretary of State

I, Jeff Ait, the Chief Executive Officer and Secretary of Site Technologies, Inc., do hereby certify:

1. That I am the Chief Executive Officer and Secretary of this corporation.

2. That this corporation is duly organized and existing under the laws of the State of California, the provisions of which permit a merger in the manner provided by Section 1110 of the California Corporations Code.

3. That this corporation owns 100 percent of the outstanding shares of site/technologies/inc. a corporation duly organized and existing under the laws of the State of Delaware, the provisions of which permit a merger in the manner provided by Section 1110 of the California Corporations Code.

4. That the following resolution was duly adopted and approved by the board of directors of this corporation:

RESOLVED, that Site Technologies, Inc. merge, and it hereby does merge into itself, site/technologies/inc., its subsidiary; and assumes all of its obligations pursuant to Section 1110 of the California Corporations Code.

The undersigned declares under penalty of perjury that the statements contained in the foregoing certificate are true of their own knowledge. Executed this twenty-first day of December, 2000.

Jeff Ait
Chief Executive Officer and Secretary

C:\WINDOWS\TEMP\ATT502318.doc

EXHIBIT 30

# EXHIBIT 31

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 08:30 AM 12/29/2000
010001194 — 2300985

## CERTIFICATE OF OWNERSHIP AND MERGER

### MERGING

### SITE/TECHNOLOGIES/INC.

### INTO

### SITE TECHNOLOGIES, INC.

* * * * * * *

Site Technologies, Inc., a corporation organized and existing under the laws of California,

DOES HEREBY CERTIFY:

FIRST: That this corporation was incorporated on the first day of February, 1989, pursuant to the Corporations Code of the State of California, the provisions of which permit the merger of a subsidiary corporation of another state into a parent corporation organized and existing under the laws of said state.

SECOND: That this corporation owns all of the outstanding shares of the stock of site/technologies/inc. a corporation incorporated on the fifteenth day of June, 1992, pursuant to the General Corporations Law of the State of Delaware.

THIRD: That this corporation, by the following resolutions of its Sole Director, duly adopted by the written consent of its Sole Director, on the thirty-first day of July, 2000, determined to merge into itself said site/technologies/inc.:

RESOLVED, that Site Technologies, Inc. merge, and it hereby does merge into itself site/technologies/inc. and assumes all of its obligations; and

FURTHER RESOLVED, that the merger shall be effective upon filing with the Secretary of State of Delaware.

FURTHER RESOLVED, that the proper officer of this corporation be and he or she is hereby directed to make and execute a Certificate of Ownership and Merger setting forth a copy of the resolutions to merge said site/technologies/inc. and assume its liabilities and obligations, and the date of adoption thereof, and to cause the same to be filed with the Secretary of State and to do all acts and things whatsoever, whether within or without the State of Delaware, which may be in anywise necessary or proper to effect said merger.

C:\TEMP\Site -- Delaware Certificate of Merger for sitetechnologiesinc..DOC

EXHIBIT 31

# EXHIBIT 32

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| SOFTWARE RIGHTS ARCHIVE, LLC | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | Civil Action No. 2:07-cv-511-TJW |
| GOOGLE INC., YAHOO! INC., | § | |
| IAC SEARCH & MEDIA, INC., AOL LLC, | § | |
| and LYCOS, INC. | § | |
| | § | JURY TRIAL DEMANDED |
| Defendants. | § | |

## DECLARATION OF J. CHRISTOPHER LYNCH

I, J. Christopher Lynch, under penalty of perjury, hereby make the following declaration. All facts set forth herein are true and correct, and I make this declaration based upon my personal knowledge and upon review of available records.

1.     I am a partner at Wyrick Robbins Yates & Ponton LLP and my practice is primarily outside general counsel representation of technology-based businesses. I assisted Daniel Egger in aspects of the 1998 acquisition of the V-Search Technology and patents from Site Technologies, Inc. (the "V-Search Acquisition") and in the subsequent filing of an assignment in 2005 (the "2005 Assignment"). A true and correct copy of the 2005 Assignment is attached hereto as Exhibit A.

2.     I understand that certain defendants in the *Software Rights Archive LLC v. Google, et al.,* case pending in the Eastern District of Texas have accused Daniel Egger of fraudulently filing the 2005 Assignment for the express purpose of correcting a defect with respect to the name of the party conveying the patents he acquired in the V-Search Acquisition. This allegation is based upon a number of factual inaccuracies.

16573.5-547719 v2

**EXHIBIT 32**

3. I was the attorney who supervised my staff in the preparation of, and who advised Daniel Egger to file, the 2005 Assignment. The purpose of filing the 2005 Assignment was not to correct any defect in the name of the party on the instrument. I did not understand there to be any distinction between the entity from which Daniel Egger purchased the patents in question ("Site Technologies, Inc.") and "Site/Technologies/Inc. at the time of the 2005 assignment. The first time I heard of this issue was after the filing of the Defendants' Motion to Dismiss. Nor did Daniel Egger raise this issue with me in 2005 or anytime prior to the defendants' allegation. Daniel Egger never raised any issue with respect to the validity of the 1998 Bill of Sale or assignments with me and never questioned the validity of his chain of title.

4. The 2005 Assignment was filed to replace the then-misplaced 1998 Bill of Sale and the 1998 Assignment used in the V-Search Acquisition. In or prior to October 2004, Daniel Egger had asked me to assign the patents to an entity named Software Rights Archive, Inc. When my staff reviewed the records at the Patent and Trademark Office (the "PTO"), we discovered that no previous assignment had yet been filed. I did not have a copy of the 1998 Bill of Sale or 1998 Assignment, so I asked Daniel Egger to locate them. He told me that he could not locate them. I advised him to file a replacement assignment reflecting the previous transaction. I then supervised my staff in the preparation of the 2005 Assignment and Daniel Egger executed it without further revision. I understand that Daniel Egger later found the missing 1998 Bill of Sale and the 1998 Assignment and filed them with the Patent and Trademark Office.

5. My understanding is that the Defendants allege that Daniel Egger intentionally represented that he was a president of Site/Technologies/Inc. and filed the 2005 Assignment to mislead others as to his ownership rights. I had advised Daniel Egger to sign as the president of

Site/Technologies/Inc. The basis for such advice was that, in 2005, the Site entities were no longer operating companies and a former officer or other agent needed to sign the 2005 Assignment. It was my belief that Daniel Egger retained a right to execute documents related to winding up past business transactions because he was a former president of Site/Technologies/Inc. Because we were merely attempting to replicate the lost 1998 Assignment that we understood had already been made, it was my understanding that these actions were fairly within the winding up authority of the companies, which were no longer operating.

