# EXHIBIT D
# Part 1

Dockets.Justia.com

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| SOFTWARE RIGHTS ARCHIVE, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | Civil Action No. 2:07-cv-511-TJW |
| v. | § | |
| | § | |
| GOOGLE INC., YAHOO! INC., | § | |
| IAC SEARCH & MEDIA, INC., AOL LLC, | § | JURY TRIAL DEMANDED |
| and LYCOS, INC., | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFF'S SUR-RESPONSE TO DEFENDANTS' MOTION TO DISMISS

### TABLE OF CONTENTS

PAGE

TABLE OF CONTENTS ................................................................................ i

TABLE OF AUTHORITIES ....................................................................... iii

I.  INTRODUCTION ................................................................................. 1

II. ARGUMENT AND AUTHORITIES ...................................................... 2

    A.  As a Matter of Law, Egger Acquired the Patents in September 1998, When He Executed a Bill of Sale and Assignment with Site Tech ............................................................................................. 2

        1.  The Northern District of California Bankruptcy Court has already found that Egger acquired the patents from Site Tech in September 1998, and reconsideration of this finding is barred by res judicata. ................................. 2

            a.  Under the doctrine of res judicata, it is settled as a matter of law that Egger acquired the patents in September 1998. ................................................ 2

            b.  Defendants' argument that res judicata does not apply because there was no adversary proceeding is wrong. ................................................ 6

i

        c.     Defendants' argument that Paragraph 14.2 of the bankruptcy plan somehow overrules the bankruptcy court's confirmation of Egger's ownership is also wrong.................................................6

   2.   Site Tech owned the patents in September 1998, because it had acquired them from Site/Tech in July 1997 by operation of the liquidation provision in Site/Tech's charter. ..................................................................7

        a.     The Northern District of California Bankruptcy Court has already found that Site Tech acquired the patents from Site/Tech in July 1997, and reconsideration of this issue is barred by res judicata....................................................7

        b.     The terms of the liquidation provision demonstrate that it effectuated an automatic transfer of the patents to Site Tech. ...........9

   3.   Even if the patents belonged to Site/Tech in September 1998, as Defendants claim, Egger still would have acquired the patents at that time, because Site/Tech was bound by the Bill of Sale and Assignment. ...........................................11

        a.     Site/Tech was Site Tech's alter ego in September 1998................................................11

        b.     Site Tech was Site/Tech's authorized agent for purposes of transferring the patents to Egger...........................14

B.   Even If Egger Did Not Acquire the Patents in September 1998, He Acquired Them as a Matter of Law in December 2000, When Defendants Claim Site Tech Acquired Title Thereto. ...........................15

   1.   Defendants' claim that title does not pass immediately and automatically to the assignee under the after-acquired title doctrine is wrong. ..................................................15

   2.   Defendants' claim that the bankruptcy extinguished Egger's rights is wrong..........................................16

        a.     The Bill of Sale and Assignment were not executory contracts and were not rejected in the Site Tech bankruptcy......................................16

        b.     Even if the Bill of Sale and Assignment were rejected in the Site Tech bankruptcy, that still would not extinguish Egger's right to the legal title to the patents. ..................................................18

   3.   Defendants' claim that Egger's supposedly unclean hands bar application of the after-acquired title

doctrine mischaracterizes Egger's actions, ignores
fundamental requirements of the unclean hands
doctrine, and flies in the face of equity. .................................................22

III.   **CONCLUSION** .......................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**

*Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 796-97 (5th Cir. 1999) ............................... 24

*American Bankers Ins. Co. of Florida v. Maness*, 101 F.3d 358, 362 (4th Cir. 1996) .................. 21

*Arachnid, Inc. v. Merit Indus., Inc.*, 939 F.2d 1574, 1576 (Fed. Cir. 1991) ............................... 19

*Burk Royalty Co. v. Robbins Title Ptr*, 117 F.3d 1417 (5th Cir. 1997) ...................................... 19

*Bush v. Person*, 59 U.S. 82 (1855).......................................................................................... 20

*Calderon v. Commodore Holdings Ltd.*, 2004 WL 385062, at *1 (S.D.N.Y. Mar. 1, 2004) ....... 21

*Cent. Trust Co. v. Shepard*, 29 B.R. 928, 932 (Bankr. M.D. Fla. 1983) .................................. 20

*Cherry v. Farmers Royalty Holding Co.*, 160 S.W.2d 908, 910 (Tex. 1942)............................ 15

*Chevron U.S.A., Inc. v. State*, 993 So.2d 187, 2008 WL 4118905, at *14 n.4 (La. Sept. 8, 2008)
............................................................................................................................................... 15

*Coastal Plains, Inc. v. Mims*, 179 F.3d 197, 205 (5th Cir. 1999)...................................... 2

*Curtis Mfg. Co., Inc. v. Plasti-Clip Corp.*, 933 F. Supp. 94 (D.N.H. 1995) ............................. 20

*Faulks v. Kamp*, 3 F. 898, 901-02 (S.D.N.Y. 1880) .............................................................. 19

*Frain v. Burgett*, 50 N.E. 873, 876 (Ind. 1898) .................................................................... 15

*Greenley Energy Holdings of Penn. v. Stone*, 110 B.R. 173, 180 (Bankr. E.D. Penn 1990)........ 21

*Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 783-84 (9th Cir. 2001) ......................... 2

*Haw v. Graue*, 158 B.R. 965, 970(S.D. Tex. 1993)............................................................... 21

*Horton v. Rehbein*, 60 B.R. 436, 440-42 (9th Cir. 1986)....................................................... 17

*In re Aimster Copyright Litigation*, 252 F.Supp.2d 634, 655 (N.D.Ill. 2002) .......................... 24

*In re Allen*, 300 F.3d 1055, 1059 (9th Cir.2002) .................................................................. 21

*In re Barker-Fowler Electric Co.*, 141 B.R. 929, 938 (Bankr. W.D. Mich. 1992)...................... 21

*In re Belmonte*, 240 B.R. 843, 851 (Bankr. E.D. Pa 1999); *In re Walker*, 227 B.R. 870, 872
(Bankr. S.D. Ind. 1998)...................................................................................................... 17

*In re Chattanooga Wholesale Antiques, Inc.*, 930 F.2d 458 (6th Cir. 1991) .................................. 2

*In re Encinas*, 27 B.R. 79, 80-81 (Bankr. D. Or. 1983)........................................................ 20

*In re Forklift LP Corp.*, 363 B.R. 388, 397 (Bankr. D. Del. 2007) ............................................. 5

*In re Golden Plan of California, Inc.*, 829 F.2d 705 (9th Cir. 1986)........................................... 6

*In re Hakim*, 244 B.R. 820, 822 (Bankr.N.D.Cal.1999) ......................................................... 21

*In re Int'l Nutronics, Inc.*, 28 F.3d 965, 969 (9th Cir. 1994); *Tally v. Fox Film Corp.*, 88 F.2d
212, 223 (9th Cir. 1937)........................................................................................................ 2

*In re Kane*, 248 B.R. 216, 224 (B.A.P. 1st Cir. 2000).......................................................... 17

*In re Marriage of Perkins*, 2004 WL 112598, at *2 (Tex. App.—Amarillo Jan. 23, 2004)......... 18

*In re Miller*, 253 B.R. 455, 459 (Bankr. N.D. Cal. 2000) ....................................................... 5

*In re Pardee*, 193 F.3d 1083, 1087 (9th Cir. 1999) ................................................................ 2

*In re Snug Enters.*, 169 B.R. 31, 33 (Bankr. E.D. Va. 1994)................................................... 5

*In re Sugarhouse Realty, Inc.*, 192 B.R. 355, 363 and fn. 15 (E.D. Pa. 1996) ............................. 3

*In the Matter of Howe*, 913 F.2d 1138, 1147 (5th Cir. 1990) ........................................................ 2

*Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004) ................................................................ 25

*Kahn v. Gen. Motors Corp.*, 77 F.3d 457, 458-59 (Fed. Cir. 1996) ............................................ 19

*Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S 240 (1933) .............................................. 25

*Ligon v. City of Detroit*, 739 N.W.2d 900, 906 (Mich. App. 2007) ............................................. 18

*Matter of Quality Holstein Leasing*, 752 F.2d 1009 (5th Cir. 1985) ........................................... 20

*Matter of TTS, Inc.*, 158 B.R. 583, 584 (D. Del. 1993) ............................................................... 20

*Mills Novelty Co. v. Monarch Tool & Manuf. Co.* ...................................................................... 16

*Mitchel v. Streets*, 882 F.2d 233 (7th Cir. 1989) ........................................................................ 17

*Mitchell Bros. Film Group v. Cinema Adult Theater*, 604 F.2d 852, 863 (5th Cir. 1979) .......... 24

*Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1337 (Fed. Cir. 2007) ...................................... 6, 18

*Old Republic Insurance Co. v. Currie*, 665 A.2d 1153, 1155 (N.J. Super. Ch. 1995) ................ 21

*Palmer v. Vogel*, 57 B.R. 332 (Bankr W.D. Vir. 1986) ............................................................... 21

*Pauley Petrol. Inc. v. Continental Oil Co.*, 239 A.2d 629, 633 (Del. 1968) ................................ 13

*Pharm-Eco Lab., Inc. v. Immtech Int'l, Inc.*, No. Civ. A. 18246, 2001 WL 220698 (Del. Ch.
    Feb.26, 2001) ............................................................................................................................ 10

*Roberts v. Roberts*, 241 Fed. Appx. 420, 421-22 (9th Cir. 2007) ................................................ 2

*Rudaw/Empirical Software Prods. Ltd. v. Elgar Elecs. Corp.*, 83 B.R. 241, 246 (Bankr. S.D.N.Y.
    1988) ........................................................................................................................................ 19

*Security Pacific Mortg. and Real Estate Services, Inc. v. Canadian Land Co.*, 690 F.Supp. 1214,
    1224 (S.D.N.Y. 1988) ............................................................................................................... 24

*Stroh v. Grant*, 34 Fed. Appx. 562, 565 (9th Cir. 2002) .............................................................. 2

*Superior Crewboats, Inc. v. Primary P & I Underwriters*, 374 F.3d 330, 334 (5th Cir. 2004) ..... 2

*Trulis v. Barton*, 107 F.3d 685, 691 (9th Cir. 1995) ................................................................. 2, 7

*U.S. v. Compean*, 2006 WL 1737536, at *3 (S.D. Tex. June 23, 2006) ...................................... 20

*U.S. v. Whiting Pools, Inc.*, 462 U.S. 198, 204 (1983) ............................................................... 20

*U.S., Dep't of Air Force v. Carolina Parachute Corp.*, 907 F.2d 1469, 1474 (4th Cir. 1990) ..... 21

*Univ. Bonding Ins. Co. v. Gittens and Sprinkle Enters., Inc.*, 960 F.2d 366, 371 (3rd Cir. 1992) 20

## Statutes

11 U.S.C. § 1125 .............................................................................................................................. 4

11 U.S.C.A. § 1142 ......................................................................................................................... 21

11 U.S.C.A. § 541(a) ...................................................................................................................... 21

35 U.S.C. § 261 ............................................................................................................................ 6, 10

37 C.F.R. § 3.56 ............................................................................................................................. 10

Bankruptcy Rule 7001 ..................................................................................................................... 6

Cal § 2309 ...................................................................................................................................... 15

Del. Gen. Corp. Law §§ 275-285 ................................................................................................... 11

Plaintiff Software Rights Archive, LLC ("SRA") files this Sur-Response to Defendants'

Motion to Dismiss.

## I.   **INTRODUCTION**

The dispositive question regarding standing in this case is this: Did Daniel Egger acquire

the patents-in-suit? The answer, *as a matter of law*, is yes:

- As a matter of law, Egger acquired the patents in September 1998, when he executed a Bill of Sale and Assignment with Site Technologies, Inc. ("Site Tech").

  - The Northern District of California Bankruptcy Court has already so found over eight years ago, and questions relating to a confirmed bankruptcy plan are barred from reconsideration by the doctrine of res judicata.

  - Every party with personal knowledge agrees that Egger acquired the patents from Site Tech in September 1998.

    - <u>Daniel Egger:</u>  "I signed [the Bill of Sale and Assignment], Jeff [Ait] signed it, I paid him the money, I bought the patents . . . ." (Ex. 1, at 45.)

    - <u>Jeffrey Ait:</u>  "On September 16, 1998, Site Tech sold and assigned, among other things, U.S. Patent No. 5,544,352, and related applications and future patents . . . to Daniel Egger." (Ex. 2, ¶ 5.) "At the time of the execution of the 1998 Bill of Sale and Assignment that assigned the Patents to Daniel Egger, I was the CEO of both Site Tech and Site/Tech and was fully authorized by both companies to assign the Patents to Daniel Egger." (Ex. 2, ¶ 6.) Furthermore, "After the July 11, 1997 acquisition, Site/Tech lacked any substantial independent operation or business from that of Site Tech. It did not design, produce, market, or sell anything, and it had no significant independent costs or revenues." (Ex. 2, ¶ 2.) "[T]hat's what I would classify as a shell." (Ex. 3, at 108.)

    - <u>Site Tech:</u>  "On September 30, 1998 . . . [Site Tech] consummated the sale of its V-Search technology and related patents. . . . The Company sold the assets relating to V-Search in cash to Daniel [Egger]. The Company received a cash payment of $100,000." (Ex. 4.)

    - <u>Site/Tech:</u>  "After the sale, neither Site Tech entity carried the Patents on their books and both recognized the validity of the 1998 Bill of Sale and Assignment . . . . Site/Tech . . . ratified the 1998 Bill of Sale and Assignment and Site Tech's authority and right to transfer the patents in those documents on behalf of all Site Tech entities a long time ago." (Ex. 2, ¶ 6.)

- As a matter of law, Egger acquired the patents at the latest in December 2000. Under the after-acquired title doctrine, if an assignor assigns property to an assignee without

1

having title and thereafter acquires title to the property, the property vests in the assignee at the moment that the assignor acquires title. Here, it is undisputed that Site Tech assigned the patents to Egger in September 1998 and that Site Tech at the latest acquired title to the patents in December 2000.

This issue is ripe for definitive resolution. This Court should find as a matter of law that Egger acquired the patents, SRA owns the patents, and SRA has standing to bring this case.

## II.     ARGUMENT AND AUTHORITIES

### A.     As a Matter of Law, Egger Acquired the Patents in September 1998, When He Executed a Bill of Sale and Assignment with Site Tech.

#### 1.     The Northern District of California Bankruptcy Court has already found that Egger acquired the patents from Site Tech in September 1998, and reconsideration of this finding is barred by res judicata.

##### a.     Under the doctrine of res judicata, it is settled as a matter of law that Egger acquired the patents in September 1998.

The law is well-settled: "Once a bankruptcy plan is confirmed, it is binding on all parties and all questions that could have been raised pertaining to the plan are entitled to *res judicata* effect." *Trulis v. Barton*, 107 F.3d 685, 691 (9th Cir. 1995).[1] Likewise, statements in the debtor's schedules are conclusively binding on the debtor. *Superior Crewboats, Inc. v. Primary P & I Underwriters*, 374 F.3d 330, 334 (5th Cir. 2004) (reversing lower court's refusal to bar debtor's claim because debtor failed to list claim as asset on its bankruptcy schedules).[2]

---

[1] *See also In the Matter of Howe*, 913 F.2d 1138, 1147 (5th Cir. 1990); *In re Int'l Nutronics, Inc.*, 28 F.3d 965, 969 (9th Cir. 1994); *Tally v. Fox Film Corp.*, 88 F.2d 212, 223 (9th Cir. 1937) (barring relitigation of whether a pre-petition transaction violated securities law because the prior transaction was recognized by the Trustee and set forth in the bankruptcy petition); *In re Pardee*, 193 F.3d 1083, 1085 (9th Cir. 1999) ("Great Lakes' failure to object to the plan or to appeal the confirmation order constitutes a waiver of its right to collaterally attack the confirmed plan postconfirmation on the basis that the plan contains a provision contrary to [law]." (internal quotation marks omitted)); *In re Chattanooga Wholesale Antiques, Inc.*, 930 F.2d 458 (6th Cir. 1991) (holding that although bank was incorrectly treated as secured creditor under confirmed bankruptcy plan, payments made to bank were authorized under bankruptcy plan and were not avoidable).

[2] *See also Coastal Plains, Inc. v. Mims*, 179 F.3d 197, 205 (5th Cir. 1999); *Roberts v. Roberts*, 241 Fed. Appx. 420, 421-22 (9th Cir. 2007) (barring debtor from asserting that creditor lacked standing because debtor listed creditor in its schedules); *Stroh v. Grant*, 34 Fed. Appx. 562, 565 (9th Cir. 2002) (barring debtor from asserting that it owned an interest in a partnership after failing to list the partnership interest in its schedules); *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 783-84 (9th Cir. 2001) (barring

2

Here, Defendants' entire standing challenge may be rejected as a matter of law based on this undisputed fact: Site Tech's bankruptcy filings repeatedly and explicitly represented to the bankruptcy court, to creditors, and to interested parties that neither it nor Site/Tech possessed any interest in the patents, but that Site Tech had transferred the patents to Egger in September 1998.[3] In its court-approved First Amended Disclosure Statement, Site Tech wrote, "In September 1998, the Company also sold its V-Search technology and related patents." (Ex. 5, § 5.5; Ex. 6, at 2.) Again, in its Statement of Financial Affairs, it listed under penalty of perjury:

**10. Other transfers**

None ☐   a. List all other property, other than property transferred in the ordinary course of business or financial affairs of the debtor, transferred either absolutely or as security within **one year** immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include transfers by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF TRANSFEREE, RELATIONSHIP TO DEBTOR | DATE | | DESCRIBE PROPERTY TRANSFERRED AND VALUE RECEIVED |
|---|---|---|---|
| Savoir Technology Group, Inc. 254 Hacienda Avenue Campbell, CA 95008 | 12/28/98 1/29/99 | $150,000 $ 50,000 | Security interest in all assets |
| Daniel Egger 2027 W. Club Blvd. Durham, NC 27705 | 9/15/98 | $80,000 | V-Search Technology |

(Ex. 7.) This is a verified statement that Egger acquired the patents before the bankruptcy and that the patents had belonged to Site Tech, not Site/Tech. Finally, in its Schedules, Site Tech deliberately excluded the patents-in-suit from the lists of current property of the estate, even though it included every other patent asset it acquired from Site/Tech. (Ex. 9, at 3.) Site Tech never amended its schedules following its merger with Site/Tech to reflect any claim of

---

debtor from asserting that it had a cause of action because it failed to list the policy as an asset on its bankruptcy schedules).
[3] In determining the provisions and meaning of a plan for purposes of res judicata, the court considers the disclosure statement and any other bankruptcy filings incorporated into the plan or confirmation order. *In re Sugarhouse Realty, Inc.*, 192 B.R. 355, 363 and n.15 (E.D. Pa. 1996) (citing multiple cases). The Plan (Ex. 8, at 1) specifically refers to the Disclosure Statement for a prior history of the Debtor's transactions and for the creditor in deciding whether to accept the plan.

ownership of the patents or any recognition that the patents became part of its bankruptcy estate. (Ex. 6.)

Thus, Site Tech's bankruptcy filings definitively raised the issue in the bankruptcy proceedings of who owned the patents, and the responsibility fell on Site/Tech and the other parties, to the extent they disagreed with Site Tech, of objecting to the bankruptcy plan and other filings and asserting that the transfer to Egger in September 1998 was defective and/or that someone other than Egger rightfully owned the patents. It is undisputed that neither Site/Tech nor anyone else objected to Site Tech's plan, disclosure statement, and schedules, and it is further undisputed that the Northern District of California Bankruptcy Court relied on the bankruptcy record and entered a confirmation order in the case.[4] This being so, as a matter of law the bankruptcy court order and other filings, along with the administration of the bankruptcy, bind Site Tech and Site/Tech and operate as a final judgment regarding Egger's acquisition of the patent in September 1998.[5] Further consideration of the issue is barred by res judicata.

Application of res judicata is particularly appropriate here because neither Site Tech nor Site/Tech has ever contested the September 1998 assignment to Egger. Rather, both have repeatedly affirmed the validity and operation of that transaction. Indeed, Jeffrey Ait, the CEO of Site Tech and Site/Tech and the Responsible Person under the Site Tech bankruptcy plan, has submitted testimony to these proceedings and executed further conveyances in support of Egger's ownership of the patents. Further, application of the doctrine is the only way to avoid manifest unfairness to Egger and to avoid violating Egger's bankruptcy and due process rights. Egger had a meritorious claim to the patents, having paid $100,000 for them and having received

---

[4] Notably, as required by 11 U.S.C. § 1125, the bankruptcy court had also previously approved Site Tech's disclosure statement as containing "adequate information" to enable creditors to decide whether to vote for or against the plan.

[5] Site/Tech was a creditor that approved the plan and was merged into Site Tech. (Ex. 10 (listing Site/Tech as a creditor).)

two warranty assignments to them. His acceptance of the plan and decision not to litigate ownership of the patents or seek modification of the plan was based on the fact that the bankruptcy plan and schedules all provided that the patents were transferred to him in 1998 and that no party in interest to the bankruptcy contested his ownership of them. Similarly, Egger's decision not to assert substantial claims against Site Tech for breach of contract and breach of title warranties, or alternatively, to assert his rights to the patents, was also based on the fact that the plan recognized his ownership of the patents. Failure to apply res judicata here would deny Egger notice that his patent rights were being challenged and would deny him an opportunity to assert his rights in the bankruptcy, to oppose or modify the plan, or to seek allowance of a claim against Site Tech for the substantial breach of contract/title warranty damages he suffered.[6]

In contrast, giving preclusive effect to the bankruptcy court's recognition that Egger had acquired the patents would create no unfairness to Site Tech's other creditors or interest holders, because all those parties were given notice of the assignment to Egger at all stages of the bankruptcy process. Furthermore, Site Tech's general unsecured creditors received payment in full, with additional funds flowing to equity. (Ex. 5.) Failing now to afford the preclusive effect to the Egger assignment would entitle Egger to a substantial claim against the estate for the failure to deliver his patents, threatening the significant recovery already received by creditors

---

[6] *In re Snug Enters.*, 169 B.R. 31, 33 (Bankr. E.D. Va. 1994); *In re Forklift LP Corp.*, 363 B.R. 388, 397 (Bankr. D. Del. 2007) (holding that it would be unfair to deprive creditors of their rights "where plan provisions do not explicitly take those rights away. If a plan explicitly puts a creditor on notice that it is in danger of losing its rights and the creditor fails to act to protect its rights, then rigid application of the plan seems justified. However, where it is more difficult or impossible for the creditor to realize that the Plan threatens its statutory rights, it is inequitable to punish the creditor for failing to object."); *In re Miller*, 253 B.R. 455, 459 (Bankr. N.D. Cal. 2000) (holding that if a confirmed bankruptcy plan is ambiguous as whether a debt is discharged, "[t]he ambiguity in the plan should be resolved against the Debtor because Debtor drafted the plan.").