6. I was not aware of any issue with respect to whether the 1998 Assignment properly conveyed legal title to Daniel Egger. I understood it was a valid transfer. My recommendation to make Site/Technologies/Inc. a party to the 2005 Assignment was driven by Daniel Egger's status as a former officer and not an attempt to correct any error with respect to the name of the party on the 1998 Assignment.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

J. Christopher Lynch

Executed on *August 19*, 2008

# EXHIBIT 33

# SITE DISCLOSURE SCHEDULE

This Site Disclosure Schedule, dated July 11, 1997, is made and given pursuant to Article II of the Stock Exchange Agreement between DeltaPoint, Inc. ("DeltaPoint") and Site\technologies\inc. ("Site") dated July 11, 1997 and the Principal Site Stockholders and Other Site Stockholders (the "Agreement").

**Section 2.2(a).** A schedule is attached as Schedule 2.2(a).

**Section 2.2(b).** Gordon Link, a holder of options to purchase 10,000 shares of Site Common Stock outstanding just prior to the closing date of this transaction has not yet signed the release in the form attached hereto as Schedule 2.2(b) agreeing to terminate his option in exchange for $50. Site agrees to use its best efforts to obtain the release as soon as possible after the close from Mr. Link. Site has received verbal agreement from Mr. Link that he will sign such a release.

**Section 2.5.** A list of Site's material assets and liabilities as of the date hereof is included as Schedule 2.5.

**Section 2.4.** Sallie Van Dyke DeGolia, a stockholder of 2,500 shares of Series A Preferred Stock of Site and 450 shares of Series B Preferred Stock of Site, has not approved the Stock Exchange and related transactions. Site agrees to use its best efforts to obtain such approval as soon as possible after the close from Ms. DeGolia.

The following agreements require the prior written consent of the other party to such agreement prior to the assignment of such agreement to DeltaPoint at the closing of the Stock Exchange: (1) Interpath - see Section 2.11(ix); and (2) BellSouth - see Section 2.11(ix). Site has obtained written consent to assignment for each of these agreements.

**Section 2.7(a)(i).** In February 1997, Site applied for automatic extensions of time to file its 1996 Federal income tax return, and its North Carolina State corporation franchise and income tax returns. Copies of these applications are included as Schedules 2.7(a)(ii)-A and 2.7(a)(ii)-B. These returns have not yet been filed.

**Section 2.7(a)(iii).** In May 1997, Site received a letter from the North Carolina Department of Revenue stating that its application for an extension of time to file its State tax return for 1996 has been denied. due to the fact that the required tax due was not paid with the extension request. A copy of this letter is included as Schedule 2.7(a)(ii). Site's 1996 State income tax liability does not exceed $750, including penalties and interest. Site has not yet paid this amount.

**Section 2.7(a)(v).** Site has a North Carolina State income tax liability not exceeding $750. See Section 2.7(a)(iii).

G:\WP\SITETECH\DISCLOS.DOC

**EXHIBIT 33**

Schedule 2.10(b)

Site/Technologies/Inc.

Disclosure  Schedule  B:  Patents

| Invention | Application No./ Registration No. | Country |
|---|---|---|
| Method and Apparatus for Indexing, Searching and Displaying Data | 5,544,352 US94/06705 2,164,954 94 9,212,955 | United States Patent Cooperation Treaty Canada European Patent Office (Germany) (France) (Great Britain) |
| Method and Apparatus for Indexing, Searching and Displaying Data Continuation In Part | 08/649,304 | United States |

# EXHIBIT 34

1  CRAIG M. PRIM   (077820)
   JANICE M. MURRAY (099996)
2  STEPHEN T. O'NEILL (115132)
   MURRAY & MURRAY
3  A Professional Corporation
   3030 Hansen Way, Suite 200
4  Palo Alto, CA  94304-1009
   (650) 852-9000
5
   Attorneys for Debtor
6

**FILED**

APR 2 5 2000 9 K

KEENAN G. CASADY, CLERK
United States Bankruptcy Court
San Jose, California

7

8              UNITED STATES BANKRUPTCY COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10             SAN JOSE DIVISION

11  In re:                        )      Case No.  99-50736-JRG-11
                                  )
12  Site Technologies, Inc.,      )      Chapter 11
    dba DeltaPoint, Inc.          )
13                                )
                      Debtor.     )
14                                )
                                  )
15  EIN No.: 77-0212760           )
                                  )
16  _____ )

17

18       **DEBTOR'S FIRST AMENDED DISCLOSURE STATEMENT**

19                  **Dated April 25, 2000**

20

21

22

23

24

25

26

27

28

*MURRAY & MURRAY*
*A Professional Corporation*
*3030 Hansen Way, Suite 200*
*Palo Alto, Ca  94304-1009*
*TELEPHONE (650) 852-9000 FACSIMILE (650) 852-9244*
*E-MAIL mail@murraylaw.com*

JMM:slb-08
I:\DAILY\MM\SITE\discl-stmt.1.wpd

ORIGINAL

1    1997, and in November 1997 the Company acquired technology to develop SiteMaster 4.0 which

2    was released in March 1998. In March 1998 the Company also released QuickSite 3.0, and in

3    May 1998 the Company released the enterprise edition of the SiteSweeper product.

4        5.5    In June 1997, as part of the Company's continuing strategy to focus its

5    development, sales and marketing efforts on Internet software products, the Company sold assets

6    related to its Delta Graph software product. With the DeltaGraph sale, the Company's future

7    operating results depended on the successful development, introduction and commercial

8    acceptance of the Company's Internet software products. In September 1998, the Company also

9    sold its V-Search technology and related patents. In addition to further focusing the Company on

10    Internet software products, these sales provided the Company with much needed liquidity.

11        5.6    The Company financed its operations primarily through private and public sales

12    of equity securities, borrowings under a term loan, the private sale of debt securities and the sale

13    of the DeltaGraph product line, and other limited asset sales. Since its inception, the Company

14    has received approximately $24 million in proceeds from private sales of stock, convertible debt

15    and from the Company's two public offerings of public stock. The Company incurred net losses

16    of $8,159,000 for the year ended December 31, 1997 and $2,497,000 for the nine months ended

17    September 30, 1998, and had an accumulated deficit of $24,334,000 as of September 30, 1998.

18        5.7    In light of its diminishing cash balances (due primarily to limited revenues from

19    its newly introduced products), in May and June 1998, the Debtor significantly reduced its head

20    count from 33 to 11 and significantly reduced its expenses and operations in the areas of sales

21    and marketing. In order to conserve its limited remaining cash balances, the Debtor sharply

22    curtailed operational activities since June 1998 by, among other things, further reducing its non-

23    technology head count (eliminating sales and marketing personnel) and limiting related

24    marketing expenditures. In December 1998, the Debtor shut down operations and laid off most

25    of its remaining employees.