5

and junior equity holders. (Ex. 6.)[7]

Therefore, it is settled under res judicata that Egger acquired the patents from Site Tech in September 1998. On this basis alone, this Court should rule as a matter of law that Egger owned the patents-in-suit, that SRA owns the patents, and that SRA possesses standing to bring this case.

**b.     Defendants' argument that res judicata does not apply because there was no adversary proceeding is wrong.**

Defendants assert that res judicata does not apply to Egger's ownership of the patents because no adversary proceeding occurred as to the issue. (Ex. 11, at 25.) Defendants are wrong. The case Defendants themselves cite, *In re Golden Plan of California, Inc.*, 829 F.2d 705 (9th Cir. 1986), as well as Bankruptcy Rule 7001, directly contradict Defendants' position. *Golden Plan* and Bankruptcy Rule 7001 only restrict a debtor or trustee from *setting aside* a creditor's (such as Egger's) property rights without giving the creditor an opportunity to defend himself in a proceeding. (This is a further significant reason why the bankruptcy plan could not have divested Egger of the patents.) Neither *Golden Plan* nor Bankruptcy Rule 7001 prevents a debtor from agreeing to *recognize* a creditor's valid property rights. Debtors and trustees routinely accept claims and liens and concede property rights when putting forward a plan, setting forth schedules of assets and transfers, abandoning property, and administering a bankruptcy. These determinations are conclusively binding on the debtor without any need for an adversary proceeding.

**c.     Defendants' argument that Paragraph 14.2 of the bankruptcy plan somehow overrules the bankruptcy court's confirmation of Egger's ownership is also wrong.**

---

[7] The writing requirement of 35 U.S.C. § 261 provides no obstacle to the transfer of patents by virtue of a bankruptcy, bankruptcy plan, or proceeding in equity. *See Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1337 (Fed. Cir. 2007).

Defendants argue that, despite the bankruptcy court's confirmation of Egger's rights, Paragraph 14.2 of the bankruptcy plan vests the patents in Site Tech free and clear of any claim by Egger. Defendants are wrong. Paragraph 14.2 provides that "all property of the debtor" will revest in the debtor free and clear of creditors' and interest holders' claims on the "Effective Date" of the plan. (Ex. 8., at 19.) The "Effective Date" of the plan was July 16, 2000.[8] Thus, Site Tech's property as of July 16, 2000 revested free and clear on that date. Defendants themselves admit, however, that Site Tech did not own the patents on July 16, 2000. Rather, under Defendants' argument, Site Tech acquired the patents only on December 21, 2000, when it merged with Site/Tech. (Ex. 12.) Paragraph 14.2 therefore could not have operated to vest the patents free and clear in Site Tech.

2. **Site Tech owned the patents in September 1998, because it had acquired them from Site/Tech in July 1997 by operation of the liquidation provision in Site/Tech's charter.**

a. **The Northern District of California Bankruptcy Court has already found that Site Tech acquired the patents from Site/Tech in July 1997, and reconsideration of this issue is barred by res judicata.**

As noted above, it is well-settled that "[o]nce a bankruptcy plan is confirmed, it is binding on all parties and all questions that could have been raised pertaining to the plan are entitled to *res judicata* effect." *Trulis*, 107 F.3d at 691. This principle mandates that this Court uphold the Northern District of California Bankruptcy Court's finding that the patents transferred in liquidation from Site/Tech to Site Tech in July 1997. Site Tech's bankruptcy disclosure statement expressly indicates that intellectual property of Site/Tech transferred to Site Tech through the July 1997 acquisition: "In July 1997, [Site Tech] acquired the technology to develop

---

[8] The plan defines the Effective Date as eleven calendar days after the Confirmation Date. (*Id.* at 6:25.) The Confirmation Order was entered on July 5, 2000. (Ex. 27.) Thus, the Effective Date was July 16, 2000.

SiteSweeper 2.0 . . . ." (Ex. 5. at § 5.4.) Further, Schedule B lists products, trademarks, and

patents pertaining to SiteSweeper and SiteMarks that Site Tech acquired from Site/Tech:

| 21. Patents, copyrights, and other intel- lectual property. Give particulars. | Intellectual property for QuickSite product, SiteSweeper product, SiteMaster product, WebTools product, SiteMarks product, WebAnimator product and Graphic Tools product Trademark held for SiteSweeper, applications pending for SiteMaster and QuickSite in Europe All source files for intellectual product resides at 380 El Pueblo Road, Scotts Valley, CA 95066 | | 1,000,000.00 | |

(Ex. 9, at 21.) Site Tech acquired these patents from Site/Tech before the bankruptcy, and did so

through the Certificate of Incorporation liquidation provision in July 1997. Furthermore, neither

Site/Tech nor any other party objected to Site Tech's representations that it had acquired

Site/Tech's intellectual property, despite the fact that Site Tech sold SiteSweeper and other

intellectual property to Starbase during the bankruptcy for $8.3 million. These assets

represented $1 million of the $1.4 million of the value of Site Tech's assets initially set forth in

the schedules. Thus, the sale of these assets represented a substantial amount of the

consideration received by Starbase and resulted in 100% of the creditors' claims' being paid

with interest. (Ex. 5, at 10 and 20.). Furthermore, several contracts related to the marketing and

distribution of Site/Tech's SiteSweeper product were also sold to Starbase. (Ex. 13, at 1-2.)

Thus, the bankruptcy plan and the principal distributions in the bankruptcy relied heavily

on the efficacy of the July 1997 asset transfer from Site/Tech to Site Tech. Because those

transfers are settled and Site Tech's bankruptcy estate has been administered, it is too late now to

challenge, based on supposed defects in documentation, whether in fact Site Tech acquired

particular properties. 11 U.S.C. § 1127(b) (barring modifications of a plan after "substantial

consummation").

In short, the bankruptcy order constitutes a final judgment that the liquidation provision operated to transfer Site/Tech's patent rights to Site Tech, and further consideration of the issue is barred by res judicata. On this basis alone, this Court should find as a matter of law that Site Tech owned the patents when it assigned them to Egger in September 1998, that SRA owns the patents today, and that SRA possesses standing to bring this suit.

> **b.    The terms of the liquidation provision demonstrate that it effectuated an automatic transfer of the patents to Site Tech.**

Defendants claim that no transfer occurred pursuant to the liquidation provision in Site/Tech's certificate of incorporation, because the liquidation provision did not automatically transfer the patents, but instead merely set the stage for a transfer that never occurred. Defendants are wrong. By its very terms, the liquidation provision effectuated an automatic transfer of the patents, with no further action necessary, from Site/Tech to Site Tech. The provision directs, in mandatory language, the distribution of all of Site/Tech's assets: "[T]he entire remaining assets and funds of the corporation legally available for distribution, if any, *shall be distributed* ratably among the [preferred stock]holders . . . . Thereafter, any remaining assets and funds legally available for distribution hereunder *shall be distributed* solely to the holders of the Common Stock." (Ex. 14 (emphasis supplied).) And it spells out in precise terms exactly how the distribution is to be effectuated—first, a "ratable" distribution, and then, a distribution of all remaining assets "solely" to Site Tech, the sole remaining stockholder. It thus resembles the self-executing provisions in *Akazawa v. Link New Technology International Inc.*, 520 F.3d 1354 (Fed. Cir. 2008), and *Sky Technologies, LLC v. SAP AG*, No. 2:06-cv-440 (DF) (E.D. Tex. Aug. 25, 2008), which also spelled out precisely how they were to operate and left no discretion to any administrator. And it differs from the vague provisions that Defendants cite in *Pharm-Eco Laboratory, Inc. v. Immtech International, Inc.*, No. Civ. A. 18246, 2001 WL

220698 (Del. Ch. Feb.26, 2001.), which did not specify how the distribution was to occur and therefore was held not to call for an automatic distribution. (Ex. 11, at 7-8.) Furthermore, under 37 C.F.R. § 3.56, conditional assignments based upon the fulfillment of future condition are sufficient to transfer patents and are treated as absolute assignments by the PTO. Here, the liquidation provision mandates a transfer upon fulfillment of a condition: "*In the event of any liquidation* . . . distributions to the shareholders of the corporation *shall be made* . . . ." (Ex. 14 (emphasis supplied).) Thus, the presence of a condition subsequent further distinguishes the liquidation provision from the language in *Pharm-Eco Laboratory*, where the Court found that the clause was merely a statement of future intent to transfer the patent. Likewise, language describing the transfer of "all assets" is sufficient to transfer patents even though the patents are not specifically identified. (Ex. 15, at n.8.)

That the liquidation provision effectuated an automatic transfer is further corroborated by abundant sworn evidence that Defendants have not even attempted to controvert. Jeffrey Ait, the CEO of Site Tech and Site/Tech following the liquidation, and one of the core parties involved in the negotiation of the July 1997 acquisition, affirmed to the SEC no fewer than six times that Site Tech had acquired the patents through the liquidation—for example: "[The patented technology] was technology that [Site Tech] acquired in the [Site/Tech] Acquisition." (Ex. 15, at 10.) Ait likewise subsequently testified under oath that "In this transaction, [Site Tech] directly acquired . . . all of the then-existing assets of [Site/Tech], including its patents . . . ." (Ex. 2, ¶ 2.) In the ten years since Site Tech's acquisition of Site/Tech and since Ait first made this representation, not one Site/Tech employee, officer, or director, or any other person with first-hand knowledge of

the negotiations in July 1997 ever disputed this sworn testimony. To the contrary, Ait's sworn

testimony stands unchallenged.[9]

Finally, Defendants argue that the transfer did not occur because no affirmative acts were

taken, as supposedly required by Delaware General Corporation Law §§ 275-285 (wind up and

dissolution provisions). These arguments fail because the transfers occurred by operation of a

mandatory conveyance clause in Site/Tech's certificate of incorporation, not because of an actual

statutory wind up under the DGCL.

### 3. Even if the patents belonged to Site/Tech in September 1998, as Defendants claim, Egger still would have acquired the patents at that time, because Site/Tech was bound by the Bill of Sale and Assignment.

#### a. Site/Tech was Site Tech's alter ego in September 1998.

In its opening brief, SRA identified over twenty core commonalities between Site/Tech

and Site Tech that demonstrated that the entities were alter egos in September 1998. (Ex. 15, at

13-14.) Defendants offer various responses, but all of them crumble under scrutiny.

- Defendants point out that Site/Tech's 1998 and 1999 tax returns reflect earnings

of $18,920 in 1998 and $50,381 in 1999. (Ex. 11, at 16.) Site/Tech did not earn those sums

through any independent business operations, however, but rather acquired them from Site Tech

through a passive internal royalty structure that had been established during the July 1997

acquisition. (Ex. 16, at 17.) Indeed, the tax returns reflect no further revenues, demonstrating

that Site/Tech had no independent operations in 1998 and 1999. Those tax returns also were not

prepared by Site/Tech, but rather by Site Tech, because Site/Tech had no employees of its own.

(Ex. 2, ¶ 2 ("[T]he former employees of Site/Tech became the employees of Site Tech . . . . Site

---

[9] In its opening brief, SRA also demonstrated that the patents transferred from Site/Tech to Site Tech pursuant to 35 U.S.C. § 261 and the ratification doctrine. (Ex. 15, at 11-13) Defendants' sole response was the response addressed here—that the liquidation provision did not operate to transfer the patents to Site Tech. Because, as already explained, Defendants are wrong, and the liquidation provision did in fact operate to transfer the patents to Site Tech, Defendants' § 261 and ratification arguments fail.

Tech maintained Site/Tech's tax records.") Further, the tax returns were prepared not in 1998 and 1999, but in 2001, because it was only in 2001 that anyone even realized that Site/Tech still existed. (Ex. 3, at 104-05.) Thus, the tax returns actually support a finding of alter ego.

- Defendants also claim that Site/Tech "retained offices and three employees in North Carolina after it became Site Tech's subsidiary . . . ." (Ex. 11, at 16.) This claim is false. As Ait testified, "I agreed to keep [the three employees] employed for one year in North Carolina but as employees of [Site Tech] not as employees of [Site/Tech]." (Ex. 3, at 107.) Furthermore, "Site Tech adopted and employed Site/Tech's . . . property as its own . . . ." (Ex. 2, ¶ 2.) Again, the evidence supports a finding that Site/Tech and Site Tech were alter egos.

- Defendants claim that Site/Tech "released a software product under its name." (Ex. 11, at 16.) This claim is irrelevant, because it concerns the relationship between Site Tech and Site/Tech in August 1997 (the date of the release), a mere month after Site Tech's acquisition of Site/Tech, whereas the operative date for determining alter ego is September 1998, over a year later. Defendants proffer no evidence that Site/Tech was engaged in any product development in September 1998. Defendants' claim is also disingenuous, because the press release on which Defendants rely contains numerous indications that Site Tech was already well on its way to converting Site/Tech into a shell. The headline of the press release states, "DeltaPoint and Site/technologies/inc. deliver SiteSweeper 2.0 . . . ." (Ex. 17.) The press release also quotes only DeltaPoint employees, evidencing the fact that all of Site/Tech's employees had already integrated into DeltaPoint. (Ex. 17.) The press release further states that "DeltaPoint plans to release SiteSweeper 2.0 on the company's Web site," negating Defendants' assertion that Site/Tech was engaged in business activity. (Ex. 17.) Finally, the press release nowhere discusses Site/Tech's business, but instead describes DeltaPoint's business in a section called "About DeltaPoint," and also nowhere provide Site/Tech's contact information, but instead

provides DeltaPoint's contact information, evidencing the fact that DeltaPoint absorbed Site/Tech's business operations. (Ex. 17.) Finally, Site Tech's sworn bankruptcy filings and SEC statements make clear that the released Site Sweeper 2.0 technology was actually a product of Site Tech, not Site/Tech. (Ex. 5, at 5.4 ("In July 1997, [Site Tech] acquired the technology to develop SiteSweeper 2.0 . . . ."); Ex. 26.)

- Defendants claim that "Ait set the record straight at his deposition, testifying that Site/Tech was **not** a shell entity after its acquisition by Site Tech." (Ex. 11, at 16 (emphasis in original).) This shamelessly mischaracterizes Ait's deposition testimony. Ait testified only that, to the extent that a "shell entity" owns no assets whatsoever, and to the extent that Site/Tech did own "desks, chairs, and computers" following its acquisition by Site Tech, Site/Tech was not a "shell entity" in September 1998. (Ex. 3, at 110.) Ait repeatedly insisted that, under a more reasonable definition of "shell entity," Site/Tech was a shell entity in September 1998: "Q. Wouldn't you agree, based on what we have seen here today, Mr. Ait, that [Site/Tech] was not a shell entity in 1998 or 1999? A. No, I don't agree with that. There was no business carried out by [Site/Tech]. . . . Q. . . . [Y]our opinion and belief, as you sit here today under oath, was that [Site/Tech] was a shell entity in 1998? A. Yes, [Site/Tech] was a wholly-owned subsidiary that did no business. I don't know what you classify as a shell but that's what I would classify as a shell." (Ex. 3, at 108.)

- Finally, Defendants note that Site Tech and Site/Tech did not "intentionally use[] their corporate structure to defraud Egger." (Ex. 11, at 17.) Delaware law does not require fraud to demonstrate alter ego, however, but instead requires only one of several types of injustices: "[C]orporate entities . . . may be disregarded . . . . in the interest of justice, when such matters as fraud, contravention of law or contract, public wrong, or where equitable consideration among members of the corporation require it, are involved." *Pauley Petrol. Inc. v. Continental Oil Co.*,

13

239 A.2d 629, 633 (Del. 1968). Here, the corporate distinction between Site Tech and Site/Tech should be disregarded in the interest of justice, to prevent contravention of contract, and in view of equitable considerations. Site/Tech had no independent ownership, directors, officers, employees, property, offices, business dealings, business departments, financial statements, headquarters, products, corporate records, bank accounts, director meetings, shareholder meetings, or operations in September 1998, when Egger bought the patents. (Ex. 2, ¶¶ 2-3.) Site/Tech was essentially an empty shell completely controlled by Site Tech. (Ex. 2, ¶ 2.) Site Tech represented—and to this day affirms through Ait —that it owned the patents-in-suit. (Ex. 2, ¶ 5.) Egger paid $100,000 out of his personal funds for the patents, and Site Tech accepted the money. (Ex. 2, ¶ 5.) Site Tech warranted that "it hereby transfers good and marketable title to the Purchased Assets." (Ex. 18.) Both Site Tech and Site/Tech intended the patents to be assigned to Egger, and Site/Tech authorized Site Tech to execute the assignment. (Ex. 2, ¶ 6.) Site Tech affirmed to the SEC that it had sold the patents to Egger. (Ex. 4.) On behalf of both Site Tech and Site/Tech Ait also ratified the assignment and disclaimed ownership of the patents in Egger's favor. (Ex. 2, ¶¶ 6-7.) Nobody with any interest in the patents has ever disputed the assignment. To strip Egger of his patent rights would be contrary to every party's intentions, contrary to contract, and contrary to every party's stated interests.

**b.** **Site Tech was Site/Tech's authorized agent for purposes of transferring the patents to Egger.**

In its opening brief, SRA demonstrated that Jeffrey Ait, the CEO of Site Tech and Site/Tech in September 1998, signed the Bill of Sale and Assignment and assigned the patents to Egger on behalf of both entities. Defendants now argue that Ait was wearing only his "Deltapoint hat" when executing the assignment and therefore could not have bound Site/Tech. (Ex. 11, at 20.) Defendants misstate the facts. Ait's detailed testimony demonstrates that he

14

wore both his "Site Tech hat" and his "Site/Tech hat" while negotiating, executing, performing, and discussing the assignment to Egger. (Ex. 2, ¶ 6-7.) Through the Bill of Sale and Assignment, he granted Site Tech the authority to assign the patents to Egger on Site/Tech's behalf.[10] Through repeated representations on Site/Tech's behalf before, during, and after the assignment, he led Egger to believe that Site Tech possessed authority to assign the patents in its own name. And through the Bill of Sale and Assignment, through representations to Egger, through statements made to the SEC, and through sworn testimony given thereafter, he ratified, on Site/Tech's behalf, Site Tech's assignment of the patents to Egger.

**B. Even If Egger Did Not Acquire the Patents in September 1998, He Acquired Them as a Matter of Law in December 2000, When Defendants Claim Site Tech Acquired Title Thereto.**

**1. Defendants' claim that title does not pass immediately and automatically to the assignee under the after-acquired title doctrine is wrong.**

Defendants argue that after-acquired title does not transfer immediately and automatically to the assignee under the after-acquired title doctrine, and therefore, Daniel Egger could not have acquired the patents without bankruptcy court intervention. Defendants' assertion is contrary to hornbook law. After-acquired title conveys to the assignee *eo instante*—at the instant that the assignor acquires the title—and automatically, without any court intervention.[11]

---

[10] California Civil Code § 2309 deals with conferring actual authority where the party asserts that it was an explicit agent for the principal. This would not have application to SRA's apparent or ostensible authority theories of agency which pertain to situations where there is not an explicit agency agreement. Furthermore, even assuming that, as Defendants contend, the "equal dignities rule" called for Site/Tech to confer authority on Site Tech in writing, Site/Tech's conferral of authority on Site Tech comported with this rule.

[11] *See, e.g.*, *Cherry v. Farmers Royalty Holding Co.*, 160 S.W.2d 908, 910 (Tex. 1942) ("The Court of Civil Appeals held that . . . the mineral interests . . . passed *eo instante* to the defendants. By such holding it applied the familiar rule known as the doctrine of after-acquired title . . . ." (citations omitted)); *Chevron U.S.A., Inc. v. State*, 993 So.2d 187, 2008 WL 4118905, at \*14 n.4 (La. Sept. 8, 2008) ("[T]itle to property sold to another by a vendor who only later acquires title vests immediately upon sale in the vendee." (citations omitted)); *Frain v. Burgett*, 50 N.E. 873, 876 (Ind. 1898) ("The title acquired by the grantor who has conveyed by warranty inures *eo instanti* that he gains the title to his grantee, and vests in

2.   **Defendants' claim that the bankruptcy extinguished Egger's rights is wrong.**

a.   **The Bill of Sale and Assignment were not executory contracts and were not rejected in the Site Tech bankruptcy.**

Defendants argue that the bankruptcy extinguished Egger's rights to the patents, because it rejected the Bill of Sale and the Assignment. Defendants are wrong. As a threshold matter, the Assignment was a separate agreement from the Bill of Sale, because it was a conveyance instrument with its own signature, and it was never rejected.[12] (Ex. 18.) While the Bill of Sale appears on the schedule of executory contracts, the Assignment does not. See Schedule G Executory Contracts and Leases. This stands to reason, since only the Bill of Sale contained an executory software license agreement with Site Tech as licensor. (Ex.18, § 7.) The debtor listed all of its licenses as executory contracts. (Ex. 19.) The Assignment is a conveyance instrument that was not executory and therefore was not scheduled as an executory contract and could not be rejected as an executory contract.

Under § 365 of the Bankruptcy Code, bankruptcy courts may only reject "executory"

---

him." (citations omitted)); Corpus Juris Secundum (Estoppel) § 25 (2008) ("As a general rule, estoppel has the effect of vesting after-acquired title in the grantee automatically and instantly, by operation of law, without further conveyance and without the intervention of any court." (citations omitted)).

Defendants misread *Mills*, wrongly attributing a quote as pertaining to the after-acquired title doctrine when it actually pertains to fraudulent transfer. *Mills Novelty Co. v. Monarch Tool & Manuf. Co.*, 49 F.2d 28 (6th Cir. 1931) ("[T]hrough fraud or mistake, a grant is made to A which should have been made to B . . . ."). In fact, immediately following Defendants' cited passage, *Mills* itself recognizes that title transfers immediately in the patent application context. *See id.* This idea of immediate transfer is what *Mills* reasoned "should be deemed to rest upon the principles by which a deed with warranty will convey in law [i.e., legal title] an after-acquired title." *See id.* Defendants also misread *Taylor Engines, Inc. v. All Steel Engines, Inc.*, 192 F.2d 171, 174 (9th Cir. 1951). Defendants rely on *dictum* stating that "[t]he equitable claim of the Nevada corporation could have been cut off by a sale to a bona fide purchaser." (Defs.' Reply, at 27.) This *dictum* is inapposite because a *bona fide* purchaser for value can "cut off" a claim by any earlier assignee, whether that assignee obtains full legal and equitable title, or only the latter. *See* 35 U.S.C. § 261. Moreover, California courts have adhered to the *eo instante* rule both before and after *Taylor*. *See Brush Elec. Co. v. Calif. Elec. Light Co.*, 52 F. 945, 963 (9th Cir. 1892) ("The sale of a patent right contains an implied warranty as to title, and an after-acquired title obtained by the vendor inures to the vendee."). In fact, the California legislature has codified the doctrine in the real property context. *See* CAL. CIV. CODE § 1106 (2008).