26        5.8    During the twelve (12) months preceding the Petition Date, the Debtor focused

27    its efforts on evaluating its strategic options, including a sale of the Debtor to a third party or a

28    sale of the Debtor's assets. When it became clear that the Debtor would be unable to raise

MURRAY & MURRAY
A Professional Corporation
3030 Hansen Way, Suite 200
Palo Alto, CA 94304-1009
TELEPHONE (650) 852-9000 FACSIMILE (650) 852-9244
E-MAIL mail@murraylaw.com

# EXHIBIT 35

Schedule F -- Creditors holding unsecured nonpriority claims

| Creditors Name and Address | Codebtor | Husband Wife | Date claim was incurred and consideration | contingent | un-liquidated | disputed | Amount of claim |
|---|---|---|---|---|---|---|---|
| 1 9 to 5 Office Coffee Service<br>PO Box 66184<br>Scotts Valley, CA 95067<br>Acct No --None | | | Trade Payable for Coffee Supplies<br>November and December 1998 | | | | $230.07 |
| 2 Alliant Partners<br>435 Tasso Street<br>Palo Alto, CA 94301 | | | | X | | | Unknown |
| 3 Alom Technologies<br>48921 Warm Springs Blvd<br>Fremont, CA 94539<br>Acct No --113 | | | Trade Payable for Inventory Storage<br>November 1998 | | | | $1,191.00 |
| 4 Andover Advanced Technologies<br>532 Great Road<br>Acton, MA 01720<br>Acct No --None | | | Trade Payable for Internet Advertising<br>March 1998 | | | | $4,000.00 |
| 5 AST StockPlan, Inc.<br>40 Wall Street<br>New York, NY 10005<br>Acct No --Sitet | | | Trade Payable for Stock Plan Adminstration<br>May 1997 - Oct 1998 | | | X | $7,814.79 |
| 6 Bowne of Los Angeles, Inc.<br>Department 0197<br>Los Angeles, CA 90084<br>Acct No --BLA20000956 | | | Trade Payable for Edgar Filing<br>December 1998 | | | | $859.00 |
| 7 Brass Key Locksmith<br>220-A Mt. Hermon Rd.<br>Scotts Valley, CA 95066<br>Acct No --None | | | Trade Payable for Keying Building<br>December 1997 | | | | $321.25 |

EXHIBIT 35

| # | Creditor | Description | Amount |
|---|----------|-------------|--------|
| 8 | BusinessWire<br>44 Montgomery St, Ste 2185<br>San Francisco, CA 94104<br>Acct No –100-4137 | Trade Payable for Press Releases<br>April 1998 - January 1999 | $3,829.55 |
| 9 | Cellular One – Santa Cruz<br>3949 Research Park Ct, Ste 100<br>Soquel, CA 95073<br>Acct No –004-00308087 | Trade Payable for Cellular Phone Access<br>December 1998 - January 1999 | $264.28 |
| 10 | Cellular One – Salinas/Mont<br>PO Box 7598<br>San Francisco, CA 94120<br>Acct No –2018409 | Trade Payable for Cellular Phone Access<br>December 1998 - January 1999 | $237.86 |
| 11 | Comerica Visa<br>PO Box 55000<br>Detroit, MI 48255<br>Acct No –4028979303018043<br>Acct No –4028979303018035 | Corporate Credit Card | $2,730.19 |
| 12 | Comerica Visa<br>Bankcard Center<br>Fargo, ND 58125<br>Acct No –4251240005649595<br>Acct No –4251240005414057 | Corporate Credit Card | $37,955.51 |
| 13 | Courier Companies, Inc.<br>100 Alpine Center<br>Stoughton, MA 02072<br>Acct No –17480 | Trade Payable for Manual Printing for Inventory<br>March 1997 - May 1997 | $28,553.59 |
| 14 | Davis & Schroeder<br>PO Box 3080<br>Monterey, CA 93940<br>Acct No –2455 | Trade Payable for Legal Work for Trademark Filings<br>October 1998 - January 1999 | $1,087.22 |

| | | | |
|---|---|---|---|
| 15 | Dean Witter Reynolds<br>5690 W Cypress St<br>Tampa, FL 33607<br>Acct No --AMZ35 | Trade Payable for Shareholder Mailing<br>May 1998 | | $90.28 |
| 16 | DFS Acceptance<br>PO Box 4125<br>Carol Stream, IL 60197<br>Acct No -001-4667702-001 | Lease Payments for two Dell Computers<br>November 1998 - January 1999 | | $689.01 |
| 17 | Dorsey & Whitney<br>PO Box 1680<br>Minneapolis, MN 55480<br>Acct No --446987 | Legal Work for Patents and Trademark Filings<br>March 1998 - December 1998 | | $14,111.43 |
| 18 | FaultLine Corp.<br>380 El Pueblo Rd<br>Scotts Valley, CA 95066 | Deposit for Sublease | X | $3,174.95 |
| 19 | Federal Express<br>2650 Thousand Oaks Blvd<br>Memphis, TN 38118<br>Acct No -11047-0029-2 | Trade Payable for Shipping Charges<br>December 1998 - January 1999 | | $569.60 |
| 20 | First Alarm<br>111 Estates Drive<br>Seacliff, CA 95003<br>Acct No -100234-0000 | Lease Payment for Alarm System<br>November 1998 - March 1999 | | $1,659.25 |
| 21 | First Union National Bank<br>7207 Chapman Highway<br>Knoxville, TN 38118<br>Acct No -- | Bank Charges<br>September 1997 | | $29.00 |
| 22 | GE Capital<br>PO Box 31001 0271<br>Pasadena, CA 91110<br>Acct No -9013707279 | Lease Payment for Copy & Fax Machines<br>November 1998 - January 1999 | | $2,531.50 |