[12] The Bill of Sale was executed by Jeffrey Ait as Chief Executive Officer of Site Tech. The Assignment was separately executed by Sharon Fugitt as secretary of Site Tech.

16

obligations of the debtor, and federal law defines an "executory" obligation as one "on which performance is due to some extent on *both* sides." *Horton v. Rehbein*, 60 B.R. 436, 440-42 (9th Cir. 1986). Bankruptcy law holds that "executory contracts are those in which the obligations of *both* parties are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." *Id.*

Furthermore, both the Bill of Sale and the Assignment contain language of complete and immediate assignment of full legal title to the Patents to Egger. Under bankruptcy law, an unperformed obligation to convey legal title is not an executory obligation. *See Horton*, 60 B.R. at 441 (9th Cir. 1986) ("The fact that a vendor retains legal title and must in the future convey it to the debtors does not render the contract executory any more than the duty of the holder of a promissory note to return the note when the debt is satisfied makes it executory" (internal quotation marks omitted)); *see Mitchel v. Streets*, 882 F.2d 233 (7th Cir. 1989) ("In our view, the delivery of a legal title is a mere formality and does not represent the kind of significant legal obligation that would render the contract executory."); *In re Kane*, 248 B.R. 216, 224 (1st Cir. 2000); *In re Belmonte*, 240 B.R. 843, 851 (Bankr. E.D. Pa 1999); *In re Walker*, 227 B.R. 870, 872 (Bankr. S.D. Ind. 1998). In *Horton*, the Ninth Circuit specifically considered whether a contract for deed's unperformed conveyance of legal title was an executory obligation:

> As a practical matter, the vendor performs no duties after the execution and deposit of title documents with the escrow agent. The vendor cannot terminate the agreement and recover possession of the property unless there is a material breach by the buyer. Unless a contract is executory on both sides, it cannot be an executory contract.

60 B.R. at 440. The Assignment is an absolute conveyance that forever relinquishes title to the Patents. As in *Horton*, once the deed was placed in escrow, no further action was required of Site Tech, and legal title would be transferred by operation of law and beyond the control of the

17

debtor.[13]   Further, Egger took possession of the patents and continued to prosecute the applications, pay the legal bills, and improve the property by obtaining two new patents.[14] Under *Horton*, the Assignment was not an executory contract by reason of any unperformed duty to convey legal title, and was not and could not be rejected by Site Tech.

> **b.     Even if the Bill of Sale and Assignment were rejected in the Site Tech bankruptcy, that still would not extinguish Egger's right to the legal title to the patents.**

Even if the Bill of Sale and Assignment were rejected in the Site Tech bankruptcy, that still would not bar operation of the after-acquired title doctrine.   This is because—it is undisputed—Egger acquired at least equitable title to the patents through the Bill of Sale and Assignment. *See Morrow v. Microsoft Corp.*, 2004 WL 1781010, *4 (N.D. Cal. 2004) ("Even if the patentee's transfer of rights does not vest legal title in the successor, it may constitute a transfer of equitable title.").   The subsequent rejection of contracts in 2000 does not change the fact that Egger had already received equitable title in 1998.

Equitable title is not merely an equitable claim; it is a vested property right in the grantee. *See Ligon v. City of Detroit,* 739 N.W.2d 900, 906 (Mich. App. 2007) ("[T]his equitable interest . . . was a preexisting vested property right"); *In re Marriage of Perkins*, 2004 WL 112598, at *2 (Tex. App.—Amarillo Jan. 23, 2004) ("[E]quitable title is a property right.").   It is transferred at the moment that a conveyance with warranty of title is executed. *See Cook v. U.S.,* 37 Fed. Cl. 435, 440 (Fed. Cl. 1997) ("[T]he date of acceptance of the purchase price . . . is the legal date of vesting of equitable title, a protected property right."); *Burk Royalty Co. v. Robbins Title Ptr,* 117

---

[13] In situations where legal title had not yet been conveyed, delivery of legal title has been described as a "mere formality," and not "the kind of significant legal obligation that would render the contract executory." *See Mitchell v. Streets*, 882 F.2d 233, 235 (7th Cir. 1989).   While some cases in other jurisdictions hold that conveyance of title can be executory, in those cases, no conveyance instrument had been executed as of the date of filing, which is a substantial act of performance required of the seller.  It is undisputed that the assignments occurred here long before filing, and were listed on the bankruptcy schedules available to all interested parties.

[14] *Horton*, 60 B.R. at 441 and n. 5 (noting possession and improvement to the property as a relevant fact).

F.3d 1417 (5th Cir. 1997). It may be transferred to third parties. *See Faulks v. Kamp*, 3 F. 898, 901-02 (S.D.N.Y. 1880). And with it comes the right to receive legal title once the grantor acquires legal title. *See id.* The Federal Circuit has repeatedly recognized the doctrine of equitable title with respect to patents.[15]

Under bankruptcy law, an assignee who possesses equitable title to property is entitled to possess the legal title to that property whenever the assignor obtains it, even if the underlying assignment contract is rejected. Defendants cite no authority for the proposition that a § 365 rejection unwinds an absolute conveyance. To the contrary, a contract is rejected to limit a debtor's burden for future performance, but does not rescind that which has already occurred. As one court explained:

> Even if the Agreement was executory, Debtor misinterprets the effects of rejection. Debtor believes rejection will restore its ownership rights to the servicing rights, and consequently the ability to resell the rights. . . . A fully executed contract cannot be rescinded. Debtor is attempting, through rejection, to regain what it has already sold, but without restoring the parties to the status quo ante. Instead of returning the purchase price, Debtor proposes leaving MVB holding a general unsecured claim for $4 million. Contrary to Debtor's argument, rejection of an executory contract constitutes a breach of such contract . . . . Moreover, rejection does not affect executed portions of an executory contract.

*In re DMR Fin. Servs., Inc.*, 274 B.R. 465, 472 (E.D. Mich. 2002) (internal citations and modifications omitted); *see Rudaw/Empirical Software Prods. Ltd. v. Elgar Elecs. Corp.*, 83 B.R. 241, 246 (Bankr. S.D.N.Y. 1988) ("[R]ejection of an executory contract is not the equivalent of rescission. . . . [R]ejection does not give the debtor the right to recover property

---

[15] The Federal Circuit recognizes that equitable title to a patent can be conveyed in various circumstances, commonly including: (1) when a patent is subject to an agreement to assign (*see, e.g., Arachnid, Inc. v. Merit Indus., Inc.*, 939 F.2d 1574, 1576 (Fed. Cir. 1991)); or (2) where a warranty deed purports to convey full title, but full title is lacking in the grantor (*see, e.g., Kahn v. Gen. Motors Corp.*, 77 F.3d 457, 458-59 (Fed. Cir. 1996)). The Federal Circuit has acknowledged the following definition of equitable title with respect to patents: "Equitable title may be defined as "the beneficial interest of one person whom equity regards as the real owner, although the legal title is vested in another." BLACK'S LAW DICTIONARY 1486 (6th ed. 1990); *see Arachnid*, 939 F.2d at 1578 n.3.

sold and transferred to the other party. . . . Such property does not revert to the debtor as a result

of the debtor's rejection of an executory contract.").

Likewise, under bankruptcy law, equitable property interests held by assignees do not

become part of the bankruptcy estate and therefore cannot be extinguished in the bankruptcy:

> Property in which the debtor holds, as of the commencement of the case, only
> legal title and not an equitable interest . . . sold by the debtor but as to which the
> debtor retains legal title . . . becomes property of the estate . . . only to the extent
> of the debtor's legal title to such property, but not to the extent of any equitable
> interest in such property that the debtor does not hold.

11 U.S.C. § 541(d); *see Curtis Mfg. Co., Inc. v. Plasti-Clip Corp.*, 933 F. Supp. 94 (D.N.H.

1995) ("Curtis, as the owner of a misappropriated patent, would have taken only its legal title to

the patent through the bankruptcy proceedings, and thus plaintiffs' equitable interest was neither

encumbered, diminished, nor discharged upon confirmation of the plan.").[16] Thus, when faced

with the issue of whether a bankruptcy debtor that acquired title could hold legal title

notwithstanding a previous conveyance, the Southern District of Texas held:

> Corpus also argues that when the bankruptcy court dismissed the bankruptcy, title
> to the property re-vested in the Arriagas and became subject to execution by him.
> Again, he misunderstands the law. Title subsequently acquired by a person who
> had previously conveyed that property with warranty instantly passes to the
> purchaser. .... Even if the Arriagas did not convey good title at the sale, following
> the bankruptcy, Compean's title was perfected.

*U.S. v. Compean*, 2006 WL 1737536, at *3 (S.D. Tex. June 23, 2006) (citations omitted). [17]

---

[16] *See also U.S. v. Whiting Pools, Inc.*, 462 U.S. 198, 204 (1983); *Cent. Trust Co. v. Shepard*, 29 B.R. 928, 932 (Bankr. M.D. Fla. 1983) ("Under the Bankruptcy Code, where a debtor holds only bare legal title to property without any equitable interest, bare legal title is all that becomes property of the estate."); *Univ. Bonding Ins. Co. v. Gittens and Sprinkle Enters., Inc.*, 960 F.2d 366, 371 (3rd Cir. 1992) ("[Bankruptcy law] simply does not authorize a trustee to distribute other people's property among a bankrupt's creditors."); *Matter of Quality Holstein Leasing*, 752 F.2d 1009 (5th Cir.1985); *Matter of TTS, Inc.*, 158 B.R. 583, 584 (D. Del. 1993) (holding that when debtor holds only legal title to property with beneficial interest being held by another party, that property is included in debtor's estate only to extent of debtor's legal title to property, not to extent of any interest in property that debtor does not hold.); *In re Encinas*, 27 B.R. 79, 80-81 (Bankr. D. Or. 1983) (same).

[17] The Supreme Court's holding in *Bush v. Person*, 59 U.S. 82 (1855), is consistent with this ruling. In *Bush*, the Supreme Court held that under the Bankruptcy Act, the debtor's personal discharge did not

Indeed, in this instance, even Site Tech's legal title to the patents-in-suit never became—and never could have become—part of the bankruptcy estate.[18] By Defendants' own argument, Site Tech did not receive legal title to the patents until December 2000, after the confirmation of the plan in July 2000. (Ex. 20, at 5.) Property acquired post-confirmation is not property of the estate.[19] Indeed, the bankruptcy estate ceases to exist upon confirmation of a plan and vests in the debtor.[20] Furthermore, the automatic stay does not protect post-confirmation assets not subject to the plan.[21] Thus, even under Defendants' theory, neither legal nor equitable title to the patents became part of the bankruptcy estate, or subject to the automatic stay.[22]

Thus, Egger's equitable title to the patents—and his right to the legal title to the patents once Site Tech obtained it—would not have been extinguished in the bankruptcy even if Site Tech had rejected the Bill of Sale and Assignment. Moreover, Site Tech's legal title to the patents—which, according to Defendants, it acquired only in December 2000—never became a

---

affect application of the doctrine of after-acquired title. *See id.* at 83-84. Even more compelling, in this matter, the bankruptcy schedules acknowledged and ratified the prior transfer to Egger, and did not discharge it in any sense. Nor was there even a discharge of any kind granted to the debtor. In *Old Republic Insurance Co. v. Currie,* 665 A.2d 1153, 1155 (N.J. Super. Ch. 1995), likewise, the court noted that "even if the mortgagor's personal liability for the debt which is secured by the mortgage has been extinguished by bankruptcy, the warranty obligation [under the after acquired property doctrine] is not nullified and he must produce the property."

[18] It should be further noted that since legal title of the Patents was not in the bankruptcy estate, the debtor's strong arm powers as a lien creditor would be inapplicable to Egger's property interest.

[19] *See* 11 U.S.C. § 541(a) (property of the estate is "all legal and equitable interests of the debtor in property as of the *commencement* of the case"); *Am. Bankers Ins. Co. of Fla. v. Maness,* 101 F.3d 358, 362 (4th Cir. 1996) ("Generally, property not owned at the time of the petition but only subsequently acquired by the debtor does not become property of the bankruptcy estate"); *Palmer v. Vogel,* 57 B.R. 332 (Bankr W.D. Va. 1986).

[20] 11 U.S.C. § 1142; *Haw v. Graue,* 158 B.R. 965, 970(S.D. Tex. 1993)("Plan confirmation dissolves the bankruptcy estate"); *Greenley Energy Holdings of Penn. v. Stone,* 110 B.R. 173, 180 (Bankr. E.D. Penn 1990); Plan, par. 14.2.

[21] *See U.S. Dep't of Air Force v. Carolina Parachute Corp.,* 907 F.2d 1469, 1474 (4th Cir. 1990) ("[T]here can be no further application of the automatic stay after confirmation" ); *In re Allen,* 300 F.3d 1055, 1059 (9th Cir.2002); *In re Barker-Fowler Electric Co.,* 141 B.R. 929, 938 (Bankr. W.D. Mich. 1992); *In re Hakim,* 244 B.R. 820, 822 (Bankr.N.D.Cal.1999)( "In the Chapter 11 context, whether the automatic stay terminates upon operation of law depends on whether or not a plan has been confirmed").

[22] *Accord Barker-Fowler,* 141 B.R. at 938 (after confirmation of the plan the automatic stay lifts); *Calderon v. Commodore Holdings Ltd.,* 2004 WL 385062, at *1 (S.D.N.Y. Mar. 1, 2004) (same).

part of the bankruptcy estate and therefore vested immediately and automatically in Egger pursuant to the after-acquired title doctrine.

### 3. Defendants' claim that Egger's supposedly unclean hands bar application of the after-acquired title doctrine mischaracterizes Egger's actions, ignores fundamental requirements of the unclean hands doctrine, and flies in the face of equity.

Defendants argue that application of the after-acquired title doctrine in this case is barred by the doctrine of unclean hands because Egger supposedly filed a fraudulent assignment ("the 2005 Assignment") with the PTO. (Ex. 11, at 28.) Defendants mischaracterize what occurred in February 2005 and ignore fundamental principles of the unclean hands doctrine.

In February 2005, Egger's attorney, Chris Lynch, discovered that Egger's September 1998 Bill of Sale and Assignment had never been recorded with the PTO, and he instructed Egger that he had to provide notice of that transaction to the PTO immediately. (Ex. 1, at 96; Ex. 21, ¶ 4.) Egger could not immediately locate the Bill of Sale and Assignment, so Lynch prepared the 2005 Assignment for Egger's signature. (Ex. 1, at 82; Ex. 21, ¶ 4.) At the time of signing, Lynch told Egger that he was authorized as the former President of Site/Tech to execute the document as a placeholder for the Bill of Sale and Assignment. (Ex. 1, at 110.; Ex. 21, ¶ 5.) Further, Egger did not realize that there was a difference between "Site Tech"—the assignor named in the Bill of Sale and Assignment—and "Site/Tech"—the assignor named in the 2005 Assignment. (Ex. 1, at 90.) The central message that Egger and Lynch intended to communicate through the 2005 Assignment—that Egger had purchased the patents from Site Tech—was true. Therefore, Egger signed it without revision. (Ex. 21, ¶ 4.) Egger's deposition testimony shows that Egger's intention was not, as Defendants claim, to defraud Site/Tech by assigning to himself patents that Site/Tech owned. Egger's testimony demonstrates that his intention was merely to provide notice, in the manner advised to him by his attorney, of patents that he had already

22

acquired from Site Tech: "My understanding was that nothing was actually transferred or assigned by this document, this was purely for notice. . . . I was told by my attorney, Chris Lynch, that this was the correct form to provide this notice, and he gave it to me this way and I relied on his advice and I signed it and we filed it." (Ex. 1, at 80-82.) Chris Lynch has also attested to Egger's intentions: "The purpose of the 2005 assignment was . . . to bring the PTO ownership records current with what we believed to be the actual state of ownership, that is, ownership by Daniel Egger." (Ex. 22, at 117.)

The truth of Egger's testimony is further confirmed by the testimony of Jeffrey Ait, the former CEO of Site/Tech, the very person whom Defendants claim Egger defrauded: "The 2005 assignment was within the intent of all the parties to the transaction and fairly represented the transaction." (Ex. 2, ¶ 8.) Ait further ratified the 2005 assignment by both Site Tech entities. (Ex. 2, ¶ 7.) Consistent with Egger's stated intention of merely providing notice of rights he owned since 1998, Egger also subsequently located and filed—so as to make the PTO records perfectly clear and complete—the Bill of Sale and Assignment that actually transferred the patent rights to him. (Ex. 24.) Attached to this brief is a contemporaneous email corroborating that Egger had initially misplaced the Bill of Sale and Assignment, but later located and filed those documents. This disproves Defendants' theory that the 2005 Assignment was created to correct the name of the party in the Bill of Sale and Assignment. (Ex. 23.)

In short, Egger did not deceive anyone in an attempt to fraudulently acquire the patents-in-suit. Egger's supposed unclean hands did not harm Site/Tech, the supposedly defrauded party. No other party was harmed either. Defendants were not harmed. Egger later transferred the patents to SRA, the present owner, and it is undisputed that SRA is without blame. Therefore, as a threshold matter, the equities hardly favor the remedy that Defendants seek—stripping SRA of the patents-in-suit. To the contrary, that remedy would be draconian.

Defendants' also ignore fundamental principles associated with the unclean hands doctrine. First, Defendants must show willful misconduct by the party requesting relief from the Court. *In re Aimster Copyright Litig.*, 252 F. Supp. 2d 634, 655 (N.D. Ill. 2002) (Conduct of non-party is irrelevant to the doctrine of unclean hands which "prevents plaintiffs from obtaining relief for conduct in which they themselves participated."); *Sec. Pacific Mortg. and Real Estate Servs., Inc. v. Canadian Land Co.*, 690 F. Supp. 1214, 1224 (S.D.N.Y. 1988). It is undisputed that SRA, the plaintiff in this case, has engaged in no misconduct whatsoever. Further, Egger has never controlled or owned SRA, which was formed in 2006—well *after* the 2005 Assignment—following the purchase of the patents by a third party. Rather, SRA and its parent company paid over a million dollars to acquire the patents from Egger and Software Rights Archive, Inc. Applying unclean hands here therefore would strip the patents from SRA, an innocent purchaser who paid value, and allow a party that misstated its ownership of a patent to benefit from its misstatement and keep both the patents and the money. This outcome is inconsistent with any principle of equity.

Second, the doctrine applies only where a party seeks equitable relief from a court: "The unclean hands doctrine is used to defeat an undeserving plaintiff's claim *for equitable relief* against a defendant that he has injured. *Positive Black Talk Inc. v. Cash Money Records, Inc.*, 394 F.3d 357, 379 (5th Cir. 2004) (emphasis supplied). Since the after-acquired title doctrine works automatically, by operation of law, without intervention of the Court, SRA is not seeking any equitable relief from this Court.

Third, "[t]he alleged wrongdoing of the plaintiff does not bar relief unless the defendant can show that he has personally been injured by the plaintiff's conduct." *Mitchell Bros. Film Group v. Cinema Adult Theater*, 604 F.2d 852, 863 (5th Cir. 1979); *see Bank of Saipan v. CNG Fin. Corp.*, 380 F.3d 836, 842 (5th Cir. 2004) ("[T]he unclean hands defense is inapplicable

altogether where the plaintiff's sins do not affect or prejudice the defendant.") (applying Texas law); *Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 796-97 (5th Cir. 1999) ("[W]here the harm done to the defendant is not serious and can be otherwise corrected, the unclean hands maxim should not be applied." (internal quotation marks omitted)) (applying Texas law). Here, it is undisputed that Defendants have not been injured by the 2005 Assignment.

Fourth, "courts of equity . . . do not close their doors because of plaintiff's misconduct, whatever its character, that has no relation to anything involved in the suit . . . ." *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S 240, 245 (1933). Here, the 2005 Assignment has no bearing whatsoever on infringement, validity, or any other issue in this case. Most importantly, it has nothing to do with standing. It occurred seven years *after* the Bill of Sale and Assignment on which SRA relies for title and through which Egger acquired the patents. (Ex. 18 and Ex. 25.) He did not acquire them via the 2005 Assignment, nor has Egger or SRA ever taken the position in this Court or in any other proceeding that he received title through the 2005 Assignment. Rather, because the 2005 Assignment was merely intended to provide *notice* of patents rights that Egger already had, it really is extraneous to Egger's acquisition and disposition of the patents. Indeed, as a mere notice document, the 2005 Assignment is a document with no legal effect; it is settled law that merely filing a notice of patent ownership at the PTO does not operate to establish or transfer any patent rights. *See Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004) ("[R]ecordation is a ministerial act and reflects no determination as to the legal validity of the document filed or its effect, if any, on title to the patent or patent application."). Thus, Defendants' unclean hands argument must be denied.

## III.  CONCLUSION

Defendants' motion to dismiss should be denied, and this Court should hold as a matter of law that SRA owns the patents-in-suit and has standing to bring this case.

Respectfully submitted,

*Lee Kaplan (by permission /RD)*

Lee L. Kaplan
LEAD ATTORNEY
State Bar No. 11094400
SMYSER KAPLAN & VESELKA, L.L.P.
700 Louisiana, Suite 2300
Houston, Texas 77002
(713) 221-2323
(713) 221-2320 (fax)
lkaplan@skv.com

Victor G. Hardy
State Bar No. 00790821
(Requesting Admission *Pro Hac Vice*)
Andrew G. DiNovo
State Bar No. 00790594
Adam G. Price
State Bar No. 24027750
Jay D. Ellwanger
State Bar No. 24036522
DINOVO PRICE ELLWANGER LLP
P.O. Box 201690
Austin, Texas 78720
(512) 681-4060
(512) 628-3410 (fax)
vhardy@dpelaw.com

*Of counsel:*

S. Calvin Capshaw
State Bar No. 03783900
Elizabeth L. DeRieux
State Bar No. 05770585
CAPSHAW DERIEUX
1127 Judson Road, Suite 220
P.O. Box 3999
Longview, TX 75606-3999
(903) 236-9800
(903) 236-8787 (fax)
ccapshaw@capshawlaw.com Robert M. Parker

State Bar No. 15498000
Robert C. Bunt
State Bar No. 00787165
Charles Ainsworth
State Bar No. 0078352
**PARKER, BUNT & AINSWORTH, P.C.**
100 East Ferguson, Suite 1114
Tyler, Texas 75702
(903) 531-3535
(903) 533-9687 (fax)

## *CERTIFICATE OF SERVICE*

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on December 15, 2008.