| 20 23 | Global Technologies<br>155 Snowberry Way<br>Dillon, CO 80435<br>Acct No – None | Royalty Payment for QuickSite<br>December 1998 - January 1999 | | $1,006.49 |
|---|---|---|---|---|
| 24 | Greg Herman Public Relations<br>726 Elizabeth St.<br>San Francisco, CA 94114<br>Acct No –ST | Trade Payable for Public Relations Work<br>May 1998 - June 1998 | | $9,321.00 |
| 25 | GTE/BBN<br>PO Box 11299<br>Boston, MA 02211<br>Acct No –7037 | Trade Payable for Web Hosting Service<br>November 1998 - January 1999 | | $3,500.00 |
| 26 | Hold Plus<br>57400 S Morse Rd<br>Warren, OR 97053<br>Acct No –None | Trade Payable for on hold message system<br>June 1998 - December 1998 | | $339.05 |
| 27 | Interpath<br>PO Box 12800<br>Raliegh, NC 27605<br>Acct No – | Trade Payable for Internet Svc in North Carolina<br>April 1998 | | $400.00 |
| 28 | ITT Hartford<br>PO Box 150406<br>Hartford, CT 06115<br>Acct No –2205795198A | Workers Compensation Payment for North Carolina<br>October 1998 - December 1998 | X | $229.39 |
| 29 | Kemper Insurance Companies<br>PO Box 419495<br>Kansas City, KS 64141<br>Acct No –SITE | Workers Compensation Mid Term Audit<br>November 1998 | | $199.00 |

| 30 Level 3 Communications<br>Department Number 182<br>Denver, CO 80291<br>Acct No --None | Trade Payable for T1 Internet Access<br>November 1998 - January 1999 | | $5,685.00 |
| 31 Luce Press Clippings, Inc.<br>PO Box 379<br>Topeka, KS 66601<br>Acct No --A312 | Trade Payable for Press Clippings<br>September 1998 - November 1998 | | $487.65 |
| 32 Masterlink<br>353 Bel Marin Keys Blvd<br>Novato, CA 94949<br>Acct No --16 | Trade Payable for Internet Link Download Site<br>October 1998 - January 1999 | | $1,200.00 |
| 33 Mecklermedia<br>20 Ketchum St.<br>Westport, CT 06880<br>Acct No --98565 | Trade Payable for Advertising & Tradeshow Booth Space<br>January 1998 - October 1998 | X | $55,232.50 |
| 34 Merrill Corporation<br>CM 9638<br>St Paul, MN 55170<br>Acct No --None | Trade Payable for Financial Printing<br>June 1996 - January 1999 | X | $277,000.00 |
| 35 Micro Warehouse Inc<br>PO Box 5840<br>Boston, MA 02206<br>Acct No --474 | Trade Payable for Catalog Advertising<br>April 1997 - July 1997 | | $43,867.00 |
| 36 Names in the News, Inc.<br>411 Theodore Framd Ave<br>Rye, NY 10580<br>Acct No --None | Trade Payable for Public Relations Activities<br>October 1997 | | $1,310.00 |
| 37 O'Neil Relocation<br>PO Box 2600<br>Long Beach, CA 90801 | Trade Payable for Company Move<br>October 1997 - November 1997 | X | $5,839.56 |

Acct No –6982

38 Office Dynamics
94 Hangar Way
Watsonville, CA 95076
Acct No –2577794

Trade Payable for Copy Machine Maintanence
November 1998 - December 1998

$158.75

39 Office Solutions
395 Del Monte Center #215
Monterey, CA 93940
Acct No –11891852

Trade Payable for Toner
December 1998

$106.74

40 Absolute Transportation
PO Box 13477
Research Triangle Park, NC 27709
Acct No –95

Trade Payable for Moving Copy Machine
November 1998

$400.00

41 Western Management Group
200 South Santa Cruz Ave
Los Gatos, CA 95030
Acct No –9703

Trade Payable for Compensation Survey
February 1998

$450.45

x

42 Pacific Bell
Payment Center
Sacramento, CA 95887
Acct No –408-648-1346
Acct No –831-435-8750
Acct No –831-438-8750
Acct No –831-430-0706
Acct No –231-284-8613
Acct No –408-461-3020

Trade Payable for Phone Service
November 1998 - January 1999

$3,675.14

43 Pacific West Water
PO Box GH
Pacific Grove, CA 93950
Acct No –None

Trade Payable for Water Cooler Service
January 1998 - January 1999

$514.14

44 Pagliaro Kuhlman

Trade Payable for Advertising Consulting

$12,111.81

333 W. San Carlos
San Jose, CA 95110
Acct No --22

April 1998 - May 1998

$2,000.00

45 Patricia Seybold Group
148 State St, Ste 700
Boston, MA 02109
Acct No --3935

Trade Payable for Research Report
April 1998

$8,894.32

46 Pitney Bowes Credit Corp
PO Box 85460
Louiseville, KY 40285
Acct No --7567639

Lease Payment for Mailing Equipment
July 1998 - January 1999

x

$1,549.16

47 Press Access
120 Boylston Street
Boston, MA 02116
Acct No --None

Trade Payable for Public Relations Work
April 1998

$1,050.00

48 Price Waterhouse LLP
PO Box 61000
San Francisco, CA 94161
Acct No --20602-588-4

Trade Payable for Tax Advise
November 1998

$2,381.22

49 PrintNet
445 Reservation Rd, #A
Marina, CA 93933
Acct No --SITE

Trade Payable for Label and Invoice Printing
May 1998

$2,792.30

50 Qwest
PO Box 85660
Louiseville, KY 40285
Acct No --34672072

Trade Payable for Long Distance Phone Service
November 1998 - January 1999

x

$348.00

51 RIA Group
PO Box 6159
Carol Stream, IL 60197
Acct No --47331042-001

Trade Payable for Accounting Information
September 1998 - November 1998

39

| 52 | Roadway Package System, Inc<br>Dept LA 21095<br>Pasadena, CA 91185<br>Acct No -- | Trade Payable for Shipping Services<br>January 1999 | $8.00 |
| 53 | Skytel<br>PO Box 3887<br>Jackson, MS 39207<br>Acct No --2185219 | Trade Payable for Pager Service<br>January 1999 | $177.25 |
| 54 | Sprint<br>PO Box 740503<br>Atlanta, GA 30374<br>Acct No --None | Trade Payable for Phone Service<br>October 1998 - November 1998 | $30.23 |
| 55 | Sprint Telimagine, Inc.<br>PO Box 6167<br>Carol Stream, IL 60197<br>Acct No --17204561 | Lease Payment for Voicemail System<br>December 1998 - January 1998 | $160.48 |
| 56 | U.S. Stock Transfer Corp<br>1745 Gardena Ave, 2nd Fl<br>Glendale, CA 91204<br>Acct No --898 | Trade Payable for Stock Transfer Agent Fees<br>December 1998 | $456.49 |
| 57 | United Parcel Service<br>PO Box 505820<br>The Lakes, NV 88905<br>Acct No --X46-62W | Trade Payable for Shipping Service<br>December 1998 - January 1999 | $170.21 |
| 58 | Universal Building Service<br>3120 Pierce Street<br>Richmond, CA 94804<br>Acct No --70933 | Trade Payable for Janitorial Service<br>November 1998 - January 1999 | $2,534.29 |
| 59 | William French<br>155 Snowberry Way | Expense Report<br>January 1999 | $1,448.66 |