_Lee Kaplan (by permission /RD)_
Lee L. Kaplan

# Sur-Response Exhibits

| No. | Description |
| --- | --- |
| 1. | Egger Deposition |
| 2. | Ait Declaration |
| 3. | Ait Deposition |
| 4. | Site Tech SEC Filing 10-QSB |
| 5. | Debtor's First Amended Disclosure Statement |
| 6. | Third Declaration of Jeffrey Franklin Ait |
| 7. | Statement of Financial Affairs |
| 8. | Debtor's First Amended Plan of Reorganization |
| 9. | Schedule B – Personal Property |
| 10. | Schedule F – Creditors Holdings Unsecured Nonpriority Claims |
| 11. | Defendants' Reply Brief |
| 12. | Certificate of Ownership Merging Site/Technologies/Inc. into Site Technologies, Inc. |
| 13. | Schedule 2.01(c) to Motion to Assume Executor Contracts, at 1-2 |
| 14. | Restated Certificate of Incorporation of Libertech Inc. |
| 15. | Plaintiff's Response to Defendants' Motion to Dismiss |
| 16. | Stock Exchange Agreement |
| 17. | Press Release |
| 18. | Bill of Sale, Assignment and License Agreement |
| 19. | Schedule G – Executory Contracts and Unexpired Leases |
| 20. | Defendants' Motion to Dismiss for Lack of Standing |

| No. | Description |
|-----|-------------|
| 21. | Declaration of J. Christopher Lynch |
| 22. | Lynch deposition |
| 23. | Email string re: locating Bill of Sale |
| 24. | PTO Record of Bill of Sale & Assignment |
| 25. | Assignment of Patent |
| 26. | Site Tech SEC Filing 10-QSB (03/31/98) |
| 27. | Site Tech Bankruptcy Docket Sheet |

1

Case 2:07-cv-00511-CE   Document 183-9   Filed 02/15/2008   Page 1 of 9

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

**CERTIFIED**

**TRANSCRIPT**

SOFTWARE RIGHTS ARCHIVE, LLC    )
                                )
    v.                          ) Civil Case No.
                                ) 2:07-cv-511(CE)
GOOGLE INC., YAHOO! INC., IAC   )
SEARCH & MEDIA, INC., AOL,      )
LLC, AND LYCOS, INC.            )


                                    October 2, 2008
                                    7:51 a.m.


        The Videotaped Deposition of DANIEL EGGER,

    taken pursuant to notice on behalf of the

    Defendants, at the Marriott Hotel at Research

    Triangle Park, 4700 Guardian Drive, Durham, North

    Carolina 27703, before Suzanne G. Patterson,

    Registered Professional Reporter and Notary Public.


**EXHIBIT 1**

45

1  signature does not appear on that document, on Exhibit

2  A, correct?

3      A.    Just my initials.

4      Q.    Did you attempt to have an officer of Site

5  Technologies, Inc. at any point execute Exhibit A as an

6  independent document?

7      A.    I understood this was one document, I signed

8  it, Jeff signed it, I paid him the money, I bought the

9  patents, and that was about my extent of my knowledge

10 of it at the time.

11          MR. WALSH:   I'm going to object to the answer

12     as nonresponsive.

13 BY MR. HUNG:

14     Q.    I'm sorry.  All I'm trying to find out is, did

15 you ever separate this Exhibit A, send it to anyone at

16 Site Technologies, Inc. and ask them to execute it?

17     A.    I don't believe so, no.

18     Q.    To make sure I didn't miss something, the

19 underlying section that, under -- under which your

20 initials appear, you have no recollection as to what

21 that underlining refers to, correct?

22     A.    Yeah.  No, I don't know what that's about.

23     Q.    Do you recall whether you paid, actually paid

24 Site Technologies, Inc. a hundred thousand dollars in

25 cash for the assets relating to the 1998 Bill of Sale?

80

1     Q.    -- assignor hereby covenants and agrees that it

2     has.  Do you see that sentence?

3     A.    Yes.

4     Q.    Do you agree that the statement, assignor

5     hereby covenants and agrees that it has full rights to

6     convey the entire interest herein assigned, is an

7     incorrect statement?

8     A.    No.

9     Q.    Let me parse this slightly.  Would you agree

10    that in February 2005, Site/Technologies/Inc. did not

11    have the full right to convey the entire interest in

12    the patents identified in Schedule A?

13    A.    They'd already -- they'd already been

14    transferred it me, had already been sold to me at that

15    time.

16    Q.    So, do you agree that in February 2005, Site

17    Technologies, Inc. did not have the full right to

18    convey the entire interest in the patents identified in

19    Schedule A?

20    A.    My understanding was that nothing was actually

21    transferred or assigned by this document, this was

22    purely for notice.  We needed to get something on file.

23    Q.    If you look at the first sentence in the third

24    paragraph in this document, Assignment of Patent, you

25    will see that it uses the present tense in stating that

81

1   the assignor hereby sells, assigns, and transfers to

2   assignee the entire right, title, and interest in and

3   to the patents.  Do you see that?

4       A.   Yes, I do.

5       Q.   To the extent that this document purported to

6   currently, contemporaneously, assign the entire right,

7   title, and interest in the patent identified in

8   Schedule A, this document would be false, correct?

9       A.   Could you repeat the question?

10      Q.   Sure.  The statement in the first sentence of

11  paragraph 3, which states in relevant part, that the

12  assignor hereby assigns -- hereby sells, assigns, and

13  transfers to assignee the entire right, title, and

14  interest in and to the patents, that statement is

15  false, correct?

16      A.   I don't know if you can read part of the

17  sentence without the whole sentence, that's the problem

18  I'm having with your question.

19      Q.   Okay.  Let me try it this way.  Do you agree

20  that paragraph 3 of the Assignment of Patent, dated

21  February 11, 2005, is inaccurate?

22      A.   No, I don't really agree with that, no.

23      Q.   So, it's your understanding that as of

24  February 11th, 2005, Site/Technologies/Inc., on that

25  date sold, assigned, and transferred to you the entire

82

1   right, title, and interest to the patents identified in

2   Schedule A?

3       A.   No, it didn't happen on that date and we were

4   attempting to use the document to describe events that

5   had happened in the past.

6       Q.   Even though you were attempting to describe

7   events that happened in the past, you chose to use the

8   present tense in this document, correct?

9       A.   Yes.

10      Q.   And the use of the present tense was incorrect,

11  correct?

12      A.   Well, I was told by my attorney, Chris Lynch,

13  that this was the correct form to provide this notice,

14  and he gave it to me this way and I relied on his

15  advice and I signed it and we filed it.

16          MR. WALSH:   I'm going to object to the answer

17      as nonresponsive.

18  BY MR. HUNG:

19      Q.   As you sit here today, you would agree with me

20  that the use of the present tense in paragraph 3 in

21  discussing, hereby sells, assigns, and transfers to

22  assignee the entire right, title, and interest, that

23  use of the present tense is incorrect, right?

24      A.   I would agree with you that it would have been

25  better to use the past tense.

90

1    Q.    You were not attempting to provide notice of

2    from whom you acquired the patents?

3    A.    I -- I was trying to provide notice that I

4    owned them and I wasn't aware that there was a

5    meaningful distinction between Site Technologies with

6    or without a Slash.

7    Q.    Do you understand that there is a distinction

8    between a corporation in Delaware and a corporation in

9    California?

10    A.    Of course, yes, of course.

11    Q.    Do you understand that the 2005 Assignment of

12    Patent refers to Site/Technologies/Inc., a Delaware

13    Corporation, correct?

14    A.    Yes, yes.

15    Q.    And this document was supposed to provide

16    notice of a transfer to you that occurred in 1998,

17    correct?

18    A.    Also correct, yes.

19    Q.    And that transfer that is reflected in the 1998

20    bill of sale, that had been a transfer between Site

21    Technologies, Inc., a California Corporation, to you,

22    correct?

23    A.    You know, I'm not really sure right now, I'm

24    not really sure right now about the distinction between

25    Site with a Slash and Site without a Slash as of 1998.

96

1      sale to me in the filing that we made in

2      February 2005.

3  BY MR. HUNG:

4      Q.   Are you aware of any documents in the 2005 time

5  frame during which this 2005 assignment was recorded

6  that used this notice of sale terminology?

7      A.   There's many documents that I'm aware of but I

8  don't know whether they use that term or not.

9      Q.   Did you and Mr. Lynch discuss in the 2005 time

10 frame the fact that absent this 2005 Assignment of

11 Patent, you would be unable to record notice of the

12 sale of the patents to you with the Patent and

13 Trademark Office?

14     A.   The way it was put to me was, we should provide

15 notice of the sale to you before we file the notice of

16 assignment from me to Software Rights Archive, Inc.

17     Q.   Why did Mr. Lynch tell you this was necessary?

18         MR. KAPLAN:   Objection; form.

19         THE WITNESS:   I don't know.

20 BY MR. HUNG:

21     Q.   Did he tell you why this was necessary?

22     A.   He said that you're supposed to provide notice

23 and there was no notice of the 1998 sale, and we should

24 provide it.

25     Q.   He told you that you should provide notice of

110

1    Q.   Mr. Lynch, in his Declaration, refers to this

2    concept of the winding-up authority of the companies.

3    My question for you is, did you discuss this concept of

4    winding-up authority with Mr. Lynch?

5    A.   Not really, no.

6    Q.   You and Mr. Lynch never discussed whether you

7    were empowered as a former executive of

8    Site/Technologies/Inc. to execute the February 2005

9    assignment on behalf of Site/Technologies/Inc., is that

10   right?

11   A.   Can you ask the question a little simpler, I

12   lost the thread there, I'm sorry.

13   Q.   Sure.  Sure.  Did you and Mr. Lynch ever

14   discuss whether you were empowered as a former

15   executive of Site/Technologies/Inc. to execute the

16   February '05 assignment on behalf of

17   Site/Technologies/Inc.?

18   A.   Okay.  We never discussed it on behalf of

19   Site/Technologies/Inc., I didn't distinguish these

20   different entities.  We did discuss that I had the

21   authority to sign the document, the February 11th, 2005

22   Assignment, he said that I had the authority to sign it

23   as a former officer.

24   Q.   As a former officer at any point in time, you

25   had the authority to sign the February 2005 document?

176

C E R T I F I C A T E

STATE OF NORTH CAROLINA:
COUNTY OF WAKE:

   I, Suzanne G. Patterson, do hereby certify that I
placed under oath the deponent, Daniel Egger, at the
time and place herein designated.

   Witness my hand this 7th day of October, 2008.




                    Suzanne G. Patterson, RPR
                    Notary Public, County of Wake
                    State of North Carolina
                    My Commission Expires: 9/5/2010


   I, Suzanne G. Patterson, Registered Professional
Reporter, certify that I was authorized to and did
stenographically report the foregoing proceedings at
the time and place herein designated; and that the
foregoing pages constitute a true, complete and
accurate transcription of my said stenotype notes.

   I further certify that I am not of counsel for,
related to, or employed by any party hereto or attorney
involved herein, nor am I financially interested in the
outcome of this action.

   Witness my hand this 8th day of October, 2008.


                    Suzanne G Patterson
                    _____
                    Suzanne G. Patterson, RPR
                    Notary Public, Wake County
                    State of North Carolina
                    My Commission Expires: 9/5/2010

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| SOFTWARE RIGHTS ARCHIVE, LLC | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | Civil Action No. 2:07-cv-511-TJW |
| GOOGLE INC., YAHOO! INC., | § | |
| IAC SEARCH & MEDIA, INC., AOL LLC, | § | |
| and LYCOS, INC. | § | |
| | § | JURY TRIAL DEMANDED |
| Defendants. | § | |

## DECLARATION OF JEFFREY FRANKLIN AIT

I, Jeffrey Franklin Ait, under penalty of perjury, hereby make the following declaration. All facts set forth herein are true and correct, and I make this declaration based upon my personal knowledge and upon review of corporate records:

1.   I became the Chief Executive Officer of DeltaPoint, Inc./Site Technologies, Inc. ("Site Tech") on March 24, 1997. I also served as Chief Financial Officer and Director of Site Tech since September 2, 1997. I was also the President and Chief Executive Officer and Secretary of the corporate shell of the Delaware corporation, Site/Technologies/Inc. ("Site/Tech"), from the time that Site Tech acquired its stock and assets until its remaining corporate shell was merged with Site Tech in 2000. I was also at times the sole director of Site/Tech as well as the official "responsible person" in the bankruptcy of Site Tech.

2.   On July 11, 1997, Site Tech acquired Site/Tech from Daniel Egger and other stockholders. At that time, Site Tech's name was Deltapoint, Inc. The purpose of this transaction was to merge the business of Site/Tech into Deltapoint, Inc.  In this transaction,

EXHIBIT 2

Deltapoint directly acquired all outstanding stock of Site/Tech and all of the then-existing assets of the company, including its patents and trademarks. Deltapoint adopted the name of "Site Technologies, Inc." from Site/Tech and began conducting business under Site/Tech's trademarks, which were directly acquired in the transaction as assets of Site Tech, and continued developing the products which were the former business of Site/Tech. All former operations of Site/Tech became operations of Site Tech and the former employees of Site/Tech became the employees of Site Tech to the extent that these employees remained in the organization. Site Tech adopted and employed Site/Tech's website, email addresses, and other property as its own, and represented that it owned them. After the July 11, 1997 acquisition, Site/Tech lacked any substantial independent operation or business from that of Site Tech. It did not design, produce, market, or sell anything, and it had no significant independent costs or revenues. Further, Site Tech conducted Site/Tech's few remaining business affairs on Site/Tech's behalf. Site Tech prepared consolidated financial statements for the companies, and Site Tech maintained Site/Tech's tax records.

3. Site/Tech did not observe corporate formalities. Site/Tech held no director meetings or shareholder meetings. Site/Tech made no decisions, and took no actions, separate from Site Tech. Site/Tech maintained no bank account separate from Site Tech's bank account. Site/Tech did not segregate any assets from Site Tech's assets; instead, Site Tech represented that it acquired all of Site/Tech's assets on July 11, 1997, including its patents. Site/Tech did not segregate its corporate records from those of Site Tech. In fact, Site/Tech maintained no separate corporate records.

4. My understanding of the corporate records is that on July 8, 1997, the change of control provision of the Certificate of Incorporation of Site/Tech was amended in connection

with the acquisition to invoke the liquidation provisions of the Certificate of Incorporation upon execution of an agreement that sold substantially all the stock of the company. Attached is a true and correct copy of the amendment to the Certificate of Incorporation. The assets, including the patents, were transferred to Site Tech and assets were in fact held by Site Tech after the acquisition.

5.      On September 16, 1998, Site Tech sold and assigned, among other things, U.S. Patent No. 5,544,352, and related applications and future patents (which include U.S. Patent Nos. 5,832,494 and 6,233,571) to Daniel Egger (the "Patents"). Daniel Egger paid $100,000 for the Patents.

6.      I was the chief corporate officer of both Site Tech entities that controlled and later sold all of the assets on behalf of both Site Tech entities in several transactions with different parties that were originally acquired from Daniel Egger and his investors. At the time of the execution of the 1998 Bill of Sale and Assignment that assigned the Patents to Daniel Egger, I was the CEO of both Site Tech and Site/Tech and was fully authorized by both companies to assign the Patents to Daniel Egger. It was my intent, as well as the intent of all the Site Tech entities, to transfer the Patents to Daniel Egger through the 1998 Bill of Sale and Assignment. After the sale, neither Site Tech entity carried the Patents on their books and both recognized the validity of the 1998 Bill of Sale and Assignment and that the Patents had been transferred to Daniel Egger through these contracts. I also delivered the other V-Search products and code due under the 1998 Bill of Sale to Daniel Egger on behalf of the Site Tech entities. To the extent that there is any question as to whether the Patents were assigned to Daniel Egger, the Site Tech entities do not claim any title to the Patents and have long disclaimed any ownership in favor of Daniel Egger. This includes Site/Tech, which ratified the 1998 Bill of Sale and Assignment and

3

Site Tech's authority and right to transfer the patents in those documents on behalf of all Site Tech entities a long time ago.

7. The Site Tech entities further approve of and ratify the previous 1998 Assignments and the 2005 Assignment to Daniel Egger filed on behalf of Site/Tech by Daniel Egger.

8. The 2005 assignment was within the intent of all the parties to the transaction and fairly represented the transaction.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August _18_, 2008
Myrtle Beach, South Carolina

4

1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

MARSHALL DIVISION

**CERTIFIED**
**TRANSCRIPT**

- - - - -

```
------------------------------------x
SOFTWARE RIGHTS ARCHIVE, LLC.,       :
                                     :
                Plaintiff,           :
                                     : Civil Action No.
            -vs-                     : 2:07-cv-511 (CE)
                                     :
GOOGLE INC., YAHOO! INC., IAC SEARCH :
& MEDIA, INC., AOL, LLC., and LYCOS, :
INC.,                                :
                                     :
                Defendants.          :
------------------------------------x
```

- - - - -

Videotaped deposition of JEFFREY FRANKLIN AIT, the witness herein, called for the purpose of Discovery Examination by the Defendants, pursuant to Federal Rules of Civil Procedure, taken before Rita Rodriguez, a Notary Public for South Carolina, at the Hilton Myrtle Beach Resort, 10000 Beach Club Drive, Myrtle Beach, South Carolina, on Tuesday, September 30, 2008, commencing at 9:45 a.m.

- - - - -

**EXHIBIT 3**

104

1  A.    Yes.

2  Q.    The next paragraph she says, "In 2000 while

3        finalizing the 2000 tax returns it appears we

4        became aware that Slash still existed on paper

5        and had not been liquidated."

6           And then she says, "I have an e-mail

7        string from Wilson, Sonsini relating to the bill

8        from the franchise tax board asking us to prepare

9        a letter saying that Slash had no assets and a

10       response back saying we were not comfortable

11       stating that since we had just determined the

12       entity still existed."

13         Do you see that?

14  A.    Okay.

15  Q.    Do you recall any of that that she just describes

16       there that Wilson, Sonsini had e-mailed -- that

17       the franchise tax board, somebody had wanted them

18       to prepare a letter saying that Slash had no

19       assets and in 2000 y'all were not comfortable

20       stating that since you hadn't determined if Slash

21       still existed?

22         Do you recall that?

23  A.    I mean, I did not recall that until she sent me

24       this e-mail.

25  Q.    But you have no reason to dispute the accuracy of

| 1 | | her e-mail; do you? |
|---|---|---|
| 2 | A. | No. |
| 3 | Q. | In fact, we have seen tax returns from 1998 and |
| 4 | | 1999 for Slash showing that they still had some |
| 5 | | ongoing business activities; correct? |
| 6 | A. | They were filed in 2001 as a result of this |
| 7 | | determination that we needed to do that. |
| 8 | Q. | Right.  Which confirmed that slash still had some |
| 9 | | ongoing business activities in 1998 and 1999; |
| 10 | | correct, Mr. Ait? |
| 11 | A. | Yes. |
| 12 | Q. | And she says, "I don't have any records but we |
| 13 | | must have done some work in 2000 to allocate |
| 14 | | something to the entity as the final tax returns |
| 15 | | have filings for the entity each year until 2000. |
| 16 | | We recognize royalty income and showed some fixed |
| 17 | | assets." |
| 18 | | Do you see that? |
| 19 | A. | Right, but we did not allocate any gain on sale |
| 20 | | of software. |
| 21 | Q. | You don't have any reason to dispute the accuracy |
| 22 | | of that statement by Miss Fugitt; right? |
| 23 | A. | I don't.  It's a direct interpretation. |
| 24 | Q. | You would agree, wouldn't you, Mr. Ait, that in |
| 25 | | 1998 and 1999, based on the documents we have |

1      misremembered it or misheard it?

2  A.    No, I said those employees I agreed to keep

3       employed for one year in North Carolina but as

4       employees of Site not as employees of Slash.

5  Q.    Well, if we look at the federal income tax return

6       for 1998, we show Slash paying salaries of

7       $88,000?

8  A.    But I don't know what that's for.  Their salaries

9       would have been much greater than that.  That

10     actually can be a portion of my salary as the CEO

11     that they decided to apply to this.  Again,

12     without asking the accountants the way that they

13     distributed these assets across that for whatever

14     purposes, I can't tell you.  I can't remember.

15          But I could tell you that Ron Sauer's

16     salary, Neal's salary and Sean's salary far

17     exceeded $88,000.

18  Q.   But that $88,000 could be a portion of their

19     salaries too; couldn't it?

20  A.   It could be but I don't believe that it is.

21  Q.   But we have here $88,000, compensation of

22     officers.  That's what was written, compensation

23     of officers, on a federal income tax return that

24     you signed in 2001 on behalf of Slash?

25  A.   But it would not have been their salary.  This

108

1       would have been mine because it says officers.

2       They were not officers.

3  Q.    But you would agree that Slash was paying at

4       least $88,000 because that was what was reported

5       to the federal government for an officer in the

6       1998 tax year; correct?

7  A.    Yes.

8           MR. KAPLAN:  Objection.  Asked and

9       answered.

10  Q.    Wouldn't you agree, based on what we have seen

11       here today, Mr. Ait, that Slash was not a shell

12       entity in 1998 or 1999?

13  A.    No, I don't agree with that.  There was no

14       business carried out by Slash.

15  Q.    Even though Slash is taking these losses and

16       other amortizations and depreciations and has

17       capital paid in as we have seen on these income

18       tax returns in 1998, your opinion and belief, as

19       you sit here today under oath, was that Slash was

20       a shell entity in 1998?

21  A.    Yes, it was a wholly-owned subsidiary that did no

22       business.  I don't know what you classify as a

23       shell but that's what I would classify as a

24       shell.