Dillon, CO 80435
Acct No – None

60  Wilson, Sonsini, Goodrich & Rosati
650 Page Mill Rd
Palo Alto, CA 94304
Acct No – 19232

Legal Services
May 1998 - January 1999
(balance is a forecast )

$152,247.61

61  Ziff Davis Publishing
Dept LA 21975
Pasadena, CA 91185
Acct No – 052990000

Trade Payable for Advertising
May 1998

$6,383.15

62  Owens Financial Group, Inc.
2221 Olympic Blvd.
Walnut Creek, CA 94595
Acct No – None

Lease Payment for Expired Property Lease
July 1998 - September 1998

$51,535.50

63  Carbonero Creek Associates
PO Box 670
Cupertino, CA 95015
Acct No – None

Lease Payment for Property Lease
December 1998
$18,383 Deposit held by Carbonero

64  Knowledge Vision
268 Patterson Dr.
Myrtle Beach, SC 29572
Acct No – None

Royalty Payment for WebAnimator License Agrmt
September 1997 - January 1999

$1,622.60

65  Inlet, Inc.
818 Dows Road SE
Cedar Rapids, IA 52403
Acct No – None

Royalty Payment for SiteMaster
October 1998 - January 1999

$314.00

66  Altura Software
510 Lighthouse Ave
Pacific Grove, CA 93950
Acct No – None

Royalty Payment for WebAnimtor Sales
May 1998 - December 1998

$13.00

67  Site/Technologies/Inc.
380 El Pueblo Rd.
Scotts Valley, CA  95066
Acct No – None

Royalty Payment for Site Sweeper Product

$7,129.93
$778,209.40

In re SITE TECHNOLOGIES, INC.                    Case No. 99-50736-jrgcz
        Debtor                                              (If known)

## SCHEDULE G - EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Describe all executory contracts of any nature and all unexpired leases of real or personal property. Include any timeshare interests.

State nature of debtor's interest in contract, i.e., " Purchaser, " " Agent, " etc. State whether debtor is the lessor or lessee of a lease.

Provide the names and complete mailing addresses of all other parties to each lease or contract described.

**NOTE:** A party listed on this schedule will not receive notice of the filing of this case unless the party is also scheduled in the appropriate schedule of creditors.

☐ Check this box if debtor has no executory contracts or unexpired leases.

| NAME AND MAILING ADDRESS, INCLUDING ZIP CODE, OF OTHER PARTIES TO LEASE OR CONTRACT | DESCRIPTION OF CONTRACT OR LEASE AND NATURE OF DEBTOR'S INTEREST. STATE WHETHER LEASE IS FOR NONRESIDENTIAL REAL PROPERTY. STATE CONTRACT NUMBER OF ANY GOVERNMENT CONTRACT |
|---|---|
| See Attached | |

Form B6G
(12/95)

Schedule G -- Executory Contracts and Unexpired Leases

| Name & address | Description of Contract | Nature of Debtor Interest |
|---|---|---|
| 1 Pitney Bowes Credit Corp<br>PO Box 85460<br>Louisville, KY 40285 | Mail Equipment Lease | Lessee |
| 2 Ge Capital<br>PO Box 3083<br>Cedar Rapids, IA 52406 | Fax & Copy Machine Lease | Lessee |
| 3 Sprint Tellmaging<br>PO Box 6167<br>Carol Stream, IL 60197 | Voicemail System Lease | Lessee |
| 4 DFS Acceptance<br>PO Box 99200<br>Chicago, IL 60693 | Dell Computer Leases (2 machines) | Lessee |
| 5 First Alarm Security System<br>1111 Estates Drive<br>Seacliff, CA 95003 | Security System | Lessee |
| 6 Jeffrey F. Ait<br>337 Kingsbury Dr.<br>Aptos, CA 95003 | Employment Agreement | Employer |
| 7 Sharon L. Fugitt<br>1268 Adobe Lane<br>Pacific Grove, CA 93950 | Employment Agreement | Employer |
| 8 Carbonero Creek Associates<br>PO Box 670<br>Cupertino, CA 95015 | Non Residential Real Property Lease | Lessee |

| | | |
|---|---|---|
| 9 FaultLine Corp.<br>380 El Pueblo Rd<br>Scotts Valley, CA 95066 | Non Residential Real Property Sub Lease | Sub Lessor |
| 10 Global Technologies<br>William French<br>155 Snowberry Lane<br>Dillon, CO 90435 | Assignment Agreement for QuickSite Product Line | Purchaser |
| 11 Global Technologies<br>William French<br>155 Snowberry Lane<br>Dillon, CO 90435 | Assingment Agreement for WebTools | Purchaser |
| 12 Unisys Corporation<br>General Patent & Technology Council<br>PO Box 500<br>Blue Bell, PA 19424 | GIF-LZW Software Patent License Agreement | Purchaser |
| 13 Molly Penguin<br>Todd C. Wilson<br>1569 Meadow Road<br>Columbus, OH 43212 | Map This License Agreement | Purchaser |
| 14 Omnicron Software Publishing Corp.<br>John Stolte<br>14 High Street<br>Cartersville, VA 23027 | Omnicron Spell Checker License Agreement | Purchaser |
| 15 FairCom Corporation<br>4006 West Broadway<br>Columbia, MO 65203 | C-Tree Plus License Agreement Serial# 472432 | Purchaser |
| 16 McLeodUSA Telecommunications Svcs<br>Mr. Randy Rings | Inlet Divestiture Coporation Acquisition 11/97 | Purchaser |