25  Q.    Let me ask you, what is your definition of a

110

```
 1            shell entity?  If you told me I didn't get it.
 2   A.    A shell entity basically is a corporation that
 3            has no assets.
 4   Q.    But we know from looking at the 1998 tax return
 5            that in fact Slash had assets in 1998, don't we,
 6            sir?
 7   A.    Desks, chairs and computers, yes.
 8   Q.    So you would agree under your own definition of
 9            shell entity, under the definition that you just
10            told me, and I mean this respectfully, Slash was
11            not a shell entity at least in 1998, you would
12            agree with that; right, and the same in 1999;
13            correct?
14   A.    Okay.
15   Q.    I'm going to get through some stuff here that I
16            don't want to ask you.  Give me a second here.
17            I'm going to cut some stuff here.
18                 V-Search technology, Mr. Ait, you have
19            talked about that being the technology that you
20            intended to sell to Mr. Egger; correct?
21   A.    Yes.
22   Q.    Did you ever try to sell the V-Search technology
23            to anyone other than Mr. Egger?
24   A.    No.
25   Q.    When we say the V-Search technology, do you know
```

```
1    STATE OF SOUTH CAROLINA        :
2                                   :    SS:      CERTIFICATE
3    COUNTY OF HORRY                :
4         I, Rita Rodriguez, a Notary Public for South
5    Carolina, do hereby certify that the within named
6    witness,                  , was by me first duly sworn to
7    testify the truth, the whole truth and nothing but the
8    truth in the cause aforesaid:
9         That the testimony then given was reduced by me
10   to stenotype in the presence of said witness,
11   subsequently transcribed onto a computer under my
12   direction, and that the foregoing is a true and correct
13   transcript of the testimony so given as aforesaid.
14        I do further certify that this deposition was
15   taken at the time and place as specified in the
16   foregoing caption, and that I am not a relative,
17   counsel or attorney of either party, or otherwise
18   interested in the outcome of this action.
19        IN WITNESS WHEREOF, I have hereunto set my hand
20   and affixed my seal of office at Myrtle Beach, South
21   Carolina this      day of              ,
22
                         _Rita Rodriguez_
23                       RITA RODRIGUEZ, Notary Public
                         for South Carolina.
24
          My Commission expires October 4, 2010.
25
```

disposition provided the Company with much needed liquidity.

V-Search Disposition. On September 30, 1998, the Company consummated the sale of its V-Search technology and related patents. This was technology that the Company acquired in the Site Tech Acquisition. The Company sold the assets relating to V-Search in cash to Daniel Edgar. The Company received a cash payment of $100,000.

Recent Acquisitions. On July 11, 1997, the Company consummated the "Site Tech Acquisition" pursuant to which the Company issued a total of 550,029 shares of Common Stock, made a cash payment of $60,000 and assumed liabilities of $73,000 for a total purchase price of $638,000 in exchange for all outstanding shares of Site. The Company recognized a charge to operations of $500,000 for the portion of the purchase price determined to be in-process research and development.

On November 19, 1997, the Company consummated the "Inlet Technology Acquisition" pursuant to which the Company acquired from Inlet certain Internet technologies. As consideration for the Inlet Technology Acquisition, the Company issued Notes payable of $825,000 in cash and 360,000 shares of the Company's Common Stock. The Company recognized a charge to operations of approximately $1.1 million for the portion of the purchase price determined to be in-process research and development

See Note 6 of Notes to Consolidated Financial Statements in the Company Form 10-KSB for the year ended December 31, 1997 for further discussion of the Site Tech and Inlet Acquisitions.

Revenues. The Company's revenues consist of license revenues from sales of software products to distributors, resellers and end users. In addition, the Company derives license revenues from royalty agreements with certain customers. Under these agreements, the Company typically receives a large percentage of the aggregate revenues in the form of a nonrefundable royalty paid upon shipment of the master copy of software, which allows the customer to license a specified number of copies of the Company's software. In addition, the Company recently introduced products targeted at the small to medium size businesses ("SMBs") and corporate department user markets for scalable Web site development and management solutions. In connection with the introduction of these products, the Company increased its use of non-retail distribution channels including value added resellers ("VARs"), original equipment manufacturers ("OEMs") and Internet Service Providers ("ISPs").

Software product sales are recognized upon shipment of the product, net of appropriate allowances for estimated returns. Revenues from software royalty agreements are recognized upon shipment of a master copy of the software product if no significant vendor obligations remain under the term of the license agreements and any amounts to be paid are nonrefundable. Payments received in

**EXHIBIT 4**

1    CRAIG M. PRIM   (077820)
      JANICE M. MURRAY (099996)
2    STEPHEN T. O'NEILL (115132)
      MURRAY & MURRAY
3    A Professional Corporation
      3030 Hansen Way, Suite 200
4    Palo Alto, CA  94304-1009
      (650) 852-9000
5

6    Attorneys for Debtor

**FILED**

APR 2 5 2000 *9 K*

KEENAN G. CASABY, CLERK
United States Bankruptcy Court
San Jose, California

8             UNITED STATES BANKRUPTCY COURT

9             NORTHERN DISTRICT OF CALIFORNIA

10                SAN JOSE DIVISION

11    In re:                       )     Case No.  99-50736-JRG-11

12    Site Technologies, Inc.,         )     Chapter 11
      dba DeltaPoint, Inc.           )

13                            )

14                Debtor.    )

15    EIN No.: 77-0212760         )

16

17

18         **DEBTOR'S FIRST AMENDED DISCLOSURE STATEMENT**

19                    **Dated April 25, 2000**

20

21

22

23

24

25

26

27

28

**DEBTOR'S DISCLOSURE STATEMENT**

**EXHIBIT 5**

## TABLE OF CONTENTS

| | Page |
|---|---|
| SUMMARY OF PLAN TREATMENT | 1 |
| 1. INTRODUCTION | 3 |
| 2. DISCLAIMER | 5 |
| 3. DEFINITIONS | 6 |
| 4. VOTING INSTRUCTIONS | 6 |
| 5. HISTORY OF THE DEBTOR | 7 |
| 6. TRANSACTIONS WITH INSIDERS | 10 |
| 7. SIGNIFICANT EVENTS DURING CHAPTER 11 | 10 |
|    7.1 StarBase Sale | 10 |
|    7.2 Sale of StarBase Stock | 11 |
|    7.3 Auction Sale | 11 |
|    7.4 Rejection of Executory Contracts and Unexpired Leases | 12 |
|    7.5 Blum Compromise | 12 |
| 8. DISTRIBUTION ANALYSIS | 13 |
|    8.1 Projected Distribution to Creditors and Shareholders | 13 |
|    8.2 Other Assets | 15 |
|    8.3 Common Stock | 15 |
|    8.4 Stock Option Plans | 15 |
|    8.5 Warrants | 16 |
| 9. DESCRIPTION OF PLAN | 16 |
|    9.1 General | 16 |
|    9.2 Classification of Claims and Interests Under the Plan | 16 |
|    9.3 Description and Treatment of Unclassified Claims | 17 |
|       A. Allowed Administrative Claims | 17 |
|       B. Tax Claims | 18 |
|    9.4 Unimpaired Classes | 18 |

MURRAY & MURRAY
A Professional Corporation
3030 Hansen Way, Suite 200
Palo Alto, Ca 94304-1009
TELEPHONE (650) 852-9000 FACSIMILE (650) 852-9244
E-MAIL mail@murraylaw.com

9.5    Description and Treatment of Impaired Classes ............................. 18

    A.    Class 1 Claims (Priority Claims) ................................ 18

    B.    Class 2 Claim (Savoir Technology Group, Inc.) ...................... 18

    C.    Class 3 Claims (Unsecured Creditors) ............................ 19

    D.    Class 4 Interests (Common Stock) ............................... 19

    E.    Class 5 Interests (Options and Warrants) .......................... 20

9.6    Means For Execution of the Plan ...................................... 20

    A.    Liquidation Proceeds; Remaining Assets .......................... 20

    B.    Disbursement of Funds ....................................... 20

    C.    Responsible Person .......................................... 20

    D.    Expedited Procedure for Compromises of Controversy, Sales and Abandonments .................................... 21

    E.    Unclaimed Property ......................................... 21

    F.    Professionals .............................................. 21

    G.    Dissolution of Corporation .................................... 22

10.   EXECUTORY CONTRACTS AND UNEXPIRED LEASES ................... 22

10.1   Assumption of Executory Contracts ................................... 22

10.2   Rejection of Executory Contracts and Unexpired Leases ..................... 22

10.3   Treatment of Executory Contracts and Unexpired Leases .................... 22

10.4   Rejection Claims .................................................. 23

11.   PROOFS OF CLAIMS; EVIDENCE OF EQUITY SECURITY; OBJECTIONS ........ 23

11.1   Time for Filing Proofs of Claim ...................................... 23

11.2   Evidence of Claim or Interest ........................................ 23

11.3   Time for Filing Objections .......................................... 24

11.4   Disputed Claims and Disputed Interests; Reserve Accounts .................. 24

12.   BEST INTERESTS TEST ............................................. 24

13.   VOTING PROCEDURES AND REQUIREMENTS .......................... 25

13.1   Ballots and Voting ................................................ 25

MURRAY & MURRAY
A Professional Corporation
3000 Hanover Way, Suite 200
Palo Alto, CA 94304-1209
TELEPHONE (650) 852-9000 FACSIMILE (650) 852-9244
E-MAIL mail@murraylaw.com

J:/M/Calb-06
I:\DAILY\UB\SAVITE\disel-stmt.1.wpd

-ii-

DEBTOR'S DISCLOSURE STATEMENT

| | | |
|---|---|---|
| 13.2 | Creditors and Interest Holders Entitled to Vote | 25 |
| 13.3 | Impairment | 26 |
| 13.4 | Vote Required for Class Acceptance | 26 |
| 14. | CONFIRMATION | 26 |
| 14.1 | Confirmation Hearing | 26 |
| 14.2 | Confirmation Requirements | 27 |
| 14.3 | Confirmation Without Acceptance by All Impaired Classes of Claims or Interests ("Cram Down") | 28 |
| | A. Secured Claims | 28 |
| | B. Unsecured Claims | 29 |
| | C. Interests | 29 |
| 14.4 | Statutory Compliance | 30 |
| 14.5 | Effect of Confirmation | 30 |
| | A. Binding Effect | 30 |
| | B. Vesting of Property | 30 |
| | C. Discharge | 30 |
| 14.6 | Plan Modification | 30 |
| 15. | CHAPTER 11 POST-CONFIRMATION REPORTS AND FINAL DECREE | 31 |
| 15.1 | Post-confirmation Reports | 31 |
| 15.2 | Service of Reports | 31 |
| 15.3 | Final Decree | 31 |
| 16. | JURISDICTION | 31 |
| 17. | MISCELLANEOUS | 33 |
| 17.1 | Headings | 33 |
| 17.2 | Singular/Plural | 33 |
| 17.3 | Gender | 33 |
| 17.4 | Computation of Time Periods | 33 |
| 18. | CONCLUSION | 34 |

MURRAY & MURRAY
A Professional Corporation
3030 Hansen Way, Suite 20
Palo Alto, Ca 94304-1009
TELEPHONE (650) 852-9000 FACSIMILE (650) 852-9244
E-MAIL mail@murraylaw.com

## SUMMARY OF PLAN TREATMENT

**THIS SUMMARY IS MODIFIED IN ITS ENTIRETY BY THE MORE DETAILED EXPLANATION CONTAINED IN THE BALANCE OF THE DISCLOSURE STATEMENT AND THE SPECIFIC PROVISIONS OF THE PLAN OF REORGANIZATION, WHICH PROVISIONS SHALL GOVERN THE TREATMENT OF CREDITORS AND EQUITY SECURITY HOLDERS.**

**Bankruptcy filing**: Site Technologies, Inc., dba Delta Point, Inc. (the "Debtor") filed its Chapter 11 Bankruptcy Case on February 2, 1999. This Disclosure Statement and the accompanying Plan of Reorganization constitute the Debtor's proposal for an orderly liquidation of its assets.

**Voting Instructions**: Accompanying this Disclosure Statement is a Ballot which may be used to vote on the Plan. In order to be timely, Ballots must be received by counsel for the Debtor not later than 5:00 p.m. on May 30, 2000 at

> Murray & Murray
> A Professional Corporation
> Attn: Janice M. Murray, Esq.
> 3030 Hansen Way, Suite 200
> Palo Alto, CA 94304-1009
> Telephone: (650) 852-9000
> Facsimile: (650) 852-9244

**Confirmation Hearing**: The Bankruptcy Court has been asked to schedule a hearing to consider confirmation of the Plan. Creditors, Equity Security Holders and parties in interest will receive a separate notice, accompanying this Disclosure Statement, identifying the date, time and place of the Confirmation Hearing, and identifying the requirements for filing and serving objections, if any, to confirmation of the Plan. The Confirmation Hearing may be adjourned from time to time without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or any subsequently adjourned Confirmation Hearing.

**Means of Implementation**: The Debtor consummated the StarBase Sale (as defined in the Plan) pursuant to which the Debtor's core technology assets were sold to StarBase in exchange for 625,000 shares of StarBase stock. After the expiration of certain restrictions, the Debtor sold all of its StarBase stock. The Debtor also conducted an auction of its fixed assets (e.g., furniture, equipment and miscellaneous personal property). Proceeds from the sale of the StarBase stock, the auction and other assets which may be liquidated by the Debtor will be distributed pursuant to the

MURRAY & MURRAY
A Professional Corporation
3030 Hansen Way, Suite 200
Palo Alto, CA 94304-1009
TELEPHONE (650) 852-9000 FACSIMILE (650) 852-9244
E-MAIL mail@murraylaw.com

1  terms of the Plan. The Bankruptcy Estate presently has approximately $8.4 million in cash with

2  which to implement the Plan.

3      **Specific Treatment**: A summary of the treatment of the various Classes of Claims and Interests

4  is set forth below:

5  <u>Claims/Interests</u>                              <u>Treatment</u>

6  Administrative Claims                            Administrative Claims will be paid in full on
7                                                   the latest of (i) the Effective Date of the Plan,
                                                    (ii) upon allowance by the Bankruptcy Court,
8                                                   (iii) in the ordinary course of the Debtor's
                                                    business or (iv) such other time as may be
9                                                   agreed to by the holder of such Claim.

10  Tax Claims                                      Tax Claims will be paid in full on the latest of
                                                    (i) the Effective Date of the Plan, (ii) upon
11                                                  allowance by the Bankruptcy Court, or (iii)
                                                    such other time as may be agreed to by the
12                                                  holder of such claim; provided, however, the
                                                    Debtor may elect to pay tax claims in
13                                                  deferred cash payments, over a period not
                                                    exceeding six (6) years after date of
14                                                  assessment.

15  Class 1: Priority Claims                        Priority Claims will be paid in full on the
                                                    Effective Date of the Plan.
16
    Class 2: Savoir Technology Group, Inc.          Savoir shall retain its lien (to the extent not
17                                                  avoided), which lien will attach to the
                                                    proceeds from the sale of its collateral.
18                                                  Savoir's Allowed Secured Claim will be paid
                                                    in full. The balance of any Claim by Savoir
19                                                  will be treated as a Class 3 Claim.

20  Class 3: Unsecured Creditors                    Unsecured Creditors will be paid in full,
                                                    including interest, as soon as practicable after
21                                                  the Effective Date and after the payment of
                                                    or reservation for all Allowed Administrative
22                                                  Claims, Allowed Secured Claims, Tax Claims,
                                                    Priority Claims, any other senior Claims, and
23                                                  post-Confirmation expenses of the Debtor;
                                                    provided, however, that said payment will be
24                                                  made no later than the later of (i) thirty (30)
                                                    days after the Effective Date, or (ii) upon
25                                                  resolution of all Disputed Claims, including
                                                    Rejection Claims. Notwithstanding the
26                                                  foregoing, in the unlikely event that there are
                                                    insufficient funds to pay unsecured Creditors
27                                                  in full with interest, unsecured Creditors will
                                                    be paid pro rata from available funds.

28

DEBTOR'S DISCLOSURE STATEMENT

| Claims/Interests | Treatment |
|---|---|
| Class 4: Common Stock Holders | Shareholders of record on the Distribution Date shall receive a pro rata distribution from available funds, as soon as practicable after (i) payment of or reservation for all Allowed Administrative Claims, Allowed Secured Claims, Tax Claims, Priority Claims, Allowed Unsecured Claims, any other senior Claims, and post-Confirmation expenses of the Debtor, and (ii) resolution of all Disputed Claims and Disputed Interests.  The Interests of common stock holders shall otherwise be cancelled and extinguished on the Distribution Date. |
| Class 5: Option and Warrant Holders | Holders, as of the Effective Date, of outstanding, unterminated options and warrants to acquire the Debtor's common stock shall receive nothing under the Plan and their respective interests shall otherwise be canceled and extinguished on the Effective Date. |

The Debtor believes that Confirmation of the Plan will result in the highest and best recovery for, and is in the best interest of, Creditors and Equity Security Holders.  Accordingly, the Debtor urges all eligible Creditors and Equity Security Holders to submit their Ballots in favor of the Plan on or before 5:00 p.m. on May 30, 2000.

**Distribution of Plan Documents:**  The Debtor has utilized the services of Bankruptcy Claims Administration ("BCA") in this case for initial data input and data base generation for information required to be served on creditors and shareholders.  BCA has also provided services related to notice preparation, printing and mailing to creditors and shareholders in this case.  The Debtor intends to retain BCA (or a similar service if BCA is not available) to prepare, print and disburse the plan solicitation package to all parties in interest.  The Debtor will pay BCA for its services in the ordinary course of business from funds on hand in the estate.

## 1.  INTRODUCTION

1.1    Site Technologies, Inc., a California corporation ("Site", the "Debtor" or the "Company") submits this Disclosure Statement in connection with the solicitation of acceptances of the DEBTOR'S PLAN OF REORGANIZATION dated March 27, 2000 (the "Plan").  The

MURRAY & MURRAY
A Professional Corporation
3030 Hansen Way, Suite 200
Palo Alto, Ca 94304-1029
TELEPHONE (650) 852-9000 FACSIMILE (650) 852-9244
E-MAIL info@murraylaw.com

D.O.C.ak-01
I:\OAL TUB-0-A\SITE-d\sd-stmt1.wpd

DEBTOR'S DISCLOSURE STATEMENT

1  Plan is being transmitted to Creditors and Equity Security Holders of the Debtor with this

2  Disclosure Statement. Capitalized terms used herein, if not separately defined, have the

3  meanings assigned to them in the Plan.

4        1.2    Chapter 11 sets forth the rules and procedures under which financially distressed

5  entities may be reorganized or liquidated pursuant to a plan of reorganization presented to

6  creditors and shareholders for consideration and approval. Confirmation of the Plan is the

7  culmination of that process.

8        1.3    The Plan is being proposed by the Debtor to effect an orderly liquidation of the

9  Company's assets, to maximize the value of those assets, and to provide for the distribution of the

10  liquidation proceeds to Creditors and Equity Security Holders.

11        1.4    The Plan sets forth a proposal for the satisfaction, discharge and/or cancellation

12  of all Claims against and Interests in the Debtor. Creditors and Equity Security Holders should

13  thoroughly review both the Plan and the Disclosure Statement before deciding whether to accept

14  or reject the Plan. The purpose of the Disclosure Statement is to provide adequate information of

15  a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history

16  of the Debtor and the condition of the Debtor's books and records, that would enable a

17  hypothetical reasonable investor typical of holders of Claims and Interests of the relevant Class to

18  make an informed judgment about the Plan.

19        1.5    Before the Debtor's Disclosure Statement may be used in connection with an

20  acceptance or rejection of the Plan, the Bankruptcy Court, after a noticed hearing, must have

21  approved the Disclosure Statement as containing adequate information to enable Creditors,

22  Equity Security Holders and parties in interest to make an informed judgment on whether or not

23  to accept or reject the Debtor's Plan.

24        1.6    As set forth in the Order Approving Disclosure Statement enclosed herewith, the

25  Bankruptcy Court approved this Disclosure Statement. The Court's approval of the Disclosure

26  Statement, however, does not constitute an endorsement of the Plan by the Bankruptcy Court.

27        1.7    Creditors and Equity Security Holders should read this Disclosure Statement and

28  the Plan in their entirety prior to voting by way of the enclosed Ballot, which must be completed

1    and returned.

2                                            **2.  DISCLAIMER**

3          **2.1    THIS DISCLOSURE STATEMENT CONTAINS INFORMATION WHICH MAY**

4    **BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PROPOSED PLAN.  PLEASE**

5    **READ THIS DOCUMENT WITH CARE.  FOR THE CONVENIENCE OF CREDITORS AND**

6    **EQUITY SECURITY HOLDERS, THIS DISCLOSURE STATEMENT SUMMARIZES THE**

7    **TERMS OF THE PLAN, BUT THE PLAN ITSELF QUALIFIES THIS SUMMARY.  IF ANY**

8    **INCONSISTENCIES EXIST BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT,**

9    **THE TERMS OF THE PLAN ARE CONTROLLING.  NO REPRESENTATIONS CONCERNING**

10   **THE DEBTOR, ITS FINANCIAL CONDITION OR ANY ASPECT OF THE PLAN ARE**

11   **AUTHORIZED BY THE DEBTOR OTHER THAN AS SET FORTH IN THIS DISCLOSURE**

12   **STATEMENT.**

13         **2.2    THE FINANCIAL INFORMATION CONTAINED HEREIN, UNLESS**

14   **OTHERWISE INDICATED, IS UNAUDITED; IN ADDITION, BECAUSE OF THE DEBTOR'S**

15   **FINANCIAL DIFFICULTIES, THE INFORMATION CONTAINED HEREIN MAY BE**

16   **INCOMPLETE OR INACCURATE.  FOR THE FOREGOING REASONS, THE DEBTOR AND ITS**

17   **PROFESSIONALS ARE UNABLE TO WARRANT THAT THE INFORMATION CONTAINED**

18   **HEREIN IS WITHOUT ANY INACCURACY.  HOWEVER, GREAT EFFORT HAS BEEN MADE**

19   **TO ENSURE THAT ALL SUCH INFORMATION IS FAIRLY PRESENTED.**

20         **2.3    THE PROFESSIONALS REPRESENTING THE DEBTOR HAVE RELIED UPON**

21   **INFORMATION PROVIDED BY THE DEBTOR IN CONNECTION WITH THE PREPARATION**

22   **OF THIS DISCLOSURE STATEMENT AND HAVE NOT INDEPENDENTLY VERIFIED ALL OF**

23   **THE INFORMATION CONTAINED HEREIN.  THE CONTENTS OF THIS DISCLOSURE**

24   **STATEMENT SHOULD NOT BE CONSTRUED AS LEGAL, BUSINESS OR TAX ADVICE.  YOU**

25   **SHOULD CONSULT WITH YOUR OWN LEGAL COUNSEL AND ACCOUNTANT AS TO**

26   **LEGAL, TAX AND RELATED MATTERS CONCERNING YOUR CLAIM OR INTEREST.**

27         **2.4    THE SECURITIES AND EXCHANGE COMMISSION HAS NOT**

28   **APPROVED OR DISAPPROVED THIS DISCLOSURE STATEMENT, OR**

MURRAY & MURRAY
A Professional Corporation
3030 Hansen Way, Suite 200
Palo Alto, Ca  94304-1009
TELEPHONE (650) 852-9000 FACSIMILE (650) 852-9244
E-MAIL mail@murraylaw.com

1   **DETERMINED IF IT IS TRUTHFUL OR COMPLETE.**

2           **3.  DEFINITIONS**

3       3.1    All definitions described in Section 2 of the Plan are incorporated herein by

4   reference.