Atlanta, GA 30305

| 24 | International Business Machines Corp.<br>Peter Schwarz<br>150 Kettletown Road MS 303<br>Southbury, CT 06488 | Software License Agreement #L96380 | Seller |
| 25 | Internet Direct<br>Paul Kraajvanger<br>544 Jersey Street #1<br>San Francisco, CA 94114 | Term Sheet - Distribution Agreement | Seller |
| 26 | MacMillan Digital Publishing USA<br>Richard Swadley<br>201 W. 103rd Street<br>Indianapolis, IN 46290 | Distribution Agreement | Seller |
| 27 | McAffee Associates, Inc.<br>Vice President Electronic Commerce<br>2710 Walsh Avenue<br>Santa Clara, CA 95051 | Distribution Agreement | Seller |
| 28 | NetNation Communication<br>Joseph Kibur<br>322-425 Carrall St.<br>Vancouver, BC V6B 6E3 | Binding Letter of Intent --Electronic Distribution Agrmt | Joint Agreement |
| 29 | Netcom, Inc.<br>Scott Brothers<br>1607 Luna Road<br>Dallas, TX | Partnership Agreement | Joint Agreement |
| 30 | Programmers Paradise, Inc.<br>1163 Shrewsbury Ave<br>Shrewbury, NJ 07702 | Dealer Agreement | Seller |

6400 C. Street SW
Cedar Rapids, IA 52406

| | | |
|---|---|---|
| 17 Anawave Software, Inc.<br>Mr. Paul Summers<br>1300 Bristol North, Ste 220<br>Newport Beach, CA 92660 | Electronic & Package Goods Distribution Agrmt | Seller |
| 18 CNET Direct, Inc.<br>1001SW Fifth St, Ste 1100<br>Portland, OR 97204 | Software Commerce Agreement | Seller |
| 19 CyberSource Corporation<br>Blake Burke<br>1050 Chestnut Street Ste 201<br>Menlo Park, CA 94025 | Electronic Software Reseller Agreement | Seller |
| 20 Data Arts<br>Carol Bowlin<br>50 San Benito<br>Novato, CA 94945 | Binding Letter of Intent --Electronic Distrubition Agrmt | Joint Agreement |
| 21 Eclipse marketing, Inc.<br>Pat Koberlein<br>16104 SW 22nd Ave<br>Portland, OR 97224 | Binding Letter of Intent --Electronic Distrubiton Agrmt | Joint Agreement |
| 22 Global Enterpreneurs Net<br>Mr. Helmann<br>100 North Tampa St.<br>Tampa, FL 33602 | Binding Letter of Intent --Electronic Distrubiton Agrmt | Joint Agreement |
| 23 HomeCom<br>Mike Hall<br>3535 Peidmont Rd. | Letter of Intent -- Partnership Agreement | Joint Agreement |

| 31 | System Connect<br>Mr. St. Arnaud<br>601 East 66th St, Ste 201<br>Savannah, GA 31405 | Binding Letter of Intent --Electronic Distribution Agrmt | Joint Agreement |
| 32 | TestDrive Corporation<br>1397 Charleston Road<br>Mountain View, CA 94043 | Electronic Distribution Services Agreement | Seller |
| 33 | Tidal Wave Communications, Inc.<br>Mr. Brian Bird<br>678 Jenny Leigh Ct.<br>Centerville, VA 22020 | Binding Letter of Intent --Electronic Distribution Agrmt | Joint Agreement |
| 34 | Total-Access Communications<br>Mr. Darwish<br>2950 Thousand Oaks Blvd.<br>San Antonio, TX 78247 | Binding Letter of Intent --Electronic Distribution Agrmt | Joint Agreement |
| 35 | VisionTeq, Inc.<br>Mr. Rothken<br>77 Mark Dr. Ste 4<br>San Rafael, CA 94903 | Binding Letter of Intent --Electronic Distribution Agrmt | Joint Agreement |
| 36 | Mr. William G. Pryor<br>22610 Gallant Fox Road<br>Monterey, CA 93940 | Software License Agreement | Licensor |
| 37 | Knowledge Vision<br>268 Patterson Dr.<br>Myrtle Beach, SC 29572 | Asset Purchase Agreement - WebAnimator Technology<br>November 1995 | Purchaser |
| 38 | Site/Technologies/Inc.<br>380 El Pueblo Rd. | Stock Exchange Agreement to purchase<br>site/technologies/inc. corporation in July 1997 | Purchaser |

Scotts Valley, CA  95066

39  SPSS, Inc.

Asset Purchase Agreement - Deltagraph Product Line
Sale of Deltagraph product line in June 1997

Seller

40  Daniel Egger
2027 West Club Blvd
Durham, NC  27705

Asset Purchase Agreement -V Search Technology
September 1998

Seller

41  Altura Software
510 Lighthouse, Ave
Pacific Grove, CA  93950

Porting and Royalty License Agreement
Webanimtor for Windows Product Line

Purchaser

In re SITE TECHNOLOGIES, INC.
Debtor

Case No. 99-50736-jrgcz
(If known)

## SCHEDULE H - CODEBTORS

Provide the information requested concerning any person or entity, other than a spouse in a joint case, that is also liable on any debts listed debtor in the schedules of creditors. Include all guarantors and co-signers. In community property states, a married debtor not filing a joint should report the name and address of the nondebtor spouse on this schedule. Include all names used by the nondebtor spouse during the six immediately preceding the commencement of this case.

[X] Check this box if debtor has no codebtors.

| NAME AND ADDRESS OF CODEBTOR | NAME AND ADDRESS OF CREDITOR |
|---|---|
|  |  |

Form B6H
(12/95)

FORM B6 - Cont.
(12/94)

In re SITE TECHNOLOGIES, INC._____,                    Case No. 99-50736-jrgcz_____
_____Debtor_____                                                              (If known)

# DECLARATION CONCERNING DEBTOR'S SCHEDULES

## DECLARATION UNDER PENALTY OF PERJURY BY INDIVIDUAL DEBTOR

I declare under penalty of perjury that I have read the foregoing summary and schedules, consisting of _____
                                                                                     *(Total shown on summary page plus 1.)*

sheets, and that they are true and correct to the best of my knowledge, information, and belief.

Date _____                    Signature: _____
                                                                                            Debtor

Date _____                    Signature: _____
                                                                                            *(Joint Debtor, if any)*

                                                             [If joint case, both spouses must sign.]

### CERTIFICATION AND SIGNATURE OF NON-ATTORNEY BANKRUPTCY PETITION PREPARER (See 11 U.S.C. § 110)

I certify that I am a bankruptcy petition preparer as defined in 11 U.S.C. § 110, that I prepared this document for compensation, and that I have provided the debtor with a copy of this document.

_____                                _____
Printed or Typed Name of Bankruptcy Petition Preparer              Social Security No.