5           **4.  VOTING INSTRUCTIONS**

6       4.1    IT IS IMPORTANT THAT YOU EXERCISE YOUR RIGHT TO VOTE TO ACCEPT

7   OR REJECT THE PLAN. If you are or may be entitled to vote on the Plan, you have been sent a

8   Ballot and instructions for voting with this Disclosure Statement. You should read the Ballot

9   carefully and follow the instructions contained therein. Please use only the Ballot sent to you

10   with this Disclosure Statement.

11       4.2    To simplify the voting procedure, Ballots have been sent to all known holders of

12   Claims and Interests, including Disputed Claims and Disputed Interests to which objections may

13   be filed. The Bankruptcy Code and the Bankruptcy Rules provide that only the holders of

14   Allowed Claims (or Claims which are deemed Allowed) and holders of Allowed Interests (of

15   record on the date the Order Approving Disclosure Statement is entered or another date fixed by

16   the Court) are entitled to vote on the Plan. A Claim or Interest to which an objection has been

17   filed is not an Allowed Claim or Allowed Interest unless and until the Bankruptcy Court rules on

18   the objection. The Bankruptcy Court may temporarily allow a Disputed Claim or Disputed

19   Interest to which an objection has been filed for purposes of voting on the Plan. Therefore,

20   although the holders of Disputed Claims or Disputed Interests to which an objection has been

21   filed will receive Ballots, these votes will not be counted unless the Bankruptcy Court

22   temporarily allows such Claims and Interests for purposes of voting on the Plan.

23       4.3    If a party in interest is a member of more than one Class, it will receive a Ballot

24   for each Class. **IF YOU ARE A MEMBER OF MORE THAN ONE CLASS, YOU MUST FILL**

25   **OUT AND RETURN ALL BALLOTS SENT TO YOU FOR YOUR VOTE TO COUNT IN EACH**

26   **CLASS. AN ACCEPTANCE OR REJECTION OF THE PLAN MAY BE VOTED BY**

27   **COMPLETING THE BALLOT THAT ACCOMPANIES THE PLAN AND THE DISCLOSURE**

28   **STATEMENT, AND RETURNING IT NO LATER THAN MAY 30, 2000 TO:**

MURRAY & MURRAY
A Professional Corporation
3030 Hansen Way, Suite 200
Palo Alto, Ca 94304-4907
TELEPHONE (650) 852-9000 FACSIMILE (650) 852-9244
E-MAIL mail@murraylaw.com

JA:ACab-05
E:\DAIL Y\B-64\SITE4\and-stmt.1.wpd

DEBTOR'S DISCLOSURE STATEMENT

1                      **Murray & Murray**

2                **A Professional Corporation**
              **Attn: Janice M. Murray, Esq.**

3               **3030 Hansen Way, Suite 200**
               **Palo Alto, CA 94304-1009**

4   **IF YOUR BALLOT IS NOT RETURNED BY MAY 30, 2000, IT MAY NOT BE CONSIDERED.**

5   **BALLOTS WHICH ARE RETURNED BUT NOT PROPERLY EXECUTED WILL NOT BE**

6   **CONSIDERED. BALLOTS WHICH ARE EXECUTED BUT WHICH FAIL TO INDICATE**

7   **EITHER ACCEPTANCE OR REJECTION OF THE PLAN WILL BE CONSIDERED AS**

8   **ACCEPTING THE PLAN.**

9                 **5. HISTORY OF THE DEBTOR**

10        5.1      The Debtor commenced this Chapter 11 case on February 2, 1999 with the filing

11   of its Voluntary Petition in the United States Bankruptcy Court for the Northern District of

12   California, San Jose Division.

13        5.2      The Debtor was in the business of designing, developing, licensing and selling

14   software products and related materials for various Web site applications. The Debtor, formerly

15   headquartered in Scotts Valley, California, was formed in 1989 and became a public company in

16   December 1995.

17        5.3      The Company was originally formed to design, develop and market visualization

18   software products for personal computers. The Company commenced shipments of its initial

19   product, DeltaGraph, at the end of 1989. Prior to 1996, the Company derived substantially all of

20   its product revenues from licenses of DeltaGraph charting and graphic software products.

21        5.4      Commencing with its acquisition of the technology required to develop

22   WebAnimater (a multi-media authoring tool for the Web) in November 1995, the Company's

23   strategy had been to realize a significant and growing percentage of its revenues from the sale of

24   Internet software products. Towards that end, the Company acquired technology to develop

25   QuickSite (a Web site creation and management tool) in December 1995 (released version 1.0 in

26   February 1996) and introduced WebTools in March 1996, WebAnimator in July 1996, QuickSite

27   Developer's Edition in September 1996 and QuiteSite 2.5 in May 1997. In July 1997, the

28   Company acquired technology to develop SiteSweeper 2.0 which was released in September

DEBTOR'S DISCLOSURE STATEMENT

1   1997, and in November 1997 the Company acquired technology to develop SiteMaster 4.0 which

2   was released in March 1998. In March 1998 the Company also released QuickSite 3.0, and in

3   May 1998 the Company released the enterprise edition of the SiteSweeper product.

4           5.5    In June 1997, as part of the Company's continuing strategy to focus its

5   development, sales and marketing efforts on Internet software products, the Company sold assets

6   related to its Delta Graph software product. With the DeltaGraph sale, the Company's future

7   operating results depended on the successful development, introduction and commercial

8   acceptance of the Company's Internet software products. In September 1998, the Company also

9   sold its V-Search technology and related patents. In addition to further focusing the Company on

10  Internet software products, these sales provided the Company with much needed liquidity.

11          5.6    The Company financed its operations primarily through private and public sales

12  of equity securities, borrowings under a term loan, the private sale of debt securities and the sale

13  of the DeltaGraph product line, and other limited asset sales. Since its inception, the Company

14  has received approximately $24 million in proceeds from private sales of stock, convertible debt

15  and from the Company's two public offerings of public stock. The Company incurred net losses

16  of $8,159,000 for the year ended December 31, 1997 and $2,497,000 for the nine months ended

17  September 30, 1998, and had an accumulated deficit of $24,334,000 as of September 30, 1998.

18          5.7    In light of its diminishing cash balances (due primarily to limited revenues from

19  its newly introduced products), in May and June 1998, the Debtor significantly reduced its head

20  count from 33 to 11 and significantly reduced its expenses and operations in the areas of sales

21  and marketing. In order to conserve its limited remaining cash balances, the Debtor sharply

22  curtailed operational activities since June 1998 by, among other things, further reducing its non-

23  technology head count (eliminating sales and marketing personnel) and limiting related ·

24  marketing expenditures. In December 1998, the Debtor shut down operations and laid off most

25  of its remaining employees.

26          5.8    During the twelve (12) months preceding the Petition Date, the Debtor focused

27  its efforts on evaluating its strategic options, including a sale of the Debtor to a third party or a

28  sale of the Debtor's assets. When it became clear that the Debtor would be unable to raise

MURRAY & MURRAY
A Professional Corporation
3030 Hansen Way, Suite 200
Palo Alto, Ca 94304-1009
TELEPHONE (650) 852-9000 FACSIMILE (650) 852-9244
E-MAIL mail@murraylaw.com

1  additional investment capital, the Debtor intensified its efforts to find a potential acquisition

2  candidate. By mid-March 1998, the Debtor developed a targeted list of likely candidates.

3  During March and April 1998, the Debtor began negotiating with one such candidate to integrate

4  some of the Debtor's technology with that company's products and also held several high level

5  discussions in which the Debtor introduced its desire to merge or be acquired. In May 1998, the

6  Debtor was informed that this company was not interested in a merger or acquisition. Also in

7  May 1998, the Debtor contacted 10-15 additional companies to investigate merger and

8  acquisition opportunities, to no avail.

9         5.9   In June 1998, the Debtor retained Alliant Partners of Palo Alto, California

10  ("Alliant"), a mergers and acquisitions firm. The Debtor and Alliant developed a strategy that

11  defined the Debtor's asset value as two-fold: (i) the Debtor's Internet technology, and (ii) its

12  status as a public company. Efforts over the following months focused on contacting potential

13  candidates that would benefit from both the technology and public corporate assets, and thus

14  yield the greatest value for the Debtor. Several companies were contacted, discussions with

15  some ensued, but nothing materialized. In August 1998, the Debtor shifted into the second phase

16  of its strategy where two teams were established – one team to focus on presenting its Internet

17  technology to public software companies and the other team to focus on presenting the

18  availability of the public shell to private companies. During August and September 1998, Alliant

19  contacted about 110 companies via telephone and mailed out approximately sixty (60) full

20  presentation packets. Several telephone interviews were held during this time frame. The

21  Debtor also commenced serious discussions with and responded to due diligence requests from a

22  public company interested in the technology. StarBase then made a firm offer and the prior

23  company dropped out of the bidding. Thereafter, the Debtor and StarBase executed the StarBase

24  Agreement.

25         5.10   In late September 1998, the Debtor commenced serious discussions with and

26  responded to due diligence requests of Savoir Technology Group, Inc. ("Savoir"), a public

27  company interested in acquiring the public shell in a reverse merger with one of its divisions.

28  Savoir made a $150,000 bridge loan in December 1998 to provide the Debtor with needed

MURRAY & MURRAY
A Professional Corporation
3030 Hansen Way, Suite 200
Palo Alto, CA 94304-1048
TELEPHONE (650) 852-9000 FACSIMILE (650) 852-9244
E-MAIL mail@murraylaw.com

1 financial resources to complete the definitive documentation process with regard to the proposed

2 transaction. Absent Savoir's support, the Debtor would have had insufficient capital to sustain

3 operations and seek shareholder approval of the transaction. Savoir made an additional $50,000

4 loan to the Debtor in January 1999. However, in mid-January 1999, the Debtor was informed

5 that Savoir would no longer pursue completion of the transaction.

6       **6. TRANSACTIONS WITH INSIDERS**

7   6.1 Jeffrey F. Ait ("Ait") is the Chief Executive Officer and Sharon Fugitt ("Fugitt")

8 is the Vice President of Finance/Operations of the Debtor. Following termination of all other

9 employees, Ait and Fugitt agreed to assist the Debtor in the orderly liquidation of its assets. Ait

10 and Fugitt negotiated the sale of the Debtor's intellectual property to StarBase which resulted in a

11 benefit to the estate of more than $8.3 million in cash. Ait and Fugitt hold claims against the

12 Debtor for unpaid wages, employee benefits, expense reimbursement and severance which are in

13 part classified as Class 1 Priority Claims and in part as Class 3 General Unsecured Claims as

14 provided in the Code. The Plan provides for the rejection of the Ait and Fugitt Employment

15 Agreements. As a result, any claims by Ait and Fugitt under the Employment Agreements

16 become Class 3 claims and receive the same treatment as all other general unsecured claims.

17 Pre-petition Claims held by Ait are for: (i) vacation pay of $3,390.44 and (ii) severance pay of

18 $165,000. Pre-petition Claims held by Fugitt are for: (i) vacation pay of $6,346.30 (of which

19 $4,300 is a priority claim) and (ii) severance pay of $65,000. Both Ait and Fugitt have been paid,

20 and will continue to be paid, for post-petition wages and expenses.

21     **7. SIGNIFICANT EVENTS DURING CHAPTER 11**

22   7.1 StarBase Sale. On March 17, 1999, the Debtor consummated the sale of its

23 intellectual property assets to StarBase. The initial aggregate purchase price paid by StarBase

24 consisted of 625,000 newly issued and initially unregistered shares of StarBase common stock.

25 Under the StarBase Agreement, the purchase price was subject to adjustment at the closing of the

26 asset sale to cause the aggregate estimated value of the StarBase common stock to be not less

27 than $500,000 and not greater than $1,500,000. Under this formula, the actual number of shares

28 constituting the purchase price was 625,000. The shares were subject to a 6-month lockup

MURRAY & MURRAY
A Professional Corporation
3030 Hansen Way, Suite 200
Palo Alto, CA 94304-1009
TELEPHONE (650) 852-9000 FACSIMILE (650) 852-9244
E-MAIL mail@murraylaw.com

MURRAY & MURRAY
A Professional Corporation
3030 Hansen Way, Suite 200
Palo Alto, CA 94304-1009
TELEPHONE (650) 852-9000 FACSIMILE (650) 852-9244
E-MAIL mail@murraylaw.com

1    period. In addition, an escrow fund containing 125,000 of the shares was in place for a period of

2    six (6) months to allow for indemnification claims by StarBase. The shares were eventually

3    released from the escrow fund, no indemnification claim having been made by StarBase.

4    Thereafter, the Debtor could not liquidate the shares in a single transaction. No more than five

5    percent (5%) of the prior business day's trading volume in the shares could be sold on any given

6    day. Also, in conjunction with the sale to StarBase, the Debtor sought and obtained Bankruptcy

7    Court approval to assume and assign to StarBase numerous executory contracts as required by

8    the StarBase Agreement.

9         7.2    <u>Sale of StarBase Stock</u>. Following expiration of the lockup and escrow periods,

10    the Debtor sought Court approval to sell the shares by way of motion to expedite the Debtor's

11    ability to liquidate the shares in view of the dramatic price increase per share which began in

12    December, 1999. On or about December 21, 1999, the Court entered its Order (the "Order")

13    authorizing the Debtor to sell the shares and to employ First Security VanKasper ("VanKasper")

14    as broker in connection with the sale. StarBase retained a right of first refusal with respect to any

15    proposed sale of the shares for a period of eighteen (18) months after the closing. The Debtor

16    sought and obtained a waiver from StarBase of this right and proceeded to sell the shares on

17    open market. As a point of reference, on February 5, 1999, immediately prior to the time the

18    Debtor filed its motion to sell its technology assets to StarBase in exchange for the shares, the

19    shares were selling at a $1.75. An internet search on November 17, 1999 indicated the last trade

20    on that day at $2.41. The Debtor ultimately sold the shares on the open market during the period

21    of January 11, 2000 to January 18, 2000 at prices ranging from $11.25 to $14.62 per share.

22    Proceeds of the sale were approximately $8,365,840. As provided in the Order, VanKasper

23    received a commission rate of two cents (2¢) per share (i.e., $12,500).

24         7.3    <u>Auction Sale</u>. On March 11, 1999, the Bankruptcy Court entered its order

25    authorizing the Debtor to sell certain furniture, equipment and other personal property assets by

26    auction. Following Bankruptcy Court approval, the Debtor hired A.R. Pagan & Co.

27    ("Auctioneer") as the Auctioneer. The auction sale was conducted on March 23, 1999. The

28    Auctioneer was paid expenses of $7,500 (consisting of $5,000 for advertising and $2,500 for

1　labor) plus a ten percent (10%) commission of actual collected bid sales. In addition, the

2　Auctioneer was entitled to charge a buyer's premium to auction buyers. The net auction

3　proceeds were $39,000. A dispute arose regarding the disposition and accounting for certain

4　cubicles that were part of the auction. The Debtor contends that a buyer was prepared to pay

5　$4,800 for the cubicles. The auctioneer, having no recollection of such a buyer, asserts that

6　efforts to sell the cubicles at auction were unsuccessful and the cubicles were removed from the

7　Debtor's premises by a party willing to take them without removal charges. Given the

8　conflicting recollection of the parties as to the facts, and given the nominal sum involved, the

9　Debtor determined not to pursue the matter any further as it would not be cost effective.

10　　　　7.4　Rejection of Executory Contracts and Unexpired Leases. On March 11, 1999,

11　the Bankruptcy Court entered its order authorizing the Debtor to reject its (i) non-residential real

12　property lease with *Carbonero Creek Associates* (the "Lease") and (ii) non-residential real

13　property sublease with *Fault Line Technology* (the "Sublease"). These leases pertained to the

14　Debtor's former business premises in Scotts Valley, California. In view of the StarBase Sale,

15　these premises were no longer needed. On May 18, 1999, the Bankruptcy Court also entered its

16　order authorizing the Debtor to reject its equipment leases with *GE Capital, First Alarm, Dell*

17　*Financial Services, Pitney Bowes Credit Corporation* and *Sprint Telimagine, Inc.* (collectively,

18　"Equipment Contracts"). Any claim for damages related to rejection of the above-referenced

19　Lease, Sublease and Equipment Contracts was required to be filed on or before June 1, 1999.

20　　　　7.5　Blum Compromise. On July 8, 1999, the Bankruptcy Court entered its order

21　authorizing the Debtor to compromise its controversy with Richard Blum, dba Knowledge

22　Vision ("Blum"). Pursuant to a prepetition agreement, Blum sold the Debtor a computer

23　program known as Power-Vision together with any derivative technology and products

24　(hereinafter collectively "Technology"). The Debtor agreed to pay a fee of $250,000 plus a seven

25　percent (7%) royalty. Blum retained a limited royalty free license to the Technology, agreed to

26　provide consulting services for three years at an additional hourly fee, and further agreed to a

27　non-compete clause for three years. The agreement also provided that should Debtor cease

28　marketing the Technology within two years of the agreement, all rights regarding the Technology

MURRAY & MURRAY
A Professional Corporation
3030 Hansen Way, Suite 200
Palo Alto, Ca 94304-1009
TELEPHONE (650) 852-9000 FACSIMILE (650) 852-9244
E-MAIL mail@murraylaw.com

1  would revert to Blum. Blum claimed that the Debtor owed him approximately $1,500 in

2  outstanding royalties and further claimed that ownership of the Technology reverted to him as a

3  result of the Debtor's failure to market the Technology as required by the agreement. The Debtor

4  contended that it marketed the Technology at the same, although reduced, level as its other

5  products, although no sales resulted for the last one and one-half years. Following Court

6  approval, the Debtor and Blum settled this dispute whereby Blum paid the Debtor $2,500 and

7  waived any and all claims against the Debtor. In return, the Debtor relinquished its rights in the

8  Technology to Blum.

## 8. DISTRIBUTION ANALYSIS

8.1   Projected Distribution to Creditors and Shareholders.

| | Case 1 | Case 2 |
|---|---|---|
| Cash Balance (as of March 31, 2000) | $8,418,752 | $8,418,752 |
| Less: Estimated Creditor claims: | | |
| Savoir Technology Group (through 3/15/00 plus $54.79 per diem interest thereafter) | $228,821+ | $228,821+ |
| Post-confirmation operating costs, wind down and shareholder distribution fees and expenses | $57,000 | $57,000 |
| Bankruptcy related costs, including U.S. Trustee fees, BCA and professional fees | $250,000 | $250,000 |
| Other Administrative Claims: | | |
|     Landlord: | $50,109 | $50,109 |
|     Miscellaneous Operating Expenses | $75,000 | $75,000 |
|     Tax Claims (estimated) | $1,102,000 | $1,102,000 |
| Priority Claims (excluding employee claims) | $2,234 | $2,234 |
| Employee Claims | $240,000 | $240,000 |
| General unsecured claims | $1,500,000 | $1,000,000 |
| Post-Petition Interest on Claims at 4.584% | $120,000 | $85,000 |
| Total Projected Creditor and Chapter 11 Claims | $3,625,164 | $3,090,164 |
| Projected cash available for distribution to shareholders | $4,793,588 | $5,328,588 |

### Assumptions

Case 1:  Includes allowance of disputed claims in full. Based on Proofs of Claim filed and the Debtor's Schedules, the Debtor estimates that the gross amount of prepetition unsecured creditor claims is approximately $1,500,000. The Debtor has filed numerous objections to claims. For those disputed claims where no formal objection has yet been filed, the Debtor is in discussions with these creditors in an effort to resolve the disputed portion of the claim without litigation. At this time, there are approximately $500,000 in disputed prepetition unsecured claims.

MURRAY & MURRAY
A Professional Corporation
3030 Hansen Way, Suite 200
Palo Alto, CA 94304-1009
TELEPHONE (650) 852-9000 FACSIMILE (650) 852-9244
E-MAIL: mail@murraylaw.com

MURRAY & MURRAY
A Professional Corporation
1020 Marsh Way, Suite 200
Palo Alto, Ca 94304-1009
TELEPHONE (650) 852-9000 FACSIMILE (650) 852-9244
E-MAIL mail@murraylaw.com

1   Case 2:  Includes only general unsecured claim amounts Debtor believes is owed.

2            THE ABOVE DISTRIBUTION ANALYSIS IS AN ESTIMATE ONLY.  ACTUAL

3   RESULTS MAY DIFFER MATERIALLY FROM THOSE ESTIMATED ABOVE.  THERE ARE

4   VARIOUS FACTORS WHICH MAY CAUSE SUCH RESULTS TO DIFFER.  FOR EXAMPLE,

5   THE DEBTOR DISPUTES SEVERAL CLAIMS ASSERTED BY CERTAIN CREDITORS, AND

6   THE DEBTOR CANNOT PREDICT THE EXTENT TO WHICH THESE CLAIMS WILL

7   ULTIMATELY BE ALLOWED.  IN ADDITION, ON THE PETITION DATE, THE DEBTOR WAS

8   A PARTY TO NUMEROUS EXECUTORY CONTRACTS AND UNEXPIRED LEASES.  WHILE

9   SEVERAL EXECUTORY CONTRACTS WERE ASSUMED BY THE DEBTOR AND ASSIGNED

10  TO STARBASE IN CONNECTION WITH THE STARBASE SALE, CERTAIN REAL PROPERTY

11  LEASES AND EQUIPMENT LEASES WERE REJECTED IN THE COURSE OF CHAPTER 11

12  CASE.  ANY EXECUTORY CONTRACTS AND UNEXPIRED LEASES NOT ALREADY

13  ASSUMED, ASSUMED AND ASSIGNED, OR REJECTED BY THE DEBTOR, WILL BE DEEMED

14  REJECTED UPON CONFIRMATION OF THE PLAN.  AS SUCH, IT IS IMPOSSIBLE TO

15  PREDICT THE AMOUNT OF ANY REJECTION CLAIMS THAT MAY BE ASSERTED AGAINST

16  THE BANKRUPTCY ESTATE.  IN CONNECTION WITH THE DEBTOR'S REJECTION OF THE

17  LEASE, THE SUBLEASE, AND THE EQUIPMENT LEASES, THE COURT ENTERED ITS

18  ORDERS REQUIRING THESE PARTIES TO SUBMIT THEIR CLAIMS FOR REJECTION

19  DAMAGES, IF ANY, ON OR BEFORE JUNE 1, 1999.  WITH RESPECT TO THE REJECTION OF

20  ANY OTHER EXECUTORY CONTRACTS OR UNEXPIRED LEASES UNDER THE PLAN,

21  REJECTION CLAIMS ARE REQUIRED TO BE FILED WITHIN THIRTY (30) DAYS

22  FOLLOWING THE CONFIRMATION DATE.  IT IS ONLY AT THAT TIME THAT ALL

23  REJECTION CLAIMS WILL BE KNOWN.  ANY ATTEMPT BY THE DEBTOR TO QUANTIFY

24  THE TOTAL REJECTION CLAIMS PRIOR TO THAT TIME WOULD BE SERIOUSLY

25  MISLEADING.  ANY ALLOWED REJECTION CLAIMS WILL BE TREATED AS CLASS 3

26  UNSECURED CLAIMS UNDER THE PLAN AND PAID IN ADVANCE OF ANY DISTRIBUTION

27  TO SHAREHOLDERS.  OTHER FACTORS WHICH MAY CAUSE SUCH DISTRIBUTION

28  RESULTS TO DIFFER INCLUDE, BUT ARE NOT LIMITED TO, THE FOLLOWING: (i) TAX

1 | CONSEQUENCES RESULTING FROM THE LIQUIDATION OF THE DEBTOR'S ASSETS; AND

2 | (ii) THE EXISTENCE OF ADDITIONAL CLAIMS OF WHICH THE DEBTOR IS NOT

3 | CURRENTLY AWARE. WHILE THE DEBTOR EXPECTS THAT PROCEEDS WILL BE

4 | AVAILABLE FOR DISTRIBUTION TO CLASS 4 SHAREHOLDERS AFTER SATISFYING ALL

5 | KNOWN CLAIMS, THERE CAN BE NO ASSURANCE THAT THE AMOUNT WHICH WILL BE

6 | AVAILABLE FOR DISTRIBUTION WILL BE AS ESTIMATED ABOVE.