_____
Address

Names and Social Security numbers of all other individuals who prepared or assisted in preparing this document:

If more than one person prepared this document, attach additional signed sheets conforming to the appropriate Official Form for each person.

X_____                                _____
Signature of Bankruptcy Petition Preparer                              Date

*A bankruptcy petition preparer's failure to comply with the provisions of title 11 and the Federal Rules of Bankruptcy Procedure may result in fines or imprisonment or both. 11 U.S.C. § 110; 18 U.S.C. § 156.*

## DECLARATION UNDER PENALTY OF PERJURY ON BEHALF OF A CORPORATION OR PARTNERSHIP

I, the CEO_____ (the president or other officer or an authorized agent of the corporation or a member or an authorized agent of the partnership) of the corporation_____ (corporation or partnership) named as debtor in this case, declare under penalty of perjury declare that I have read the foregoing summary and schedules, consisting of _____ 33 _____ sheets, and that they are true and
                                                                   *(Total shown on summary page plus 1.)*
correct to the best of my knowledge, information, and belief.

Date February 18, 1999_____              Signature: _____

                                                             Jeffrey F. Ait, CEO
                                                             [Print or type name of individual signing on behalf of debtor.]

[An individual signing on behalf of a partnership or corporation must indicate position or relationship to debtor.]

# EXHIBIT 36

CRAIG M. PRIM   (077820)
JANICE M. MURRAY   (099996)
STEPHEN T. O'NEILL (115132)
MURRAY & MURRAY
A Professional Corporation
3030 Hansen Way, Suite 200
Palo Alto, CA  94304-1009
(650) 852-9000

Attorneys for Debtor

FILED

FEB 1 1 1999

KENNETH R. EMERY CLERK
United Court
San Jose, California

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| In re: | Case No. 99-50736-JRG-11 |
| Site Technologies, Inc.,<br>dba DeltaPoint, Inc., | Chapter 11 |
| Debtor. | Date:   March 9, 1999<br>Time:   2:00 p.m.<br>Place:   Room 3020<br>Judge:   Hon. James R. Grube |
| EIN No.: 77-0212760 | |

**NOTICE OF MOTION AND MOTION TO SELL ASSETS
OUT OF THE ORDINARY COURSE OF BUSINESS (11 U.S.C. § 363(b))
AND FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES
AND INTERESTS (11 U.S.C. § 363(f))**

**Purchaser:   StarBase Corporation**

**Affected Lien Claimants:   Savoir Technology Group, Inc. and State Board of Equalization**

TO:   THE HONORABLE JAMES R. GRUBE, UNITED STATES BANKRUPTCY
JUDGE

COMES NOW Site Technologies, Inc., the Debtor and Debtor-In-Possession (the "Debtor") who hereby moves for an Order authorizing the Debtor to sell its core technology and related assets, as described herein, other than in the ordinary course of business and free and clear of liens.

MURRAY & MURRAY
A Professional Corporation
3030 Hansen Way, Suite 200
Palo Alto, Ca  94304-1009
TELEPHONE (650) 852-9000 FACSIMILE (650) 852-9244
E-MAIL mail@murraylaw.com

JMM:slb-08
SITE\not-mot-sell.pl1.wpd

ORIGINAL

-1-

**EXHIBIT 36**

# I. **NOTICE**

PLEASE TAKE NOTICE that a hearing will be held on March 9, 1999 at 2:00 p.m. before the Honorable James R. Grube, United States Bankruptcy Judge, in Courtroom 3020, United States Courthouse and Federal Building, 280 South First Street, San Jose, California, to consider the MOTION TO SELL ASSETS OUT OF THE ORDINARY COURSE OF BUSINESS (11 U.S.C. § 363(b)) AND FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS (11 U.S.C. § 363(f)) (StarBase Corporation) (the "Sale Motion") filed by the Debtor.

Any opposition to the Sale Motion must be filed with the United States Bankruptcy Court, United States Courthouse and Federal Building, 280 South First Street, Room 3035, San Jose, California 95113 and served on the Debtor's counsel, Janice M. Murray, Esq., Murray & Murray, A Professional Corporation, 3030 Hansen Way, Suite 200, Palo Alto, California 94304-1009, telephone (650) 852-9000, facsimile (650) 852-9244 no later than February 23, 1999.

# II. **SUMMARY OF RELIEF SOUGHT**

1. The Debtor is requesting the Court for authority to consummate that certain Asset Purchase and Sale Agreement dated December 18, 1998 as amended by that certain First Amendment to Asset Purchase and Sale Agreement dated February 9, 1999 (collectively, the "Agreement") with StarBase Corporation, a Delaware corporation ("StarBase") for the sale of the Debtor's core technology assets, including SiteMaster, SiteSweeper, QuickSite, Webtools and SiteMarks software products and related assets ("Assets"). StarBase shall also assume certain obligations of the Debtor as provided in the Agreement. A copy of the Agreement is attached as Exhibit "A" to the DECLARATION OF JEFFREY F. AIT IN SUPPORT OF MOTION TO SELL ASSETS OUT OF THE ORDINARY COURSE OF BUSINESS (11 U.S.C. § 363(b)) AND FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS (11 U.S.C. § 363(f)) (StarBase Corporation) (the "Ait Declaration") and is incorporated herein by reference.

2. Concurrently herewith, the Debtor has also filed its MOTION TO ASSUME AND ASSIGN EXECUTORY CONTRACTS which provides for the assumption by the Debtor and

MURRAY & MURRAY
A Professional Corporation
3030 Hansen Way, Suite 200
Palo Alto, Ca 94304-1009
TELEPHONE (650) 852-9000 FACSIMILE (650) 852-9244
E-MAIL mail@murraylaw.com

JMM:slb-08
SITE\not-mot-sell.pl1.wpd

-2-

NOTICE OF MOTION AND MOTION TO SELL ASSETS OUT OF
THE ORDINARY COURSE OF BUSINESS FREE AND CLEAR OF
LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS

EXECUTION COPY

## ASSET PURCHASE AND SALE AGREEMENT

This Asset Purchase and Sale Agreement, dated December 18, 1998 between Site Technologies, Inc., a California corporation having an address at 380 El Pueblo Road, Scotts Valley, California 95066 (the "Seller"), and StarBase Corporation, a Delaware corporation having an address at 4 Hutton Centre Drive, Suite 800, Santa Ana, California 92707(the "Purchaser").