7 |     8.2   Other Assets.

8 |       A.    During the course of the Chapter 11 case, the Debtor has attempted to

9 | find a buyer for its corporate shell. The Debtor's efforts in this regard were unsuccessful.

10 |       B.    Based on its estimate of the Claims in the case, the Debtor believes that

11 | Creditors will be paid in full with interest. As such, the Debtor has yet to undertake and

12 | complete a thorough analysis of the Avoidance Claims and the potential defendants in respect

13 | thereof. However, the Debtor reserves the right to pursue any such action in the event that the

14 | Debtor determines that such an action is appropriate and beneficial to the Bankruptcy Estate.

15 | The entry of the Confirmation Order shall not constitute res judicata or otherwise bar or inhibit

16 | the prosecution of the Avoidance Claims by the Debtor.

17 |     8.3   Common Stock. The Company had outstanding approximately 8.5 million

18 | shares of common stock, held by approximately 1,400 shareholders.

19 |     8.4   Stock Option Plans.

20 |       A.    The Debtor had three (3) employee stock option plans as set forth in (i) the

21 | Restatement and Amendment by the Entirety of the DeltaPoint, Inc. 1990 Key Employee Incentive

22 | Stock Option Plan (the "1990 Stock Option Plan"), (ii) the DeltaPoint, Inc. 1992 Non-Statutory

23 | Stock Option Plan (the "1992 Stock Option Plan") and (iii) the DeltaPoint, Inc. 1995 Stock Option

24 | Plan (the "1995 Stock Option Plan").

25 |       B.    The 1990 Stock Option Plan and the 1992 Stock Option Plan required the

26 | employee participants to exercise their options not later than sixty (60) days (and in some cases thirty

27 | (30) days) following termination of employment. The Debtor believes that the only outstanding

28 | option rights under the 1990 Stock Option Plan are those of Fugitt. Insofar as these options are

MURRAY & MURRAY
A Professional Corporation
3030 Hansen Way, Suite 200
Palo Alto, Ca 94304-1009
TELEPHONE (650) 852-9000 FACSIMILE (650) 852-9244
E-MAIL: mail@murraylaw.com

DEBTOR'S DISCLOSURE STATEMENT

1  "underwater", Fugitt does not intend to exercise them. The Debtor further believes that there are no

2  outstanding option rights under the 1992 Stock Option Plan.

3          C.     The 1995 Stock Option Plan was divided into two separate equity programs:

4  (i) the Discretionary Option Grant Program (the "Discretionary Program") and (ii) the Automatic

5  Option Grant Program (the "Automatic Program"). The Discretionary Program provided that

6  options outstanding when an employee terminated remained exercisable for a period determined by

7  the plan administrator. The Automatic Program gave non-employee directors twelve (12) months

8  following termination of board service to exercise their options. The Debtor believes that the only

9  outstanding option rights under the 1995 Stock Option Plan are those of Ait and Fugitt. Insofar as

10  these options are "under water", neither Ait nor Fugitt intend to exercise their option rights.

11      8.5   <u>Warrants</u>. The Debtor has 543,413 warrants outstanding subject to various

12  expiration dates from November, 2000 to October, 2003.

13  <center>**9. DESCRIPTION OF PLAN**</center>

14      9.1   <u>General</u>.

15          A.     The following description of the Plan is a summary only. All holders of

16  Claims and Interests should read the actual Plan which accompanies this Disclosure Statement.

17          B.     The objective of the Plan is to implement an orderly liquidation of the

18  Debtor's assets and to provide Creditors and Equity Security Holders with the highest possible

19  recovery on their respective Allowed Claims and Allowed Interests.

20      9.2   <u>Classification of Claims and Interests Under the Plan</u>. Allowed Claims and

21  Allowed Interests are subject to the following classifications under the Plan:

22             <u>Class 1</u>. Priority Claims.

23             <u>Class 2</u>. Allowed Secured Claim of Savoir Technology Group, Inc.

24             <u>Class 3</u>. Allowed Unsecured Claims

25             <u>Class 4</u>. Allowed Interests (common stock) of Equity Security Holders as

26  of the Distribution Date.

27             <u>Class 5</u>. Allowed Interests of the holders of outstanding, unterminated

28  options, warrants and/or other rights to acquire any Equity Security of the Debtor.

MURRAY & MURRAY
A Professional Corporation
3030 Hansen Way, Suite 200
Palo Alto, Ca 94304-1009
TELEPHONE (650) 852-9000 FACSIMILE (650) 852-9244
E-MAIL mail@murraylaw.com

DJM:alb-03
I:\DAILY\D.006\TED\disol-stmt.1.wpd

9.3     <u>Description and Treatment of Unclassified Claims</u>.

A.     <u>Allowed Administrative Claims</u>. Each holder of an Allowed Administrative Claim shall receive payment of such Claim, in cash, in full, upon the latest of (i) the Effective Date, (ii) if such Claim is a Disputed Claim, upon allowance of such Claim by a Final Order of the Bankruptcy Court, (iii) if such Claim is incurred after the Petition Date in the ordinary course of the Debtor's business, within such time as payment is due pursuant to the terms giving rise to such Claim, or (iv) such other time as may be agreed to by the holder of such Claim. Any request for allowance of an Administrative Claim pursuant to Section 503(a) of the Bankruptcy Code, other than by the Debtor's Professionals and the U.S. Trustee, must be filed within ten (10) days following the Effective Date or the holder of such Claim will be forever barred from asserting such Claim or receiving any payment on account of such Claim.

(i)     <u>Professional Fees</u>. During the Debtor's Chapter 11 case, the Bankruptcy Court has approved the employment of the law firms of Murray & Murray and Wilson, Sonsini, Goodrich & Rosati as bankruptcy counsel and special counsel, respectively, and PricewaterhouseCoopers as accountant for the Debtor with compensation to the extent allowed by the Court to be paid by the Debtor. It is estimated that as of the Confirmation Date, fees and expenses of approximately $200,000 will be collectively owed to the Debtor's professionals assuming that confirmation of the Debtor's Plan will be uncontested. The Debtor's professionals anticipate additional Administrative Claims related to implementation of the Plan, the liquidation of any remaining assets, Distributions to Creditors and Equity Security Holders, Claims objections, potential Avoidance Claims, and final administration of the Bankruptcy Estate.

(ii)     <u>Bankruptcy Fees</u>. Bankruptcy Fees are payable by the Debtor to the U.S. Trustee pursuant to a quarterly fee schedule ranging from a minimum of $250.00 to a maximum of $10,000.00 depending upon the disbursements by the Debtor in a given quarter. Bankruptcy Fees are required to be paid until the entry of a final decree closing the Bankruptcy Case. Bankruptcy fees are estimated as follows: $250.00 (1st Quarter 2000), $10,000 (2nd Quarter 2000), and $250.00 (3rd Quarter 2000).

(iii)     <u>Post-Petition Operating and Tax Expenses</u>. The Debtor shall

MURRAY & MURRAY
A Professional Corporation
3030 Hansen Way, Suite 200
Palo Alto, Ca 94304-1006
TELEPHONE (650) 852-9000 FACSIMILE (650) 852-9244
E-MAIL mail@murraylaw.com

1   continue to pay its normal operating expenses in the ordinary course of business. In addition,

2   Carbonero Creek, the Debtor's landlord, shall be paid its allowed administrative claim of

3   $50,109; and the Debtor shall pay any and all claims relating to taxes determined to be owed

4   post-petition as a consequence of the liquidation.

5          B.     Tax Claims. Each holder of a Tax Claim will be paid in full on the latest

6   of (i) the Effective Date of the Plan, (ii) upon allowance by the Bankruptcy Court, or (iii) such

7   other time as may be agreed to by the holder of such claim; provided, however, the Debtor may

8   elect to pay tax claims in deferred cash payments, over a period not exceeding six (6) years after

9   date of assessment. However, in no event shall the holder of a Tax Claim be paid prior to the

10  payment in full or reservation for Allowed Secured Claims and Allowed Claims entitled to

11  priority pursuant to Section 507(a)(1) through (a)(7) of the Bankruptcy Code. As of September

12  2, 1999, a search of the records of the California Secretary of State disclosed one (1) existing tax

13  lien on the Debtor's prepetition property in favor of the State Board of Equalization. This tax

14  liability in the amount of $13,254.48 was paid by the Debtor prepetition and the lien satisfied.

15  The Debtor currently estimates that it has prepetition Tax Claims of $750.00, plus applicable

16  interest and penalties.

17      9.4    Unimpaired Classes. There are no classes of Claims and Interests which are not

18  impaired under the Plan.

19      9.5    Description and Treatment of Impaired Classes.

20          A.     Class 1 Claims (Priority Claims). Each holder of a Claim in Class 1 shall

21  receive payment in cash in full, plus Post-Petition Interest, on the Effective Date. The Debtor

22  currently estimates that it has prepetition Priority Claims in the amount of $11,250.

23          B.     Class 2 Claim (Savoir Technology Group, Inc.). The Class 2 Claim of

24  Savoir is based on prepetition loans and advances, in the principal amount of approximately

25  $200,000, plus interest, as evidenced by certain notes, security agreements and UCC-1 financing

26  statements. Insofar as Savoir's first financing statement was filed approximately twenty-eight

27  (28) days after disbursing funds, Savoir's lien with respect to its first advance was, initially, in

28  bona fide dispute. However, because the liquidation proceeds available for distribution to

MURRAY & MURRAY
A Professional Corporation
3030 Hansen Way, Suite 200
Palo Alto, Ca 94304-1000
TELEPHONE (650) 852-9000 FACSIMILE (650) 852-9244
E-MAIL mail@murraylaw.com

1  creditors appear to be more than adequate to pay all creditors in full with interest, it now appears

2  that the dispute it moot. Savoir shall retain its lien to the extent not avoidable, which lien will

3  attach to the proceeds from the sale of its collateral. Savoir's Allowed Secured Claim will be

4  paid in full on the latest of (i) the Effective Date, (ii) ten (10) days following entry of a Final

5  Order allowing its Class 2 Claim or (iii) such date as otherwise agreed between the Debtor and

6  Savoir. The balance of any Claim by Savoir will be treated as a Class 3 Claim. Savoir's claim as

7  of March 15, 2000 (including principal, interest, attorneys' fees and costs) is approximately

8  $228,821.00. Savoir's claim will continue to accrue per diem interest thereafter at the rate of

9  $54.79 until paid.

10            C.    Class 3 Claims (Unsecured Creditors). The prepetition general unsecured

11 Claims asserted against the Debtor are approximately $1,500,000.00 as of the Petition Date

12 (excluding Rejection Claims). Of this amount, the Debtor disputes approximately $500,000.00.

13 The holders of Class 3 Allowed Unsecured Claims shall receive payment in cash in full,

14 including Post-Petition Interest, as soon as practicable after the Effective Date, but in no event

15 later than the later of (i) thirty (30) days after the Effective Date or (ii) upon resolution of all

16 Disputed Claims, including Rejections Claims; provided, however, no payment shall be made to

17 members of Class 3 until after the payment of or reservation for all Allowed Administrative

18 Claims, Allowed Secured Claims, Tax Claims, Priority Claims, any other senior Claims, and

19 post-Confirmation expenses of implementing the Plan, winding up the affairs of the Debtor and

20 closing the Bankruptcy Case. In the unlikely event there are insufficient funds available to pay

21 Class 3 Claims in full with Post-Petition Interest as described herein, holders of Class 3 Allowed

22 Unsecured Claims shall be paid pro rata from the funds available for the payment of Class 3

23 Claims.

24            D.    Class 4 Interests (Common Stock). Each Equity Security Holder with an

25 Allowed Class 4 Interest as of the Distribution Date shall receive a pro rata distribution from

26 available funds, as soon as practicable after (i) the payment of or reservation for all Allowed

27 Administrative Claims, Allowed Secured Claims, Tax Claims, Priority Claims, Allowed

28 Unsecured Claims, any other senior Claims, and post-confirmation expenses of implementing the

MURRAY & MURRAY
A Professional Corporation
3000 Hanover Way, Suite 200
Palo Alto, CA 94304-1089
TELEPHONE (650) 852-9000 FACSIMILE (650) 852-9244
E-MAIL mail@murraylaw.com

JMM-1:B-00
L:\DAILY\MURRAY\SITE\sd-stmt.1.wpd

DEBTOR'S DISCLOSURE STATEMENT

1   Plan, winding up the affairs of the Debtor and closing the Bankruptcy Case and (ii) resolution of

2   or reservation for all Disputed Claims and Disputed Interests. All Class 4 Interests shall

3   otherwise be canceled and extinguished on the Distribution Date.

4                  E.     Class 5 Interests (Options and Warrants). The holders, as of the Effective

5   Date, of outstanding unterminated options and warrants to acquire the Debtor's common stock

6   shall receive nothing under the Plan and their respective interests shall otherwise be canceled and

7   extinguished on the Effective Date.

8           9.6    Means For Execution of the Plan.

9                  A.    Liquidation Proceeds; Remaining Assets. Proceeds from the sale of the

10  StarBase stock, the auction and the Blum compromise will be the primary source of funds for

11  execution of the Plan. Any other assets of the Debtor (e.g., Avoidance Claims) shall be

12  liquidated as appropriate, except for those assets which the Responsible Person determines to be

13  burdensome or of inconsequential value, which assets will be abandoned.

14                 B.    Disbursement of Funds. The Debtor shall make the payments to all

15  creditors with Allowed Claims. The Debtor shall wire transfer the balance of funds designated

16  for shareholders to the Transfer Agent with appropriate instructions from the Responsible Person

17  directing the Transfer Agent to make a pro rata distribution to shareholders of record as of the

18  Distribution Date.

19                 C.    Responsible Person.

20                    (i)    Ait shall be designated as the Responsible Person. The

21  Responsible Person shall be compensated on an hourly basis at an hourly rate not to exceed

22  $200.00 from and after the Effective Date. The Responsible Person may, in his discretion,

23  employ such other persons as may be necessary to assist in the implementation of the Plan, the

24  liquidation of any remaining assets, Distributions to Creditors and Equity Security Holders,

25  Claims objections, potential Avoidance Claims and final administration of the Bankruptcy Estate.

26  In the event that Ait is unable to serve as the Responsible Person, the Debtor's Board of Directors

27  will appoint an individual to serve as the Responsible Person.

28                   (ii)    The Responsible Person shall continue to liquidate the Debtor's

MURRAY & MURRAY
A Professional Corporation
3030 Hansen Way, Suite 200
Palo Alto, Ca 94304-1009
TELEPHONE (650) 852-9000 FACSIMILE (650) 852-9244
E-MAIL smith@murraylaw.com

1  remaining assets, but may abandon such assets as the Responsible Person determines to be

2  burdensome or of inconsequential value to the Bankruptcy Estate.  The Responsible Person may

3  enforce any claims and causes of action in favor of the Bankruptcy Estate, including any actions

4  under Sections 510, 542, 543, 544, 545, 547, 548 and 549 of the Bankruptcy Code.

5          (iii)  The Responsible Person may review and object to Claims and

6  Interests, enter into compromises to allow and satisfy Disputed Claims and Disputed Interests

7  and settle and liquidate any claim or cause of action that the Debtor may have against a third

8  party.

9          (iv)  The Responsible Person shall review and approve the Distribution

10  amounts to Creditors and to the Transfer Agent (on behalf of shareholders of record as of the

11  Distribution Date) and shall be responsible for making, or causing to be made, Distributions

12  pursuant to the Plan.

13          (v)  The Responsible Person shall be responsible for doing all things

14  necessary and appropriate to implement the Plan and facilitate Distributions, to wind up the

15  affairs of the Debtor, to file the Debtor's tax returns, to formally dissolve the Debtor, to move for

16  entry of a final decree and to file such reports as the Bankruptcy Court may require.

17      D.  **Expedited Procedure for Compromises of Controversy, Sales and**

18  **Abandonments**.  The Plan provides for an expedited approval of post-Confirmation sales of

19  assets, abandonment of assets, and compromises of Disputed Claims and Disputed Interests.

20  Notices of such sales, abandonments or compromises will be served on Savoir, the 20 largest

21  unsecured creditors, the U.S. Trustee and those parties who have requested special notice.  The

22  proposed sale, abandonment or compromise described in such notice will become final and

23  binding without further Bankruptcy Court approval unless a party in interest objects within ten

24  (10) days of the notice.

25      E.  **Unclaimed Property**.  Distribution checks returned or not presented for

26  payment within ninety (90) days will become void and the holder of the Claim or Interest to

27  whom such Distribution was made forfeits all rights to the payment and any further Distributions.

28      F.  **Professionals**.  The Responsible Person may employ such professionals as

DEBTOR'S DISCLOSURE STATEMENT

1   may be necessary without further Bankruptcy Court approval. The Plan also provides a

2   procedure for professionals to receive payment of fees and expenses on a monthly basis and for

3   the resolution of any disputed fees or expenses of professionals. Professionals shall not

4   otherwise be required to file applications for Court approval of post-Confirmation fees and

5   expenses.

6          G.    Dissolution of Corporation. Pursuant to authority contained in Section

7   1400 of the California Corporations Code, the Debtor shall be dissolved and its corporate

8   existence terminated without further corporate action upon the entry of a final decree in this case

9   pursuant to Rule 3022 of the Bankruptcy Rules. The Confirmation Order shall be deemed an

10  order authorizing and directing the Responsible Person to file a certificate of dissolution as

11  required by Section 1401 of the California Corporations Code and the Responsible Person shall

12  file such certificate concurrently with the request for entry of a final decree.

13          **10.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

14         10.1   Assumption of Executory Contracts. Except as previously provided by

15  Bankruptcy Court order, no other executory contract or unexpired lease will be assumed by the

16  Debtor.

17         10.2   Rejection of Executory Contracts and Unexpired Leases. Without admitting the

18  validity of any other executory contract or unexpired lease, any executory contract or unexpired

19  lease not expressly assumed under the Plan or otherwise assumed (and assigned, where

20  applicable) pursuant to prior Bankruptcy Court order, shall be rejected as of the Effective Date,

21  subject to Section 10.3.

22         10.3   Treatment of Executory Contracts and Unexpired Leases. The Debtor reserves

23  the right to apply to the Bankruptcy Court prior to Confirmation to assume, assume and assign, or

24  reject, pursuant to Bankruptcy Code Section 365, any and all contracts that are executory and

25  leases that are unexpired. All executory contracts and unexpired leases of the Debtor that are not

26  (a) assumed or assumed and assigned prior to Confirmation, (b) the subject of a pending motion

27  to assume or assume and assign filed prior to Confirmation, or (c) assumed or assumed and

28  assigned pursuant to the terms of the Plan are hereby rejected by the Debtor. Confirmation of the

MURRAY & MURRAY
A Professional Corporation
3030 Hansen Way, Suite 200
Palo Alto, CA 94304
TELEPHONE (650) 852-9000 FACSIMILE (650) 852-9244
E-MAIL mail@murraylaw.com

DEBTOR'S DISCLOSURE STATEMENT

1   Plan shall be deemed to constitute Bankruptcy Court approval of such rejection.

2         10.4   <u>Rejection Claims</u>.  Rejection Claims shall be classified as Class 3 Claims.

3             A.     In connection with the Debtor's rejection of the Lease, the Sublease and

4   the Equipment Leases, the Court entered its orders requiring these parties to submit their

5   Rejection Claims, if any, on or before June 1, 1999.

6             B.     With respect to the rejection of any other executory contracts or

7   unexpired leases under the Plan, within thirty (30) days following the Effective Date, the holder

8   of a Rejection Claim (not subject to Section 10.4.A above) shall file with the Bankruptcy Court,

9   and serve on the Debtor's counsel, a proof of Claim evidencing such Rejection Claim or be

10  forever barred from asserting any such Claim or receiving any payment on account of such

11  Claim.

12                  **11.  PROOFS OF CLAIMS;**
    **EVIDENCE OF EQUITY SECURITY; OBJECTIONS**

13

14        11.1   <u>Time for Filing Proofs of Claim</u>.  Proofs of Claim shall be filed with the

15  Bankruptcy Court no later than the Claims Bar Date.

16        11.2   <u>Evidence of Claim or Interest</u>.

17            A.     As soon as practicable after the Distribution Date, the Debtor shall obtain

18  from the Transfer Agent a list of all Equity Security Holders of record and their respective

19  Interests as of the Distribution Date.  Said list shall be conclusively presumed to be complete and

20  accurate in all respects.  The Debtor, its professionals and the Responsible Person shall be

21  entitled to rely on said list in connection with any Distributions to be made to Class 4 Interests.

22            B.     For purposes of any Distribution under the Plan, the Debtor and the

23  Responsible Person shall have no obligation to recognize any transfer of Claims or Interests

24  occurring on or after the Distribution Date.  The Debtor, its professionals and the Responsible

25  Person shall be entitled to recognize and deal for all purposes with only those claimholders of

26  record stated on the claims docket maintained by the Bankruptcy Court and those stockholders of

27  record stated on the stock records maintained by the Transfer Agent as of the Distribution Date.

28            C.     The Responsible Person shall cause the Debtor to make the payments to

1 all creditors with Allowed Claims. The Responsible Person shall also cause the Debtor to wire

2 transfer the balance of funds designated for shareholders to the Transfer Agent who will be

3 instructed by the Responsible Person to make a pro rata distribution to shareholders of record as

4 of the Distribution Date.