### Recitals

The Seller is in the business of designing, developing, licensing and selling software products and related materials for various Web site applications. The Seller has decided to sell certain of its assets and properties. The Seller has agreed to sell such assets and properties to the Purchaser, and the Purchaser has agreed to buy such assets and properties, all upon the terms and provisions and subject to the conditions hereinafter set forth.

### Agreement

In consideration of the foregoing and the mutual covenants and agreements hereinafter set forth, the parties hereto hereby agree as follows:

### ARTICLE I

### Definitions

1.01    Certain Defined Terms.  As used in this Agreement, the following capitalized terms and non-capitalized words and phrases shall have the meanings respectively assigned to them below, which meanings shall be applicable equally to the singular and plural forms of the terms so defined:

"Agreement" shall mean this Asset Purchase and Sale Agreement, together with all schedules and exhibits hereto, as the same may be supplemented, modified, amended or restated from time to time in the manner provided herein.

"Affiliate" of a referenced person shall mean (a) another person controlling, controlled by or under common control with such referenced person, (b) any other person beneficially owning or controlling ten percent (10%) or more of the outstanding voting securities or rights or of the interest in the capital, distributions or profits of the referenced person or (c) any officer or director of or partner in the referenced person, or any person controlled by any such individual. The terms "control", "controlling", "controlled" and the like shall mean the direct or indirect possession of the power to direct or cause the direction of the management or policies of a person or the disposition

EXHIBIT *A*

Page 1 Of 99

"Tax" shall mean any federal, state, local or foreign tax (including, without limitation, any income tax, franchise tax, capital gains tax, gross receipts tax, value-added tax, surtax, excise tax, ad valorem tax, transfer tax, stamp tax, sales tax, use tax, property tax, inventory tax, occupancy tax, withholding tax, payroll tax, gift tax, estate tax, inheritance tax, employment tax, unemployment tax, social security tax, services tax, value added tax, privilege tax, license tax, profits tax, capital stock tax, severance tax, minimum tax, environmental tax, occupancy tax or occupation tax), levy, assessment, tariff, impost, imposition, toll, duty (including without limitation, any customs duty), deficiency or fee, and any related charge or amount (including any fine, penalty or interest), imposed, assessed or collected by or for any governmental authority, including, without limitation, any liability therefor as a transferee (including, without limitation, under Section 6901 of the Code or any comparable applicable law), as a result of Treasury Regulation § 1.1502-6 or any comparable applicable law, or pursuant to any tax-sharing agreement or any other agreement, arrangement or understanding relating to the sharing or payment of any such tax, levy, assessment, tariff, impost, imposition, toll, duty, deficiency or fee.

"Tax Return" shall mean any return, declaration, report, estimate, claim for refund or credit, or information return or statement, and any amendment, supplement or modification thereto, together with any supporting information and schedules, which is filed or required to be filed under applicable law in connection with the determination, assessment, collection or administration of any Tax or ERISA, whether on a consolidated, combined, unitary or separate basis or otherwise.

## ARTICLE II

### Purchase of Assets; Payment

2.01    Assets to be Transferred.  Upon the terms and subject to the conditions set forth in this Agreement, and subject to the satisfaction of the conditions precedent set forth in Section 2.08 (or the waiver thereof by the Seller or the Purchaser, as applicable), at the Closing, the Seller shall sell, assign, transfer, convey and deliver to the Purchaser, and the Purchaser shall purchase and accept from the Seller, all right, title and interest of the Seller or any subsidiary of the Seller, as the case may be, in and to all of the following assets of Seller, together with all books and records of the Seller pertaining primarily thereto (individually, an "Asset", and collectively, the "Assets"):

(a)    the Software and the Software Products, files specifications, design documents, user documentation, change requests and defects lists, each as listed on Schedule 2.01(a) hereto;

(b)    all marketing collateral materials, including, but not limited to, brochures, data sheets, ad and editorial reprints, web site content, and materials for the Software and the Software Products, each as listed on Schedule 2.01(b) hereto;

-6-

## Schedule 2.01(a)

Section 2.01(a) shall be limited to the following assets and properties:

SiteMarks source code

SiteSweeper 1.0 source code
SiteSweeper 1.0 specifications
SiteSweeper 1.0 written documentation

SiteSweeper 2.0 workstation edition source code
SiteSweeper 2.0 workstation edition specifications
SiteSweeper 2.0 workstation edition on-line documentation
SiteSweeper 2.0 workstation edition written user documentation
TrialWare and licensing classes used by SiteSweeper 2.0
SiteSweeper 2.0 open & closed issues Filemaker database

SiteSweeper 2.0 enterprise edition source code
SiteSweeper 2.0 enterprise edition specifications
SiteSweeper 2.0 enterprise edition serial number licensing utility
SiteSweeper 2.0 enterprise edition written user documentation

Current Issue 3.0 source code
Current Issue 3.0 open & closed issues Filemaker database

SiteMaster 4.0 source code
SiteMaster 4.0 written user documentation
SiteMaster 4.0 HTML help files
SiteMaster Components (MeetingTracker, StaffTracker, RapidApp)
SiteMaster open & closed issues Filemaker database

SiteMaster 4.5 source code

QuickSite 1.0 – 1.03 source code
QuickSite 1.02 Kanji source code
QuickSite 1.02 Macintosh (Foxpro) source code
QuickSite 1.02 Macintosh documentation
QuickSite 1.02 Macintosh open & closed issues Filemaker database

QuickSite 2.0 Developers Edition 2.0 – 2.02 source code
QuickSite 2.0 Developers Edition 2.0/2.01 manual and help
QuickSite 2.0 Developers Edition open & closed issues Filemaker database

EXHIBIT A
Page 57 Of 99

## Schedule 2.01 (a) Continued

QuickSite 2.53 source code
QuickSite 2.5 manual
QuickSite AVI tutorial
QuickSite 2.5 help
QuickSite 2.5 NT help
QuickSite 2.0 open & closed issues Filemaker database

QuickSite 3.0 source code
QuickSite 3.0 getting started guide
QuickSite 3.0 content and examples
QuickSite 3.01 (beta) source code

QuickSite OEM Version source code
     PSA-Germany 3.01
     Earthlink 3.00e
     Interprise Now! (Borland) 2.53
     Earthlink     1.02/1.03
     Gen    1.02/1.03
     Sony 1.03
     Internet Direct 1.03

QuickSite white paper & research documents

Visual Site Architect 1.0 source code

HomeSite source code

WebTools 1.0 source code

Defect Automation Prototype 1.0

Filemaker bug database

Technology Integration master plan written document

EXHIBIT A
Page 58 Of 99