5         11.3    <u>Time for Filing Objections</u>. Any objection to any Claim or Interest shall be filed

6 no later than ninety (90) days after the Effective Date.

7         11.4    <u>Disputed Claims and Disputed Interests; Reserve Accounts</u>. Only Allowed

8 Claims and Allowed Interests shall be entitled to a Distribution under the Plan. If appropriate,

9 the Debtor shall maintain and administer a Disputed Claims Reserve Account and a Disputed

10 Interests Reserve Account. Cash payments attributable to Disputed Claims and Disputed

11 Interests shall be maintained in the appropriate reserve account until such time as such Claim or

12 Interest is allowed or disallowed pursuant to a Final Order.

13                         **12.   BEST INTERESTS TEST**

14         12.1    The Bankruptcy Court must independently determine that the Plan is in the best

15 interest of all Classes of Creditors and Interests. The "best interest" test requires that a plan

16 provide to each dissenting member of each impaired Class a recovery that has a present value at

17 least equal to the present value of the distribution which each such Creditor or Interest holder

18 would receive if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

19         12.2    In performing this analysis, the Bankruptcy Court must first determine the

20 amount that would be generated from a Chapter 7 liquidation of the Debtor's assets after

21 deducting the cost of liquidation. The cost of liquidation would include the Trustee's

22 commissions (approximately four to five percent), the Trustee's expenses, fees for counsel and

23 other professionals retained by the Trustee and any Administrative Claims. In addition to

24 liquidating the Debtor's assets, the Trustee must also decide whether to proceed with litigation

25 against Creditors or other parties in interest for recovery of avoidable transfers. Generally, no

26 distribution is made in a Chapter 7 case until all assets of the Bankruptcy Estate and all Claims

27 have been liquidated, a process that could take several years. This delay could further impair the

28 value of any distribution made to holders of Claims and Interests under a Chapter 7 liquidation.

MURRAY & MURRAY
A Professional Corporation
3030 Hansen Way, Suite 200
Palo Alto, CA 94304-1009
TELEPHONE (650) 852-9000 FACSIMILE (650) 852-9244
E-MAIL mail@murraylaw.com

JMM.dib-08
I:\DAILY\MM\RTBW\disel-stmt.1.wpd

DEBTOR'S DISCLOSURE STATEMENT

1   12.3   However, Confirmation of the Plan will enable the Debtor to conclude its orderly

2   liquidation and timely distribute all liquidation proceeds which the Debtor believes will result in

3   the highest and best recovery for Creditors and Equity Security Holders. By proceeding to

4   liquidate the remaining assets and distribute the Debtor's cash proceeds with a Responsible

5   Person and counsel that are already familiar with the Case, the Debtor believes that the

6   liquidation proceeds can be distributed sooner and at a lesser expense.

7   12.4   Inasmuch as the Plan proposes to pay all Allowed Claims in full, together with

8   Post-Petition Interest, Creditors will be made whole, and as such, are receiving at least as much

9   as they would receive in a Chapter 7 Bankruptcy. Furthermore, as the Plan proposes to distribute

10  the remaining liquidation proceeds to holders of Interests, after the payment of senior Claims, all

11  Equity Security Holders are receiving at least as much as they would receive in a Chapter 7

12  Bankruptcy.

13  **13.   VOTING PROCEDURES AND REQUIREMENTS**

14  13.1   Ballots and Voting. Ballots to be used for voting to accept or reject the Plan are

15  enclosed with all copies of this Disclosure Statement. The Bankruptcy Court has directed that, in

16  order to be counted for voting purposes, Ballots for the acceptance or rejection of the Plan must

17  be received by the Debtor's counsel no later than the date set forth in the accompanying Order

18  Approving Disclosure Statement. The address, phone and fax numbers for Debtor's bankruptcy

19  counsel are:

20                     Janice M. Murray, Esq.
                          Murray & Murray
21                     A Professional Corporation
                     3030 Hansen Way, Suite 200
22                     Palo Alto, CA 94304-1009
                       Telephone: (650) 852-9000
23                     Facsimile: (650) 852-9244

24  IF YOU HAVE ANY QUESTIONS REGARDING THE PROCEDURES FOR

25  VOTING ON THE PLAN, YOU MAY CONTACT DEBTOR'S BANKRUPTCY COUNSEL.

26  13.2   Creditors and Interest Holders Entitled to Vote. With respect to the Plan, all

27  members of an impaired Class are entitled to vote. The holder of a Claim or Interest is entitled to

28  vote if either (i) its Claim or Interest has been listed or scheduled by the Debtor (and such Claim

MURRAY & MURRAY
A Professional Corporation
3030 Hansen Way, Suite 200
Palo Alto, CA 94304-1009
TELEPHONE (650) 852-9000 FACSIMILE (650) 852-9244
E-MAIL mail@murrylaw.com

DEBTOR'S DISCLOSURE STATEMENT

1  or Interest is not scheduled as disputed, contingent, unliquidated or unknown), or (ii) it has filed

2  a Proof of Claim or Interest with the Bankruptcy Court within the time ordered by the

3  Bankruptcy Court, or if no time is ordered by the Bankruptcy Court, within the time prescribed

4  by the Plan, the Bankruptcy Code, the Bankruptcy Rules or by the Local Rules. Any Claim or

5  Interest as to which an objection has been filed (and such objection is still pending) is not entitled

6  to vote, unless the Bankruptcy Court temporarily allows the Claim or Interest in an amount which

7  it deems proper for the purpose of accepting or rejecting the Plan. The vote of a Creditor or

8  Interest holder may also be disregarded if the Bankruptcy Court determines that the Creditor's or

9  Interest holder's acceptance or rejection was not solicited or procured in good faith or in

10  accordance with the provisions of the Bankruptcy Code. In addition, with respect to Interests,

11  Bankruptcy Rule 3018(a) provides that only holders of Allowed Interests of record on the date

12  the Order Approving Disclosure Statement is entered (or another date fixed by the Court) are

13  entitled to vote on the Plan.

14       13.3  <u>Impairment</u>. A Class is "impaired" if the legal, equitable, or contractual rights

15  attaching to the Claims and Interests of that Class are altered, other than by curing defaults and

16  reinstating maturities. All Classes of Claims and Interests are impaired under the Plan and are

17  therefore entitled to vote.

18       13.4  <u>Vote Required for Class Acceptance</u>. The Bankruptcy Code requires that each

19  Class of Claims or Interests accept the Plan, unless the Plan is imposed on a dissenting class as

20  described in Section 14.3 below. The Bankruptcy Code defines acceptance by a Class of Claims

21  as acceptance by holders of two-thirds in dollar amount and a majority in number of Claims of

22  that Class. The Bankruptcy Code defines acceptance by a Class of Interests as acceptance by

23  holders of two-thirds (2/3) in amount of that Class. However, only the votes of those Creditors

24  and Equity Security Holders who actually vote to accept or to reject the Plan are counted for this

25  purpose.

26                      **14. CONFIRMATION**

27       Under the Bankruptcy Code, the following steps must be taken to confirm the Plan:

28       14.1  <u>Confirmation Hearing</u>. Section 1128(a) of the Bankruptcy Code requires the

MURRAY & MURRAY
A Professional Corporation
3030 Hansen Way, Suite 200
Palo Alto, CA 94304-1000
TELEPHONE (650) 852-9000 FACSIMILE (650) 852-9244
E-MAIL mail@murraylaw.com

1    Bankruptcy Court, after notice, to hold the Confirmation Hearing. Section 1128(b) provides that

2    any party in interest may object to Confirmation of the Plan. The Confirmation Hearing may be

3    adjourned from time to time by the Bankruptcy Court without further notice except for the

4    announcement made at the Confirmation Hearing or any adjournment thereof. Any objection to

5    Confirmation must be made in writing and filed with the Bankruptcy Court and served upon the

6    following parties, together with proof of service, on or before the date set forth in the

7    accompanying Order Approving Disclosure Statement:

8                 Janice M. Murray, Esq.

9                    Murray & Murray
                       A Professional Corporation

10                 3030 Hansen Way, Suite 200
                    Palo Alto, CA 94304-1009

11                 Office of the U.S. Trustee
                  Attn: Nanette Dumas, Esq.

12            280 South First Street, Suite 268
                   San Jose, CA 95113

13

14    Objections to Confirmation of the Plan are governed by Bankruptcy Rule 9014.

15        14.2   <u>Confirmation Requirements</u>. For the Plan to be confirmed and binding on all

16    holders of Claims and Interests, the Bankruptcy Court must determine that the following

17    requirements of Section 1129 of the Bankruptcy Code have been satisfied:

18            A.     The Plan complies with the provisions of the Bankruptcy Code;

19            B.     The Plan proponent has complied with the provisions of the Bankruptcy

20    Code;

21            C.     The Plan has been proposed in good faith and not by any means

22    forbidden by law;

23            D.     Any payment made or to be made by the Plan proponent or a person

24    issuing securities or acquiring property under the Plan for services or costs in connection with the

25    Chapter 11 Case or the Plan has been approved or is subject to approval by the Bankruptcy Court

26    as reasonable;

27            E.     The Plan proponent has disclosed the identity of any individual to serve

28    after confirmation as an officer or director of the Debtor and the appointment to, or continuance

1   in; such office of such individual, is consistent with the interests of holders of Claims and

2   Interests and with public policy, and the Debtor has disclosed the identity of any insider that will

3   be employed or retained by the Debtor, and the nature of any compensation for such insider;

4          F.     Any regulatory commission with jurisdiction, after Confirmation of the

5   Plan, over the rates of the Debtor has approved any rate change provided for in the Plan, or such

6   rate change is expressly conditioned on such approval;

7          G.    The holder of each Claim or Interest in each Class of impaired Claims or

8   Interests has accepted the Plan or will receive under the Plan not less than what that holder would

9   receive if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code;

10        H.    Each Class of Claims or Interests has accepted the Plan, is not impaired

11   by the Plan, or the Plan is imposed on a dissenting class as described in Section 14.3 below.

12        I.     Priority Claims and Administrative Claims receive cash in the full amount

13   of such claims on the Effective Date and Tax Claims receive deferred cash payments, over a

14   period not exceeding six years from date of assessment, of a value equal to such Claims;

15        J.     At least one impaired Class of Claims has accepted the Plan;

16        K.    Confirmation is not likely to be followed by liquidation or further

17   reorganization of the Debtor unless such liquidation or reorganization is proposed in the Plan.

18        14.3   <u>Confirmation Without Acceptance by All Impaired Classes of Claims or Interests</u>

19   ("Cram Down"). Section 1129(b) of the Bankruptcy Code enables the Debtor, as the Plan

20   proponent, to confirm the Plan over the dissent of one or more impaired Classes of Claims or

21   Interests so long as at least one impaired Class of Claims votes to accept the Plan. In the event

22   that any impaired Class does not accept the Plan, the Bankruptcy Court may still confirm the Plan

23   at the request of the Debtor if, as to each impaired Class which has not accepted the Plan, the

24   Plan "does not discriminate unfairly" and is "fair and equitable." A plan of reorganization does

25   not discriminate unfairly within the meaning of the Bankruptcy Code if no Class receives more

26   than it is legally entitled to receive for its Claims or Interests. "Fair and equitable" has different

27   meanings for holders of secured and unsecured Claims and for holders of Interests.

28        A.    <u>Secured Claims</u>. With respect to a secured Claim, "fair and equitable"

MURRAY & MURRAY
A Professional Corporation
2020 Embarcadero Way, Suite 200
Palo Alto, CA 94304-4009
TELEPHONE (650) 852-9000 FACSIMILE (650) 852-9244
E-MAIL mail@murraylaw.com

1   means either:  (i) the impaired secured Creditor retains its lien to the extent of its Allowed Claim

2   and receives deferred cash payments at least equal to the allowed amount of its Claim with a

3   present value as of the Effective Date at least equal to the value of such Creditor's interest in the

4   property securing its lien; (ii) property subject to the lien of the impaired secured Creditor is sold

5   free and clear of that lien, with that lien attaching to the proceeds of the sale, and such lien

6   proceeds are treated in accordance with clauses (i) or (iii) hereof; or (iii) the impaired secured

7   Creditor realizes the "indubitable equivalent" of its Claim under the Plan.  Class 2 (Savoir) is an

8   impaired secured Claim under the Plan.  The Debtor believes that the Plan meets the "cram

9   down" test as to this impaired Class and will therefore seek to have the Plan confirmed as to such

10  Class pursuant to Section 1129(b)(2)(A) of the Bankruptcy Code in the event the Class does not

11  accept the Plan.

12              B.      Unsecured Claims.  With respect to an unsecured Claim, "fair and

13  equitable" means either:  (i) each impaired unsecured Creditor receives or retains property of a

14  value equal to the amount of its Allowed Unsecured Claim; or (ii) the holders of Claims and

15  Interests that are junior to the Claims of the dissenting Class will not receive or retain any

16  property under the Plan.  Allowed Unsecured Claims are designated as Class 3 under the Plan.

17  The Debtor believes that the Plan meets the "cram down" test as to this impaired Class because

18  either (i) they will receive payment in full or (ii) no junior Claim or junior Interest will receive or

19  retain any property under the Plan.  The Debtor will therefore seek to have the Plan confirmed as

20  to such Class pursuant to Section 1129(b)(2)(B) of the Bankruptcy Code in the event the Class

21  does not accept the Plan.

22              C.      Interests.  With respect to Interests, "fair and equitable" means that each

23  holder of an Allowed Interest either receives:  (i) property of a value, as of the Effective Date,

24  equal to the greatest of the amount of any fixed liquidation preference, any fixed redemption

25  price, or the value of the Interest; or (ii) that no junior Interest will receive or retain any property

26  under the Plan.  As no junior Interest will receive or retain any property under the Plan, the Plan

27  is fair and equitable as to the Class 4 and Class 5 Interests.  The Debtor will therefore seek to

28  have the Plan confirmed as to such Classes pursuant to Section 1129(b)(2)(C) of the Bankruptcy

MURRAY & MURRAY
A Professional Corporation
3030 Hansen Way, Suite 200
Palo Alto, Ca 94304-1009
TELEPHONE (650) 852-9000 FACSIMILE (650) 852-9244
E-MAIL mail@murraylaw.com

RM/cab-08
I:\DAILY\RM\ASITE\disel-stmt.1.wpd

1  Code in the event that any such Class does not accept the Plan.

2      14.4  <u>Statutory Compliance</u>. The Debtor believes that the Plan satisfies all of the

3  statutory requirements of Chapter 11 of the Bankruptcy Code, that the Debtor has complied or

4  will have complied with all of the requirements of Chapter 11, and that the Plan has been

5  proposed in good faith.

6      14.5  <u>Effect of Confirmation</u>. As of the Effective Date, the effect of Confirmation

7  shall be as provided in Section 1141 of the Bankruptcy Code, and as follows:

8      A.  <u>Binding Effect</u>. The provisions of the confirmed Plan shall bind the

9  Debtor, StarBase, any entity acquiring property under the Plan, any Creditor, and any Equity

10  Security Holder, whether or not the Claim or Interest of such Creditor or Equity Security Holder

11  is impaired under the Plan and whether or not any such Creditor or Equity Security Holder has

12  accepted the Plan.

13      B.  <u>Vesting of Property</u>. All property of the Bankruptcy Estate shall vest in

14  the Debtor subject to the terms and conditions of this Plan. All property of the Debtor except as

15  otherwise provided in this Plan, shall be free and clear of any liens, encumbrances, Claims of

16  Creditors and Interests of Equity Security Holders.

17      C.  <u>Discharge</u>. Due to the liquidating nature of this Plan and pursuant to

18  Bankruptcy Code 1141(d)(3), the entry of the Confirmation Order shall not act as a discharge of

19  any debt of the Debtor that arose prior to Confirmation, except to the extent that such debt is paid

20  under the Plan.

21      14.6  <u>Plan Modification</u>. Only the Debtor, as the Plan proponent, may modify the Plan.

22  Any modification must comply with the disclosure requirements. After the Plan has been

23  accepted, but before Confirmation, only modifications that do not adversely affect holders of

24  Claims and Interests are permitted without a solicitation of new votes. After Confirmation, the

25  Debtor may modify the Plan before substantial consummation in accordance with the provisions

26  of the Bankruptcy Code.

27  ///

28  ///

DEBTOR'S DISCLOSURE STATEMENT

## 15. CHAPTER 11 POST-CONFIRMATION
REPORTS AND FINAL DECREE

15.1 _Post-confirmation Reports_. Not later than 90 days after entry of the Confirmation Order, the Debtor shall file a post-confirmation status report, the purpose of which is to explain the progress made toward substantial consummation of the confirmed Plan. The report shall include a statement of receipts and disbursements, with the ending cash balance, for the entire 90 day period. The report shall also include information sufficiently comprehensive to enable the Court to determine (1) whether the Confirmation Order has become final; (2) whether deposits, if any, required by the Plan have been distributed; (3) whether any property proposed by the Plan to be transferred has been transferred; (4) whether the Debtor under the Plan has assumed the business or the management of the property dealt with by the Plan; (5) whether the payments under the Plan have commenced; (6) whether accrued fees due to the U.S. Trustee under 28 U.S.C. § 1930(a)(6) have been paid; and (7) whether all motions, contested matters and adversary proceedings have been finally resolved. Further reports must be filed every 90 days thereafter until entry of a final decree, unless otherwise ordered by the Court.

15.2 _Service of Reports_. A copy of each report shall be served, no later than the day upon which it is filed with the Court, upon the U.S. Trustee and such other persons or entities as may request such reports in writing by special notice filed with the Court.

15.3 _Final Decree_. After the Bankruptcy Estate is fully administered, the Debtor shall file an application for a final decree, and shall serve the application on the U.S. Trustee, together with a proposed final decree. The U.S. Trustee shall have twenty (20) days within which to object or otherwise comment upon the Court's entry of the final decree.

## 16. JURISDICTION

16.1 After Confirmation, the Bankruptcy Court shall retain and have all authority and jurisdiction as is allowed under the Bankruptcy Code and other applicable law to enforce the provisions, purposes, and intent of this Plan including, without limitation, matters or proceedings that relate to:

    A.    The StarBase Sale;

MURRAY & MURRAY
A Professional Corporation
3930 Freedom Way, Suite 200
Palo Alto, CA 94061-1208
TELEPHONE (650) 852-9000 FACSIMILE (650) 852-9244
E-MAIL mail@murraylaw.com

DEBTOR'S DISCLOSURE STATEMENT

B.    Allowance, disallowance, adjustment, treatment, or liquidation of Claims and Interests and objections thereto;

C.    The assumption, assignment, or rejection of any executory contract or unexpired lease, or any agreement, lease, contract, sale, purchase, assignment, or other action taken with regard to property of the Debtor;

D.    The title, rights, or interests of the Debtor in any property;

E.    Any right, power, action, or duty of the Debtor under this Plan;

F.    Any determination or estimation necessary or appropriate under Section 505 of the Bankruptcy Code or other determination or estimation relating to tax returns filed or to be filed by the Debtor for periods through the end of the fiscal year in which the Effective Date occurs, including, without limitation, the determination of the amount of taxes, net operating losses, tax attributes, tax benefits, tax refunds, and related matters of the Debtor;

G.    Requests for payment of Claims entitled to priority under Section 507(a) of the Bankruptcy Code, including compensation and reimbursement of expenses for professionals, to the extent Bankruptcy Court approval therefor is required under this Plan or the Confirmation Order;

H.    Resolution of controversies and disputes, including the correction of any mistake, defect, or omission regarding interpretation or enforcement of this Plan, the Confirmation Order, and any agreements referred to herein or executed in contemplation of or to implement this Plan;

I.    Implementation of the provisions of this Plan and entry of orders in aid of Confirmation of this Plan, including, without limitation, appropriate orders to protect the Debtor from actions by holders of Claims and Interests;

J.    Modification of this Plan pursuant to the Bankruptcy Code;

K.    Adjudication of any causes of action brought by the Debtor;

L.    The entry of an order, including injunctions, necessary to enforce the title, rights, and powers of the Debtor and the purposes and intent of this Plan, and to impose such limitations, restrictions, terms and conditions of such title, rights, and powers as the Court may

MURRAY & MURRAY
A Professional Corporation
3030 Hansen Way, Suite 200
Palo Alto, Ca  94304-1009
TELEPHONE (650) 493-9300 FACSIMILE (650) 493-2514
E-MAIL mail@murraylaw.com

B-M-12b-08
I:\DAILYUM\OASITE\disel-stmt.1.wpd

1   deem necessary;

2         M.    Such other matters as may be provided under the Bankruptcy Code, this

3   Plan, the Confirmation Order, or other applicable law; and

4         N.    Entry of a final decree closing this Chapter 11 Case, including provisions

5   for injunctive relief as may be equitable, consistent with Bankruptcy Rule 3022.

6                      **17. MISCELLANEOUS**

7       17.1   <u>Headings</u>. The headings contained in this Disclosure Statement are for

8   convenience of reference only and shall not limit or otherwise affect in any way the meaning or

9   interpretation of the Disclosure Statement.

10      17.2   <u>Singular/Plural</u>. All references in this Disclosure Statement to the singular shall

11   be construed to include references to the plural and vice versa.

12      17.3   <u>Gender</u>. All references in this Disclosure Statement to any one of the masculine,

13   feminine or neuter genders shall be deemed to include references to both other such genders.

14      17.4   <u>Computation of Time Periods</u>. In computing any period of time prescribed or

15   allowed by this Disclosure Statement, the day of the act, event or default from which the

16   designated period of time begins to run shall not be included. The last day of the period so

17   computed shall be included, unless it is a Saturday, Sunday, or a legal holiday, or, when the act to

18   be done is the filing of a paper in the Bankruptcy Court, a day on which weather or other

19   conditions have made the clerk's office inaccessible, in which event the period shall run until the

20   end of the next day which is not one of the aforementioned days.

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

DEBTOR'S DISCLOSURE STATEMENT

1     **18.  CONCLUSION**

2          The Debtor urges Creditors and Interest holders to carefully consider the Plan and the

3     Disclosure Statement, to vote on the Plan and to return their ballots no later than May 30, 2000 to

4     the following:

5                                      Murray & Murray
                                       A Professional Corporation
6                                      Attn:  Janice M. Murray, Esq.
                                       3030 Hansen Way, Suite 200
7                                      Palo Alto, CA 94304-1009

8

9     Dated: April _25_, 2000              SITE TECHNOLOGIES, INC.
                                           A California corporation
10

11                                     By _____
                                          Jeffrey F. Ait
12                                        Chief Executive Officer

13

14    MURRAY & MURRAY
      A PROFESSIONAL CORPORATION
15

16    By _____
         Janice M. Murray
17       Attorneys for Debtor

18

19

20

21

22

23

24

25

26

27

28

DEBTOR'S DISCLOSURE STATEMENT