# EXHIBIT D
# PART 3

Dockets.Justia.com

Acct No -9982

38 Office Dynamics
94 Hangar Way
Watsonville, CA 95076
Acct No -2577794

Trade Payable for Copy Machine Maintenance
November 1998 - December 1998

$153.75

39 Office Solutions
395 Del Monte Center #245
Monterey, CA 93940
Acct No -11691852

Trade Payable for Toner
December 1998

$168.74

40 Absolute Transportation
PO Box 13477
Research Triangle Park, NC 27709
Acct No -35

Trade Payable for Moving Copy Machine
November 1998

$450.00

41 Western Management Group
200 South Santa Cruz Ave
Los Gatos, CA 95030
Acct No -8703

Trade Payable for Compensation Survey
February 1999

$453.45

42 Pacific Bell
Payment Center
Sacramento, CA 95887
Acct No -408-942-1348
Acct No -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
Acct No -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
Acct No -831-430-0705
Acct No -231-264-5513
Acct No -408-461-3026

Trade Payable for Phone Service
November 1998 - January 1999

$3,675.14

43 Pacific West Water
PO Box 634
Pacific Grove, CA 93950
Acct No -None

Trade Payable for Water Cooler Service
January 1998 - January 1999

$534.14

44 Pagliaro Kuhlman

Trade Payable for Advertising Consulting

$12,111.81

333 W. San Carlos
San Jose, CA 85116
Acct No --22

April 1998 - May 1998

$2,090.00

---

45 Patricia Seybold Group
148 State St, Ste 700
Boston, MA 02109
Acct No --3635

Trade Payable for Research Report
April 1998

$1,964.32  ✗

---

46 Pitney Bowes Credit Corp
PO Box 85460
Louisville, KY 40285
Acct No --7567530

Lease Payment for Mailing Equipment
July 1998 - January 1999

$1,549.16

---

47 Press Access
120 Boylston Street
Boston, MA 02116
Acct No --None

Trade Payable for Public Relations Work
April 1998

$1,050.00

---

48 Price Waterhouse LLP
PO Box 61000
San Francisco, CA 94161
Acct No --20502-582-4

Trade Payable for Tax Advice
November 1998

$2,361.22

---

49 Printivi
445 Restoration Rd, #A
Marina, CA 93933
Acct No --SEE

Trade Payable for Label and Invoice Printing
May 1998

$2,792.39

---

50 Qwest
PO Box 85690
Louisville, KY 40285
Acct No --34672072

Trade Payable for Long Distance Phone Service
November 1998 - January 1999

$348.00  ✗

---

51 RSA Group
PO Box 5150
Carol Stream, IL 60197
Acct No --4731042-001

Trade Payable for Accounting Information
September 1998 - November 1998

| # | Name / Address | Description | Amount |
|---|---|---|---|
| 52 | Roadway Package System, Inc<br>Dept LA 21095<br>Pasadena, CA 91185<br>Acct No -- | Trade Payable for Shipping Services<br>January 1999 | $8.00 |
| 53 | Sprint<br>PO Box 3887<br>Jackson, MS 30237<br>Acct No -2185219 | Trade Payable for Pager Service<br>January 1999 | $177.25 |
| 54 | Sprint<br>PO Box 740303<br>Atlanta, GA 30374<br>Acct No -None | Trade Payable for Phone Service<br>October 1998 - November 1998 | $30.23 |
| 55 | Sprint Technologies, Inc.<br>PO Box 6187<br>Carol Stream, IL 60197<br>Acct No -17204561 | Lease Payment for Voicemail System<br>December 1999 - January 1999 | $180.48 |
| 56 | U.S. Stock Transfer Corp<br>1745 Gardena Ave, 2nd Fl<br>Glendale, CA 91204<br>Acct No -958 | Trade Payable for Stock Transfer Agent Fees<br>December 1998 | $458.49 |
| 57 | United Parcel Service<br>PO Box 650550<br>The Lakes, NV 88905<br>Acct No -X48-52W | Trade Payable for Shipping Service<br>December 1998 - January 1999 | $170.21 |
| 58 | Universal Building Service<br>3520 Pierce Street<br>Richmond, CA 94804<br>Acct No -70033 | Trade Payable for Janitorial Service<br>November 1998 - January 1999 | $2,534.29 |
| 59 | William French<br>155 Stonebeny Way | Expense Report<br>January 1999 | $1,448.65 |

Dillon, CO 80435
Acct No - None

60 Wilson, Sonsini, Goodrich & Rosati
650 Page Mill Rd
Palo Alto, CA 94304
Acct No - 18232

Legal Services
May 1998 - January 1999
(balance is a forecast)                    $452,247.61

61 Ziff Davis Publishing
Dept LA 21675
Pasadena, CA 91185
Acct No - 482900000

Trade Payable for Advertising
May 1998                                   $8,383.15

62 Owens Financial Group, Inc.
2221 Olympic Blvd.
Walnut Creek, CA 94595
Acct No - None

Lease Payment for Expired Property Lease
July 1998 - September 1998                 $51,535.50

63 Carbonaro Creek Associates
PO Box 670
Cupertino, CA 95015
Acct No - None

Lease Payment for Property Lease
December 1998
$18,383 Deposit held by Carbonaro

64 Knowledge Vision
283 Patterson Dr.
Myrtle Beach, SC 29572
Acct No - None

Royalty Payment for WebAnimator License Agmt
September 1997 - January 1999              $1,622.60

65 Intel, Inc.
616 Dows Road SE
Cedar Rapids, IA 52403
Acct No - None

Royalty Payment for SiteMaster
October 1998 - January 1999               $344.00

66 Altera Software
549 Lighthouse Ave
Pacific Grove, CA 93950
Acct No - None

Royalty Payment for WebAnimator Sales
May 1998 - December 1998                   $13.00

$7,129.93
$778,299.40

Royalty Payment for Site Sweeper Product

67 Site/Technologies/Inc.
389 El Pueblo Rd.
Scotts Valley, CA 95066
Acct No -- None

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

SOFTWARE RIGHTS ARCHIVE, LLC

     v.

GOOGLE INC., YAHOO! INC., IAC
SEARCH & MEDIA, INC., AOL, LLC,
AND LYCOS, INC.

Civil Case No. 2:07-cv-511 (CE)

FILED UNDER SEAL

<u>REPLY IN SUPPORT OF DEFENDANTS' MOTION TO</u>

<u>DISMISS FOR LACK OF STANDING</u>

**EXHIBIT 11**

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................ I

I.      SUMMARY ............................................................................................... 1

II.     ARGUMENT ............................................................................................. 4

      A.    The 1997 Stock Exchange Agreement Did Not Transfer The
           Patents-In-Suit From Site/Tech To The Stock Purchaser, Site
           Tech. .................................................................................................... 4

           1.    Site Tech Did Not Receive The Patents-In-Suit By
                  Operation Of Law. ................................................................. 4

           2.    The Stock Exchange Agreement Did Not Cause a *De
                  Jure* or *De Facto* Merger Between Site/Tech And Site
                  Tech In 1997. ...................................................................... 11

           3.    Site/Tech Did Not Transfer the Patents To Site Tech Via
                  Written Conveyance Under § 261 .......................................... 12

           4.    Site/Tech Did Not Ratify An Assignment To Site Tech. ........... 13

      B.    The Doctrines Of *Alter Ego*, Agency, And Ratification Did Not
           Convey The Patents-In-Suit To Egger. .................................................. 14

           1.    The Patent Laws Require A Written Patent Assignment
                  From The True Patentee, Site/Tech, And None Exists. ............ 14

           2.    Site/Tech Was Not The *Alter Ego* Of Site Tech. ..................... 15

           3.    Site Tech Was Not Site/Tech's Agent For Conveying
                  Patent Rights. ...................................................................... 18

      C.    No Equitable Principle Conveyed the Patents-In-Suit To Egger
           After Site Tech Filed For Bankruptcy. ................................................. 23

           1.    The Rejection Of The 1998 Bill Of Sale During The
                  Bankruptcy Proceedings Relieved Site Tech Of Any
                  Obligation To Transfer The Patents-In-Suit. ........................... 23

           2.    Contrary To SRA's "*Res Judicata*" Forfeiture Theory,
                  The Patents Remain Subject To The Jurisdiction Of The
                  Bankruptcy Court. ................................................................ 25

           3.    Because The After-Acquired Title Doctrine Does Not
                  Cause "Immediate" And Automatic Transfers, Title
                  Remains With Site Tech. ....................................................... 27

          4.     Unclean Hands And Other Equitable Defenses Bar Any
Equitable Remedy Under The After-Acquired Title
Doctrine...................................................................................................28

    D.    The August 2008 Assignment Also Does Not Convey Rights To
The Patents-In-Suit. ..............................................................................30

III.    CONCLUSION...............................................................................................30

**TABLE OF ABBREVIATIONS**

For the ease of the Court, Defendants have adopted Plaintiff's abbreviations for the corporate entities Site Technologies, Inc. (aka Deltapoint, Inc.) and Site/Technologies/Inc. (aka Libertech, Inc.). These and other abbreviations are summarized below:

| | |
|---|---|
| Ait Depo. | Deposition of Jeffrey Franklin Ait on September 30, 2008 (Rp. Ex. 2) |
| Deltapoint | Deltapoint, Inc. (later known as Site Technologies Inc., a California corporation) |
| DGCL | Delaware General Corporations Law |
| Egger Depo. | Deposition of Daniel Egger on October 2, 2008 (Rp. Ex. 1) |
| Libertech | Libertech, Inc. (later known as Site/Technologies/Inc., a Delaware corporation) |
| Lynch Depo. | Deposition of J. Christopher Lynch on October 1, 2008 (Rp. Ex. 3) |
| Mot. | Defendants' Brief in Support of their Motion to Dismiss (Docket No. 66) |
| Opp. | SRA's Brief in Opposition to Defendants' Motion to Dismiss (Docket No. 76) |
| Mot. Ex. __ | An exhibit attached to Defendants' Motion to Dismiss |
| Opp. Ex. __ | An exhibit attached to the Declaration of Lee L. Kaplan submitted with SRA's Brief in Opposition |
| Rp. Ex. __ | An exhibit attached to this Reply |
| Site Tech | Site Technologies Inc., a California corporation, (formerly known as Deltapoint) |
| Site/Tech | Site/Technologies/Inc., a Delaware corporation, (formerly known as Libertech) |
| SRA | Plaintiff Software Rights Archive, LLC |
| 1997 Stock Exchange Agreement | Stock Exchange Agreement between Deltapoint, Inc. and Site/Technologies/Inc. dated July 11, 1997 (Mot. Ex. 6) |
| 1998 Bill of Sale | Bill of Sale, Assignment and License Agreement Between Site Technologies, Inc. and Daniel Egger dated September 16, 1998 (Mot. Ex. 10) |
| 2005 Assignment | Assignment from Site/Technologies/Inc. to Daniel Egger dated February 11, 2005 (Mot. Ex. 14) |
| 2008 Assignment | Assignment from Site Technologies, Inc. to Daniel Egger dated August 13, 2008 (Rp. Ex. 5) |

## I.    SUMMARY

SRA never owned the patents-in-suit and thus has no standing to sue Defendants.  SRA claims that its rights in the patents trace back to the 1998 Bill of Sale from Site Tech to Egger (who then purported to assign his rights to SRA in 2005).  But SRA does not dispute that Site/Tech, the record title holder to the patents, was not a party to the 1998 Bill of Sale.  SRA also implicitly concedes that there is no written instrument specifically transferring title to the patents from Site/Tech to Site Tech prior to the 1998 Bill of Sale.  Thus, because Site Tech did not own the patents, Egger obtained no rights by this contract.

Because of this fatal flaw, SRA now offers a litany of legal theories to excuse the broken chain of title.  Yet, SRA, through its own actions, has twice conceded that the 1998 Bill of Sale failed to transfer anything.  First, in 2005, Egger, his lawyer, and SRA recognized that Egger needed to take title from Site/Tech and thus that the 1998 Bill of Sale by Site Tech (rather than Site/Tech) was defective.  Undeterred by their lack of authority to act for Site Tech, Egger and his lawyer proceeded to manufacture a new instrument – the fraudulent 2005 Assignment (Mot. Ex. 14) – which Egger signed as Site/Tech's "President" even though Egger himself admits that he was not Site/Tech's President in 2005 and that Site/Tech had since ceased to exist.[1]

This was no isolated act.  After Defendants filed this motion, Egger and SRA persuaded Jeffrey Ait, the former CEO of Site Tech, to likewise go beyond Ait's authority and execute another assignment again purporting to convey the patents to Egger (the 2008 Assignment). They did so even though the Bankruptcy Court of the Northern District of California retains jurisdiction over the assets of Site Tech and Site/Tech and even though Ait had no authority to bind Site Tech – his status as the responsible person for the Site Tech estate ended long ago in 2004, and Ait conceded that he was not Site Tech's CEO in 2008.[2]

---

[1] Egger Depo at 63:1-3. (Rp. Ex 1).  During Egger's deposition, Site/Tech was referred to as "Slash."  *Id.* at 27:2-5.

[2] Ait Depo. at 134:14-19; 166:35-167:7. (Rp. Ex 2).

As a consequence of these events, there are now three documents that purportedly conveyed the patents to Egger – the 1998 Bill of Sale, the 2005 Assignment, and the August 2008 Assignment. None was effective:

A. **The 1998 Bill of Sale.** SRA relies on the 1998 Bill of Sale (Mot. Ex. 10) to evidence Egger's alleged receipt of the patents-in-suit from Site/Tech, a Delaware corporation (aka Libertech), in 1998, even though Site/Tech was *not* a party to the 1998 agreement and even though Site/Tech never assigned its rights to Site Tech, a California corporation, in a writing. SRA offers three theories for why the 1998 Bill of Sale was effective despite the absence of the patent owner as a party. (Opp. at 1-2). Each theory fails.

   1. **Site Tech did not obtain the patents by operation of law in 1997.** SRA argues that Site Tech obtained the patents by operation of law when it purchased Site/Tech's stock in 1997. However, Delaware law does not "operate" to vest property as SRA posits.

   2. **Site Tech's actions did not bind Site/Tech.** SRA claims that the doctrines of *alter ego*, agency, and ratification transferred Site/Tech's title to the patents. But Site Tech was neither Site/Tech's *alter ego* nor its agent, and Site/Tech never ratified the 1998 Bill of Sale. Furthermore these equitable and common law doctrines cannot circumvent the statutory requirement that a patent conveyance be in writing.

   3. **The doctrine of after-acquired title does not help Egger.** SRA theorizes that, under the doctrine of after-acquired title, legal title to the patents "immediately" transferred to Egger when Site/Tech and Site Tech merged. Critically, SRA ignores that the bankruptcy proceedings extinguished Egger's alleged right to specific performance. Moreover, the doctrine of after-acquired title does not "immediately" transfer title and is eviscerated by Egger's unclean hands.

B. **The 2005 Assignment.** SRA now attempts to wash its hands of the purported 2005 Assignment from Site/Tech to Egger. (Opp. at 24; Mot. Ex. 14). This is unsurprising, as the document falsely identifies Egger as Site/Tech's "President" and both Egger and his attorney knew this representation to be inaccurate.[3] Egger

---

[3] Egger Depo. at 84:4-11: Lynch Depo. at 140:5-8. (Rp. Ex. 3).

and his attorney now claim that they prepared and recorded the assignment merely to provide "public notice" of Egger's ownership – not to prove that the patents were actually conveyed to Egger.[4] But Egger made no such distinction when he filed the 2005 Assignment with the Patent Office.

In fact, the law firm that Egger hired informed him that the 2005 assignment was "necessary to establish a clear chain of title" from Site/Tech to Egger. (Rp. Ex. 4). Thus, the 2005 Assignment evidences Egger's own belief that, as late as 2005, he owned nothing, and that he needed to take title from Site/Tech, rather than its parent, Site Tech. Moreover, the 2005 Assignment – which Egger himself signed – asserts that "Site/Technologies/Inc . . . *is* the owner of the patent(s)." Egger and SRA cannot plausibly deny that Site/Tech continued to own the patents after the 1998 Bill of Sale.

C.    *The 2008 Assignment*. Finally, in August 2008, Egger belatedly tried to obtain yet *another* assignment purporting to assign Site Tech's remaining interests in the patents to himself. (Rp. Ex. 5). However, Site Tech had long since ceased to operate, and the signing officer, Jeffrey Ait, had long been relieved of his authority to act for Site Tech.[5] As a result, this third document is no more effective than the other two.

In short, no written document conveyed the patents-in-suit to Egger. SRA advances various theories about the 1997 Stock Exchange Agreement, but these are wrong as a matter of law. Its remaining theories require the court to ignore the Patent Law's requirement for a written transfer and respect for the corporate form of the patentee, Site/Tech. SRA would disregard that settled law on the ground that Site/Tech was a shell company. However, the facts prove Site/Tech was not a shell, and Ait, the former President of Site/Tech, acknowledged this at

---

[4] Egger Depo. at 121:11-22.

[5] Ait Depo. at 166:25-167:7.

deposition.[6]  Consequently, the 1998 Bill of Sale gave Egger no rights to the patents-in-suit, and SRA obtained none from Egger.  Plaintiff SRA has failed to meet its burden of establishing standing to sue.  *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992).

## II.    ARGUMENT

### A.    The 1997 Stock Exchange Agreement Did Not Transfer The Patents-In-Suit From Site/Tech To The Stock Purchaser, Site Tech.

#### 1.    Site Tech Did Not Receive The Patents-In-Suit By Operation Of Law.

SRA incorrectly argues that Site/Tech's Certificate of Incorporation (Opp. Ex. 10) transferred the patents to Site Tech "by operation of law" as a consequence of Site Tech's acquisition of Site/Tech stock.  SRA relies upon a single clause in the Certificate – Art. IV.B.2.b (the "Liquidation Preference").  This clause states that, when it is triggered, "any remaining assets and funds [of Site/Tech] . . . shall be distributed among the [stockholders of Site/Tech]." SRA erroneously theorizes that Site Tech's stock acquisition invoked the Liquidation Preference and caused this clause to automatically vest all of Site/Tech's property in Site Tech.  This theory fails because there is no law in "operation."

##### a.    The Liquidation Preference Does Not Vest Property "By Operation of Law."

SRA argues that the Liquidation Preference conveys property "by operation of law." However, there is no underlying law in "operation."  The Supreme Court has held that a transfer "by operation of law" only occurs if the transaction "mechanism is entirely statutory, effecting an automatic transfer without any voluntary action by the parties."  *United States v. Seattle-First Nat'l Bank,* 321 U.S. 583, 588 (1944).  Delaware also follows this rule.[7]  In *Pioneer National Title Insurance Co. v. Child, Inc.,* 401 A.2d 68, 70 (Del. 1979), the Delaware Supreme Court held that an assignment or transfer "by operation of law" only occurs "by the mere application . . . of the established rules of law, without the act or cooperation of that person," and

---

[6] Ait Depo. at 110:8-14.  During Ait's deposition. Site/Tech was referred to as "Slash."

[7] Delaware law controls as Site/Tech was a Delaware corporation at the time of the stock exchange agreement.  SRA likewise relies upon Delaware law.  Opp. at 9.

applied the rule to reject an alleged transfer of a claim by "operation of law" between a corporation and its successor.

Delaware does have laws that vest property by operation of law, such as its version of the UCC foreclosure law.[8] However, Site/Tech's Liquidation Preference does not invoke any of these laws, and SRA does not rely on them. As its name suggests, the Liquidation Preference is intended primarily for distributions in a "liquidation, dissolution, or winding up." The Delaware laws that pertain to dissolution, DGCL §§ 275-285, do not automatically vest property. Rather they call on dissolving corporations to actively administer their assets. DGCL § 278 is illustrative: it continues the existence of dissolved corporations so that they may "gradually . . . dispose of and convey their property, . . . discharge their liabilities and . . . distribute to their shareholders any remaining assets."[9] This process necessarily involves voluntary acts. For example, the statute does not require any particular party to be vested with the corporation's property and expressly permits its disposal generally.[10] Thus, Delaware's dissolution laws cannot convey property "by operation of law." *See Seattle-First Nat'l Bank*, 321 U.S. at 588.

SRA relies on Delaware's dividend law, DGCL § 173, as the operative law. (Opp. at 9). But DGCL § 173 cannot vest property "by operation of law." DGCL § 173 simply provides that no corporation shall pay dividends except in accordance with the Delaware statute, particularly DGCL § 170, which provides that "directors . . . *may* declare and pay dividends" if certain

---

[8] Delaware's version of UCC § 9-617 reads: "A secured party's disposition of collateral after default: . . . *transfers to a transferee for value all of the debtor's rights in the collateral*." Del. Code Ann. tit. 6, § 9-617 (emphasis added). Its merger law, DGCL § 259(a), states that "all property, real, personal and mixed [of the disappearing corporation in the merger], and all debts due . . . *shall be vested* in the corporation surviving or resulting." (emphasis added). *See also* DGCL § 292 ("Trustees . . . shall, upon their appointment . . . be *vested by operation of law and without any act or deed*, with the title of the corporation to all of its property.") (emphasis added).

[9] *See also* DGCL § 279 (requiring that the corporation "appoint . . . trustees . . . to take charge of the corporation's property, . . . and to do all other acts . . . necessary for the final settlement"); DGCL § 280(e) (providing for a successor entity "to [*inter alia*] dispose of and convey the property of the dissolved corporation"); DGCL § 281 (permitting exercise of "the judgment of directors" in paying for claims out of corporate assets before any distribution of remaining assets).

[10] *See e.g.*, Storm Waterproofing Corp. v. L. Sonneborn Sons, Inc., 31 F.2d 992, 994 (D. Del. 1929) (permitting dissolving company under predecessor statute to DGCL § 278 to sell a trademark asset to a third party).

financial tests are met.[11] (emphasis added). Dividends therefore are discretionary and entirely dependent on voluntary acts – specifically, a declaration of a dividend by the board of directors, followed by actual payment of the dividend by the corporation.[12] *See Gabelli & Co., Inc. Profit Sharing Plan v. Liggett Group, Inc.*, 444 A.2d 261, 264 (Del. Ch. 1982) ("A decision to declare a dividend is a matter ordinarily addressed to the discretion of the Board of Directors."). Thus, § 173 and Delaware's dividend statutes cannot be the law "in operation" according to *Seattle-First National Bank*. Because no law operated to automatically vest Site/Tech's property in Site Tech, SRA's argument that the Liquidation Preference vested the patents "by operation law" fails.

> **b.** **Even If There Were Operative Law, Site/Tech Never Performed The Statutory Acts Required To Cause A Distribution.**

Even if one were to assume that Delaware law could somehow "operate" to transfer the patents to Site Tech, Site/Tech never performed the legal acts required to transfer its property. Distributions under Delaware corporate law require affirmative acts as a matter of law. Dividends and dissolutions are no exception. With respect to dividends, DGCL §§ 170, 173 and 213 require a declaration of the board, a determination of which stockholders are entitled to receive the dividend by setting a formal record date, and affirmative action to actually make the dividend payment.[13] Site/Tech did not take these steps. With respect to dissolutions, DGCL §§ 275 and 278 require board and stockholder approval of the dissolution and the filing of a certificate of dissolution with the Delaware Secretary of State. Thereafter, either a court proceeding occurs or the board of directors adopts a "plan of distribution" pursuant to § 281(b) of the DGCL that provides for noticing claimants, the paying off the corporation's liabilities, and

---

[11] DGCL § 173 requires that "[n]o corporation shall pay dividends except in accordance with this chapter," and thus invokes § 170, which provides that a board may declare and pay dividends but restricts dividends to monies payable "(1) out of surplus, . . . or (2) . . . out of its net profits."

[12] *See also* Drexler, Black & Sparks, Delaware Corporation Law & Practice § 20.02 (2007) ("Specific board action exercising the board's discretionary power to declare a dividend is essential to the creation of an enforceable obligation by the corporation to pay dividends to stockholders."). Nor is there any evidence that the required voluntary acts, such as a board declaration and payment, took place. Indeed, the payment of a patent as dividend would require a written assignment. 35 U.S.C. § 261.

[13] *See* Drexler, Black & Sparks, Delaware Corporation Law & Practice § 20.02 (2007).

only then distributing any remaining funds or assets to the stockholders. Again, Site/Tech did not take these steps. Delaware law is straightforward – distributions do not occur unless the corporation takes affirmative steps required by statute. Under the law that SRA alleges was in operation to transfer the patents, Site/Tech never took the statutorily required steps to effect a conveyance.

### c. The Liquidation Preference Is Not Self-Executing As A Matter Of Contract Interpretation.

SRA's argument also fails as a matter of contract interpretation.[14] First, the absence of language mandating automatic action precludes the Liquidation Preference's prospective term ("shall be distributed") from being construed as self-executing. The Delaware Chancery Court reached this same conclusion in *Pharm-Eco Lab., Inc., v. Immtech Int'l, Inc.*, No. Civ. A.18246, 2001 WL 220698 (Del. Ch. Feb. 26, 2001). The contract in *Pharm-Eco* stated that "upon completion of [Immtech's] IPO . . . Pharm-Eco *will grant or assign* to Immtech . . . an exclusive worldwide license." *Id.* at *2 (emphasis added). The court rejected the argument "that the Letter Agreement's provision requiring [Pharm-Eco] to grant or assign a license to Immtech was self-executing upon the occurrence of the IPO." *Id.* at *6. It explained:

> [T]he natural inference one draws from the language is that Pharm-Eco *was obligated to take specific action to grant or assign* the Exclusive License upon completion of the IPO. If it were otherwise, one would expect that the Letter Agreement would state that upon completion of the IPO, all of Pharm-Eco's rights under the 1993 Letter Agreement *would be automatically* assigned to Immtech.

*Id.* at *7 (emphasis added). Like the license grant in *Pharm-Eco*, Site/Tech's Liquidation Preference does not state that its assets *would be automatically* assigned to stockholders. Consequently it is not self-executing, but merely prospective. Site/Tech knew how to use such self-executing language since Article 3(a)(iii) in its Articles of Incorporation, for example, called for preferred shares to "automatically convert." (Rp. Ex. 6 at 6).

---

[14] A corporation's certificate of incorporation is a contract between the corporation and its stockholders and "general rules of contract interpretation apply to its terms." *See Staar Surgical Co. v. Waggoner*, 588 A.2d 1130, 1136 (Del. 1991); *accord Waggoner v. Laster*, 581 A.2d 1127, 1134 (Del. 1990); *Ellingwood v. Wolf's Head Oil Ref. Co.*, 38 A.2d 743 (Del. 1944); *Lawson v. Household Fin. Corp.*, 152 A. 723, 727 (Del. 1930).

Even apart from the contractual language, the Federal Circuit has held that a prospective agreement to assign an invention cannot serve as a present assignment sufficient to confer standing to sue. *See Arachnid, Inc. v. Merit Indus.*, 939 F.2d 1574, 1580-81 (Fed. Cir. 1991). In *Arachnid*, a consulting agreement provided that "any inventions conceived" during the consultancy *"shall be* the property of [Arachnid], and all rights thereto *will be assigned* by [the consultant] to [Arachnid]." *Id.* at 1576 (emphasis added). The Federal Circuit held that this language did not constitute a present assignment of rights to the patented invention and thus did not clothe plaintiff with standing to sue. *Id.* at 1580-81. As in *Pharm-Eco* and *Arachnid*, the Liquidation Preference's directive that Site/Tech's assets "shall be distributed" did not constitute a present assignment and thus did not actually transfer those assets.

Moreover, Site/Tech was not obliged to transfer any specific property under this clause. In fact, the Liquidation Preference, at most, was an obligation to distribute "an amount" corresponding to the corporation's "remaining assets." The Liquidation Preference nowhere required that any specific property be transferred. Rather, its language (*e.g.,* "remaining") contemplated disposing of corporate property to raise funds and then distributing the proceeds of such funds (*i.e.,* distributing an "amount"). Thus, there was no absolute requirement that corporate property be distributed "in kind," and hence cannot be regarded as automatically vesting the corporate property with the stockholders.

        **d.**     **SRA's Reliance On *Akazawa* And *Sky Tech* Is Misplaced.**

SRA cites two cases as allegedly obviating the need for a written assignment from Site/Tech to Site Tech, but neither case applies here.

The first case – *Akazawa v. Link New Technology International, Inc.*, 520 F.3d 1354 (Fed. Cir. 2008) – concerned a disputed conveyance under Japanese intestacy law. Contrary to SRA's reading of *Akazawa,* the Federal Circuit held that a written instrument might be necessary, depending on the facts of the case. The court stressed that, if Japanese law provided for administration of a decedent's estate, "a written assignment in accordance with § 261 may

then be necessary to convey the patent from the estate to [the] heirs." *Id.* at 1358. The court expressly distinguished situations where the law automatically vests property in the heirs (as in *H.M. Stickle v. Heublein, Inc.*, 716 F.2d 1550 (Fed. Cir. 1983)) from situations requiring administration of an estate. *See Akazawa*, 520 F.3d at 1356, 1358. Here, as demonstrated above, no law automatically vests property under the Liquidation Preference. At a minimum, administrative acts (that did not occur here) would have been required to dispose of Site/Tech's assets under the Liquidation Preference and Delaware law. *See* DGCL §§ 278-281. Thus, the situation here is akin to the one that the Federal Circuit in *Akazawa* contemplated would require a written assignment, and so *Akazawa* actually undermines SRA's position that none is needed.

SRA's other case – *Sky Technologies, LLC v. SAP AG* ("*Sky Tech*"), Case No. 2:06-cv-440 (DF), (E.D. Tex. August 25, 2008) (Opp. Ex. 25) – also does not support finding a valid transfer of the patents from Site/Tech to Site Tech.[15] *Sky Tech* involved an underlying state law that expressly vested property with a successful bidder in a public auction. The court found the transfer to the successful bidder to be valid because the auction triggered a state foreclosure law that directly vested the auctioned property in the purchaser. *Id.* at *18. The court emphasized that the operative state law expressly stated that the "disposition [*i.e.*, the public auction] *transfers . . .* all of debtor's rights in the collateral." Mass. Ann. L. ch. 106 § 9-617(a) (emphasis added). *Sky Tech* thus turned on a statute that automatically transfers property. As discussed above, the deemed liquidation event invoked by SRA did not trigger any such law and so *Sky Tech* does not support SRA's position.

### e. The Circumstances Of The 1997 Stock Exchange Agreement Further Belie SRA's Position.

The circumstances surrounding 1997 Stock Exchange Agreement also do not support SRA's position that this Agreement transferred all Site/Tech assets to Site Tech. First, Site/Tech

---

[15] The Federal Circuit recently granted an interlocutory appeal in *Sky Tech*. Fed. Cir. Case No. 2008-1606. The Eastern District of Texas (Judge Folsom) has stayed the case pending the outcome.

actually retained assets following the stock exchange according to its tax returns and Jeffrey Ait, Site/Tech's former President.[16]

Second, Ait testified that the former owners of Site/Tech rejected Site Tech's (then Deltapoint's) offer to buy Site/Tech's assets because they "wanted to get rid of all liabilities as well as all assets."[17] Thus the owners of Site/Tech sold the entire company, *i.e.*, as a full-fledged entity comprising all its liabilities together with its assets. Likewise, Site Tech maintained Site/Tech as a separate legal entity in order to insulate itself from potential liabilities. Ait testified that "We kept a legal entity in place as a Delaware corporation because . . . we wanted to protect the public corporation from any liabilities that might arise out of [Site/Tech]."[18] Since Site/Tech's liabilities were not transferred into Site Tech pursuant to the 1997 Stock Exchange Agreement, its assets also did not transfer. Delaware liquidation law requires that an asset transfer to stockholders cannot be accomplished until liabilities are addressed, and, not until December 2000 did this deliberate separation end when the two companies merged and the surviving company expressly assumed responsibility for Site/Tech's liabilities. (Mot. Ex. 12).

Third, there is no evidence that the parties intended to cause an asset transfer by amending the Articles of Incorporation for Site/Tech. Rather, the articles were amended so that the preferred shareholders of Site/Tech could receive a preferential payment in the 1997 Share Exchange Agreement.[19] Unless the articles were amended to define a share exchange as a liquidation event, the preferred shareholders had no right to the preferred payment that they received in the 1997 Share Exchange Agreement.[20] It was for this reason that the parties amended the Articles of Incorporation to define a share exchange as a liquidation event.

---

[16] *See* Ait Depo. at 79:12-16 (filing of tax returns after stock exchange); *id.* at 81:11-19; 82:8-21 (continuing to pay salaries after stock exchange); *id.* at 85:5-94:18; 110:4-7 (continuing to file tax returns, retain assets, pay rent and pay salaries after stock exchange). *See also* Rp. Exs. 7-8.

[17] Ait Depo. at 78:16-21.

[18] *Id.* at 109:2-10.

[19] Rp. Ex. 6.

[20] *Id.*

The simple fact remains that there is no evidence that Site/Tech transferred all its property to its Site Tech pursuant to the 1997 Stock Exchange Agreement. As explained above, the evidence shows that Site/Tech retained assets and that Site/Tech continued as a separate corporate entity until December 2000.[21]

### 2. The Stock Exchange Agreement Did Not Cause a *De Jure* or *De Facto* Merger Between Site/Tech And Site Tech In 1997.

SRA alludes to a "*de facto* merger transaction" between Site/Tech and Site Tech (Opp. at 3-6), but the patents could not have transferred to Site Tech by virtue of a *de facto* merger since Delaware courts have applied "*de facto* mergers" in only very limited circumstances not present here.[22] Moreover, Delaware courts have explicitly rejected characterizing stock exchanges as *de facto* mergers that result in the automatic transfer of assets. For instance, in *Orzeck v. Englehart*, 195 A.2d 375, 377 (Del. 1963), the Delaware Supreme Court found that a stock exchange was not a *de facto* merger and did "nothing more" than make the purchasing corporation the stockholder of the other corporation. In emphasizing this point, the court stated:

> [T]he purchasing corporation is *not the owner of the assets* of the other corporation, but is merely a stockholder . . . . Nor do the corporate identities [merge] by reason solely of the purchase by one of all of the other's stock.[23]

*Id.* (Emphasis added). Here, Site/Tech and Site Tech intentionally structured the transaction as a stock exchange so that Site/Tech's sellers could declare a tax loss, and so that Site Tech would be insulated from Site/Tech's liabilities.[24] Under Delaware law, this transaction was not a merger, and cannot be so characterized to erode the distinctiveness of Site/Tech as a separate legal entity from Site Tech. Absent a *de jure* merger, Site/Tech's assets remained squarely with

---

[21] *See supra* note 16.

[22] *See* Balotti & Finkelstein, Delaware Law of Corporations and Business Organizations § 9.3. Under Delaware law, the rare cases acknowledging *de facto* mergers typically have involved illegal asset sales *See Heilbrunn v. Sun Chem. Corp.*, 150 A.2d 755, 758 (Del. 1959). No asset sale occurred here, however.

[23] Likewise, *Findanque v. Am. Maracaibo Co.*, 92 A.2d 311 (Del. Ch. 1952), held that the acquisition of all the outstanding stock by a corporation of another corporation did not result in a de facto merger of the two corporations, for the reason that ownership of stock in one corporation by another does not create an identity of interest between the two corporations and make one the owner of the property of the other. *See also Owl Fumigating Corp. v. Cal. Cyanide Co.*, 24 F.2d 718 (D. Del. 1928).

[24] *See supra* note 18.

REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS FOR LACK OF STANDING    Page 11
FILED UNDER SEAL

Site/Tech until its December 2000 merger into Site Tech. Thus, Site/Tech continued to be the title holder of the patents-in-suit well after the 1997 Stock Exchange Agreement.

Notably, the filing of merger papers in December 2000 undermines any claim that a merger, whether *de facto* or *de jure*, occurred earlier. There would have been no need for the December 2000 merger if the companies had merged earlier. The continued separateness of the two corporate identities also is reflected by the fact that, after the 1997 Stock Exchange Agreement, Site/Tech continued to maintain a separate office, hold assets in its name, pay salaries to its employees, and pay taxes.[25]

### 3. Site/Tech Did Not Transfer the Patents To Site Tech Via Written Conveyance Under § 261.

SRA also relies on Site/Tech's Certificate of Incorporation to purportedly satisfy 35 U.S.C. § 261's requirement that an assignment of a patent be evidenced by "an instrument in writing." As SRA notes, the Federal Circuit recently observed in a footnoted *dictum* that § 261 "allow[s] the instrument that assigns 'any interest' to take the form of a patent license or any other *written instrument that transfers patent rights.*" *See Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1338 n.3 (Fed. Cir. 2007) (emphasis added). For the reasons explained above, however, Site/Tech's Certificate of Incorporation is not a "*written instrument that transfers patent rights.*" It did not invoke any law that automatically vests property. It did not mention (let alone automatically effect) the conveyance of any specific property much less the corporation's patents. At most, it was a prospective agreement to allocate value (rather than property), and thus did not constitute an assignment under *Arachnid*. Consequently, the Certificate of Incorporation does not satisfy § 261's writing requirement.[26]

---

[25] Ait Depo. at 87:10-88:5; 110:4-7. These facts also confirm that Site/Tech was not liquidated in July 1997.

[26] The cases cited in footnote 8 of SRA's opposition (Opp. at 12) do not address the situation here. In *CMS Industries*, there was nothing in the opinion to suggest that the asset transfer from one subsidiary to another subsidiary was not accomplished pursuant to a valid written assignment. *See generally CMS Indus., Inc. v. L.P.S. Int'l, Ltd.*, 643 F.2d 289 (5th Cir. 1981). In *Intel Corp.*, the court expressly recognized that the patents were transferred by a written document recorded at the patent office. *See Intel Corp. v. Broadcom Corp.*, 173 F. Supp. 2d 201, 209 (D. Del. 2001). *Surfer Internet* concerned a motion to transfer and the opinion did not address whether or not there was a valid transfer of patent rights. *See generally Surfer Internet Broad. of Miss. v. XM Satellite Radio, Inc.*, No. 4:07-CV-034, 2008 WL 1868426 (N.D. Miss. April 24, 2008). And in *Mechmetals*,

#### 4. Site/Tech Did Not Ratify An Assignment To Site Tech.

SRA argues that Site/Tech ratified a transfer of the patents from Site/Tech to Site Tech. According to SRA, ratification occurs "where a board of directors has notice of a transfer, does not object to a transfer, and retains the fruits of the transfers." (Opp. at 12). The premise of this argument is that there was an actual "transfer," since SRA does not suggest that ratification can be used to circumvent the writing requirement of 35 U.S.C. § 261. As discussed above, however, there was no such "transfer" of the patent rights and no assignment that complied with § 261. Consequently there was nothing for Site/Tech to "ratify" in connection with Site Tech's acquisition of Site/Tech stock.[27] Thus, SRA's ratification argument fails.

Furthermore, SRA has failed to point to any affirmative act by Site/Tech, let alone a writing, in which Site/Tech specifically ratified the conveyance of the patents prior to this litigation.[28] Site/Tech did not, in fact, convey all its property to Site Tech as it continued to have its own North Carolina office and assets after the agreement. Also, according to Ait, Site/Tech was continued as a separate entity to prevent its liabilities from reaching Site Tech.[29] These facts further demonstrate that there was no ratification.

<u>Conclusion</u>: Contrary to SRA's argument, the Liquidation Preference in Site/Tech's Articles of Incorporation failed to convey the patents from Site/Tech to Site Tech. Thus, Site Tech did not have any rights to the patents-in-suit when it entered into the 1998 Bill of Sale with Egger.

---

there was no indication that the transfer of patent rights was not done via a valid written assignment. *See Mechmetals Corp. v. Telex Computer Prods., Inc.,* 709 F.2d 1287, 1290 (9th Cir. 1983).

[27] There is no evidence that, at the time the alleged transfer occurred, that Site/Tech retained any fruits of the alleged transfer. Under SRA's theory, Site/Tech would have been gutted of all its assets, and left with liabilities.

[28] Ratification is an act that occurs *after* the alleged transaction, but in its brief, (Opp. at 12), SRA emphasizes the acts of Site/Tech's pre-acquisition board in amending Site/Tech's articles of incorporation as amounting to a ratification. Even so, this board (acting *before* the alleged transaction) never acted to ratify any acquisition-related transfer of any specific property (let alone the patents) out of Site/Tech. All the pre-acquisition board did was to sell out its shares in Site/Tech and obtain preferential payment for its preferred shareholders. These acts *before* the alleged transaction are also distinguishable from *CarrAmerica Realty Corp. v. Kaidanow.* 321 F.3d 165, 173 (D.C. Cir. 2003), where the board passed a resolution specifically ratifying the disputed transaction.

[29] Ait Depo. at 109:2-10.

**B.** **The Doctrines Of *Alter Ego*, Agency, And Ratification Did Not Convey The Patents-In-Suit To Egger.**

Unable to show that Site Tech owned the patents when it purported to assign them to Egger in 1998, SRA claims that the 1998 Bill of Sale bound Site/Tech, the true owner of the patents, under the *alter ego* doctrine and agency and ratification principles. For the reasons below, SRA is again wrong.

**1.** **The Patent Laws Require A Written Patent Assignment From The True Patentee, Site/Tech, And None Exists.**

As an initial matter, for there to be an assignment of patent rights, the owner of the patent must deliver title to the assignee by way of a written instrument. *See* 35 U.S.C. § 261. This provision sets forth a bright line rule that protects the issue of ownership from being clouded by parol evidence. Indeed, the Federal Circuit has consistently held that the writing requirement cannot be evaded, as only a writing provides the requisite "certainty" that a transfer has occurred. *See Enzo APA & Son, Inc. v. Geapag AG*, 134 F.3d 1090, 1093 (Fed. Cir. 1998). The court explained that absent a writing, "[p]arties would be free to engage in revisionist history, circumventing the certainty provided by the writing requirement of section 261." *Id.*

To support its *alter ego*, agency, and ratification arguments, however, SRA offers exactly the type of parol evidence that the Federal Circuit found to undermine the certainty of § 261. Specifically, SRA offers declarations prepared expressly for this litigation, rather than any assignment by Site/Tech itself. But, as detailed below, there is a wealth of other evidence that controverts SRA's claim that Site Tech was Site/Tech's agent or that Site/Tech was a "shell company." Among other things, Site/Tech's own tax returns show that Site/Tech was a separate business entity that reported its own income and losses. One need not balance all of this parol evidence, as one thing remains certain: no written conveyance ever transferred the patents-in-suit from Site/Tech.

Nonetheless, on the basis of its controverted evidence, SRA asks this Court to ignore the fact that Site/Tech, the actual patentee in 1998, was not a party to the 1998 Bill of Sale. The case law and patent statutes do not permit SRA to disregard the corporate form in this manner. A

patentee's owner is not a legally equivalent of the patentee. *See e.g.*, *Lans v. Digital Equip. Corp.*, 252 F.3d 1320, 1328 (Fed. Cir. 2001); Mot. at 10. As the Federal Circuit explained in *Lans*, the sole owner of a patentee does not have standing to assert the patentee's patent. As a result, Site Tech clearly lacked standing to assert Site/Tech's patents in 1998.

It is axiomatic that a party cannot grant another more rights than it has. *See TM Patents, L.P. v. Int'l Bus. Machs. Corp.*, 121 F. Supp. 2d 349, 365 (S.D.N.Y. 2000). Since Site Tech itself lacked standing to sue in 1998, it could not have assigned this right to Egger (or any subsequent assignee), and thus the 1998 Bill of Sale between Site Tech and Egger could not have conferred standing on Egger, nor SRA.

### 2. Site/Tech Was Not The *Alter Ego* Of Site Tech.

SRA argues that Site/Tech's separate corporate identity should be disregarded under Delaware's *alter ego* law. (Opp. at 13-15). Under Delaware law, however, "[i]t is only the exceptional case where a court will disregard the corporate form." *Sears, Roebuck & Co. v. Sears plc*, 744 F. Supp. 1297, 1305 (D. Del. 1990). To prove Site/Tech was an *alter ego* of Site Tech, SRA must show that: (i) Site/Tech and Site Tech operated as a single economic entity; and (ii) an overall element of fraud or injustice is present. *In re Foxmeyer Corp.*, 290 B.R. 229, 235-236 (Bankr. D. Del. 2003) ("The requisite injustice or unfairness is also not simple in nature but rather something that is similar in nature to a fraud or sham . . . fraud *or something like it is required*.") (emphasis in original); *see also Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1457 (2nd Cir. 1995). Neither element is present here.

*Not A Single Economic Unit.* To demonstrate that the two companies allegedly operated as a single economic unit, SRA emphasizes that Site/Tech was wholly-owned by Site Tech and had the same directors and officers. (Opp. at 13-14). These factors are insufficient to establish *alter ego* status under Delaware law. *See Mabon, Nugent & Co. v. Tex. Am. Energy Corp.*, Civ. A. No. 8578, 1990 WL 44267, at *5 (Del. Ch. April 12, 1990) (refusing to apply the *alter ego* doctrine based "merely on a showing of common management of the two entities" or "a showing that the parent owned all the stock of the subsidiary").

SRA also claims that Site/Tech had "essentially no assets" or "employees or operations of its own." (Opp. at 14). However, Site/Tech's 1998 and 1999 tax returns controvert these claims. (Rp. Exs. 7-8).[30] According to these tax returns, Site/Tech had its own assets, earned $18,920 and $50,381 from its business activities in 1998 and 1999 respectively,[31] declared $581,668 and $36,167 in losses in those two years, and paid $88,000 in annual employee salaries.[32] Moreover, Site/Tech retained offices and three employees in North Carolina after it became Site Tech's subsidiary,[33] and also released a software product under its name.[34] These facts demonstrate that Site/Tech continued as an independent business after the 1997 stock exchange agreement and prove conclusively that Site/Tech was not Site Tech's *alter ego*. This independence is also consistent with Ait's testimony, quoted above (see fn. 18), that Site/Tech was maintained as a separate entity to insulate Site Tech from Site/Tech's liabilities.

SRA's claim that Site/Tech was a "shell entity" of Site Tech is also wrong. (Opp. at 14). Ait set the record straight at his deposition, testifying that Site/Tech was *not* a shell entity after its acquisition by Site Tech:

> Q:    So you would agree under your own definition of shell entity, under the definition that you just told me, and I mean this respectfully, Slash [*i.e.*, Site/Tech] was not a shell entity at least in 1998, you would agree with that; right, and the same in 1999; correct?
> A:    Okay.[35]

In light of all this evidence, SRA cannot show that Site/Tech and Site Tech operated as a single economic entity.

*No Fraud Or Injustice.* Even if Site/Tech and Site Tech were a single economic entity (which they were not), SRA's *alter ego* argument still fails because these companies were not

---

[30] *Id.* at 85:5-20.

[31] Rp. Exs. 7-8; Ait Depo. at 88:20-22, 89:22-24.

[32] Rp. Exs. 7-8.

[33] Ait Depo. at 81:11-19; 82:8-21.

[34] *See* Mot. Exs. 7-8.

[35] Ait Depo. at 110:8-14. During Ait's deposition, Site/Tech was referred to as "Slash." *Id.* at 15:5-9.

used to perpetrate a fraud or injustice. Under Delaware law, the *alter ego* doctrine applies only where a corporation uses its alleged *alter ego* to perpetrate "fraud or similar injustice." *See, e.g., Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. 1999) ("Piercing the corporate veil under the *alter ego* theory 'requires that the corporate structure cause fraud or similar injustice.' Effectively, the corporation must be a sham and exist for no other purpose than as a vehicle for fraud."); *In re Foxmeyer*, 290 B.R. at 236.

Here, there is no evidence that Site Tech and Site/Tech intentionally used their corporate structure to defraud Egger. When Site Tech purchased all shares in Site/Tech, it maintained Site/Tech as a separate entity for legitimate tax and liability purposes – not to perpetrate a fraud or injustice on Egger.[36] *See Sears*, 744 F. Supp. at 1305 (desire to benefit from Delaware tax law does not evidence fraudulent intent for purposes of *alter ego* theory).

That Egger might have had a breach of contract claim against Site Tech for its failure to convey title to the patents-in-suit does not demonstrate the necessary fraud or injustice. *See Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 268 (D. Del. 1989) (cause of action for breach of contract or tort "does not supply the necessary fraud or injustice" to pierce corporate veil). As a former officer of Site/Tech and stockholder at the time of the 1997 stock exchange agreement, Egger was (or should have been) familiar with Site/Tech's status as a Site Tech subsidiary after the stock exchange was concluded.[37] Given this knowledge, Egger cannot claim to have been "defrauded" for *alter ego* purposes. *See Harper v. Del. Valley Broadcasters, Inc.*, 743 F. Supp. 1076, 1086 (D. Del. 1990) (finding no *alter ego* liability where party advancing theory was former director and officer of one of the companies and familiar with their corporate structure).

Moreover, the Patent Office records at the time of the 1998 Bill of Sale indicated that Libertech (*i.e.*, Site/Tech) was the owner of the patents-in-suit, not Site Tech. (Mot. Exs. 3-4).

---

[36] *See* Opp. at 3 ("For tax reasons, the parties structured the acquisition as a stock exchange with a distribution of assets into the parent, rather than as a formal merger.").

[37] Egger Depo. at 12:22-13:4; 28:4-16.

Egger therefore was on constructive notice that Site Tech did not own the patents in 1998. This, too, weighs against a finding of "fraud or similar injustice." *See Hauspie v. Stonington Partners, Inc.*, 945 A.2d 584, 586 (Del. 2008) (a fraud claim requires *justifiable* reliance by the alleged victim upon a false representation). In short, neither of the two factors required for finding Site Tech and Site/Tech to be *alter egos* is present here.

**SRA Is Not Entitled To Raise An *Alter Ego* Claim.**  SRA alleges that Site Tech was generally Site/Tech's *alter ego*, but SRA has no standing to bring an *alter ego* claim against Site Tech in view of Site Tech's bankruptcy. A debtor's claims against its alleged principal are property of the bankruptcy estate, and thus can only be asserted by the debtor acting as trustee under 11 U.S.C. § 1107. *See, e.g., In re Davey Roofing, Inc.*, 167 B.R. 604, 608 (Bankr. C.D. Cal. 1994) ("[T]hese *alter ego* claims are property of the bankruptcy estate, and . . . *Debtor's creditors are barred from bringing such claims.*") (emphasis added). Thus, once Site Tech filed for bankruptcy, only Site Tech itself could have brought an *alter ego* claim *alter ego* claim based on contracts arising before the bankruptcy. Accordingly SRA is not the proper party to assert this claim now.

> **3.  Site Tech Was Not Site/Tech's Agent For Conveying Patent Rights.**

Relying on California law, SRA also contends that Egger obtained title from the 1998 Bill of Sale because Site Tech acted as Site/Tech's actual or apparent agent and because Site/Tech also ratified the assignment. (Opp. at 15-21). As shown below, these arguments fail because Site/Tech never made Site Tech its agent to dispose of its patents, nor did it ever represent as much.

***Equal Dignity Rule.***  Under California law, an agent must be authorized in writing in order to enter into contracts that are required by law to be in writing on behalf of a principal. Specifically, Cal. Civ. Code § 2309 ("the equal dignity rule") provides that "an authority to enter into a contract required by law to be in writing can only be given by an instrument in writing." 35 U.S.C. § 261 requires that patent assignments be in writing and thus is the equivalent of the statute of frauds for patent rights. Therefore, for Site Tech to have been Site/Tech's agent in

executing patent assignments, SRA must identify a writing that appoints Site Tech as Site/Tech's agent. It failed to do so.

The purpose behind the equal dignity rule is to prevent parties from evading statutory writing requirements and thus applies here. The Federal Circuit itself has adopted this principle, holding that "virtual assignments" must be in writing, like true assignments, so as to satisfy the degree of "certainty" required by § 261. *Enzo APA* 134 F.3d at 1093. The equal dignity rule provides this certainty and thus bars SRA's agency arguments, whether based on actual or apparent agency.

*No Actual Authority*. SRA's claim that Site Tech was Site/Tech's actual agent is also not supported by the facts. Under California law, "the significant test of an agency relationship is the principal's right to control the activities of the agent." *CenterPoint Energy, Inc. v. Superior Court*, 157 Cal. App. 4th 1101, 1118 (Cal. Ct. App. 2007); *accord Malloy v. Fong*, 232 P.2d 241, 249 (Cal. 1951). Here, SRA has produced no evidence that Site/Tech (the supposed principal) could control the activities of Site Tech (the supposed agent). To the contrary, SRA contends that the supposed agent, Site Tech, totally controlled the principal, Site/Tech, because Site Tech took over Site/Tech's daily operations, controlled Site/Tech's officers, and filed Site/Tech's tax returns on its behalf. (Opp. at 14). There is no evidence supporting the converse – that Site/Tech, as principal, controlled Site Tech, as agent. As a result, Site Tech could not have been Site/Tech's actual agent.[38] *See Kaplan v. Coldwell Banker Res. Affiliates, Inc.*, 59 Cal. App. 4th 741, 746 (Cal. Ct. App. 1997) (finding absence of agency because alleged principal "did not control or have the right to control [the alleged agent's] business activities.").

---

[38] Because Site Tech was *not* Site/Tech's agent, SRA's argument that an agent may bind its principal to a contract made in the agent's name is simply irrelevant. *See* Opp. at 17, fn. 9. In all the cases SRA cites to support this argument, there was an acknowledged agency relationship. *See Sterling v. Taylor*, 152 P.3d 420, 430 (Cal. 2007) ("Defendants . . . do not dispute Taylor's authorization to act as SMC's agent"); *Sumner v. Flowers*, 279 P.2d 772, 773 (Cal. Ct. App. 1955) ("Miss Flowers' position as confidential secretary and agent to Furnish was known and recognized as such"); *Pac. Fin. Corp. v. Foust*, 285 P.2d 632, 633-34 (Cal. 1955) ("The trial court found . . . that Universal gave to Lonnie's authority to sell the cars . . . . There can be no doubt as to the sufficiency of the evidence to support the findings on factorship [agency] issue.").

SRA incorrectly asserts that Site/Tech should be bound by Site Tech's claims to own the patents. The claims of ownership upon which SRA relies all were made on behalf of Site Tech, not Site/Tech. (*See* Opp. at 16; Opp. Exs. 12-16, 24). Under Delaware law, an officer who signs a document on behalf of one company does not bind every other company for whom he or she is an officer, even if the two companies are parent and subsidiary. *Cf. United States v. Bestfoods*, 524 U.S. 51, 69 (1988) ("[D]irectors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership."). As a result, Ait's remarks on behalf of Site Tech (aka Deltapoint) – while wearing his "Deltapoint hat" – cannot be imputed to or bind Site/Tech.[39]

SRA also improperly relies upon DGCL § 271(a) & (c) as authorizing Site Tech to transfer its subsidiary's (Site/Tech's) property. DGCL § 271 simply has no application here. First, the statute only applies when a parent company sells "all or substantially all of its property and assets."[40] Here, there was no sale of *any* assets of the parent company, and so the statute does not apply. Second, even if § 271 did apply, it would require the approval of the parent's stockholders for the asset sale. There is no evidence that the approval of Site Tech's stockholders was obtained here. Third, the statute also does not change the fact that the assets of the subsidiary are still legally owned by the subsidiary alone. *See Orzeck*, 195 A.2d at 377 ("[T]he purchasing corporation is not the owner of the assets of the other corporation [that was purchased], but is merely a stockholder."). Thus, § 271 also does not change the fact that no sale can occur unless the subsidiary does in fact convey the assets. In sum, contrary to SRA's

---

[39] SRA claims that the facts here are similar to those in *Kothman Enters., Inc. v. Trinity Indus., Inc.*, 394 F. Supp. 2d 923, 941-42 (S.D. Tex. 2005). In *Kothman*, however, the true owner of the patent assigned the patent. *See id.* at 941-42 ("It is undisputed that ISC held valid legal title to the '003 Patent on October 30, 2000, when Kothman [ISC's owner] signed the document."). The Court merely refused to recognize language in the assignment that purported to make the assignment effective as of a date earlier than it was signed. *Id.* Here, by contrast, Site Tech did *not* own the patents when it purportedly assigned them to Egger in 1998. *See RAD Data Commc'ns, Inc. v. Patton Elecs. Co.*, 882 F.Supp. 351, 353 (S.D.N.Y. 1995) (finding no assignment because assignor had no rights on stated execution date and rejecting argument based on "intent" of parties).

[40] *See Gimbel v. Signal Companies, Inc.*, 316 A.2d 599, 605 (Del. Ch. 1974) (holding that by negative implication "[a] sale of less than all or substantially all assets is not covered" by § 271).

REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS FOR LACK OF STANDING Page 20
FILED UNDER SEAL

argument, § 271 does not generally authorize a parent to sell the assets of its subsidiary and does not apply to the alleged sale of the patents in September 1998.

*No Apparent Authority.* SRA's argument that Site Tech was Site/Tech's apparent agent is also wrong, and barred by the equal dignity rule. To create apparent authority, the principal must "cause[] a third person to believe another to be his agent who is not really employed by him." Cal. Civ. Code § 2300. There is no evidence that Site/Tech caused Egger or anyone else to believe that Site Tech was Site/Tech's agent for disposing of its patent rights. Egger testified that he knew at the time that he was dealing with Site Tech: "I knew that I was dealing with Delta Point [aka Site Tech], of course."[41]

Furthermore, SRA has contended that Site/Tech did not undertake any corporate actions after its acquisition by Site Tech in 1997. (Opp. at 14). If so, Site/Tech did nothing to make Egger believe that Site Tech was Site/Tech's agent. *See Emery v. Visa Int'l Serv. Ass'n*, 95 Cal. App. 4th 952, 961 (Cal. Ct. App. 2002) ("Ostensible authority must be based on the acts or declarations of the principal and not solely upon the agent's conduct."). Moreover, SRA cannot point to any action that *Site/Tech itself* took to convince anyone that Site Tech was Site/Tech's agent for selling the patents. Absent such action, Site Tech cannot be deemed Site/Tech's apparent agent.[42]

*No Ratification.* SRA also incorrectly claims that Site/Tech created an after-the-fact agency relationship through the ratification doctrine. (Opp. at 21). As an initial matter, there

---

[41] Egger Depo. at 91:20-92:1.

[42] SRA cites the unpublished *Regency Centers* case, Opp. at 20, but this decision is inapplicable for many reasons. First, the decision concerned a dispute over an option to be an interest in a company (Vista Village LLC), and thus the disputed contract was not required to be in writing. *See Regency Centers v. Civic Partners Vista Village I, LLC*, No. G038095, 2008 WL 2358860, at *3 (Cal. App. 4th Dist. June 11. 2008). Moreover, unlike the circumstances here, all the elements of an "implied agency" were present. *See, e.g., id.* at *14 (noting that there was no dispute that the parties understood that the agent exercised the option on behalf of the principal). Further, SRA's contention that "California law was applied [in *Regency*] to find an implied agency relationship to manifest the parties intentions" is wrong since *Regency* court explicitly rejected applying California law and applied Delaware law instead. *See id.* (finding that "Defendants' reliance on [California law] is inapt"). SRA's other cited case, *People Express Pilot*, also is distinguishable for at least the same reasons: it did not concern an agreement required to be in writing, it did not apply California law, and it did not involve facts where the principal took no action. *See People Express Pilot Merger Comm. v. Tex. Air Corp.*, Civ. A. No. 87-1155, 1987 WL 18450, at *4 (D.N.J. Oct. 14, 1987).

was no effective transfer of rights pursuant to the 1998 Bill of Sale, and therefore no transfer for Site/Tech to ratify. Under California law, the ratification doctrine requires that the principal have the ability to create an actual agency relationship. *See* Cal. Civ. Code § 2312 ("A ratification is not valid unless, at the time of ratifying the act done, the principal has power to confer authority for such an act"); *accord* 2B Cal. Jur. 3d Agency § 74 ("[A]n effective ratification requires that the principal possess the power to authorize the agent's unauthorized act, both at the time the act is done and at the time of ratification."). As discussed above, Site/Tech lacked authority to make Site Tech its agent because Site/Tech had no ability to control Site Tech. Thus, Site/Tech could not have "ratified" Site Tech's purported sale of the patents to Egger in 1998 after-the-fact. *See Lindsay-Field v. Friendly*, 36 Cal. App. 4th 1728, 1736 (Cal. Ct. App. 1995) ("The principal cannot ratify if the principal lacks power to confer authority.").[43]

As a result of the December 2000 merger between Site/Tech and Site Tech, Site Tech became the owner of the patents-in-suit. While SRA argues that Site Tech also ratified the 1998 Bill of Sale and the fraudulent 2005 Assignment concocted by Egger in 2008, this argument carries no weight. The evidence that SRA offers in support of this alleged ratification are the Declaration of Ait (Opp. Ex. 7) and the 2008 Assignment (Rp. Ex. 5), signed by Ait. These documents prove nothing, however, as Ait had no authority to act or speak on Site Tech's behalf after the bankruptcy proceeding concluded on January 6, 2004.[44]

**Conclusion**: For the reasons above, Egger did not obtain the patents-in-suit pursuant to the doctrines of *alter ego*, agency, and ratification. Furthermore, even assuming that Egger could

---

[43] By contrast, the lone case that SRA cites in support of its ratification argument – *Scholastic Book Clubs, Inc. v. State Bd. of Equalization*, 207 Cal. App. 3d 734 (Cal. Ct. App. 1989) – involved a principal (Scholastic) that *did* have the power to authorize other parties (various teachers) to act as its agents at all relevant times. *See id.* at 737 ("The teachers are obviously not acting under anyone else's authority, and once they undertake to act, they are obviously acting under appellant's [Scholastic's] authority."). In addition, the principal received payments, *i.e.*, the fruits of the teachers' acts, *id.* at 738, whereas here there is no evidence that Site/Tech received any benefit.

[44] *See supra* at 28; Ait Depo. at 134:14-19; *see also* Article 7.3 of the Plan provided that "[t]he Responsible Person shall be discharged from all duties and responsibilities of the Plan upon the issuance of the final decree." (Rp. Ex. 9). Moreover, Ait had not even seen the 2005 Assignment when he allegedly ratified it. Ait Depo. at 168:7-14.

have raised a claim against Site/Tech (while it existed) under the doctrines of agency, *alter ego*, and ratification to obtain a written assignment or a final, written judgment delivering title, Egger never did so prior to Site Tech's bankruptcy.[45] As a result, title to the patents remained squarely with Site/Tech until its merger with Site Tech in December 2000 while the bankruptcy proceedings were pending. As explained below, Site Tech's bankruptcy bars Egger from subsequently attempting to procure title from Site Tech.

**C.     No Equitable Principle Conveyed the Patents-In-Suit To Egger After Site Tech Filed For Bankruptcy.**

SRA further alleges that it obtained title to the patents-in-suit when Site Tech and Site/Tech merged in December 2000 based on the doctrine of after-acquired title. (Opp. at 21-24). This theory also fails for the reasons set forth below.

**1.     The Rejection Of The 1998 Bill Of Sale During The Bankruptcy Proceedings Relieved Site Tech Of Any Obligation To Transfer The Patents-In-Suit.**

SRA's after-acquired title argument ignores that, on February 2, 1999, Site Tech filed a petition for relief under Chapter 11 of the Bankruptcy Code in the Northern District of California. (Rp. Ex. 10). Assuming that the 1998 Bill of Sale obligated Site Tech to transfer the patents-in-suit to Egger, that obligation remained unperformed since Site Tech could not have conveyed to Egger what it did not own and thus Egger could not have received title to the patents. When Site Tech filed for bankruptcy, its unperformed obligations became "executory obligations" and the 1998 Bill of Sale became an "executory contract" subject to rejection by the trustee or debtor-in-possession.[46]

Section 365 of the Bankruptcy Code governs the treatment of executory contracts and the obligations of parties to such contracts.[47] The Supreme Court has held that the commencement

---

[45] Egger did obtain such a document, allegedly from Site Tech, in August 2008. That alleged assignment is discussed below. *See supra* at 30.

[46] Under ¶ 4 of the 1998 Bill of Sale, for example, both parties had continuing obligations, among other things, to defend and indemnify the other party. Mot. Ex. 10.

[47] Subject to bankruptcy court approval, § 365 provides the trustee or the debtor-in possession with the option of "assuming" or "rejecting" the executory contract that was suspended by filing of the bankruptcy petition. (Site Tech was a "debtor-in-possession," as no Chapter 11 trustee had been appointed.) "Assumption" means that the

of a bankruptcy case immediately and automatically suspends the debtor's obligation to render any further performance under an executory contract. *See NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 533 (1984) ("[T]he filing of a petition in bankruptcy under Chapter 11 makes the contract unenforceable."). Thus, as of the commencement of its Chapter 11 case, Site Tech's alleged obligation to deliver title to the patents-in-suit – an obligation that it could not possibly have performed until it acquired title – was at most an executory obligation under an executory contract, *i.e.*, the 1998 Bill of Sale.

Site Tech then proceeded to reject this contract pursuant to its court-approved Chapter 11 reorganization plan ("Plan"; Rp. Ex. 9). The Plan comprehensively addressed the treatment of all executory contracts. Article 8.1 of the Plan provided that, "[e]xcept as previously provided by the Bankruptcy Court order, no other executory contract . . . will be assumed by the debtor." Article 8.3 of the Plan then provided that all executory contracts that had not previously been assumed or assigned were rejected, and further that "[c]onfirmation of the Plan shall be deemed to constitute Bankruptcy Court approval of such rejection." Site Tech did not expressly assume the 1998 Bill of Sale before the Plan was confirmed, and thus it was rejected when the Bankruptcy Court confirmed the Plan on June 15, 2000. (Rp. Ex. 11).

The court's confirmation of Site Tech's Plan relieved Site Tech of any obligation to thereafter specifically perform under the rejected 1998 Bill of Sale.[48] Egger's exclusive remedy for non-performance was to timely assert a general unsecured claim for damages under 11 U.S.C. § 365(g)(1), which he did not do. *See Midway Motor Lodge of Elk Grove v. Innkeepers' Telemanagement & Equip. Corp.*, 54 F.3d 406, 407 (7th Cir. 1995) ("Rejection avoids specific performance, but the debtor assumes a financial obligation equivalent to damages for breach of contract."); *Lubrizol Entr. Inc., v. Richmond Metal Finishers, Inc.*, 756 F.2d. 1043, 1048 (4th

---

debtor-in-possession commits to perform all of its obligations under the contract and becomes entitled to receive all of the performance due it under the contract. "Rejection" discharges the debtor-in-possession of all obligations to further perform under the contract.

[48] *Begier v. INS*, 496 U.S. 53 (1990), and the other cases cited by SRA at Opp. at 26-27 are not to the contrary. These authorities do not alter the fact that at most Egger had an unsecured claim against the bankrupt party, Site Tech. *Begier*, for example, concerned preferential avoidance powers under § 547, which is not at issue here.

Cir. 1985) ("Under 11 U.S.C. § 365(g), Lubrizol . . . could not seek to retain its contract rights in the technology by specific performance even if that remedy would ordinarily be available upon breach of this type of contract.").

In light of the rejection of the 1998 Bill of Sale and the court's approval of that rejection, Egger cannot invoke the after-acquired title doctrine now. Egger's invocation of the doctrine is nothing more than a request for specific performance of an obligation that the Supreme Court has held to be unenforceable as of the commencement of the case and a collateral attack on the rejection effected by the Confirmation Order. *See, e.g.,* 11 U.S.C. § 365(g)(1); *Bildisco,* 465 U.S. at 533; *Midway Motor Lodge,* 54 F.3d at 407.

### 2. Contrary To SRA's *"Res Judicata"* Forfeiture Theory, The Patents Remain Subject To The Jurisdiction Of The Bankruptcy Court.

SRA argues, without citing any authority, that confirmation of Site Tech's bankruptcy plan "is *res judicata* that the property was not in the estate." (Opp. at 26). SRA's argument is contrary to the explicit provisions of the Federal Rules of Bankruptcy Procedure and black letter bankruptcy law. Under bankruptcy law, only an adversary proceeding can determine the "validity, priority, or extent" of an interest in property. *See* Fed. R. Bankr. Proc. 7001; *see also In re Golden Plan of Cal., Inc.,* 829 F.2d 705, 711 (9th Cir. 1986). No such adversary proceeding occurred here. Thus, confirmation of the Plan cannot operate as *res judicata* confirming Egger's title to the patents.

While the *res judicata* effect of the Plan is not dispositive of title to the patents-in-suit (or to any matter involving Defendants), it *is* dispositive of Egger's right to assert a claim with respect to the 1998 Bill of Sale and any obligations he contends were not fully performed prior to February 2, 1999. Not only did Egger receive notification of the bankruptcy proceeding, but Egger admitted that he was aware of the bankruptcy proceedings and gave it attention out of concern over the title to the patents.[49] At this time, of course, Egger had constructive and actual notice that Site Tech was the only contracting party to the 1998 Bill of Sale and that the

---

[49] Egger Depo. at 51:11-22; 54:12-21.

contemporaneous Patent Office records (which constituted assignments signed by him to Site/Tech) showed that Site Tech was not the owner of the patents. Nonetheless, Egger chose not to assert a claim against Site Tech based on its failure to deliver title, and not to object to the Plan's rejection of unassumed executory contracts, including the 1998 Bill of Sale, even though the Plan set forth unequivocal bar dates for these actions. (Plan at ¶ 8.4). Indeed, Egger waited until January 7, 2004 – the very day after the final decree issued in Site Tech's bankruptcy (January 6, 2004) – to incorporate SRA for the express purpose of holding the patents-in-suit.[50] (Rp. Exs. 12-13).

However, the Bankruptcy Court's Confirmation Order is a *res judicata* judgment and is binding on Egger and SRA. *See, e.g.*, *Trulis v. Barton*, 107 F.3d 685, 691 (9th Cir. 1995) ("Once a bankruptcy plan is confirmed, it is binding on all parties and all questions that could have been raised pertaining to the plan are entitled to *res judicata* effect."). Egger cannot contest that the 1998 Bill of Sale was rejected now, and he cannot avoid the important consequences that flow from that rejection under the Plan and the Confirmation Order – including his lack of entitlement to equitable relief.

To the extent that Egger is now attempting an untimely assertion of his alleged rights, he must do so with the Bankruptcy Court of the Northern District of California. In its Confirmation Order at ¶ 5 (Rp. Ex. 11), "[t]he Court reserve[d] jurisdiction with regard to the matters and proceedings set forth in Article 13 of the First Amended Plan." Since Article 13 of the Plan (Rp. Ex. 9) encompasses Site Tech's property rights (¶ 13.1D), the rejection of any executory contract (¶ 13.1C), and the treatment of any claims (¶ 13.1B), it necessarily encompasses any resolution of the rights that Egger and SRA are now asserting over the patents-in-suit. The Supreme Court confirms that such a dispute must be resolved by the Bankruptcy Court. *See Celotex Corp. v. Edwards*, 514 U.S. 300, 313 (1995) (holding that judgment creditors were required to abide by bankruptcy court's injunction and could not collaterally attack its order in another court). In

---

[50] *Id.* at 65:7-12; 66:7-13.

addition, because the Bankruptcy Court of the Northern District of California ordered the dissolution of Site Tech many years ago when it issued its final decree in Site Tech's bankruptcy, it alone has the power to exercise Site Tech's corporate authority and take any action with respect to the company's property.

### 3. Because The After-Acquired Title Doctrine Does Not Cause "Immediate" And Automatic Transfers, Title Remains With Site Tech.

Even apart from the fact that bankruptcy law bars Egger's claim for specific performance, the doctrine of after-acquired title does not "immediately" and automatically transfer title to a supposed assignee, as SRA posits occurred with Site/Tech and Site Tech's merger in December 2000. Any right to invoke the doctrine of after-acquired title can be negated by equitable defenses, such as unclean hands, as well as equitable subordinations, fraudulent transfer, and other avoiding powers in bankruptcy. *See, e.g.,* 11 U.S.C. § 549.

*Mills Novelty Co. v. Monarch Tool & Manufacturing Co.,* a Sixth Circuit opinion cited by SRA (Opp. at 23), confirms that the after-acquired title doctrine does not result in any transfer of title, but rather regards the after-acquiring party as merely "hold[ing] legal title." 49 F.2d 28, 31 n.3 (6th Cir. 1931). Under the doctrine, legal title can be passed to a third party other than the alleged prior assignee. If the third party is a *bona fide* purchaser, such a transfer is superior to any equitable rights that the alleged assignee might have held. *See also Taylor Engines, Inc. v. All Steel Engines, Inc.,* 192 F.2d 171, 174 (9th Cir. 1951) ("The equitable claim of the Nevada corporation could have been cut off by a sale to a *bona fide* purchaser.").[51] Although Site Tech did not appear to have sold the patents-in-suit to such a *bona fide* purchaser, the fact that it could have done so under the law demonstrates that legal title to the patents did not "immediately" and automatically transfer to Egger when Site Tech acquired the patents-in-suit by merger in December 2000. However, to this day, Egger has not made any legitimate attempts to obtain title

---

[51] *Gottfried v. Miller* is not inconsistent. In *Gottfried,* the Supreme Court's holding did not address when if ever title to an after-acquired patent would vest in an earlier assignor. Rather the Court only held that a subsequent assignor was bound by an express release clause from asserting a patent against an alleged infringer against whom an earlier assignor would have been estopped from suing. *See* 104 U.S. 521, 527 (1881).

from Site/Tech or from Site Tech by acting on his alleged right to after-acquired title or otherwise. Rather, Egger's efforts to obtain title were to manufacture the fraudulent 2005 Assignment with his lawyer and then, through SRA, to cause Ait to purportedly act on Site Tech's behalf despite Ait's lack of authority to do so. As a result, Site Tech's estate, not SRA, continues to hold title to the patents, and thus SRA has no standing to assert them.

### 4.     Unclean Hands And Other Equitable Defenses Bar Any Equitable Remedy Under The After-Acquired Title Doctrine.

Even if Egger were able to enforce his alleged rights under the equitable doctrine of after-acquired title, he is barred from exercising these rights by his own unclean hands, among other equitable defenses. "[H]e who comes into equity must come with clean hands." *Precision Instrument Mfg. Co. v. Auto. Co.*, 324 U.S. 806, 814 (1945). Here, Egger has unclean hands because, among other things, he created patently false conveyance documents and submitted them before the Patent and Trademark Office ("PTO") to establish his alleged ownership of Site/Tech assets:

a.    In February 2005, as described above and in the Mot. at 5-6; 11-12, Egger executed an assignment allegedly on behalf of Site/Tech to grant himself rights to the '352 and '494 patents. Egger knew this document to contain false information that was not disclosed therein to establish a "clear chain of title." (Rp. Ex. 4). Although the identity of the assignor, the existence of the assignor, and the corporate authority of the executing party were all necessarily material facts when proving ownership by assignment, Egger concealed the truth about each of these facts. The actual assignor of the 1998 Bill of Sale was Site Tech (not Site/Tech), Site/Tech had ceased to exist, and Daniel Egger was not in fact the President as he alleged. Nonetheless, Egger and SRA used this assignment before the PTO in an attempt to establish Egger's ownership to the '494 patent when he sought to revive the expired '494 patent. (Rp. Ex. 14).

b.    In 2003, during Site Tech's bankruptcy, Egger executed an assignment allegedly on behalf of Libertech (aka Site/Tech) to grant to himself the V-Search Trademark (Registration No. 2,058,774). (Rp. Ex. 15). Egger purported to be the President and CEO of Libertech at this time even though, by his own admission, Egger knew this information to be false.[52] The day after executing this purported assignment Egger filed this assignment with the PTO to advance the prosecution of his trademark. (Rp. Ex. 16). This assignment proves that Egger repeatedly relied upon Site/Tech as the true former owner of the property allegedly

---

[52] Egger Depo. at 141:3-20.

purchased in the 1998 Bill of Sale and further repeatedly and falsely presented himself as its current officer.

The creation and use of documents with patently false information tarnishes Egger's hands and those of his purported successor, SRA. These unclean acts further bar Egger and SRA from relying upon equitable principles to regain title to the patents. Other deeds by Egger and SRA to procure Site/Tech's property include acts that have evaded the jurisdiction of the Bankruptcy Court presiding over Site Tech.

In view of these acts, equity estops SRA from denying that Site/Tech continued to own the patents-in-suit despite the 1998 Bill of Sale. The fraudulent 2005 Assignment signed by Egger asserted, without equivocation, that Site/Tech was the owner of the patents-in-suit in February 2005. Egger submitted this document to the PTO in an attempt to (falsely) create a chain of title between Site/Tech, as the assignee of the named inventors of the '494 patent, and himself. The basic tenets of estoppel prevent SRA from repudiating the 2005 Assignment.[53]

**Conclusion**:  In conclusion, Egger did not obtain the patents from Site/Tech in December 2000 or anytime thereafter pursuant to the after-acquired title doctrine. Any alleged equitable right to such a conveyance was extinguished by bankruptcy law and Egger's unclean hands. Furthermore, because Egger never sought such a conveyance before bringing suit, SRA had no standing when it filed its complaint here.

---

[53] *See New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001) ("The circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation of principle."). The first factor identified in this case is: (1) whether the positions are "clearly inconsistent." Here SRA's position is clearly inconsistent with the 2005 Assignment which states that Site/Tech continued to be the "owner" of the patents after the 1998 Bill of Sale. The second factor is: (2) "whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled." Here, SRA persuaded the Patent Office that it was the owner so as to revive the '494 patent. (Mot. Ex. 16 & 17). The 2005 Assignment was the only submitted assignment that could establish a clear chain of title from the prior record owner Site/Tech to Egger. The third factor is: (3) "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." The public and Defendants are prejudiced by SRA's inconsistent position, in part because the 2005 Assignment was never authorized by Site/Tech and the PTO was never told of the omitted material facts.

**D.     The August 2008 Assignment Also Does Not Convey Rights To The Patents-In-Suit.**

Apparently motivated by the many deficiencies in the earlier alleged assignments to Egger and Defendants' Motion to Dismiss, on August 13, 2008, SRA paid $1000 to Ait to obtain a further assignment of Site Tech's rights to the patents-in-suit. (Rp. Ex. 17). This Assignment (Rp. Ex. 5) purports to deliver the "entire right, title and interest into and under the patents to the extent that now held by the Site Entities." Ait executed this Assignment stating that he "acted as and remains Chief Executive Officer of [Site Tech]." *Id.* However, Ait testified that this was untrue at his deposition. He explained that, after Site Tech declared bankruptcy, he ceased to be Site Tech's CEO.[54] Ait's only subsequent authority, as Responsible Person under the Chapter 11 Plan, ended on January 4, 2004, when the Bankruptcy Court issued the Final Decree ending the bankruptcy proceedings.[55] Since Ait was neither the CEO (or other officer) of Site Tech nor empowered by the Bankruptcy Court as Responsible Person when he executed the August 13, 2008, he lacked the necessary corporate authority to divest Site Tech of its property. Consequently, the August 2008 assignment is void and does not give Egger (or SRA) any rights.[56] As explained above, the Bankruptcy Court alone retains jurisdiction over this property.

**III.    CONCLUSION**

For the reasons stated, SRA lacks standing to bring this litigation and thus this Court lacks subject matter jurisdiction over this case. Defendants respectfully move the Court for dismissal of SRA's Complaint and this lawsuit.

---

[54] Ait Depo. at 42:18-43:10; 167:3-7.

[55] The Plan provided that "[t]he Responsible Person shall be discharged from all duties and responsibilities of the Plan upon the issuance of the final decree." (Rp. Ex. 11). *See also supra* note 44.

[56] Even if the August 2008 Assignment was effective, it does not cure the fact that SRA lacked title to the patents-in-suit when it brought this action in November 2007 (*i.e.*, before SRA obtained rights under the August 2008 assignment). A Plaintiff must have standing at the time that the complaint is filed. *Schreiber Foods, Inc. v. Beatrice Cheese, Inc.*, 402 F.3d 1198, 1203 (Fed. Cir. 2005). Thus, SRA's most recent effort to obtain title would not give them standing to maintain this litigation.

Dated: November 10, 2008

Respectfully submitted,

By: /s/ Thomas B. Walsh, IV

Juanita R. Brooks – Lead Attorney
(CA Bar No. 75934)
E-mail: brooks@fr.com
Jason W. Wolff
(CA Bar No. 215819)
E-mail: wolff@fr.com
Fish & Richardson P.C.
12390 El Camino Real
San Diego, CA 92130
Telephone: (858) 678-5070
Facsimile: (858) 678-5099

Thomas B. Walsh, IV
Texas Bar No. 00785173
Fish & Richardson P.C.
5000 Bank One Center
1717 Main Street
Dallas, TX 75201
Telephone: (214) 747-5070
Facsimile: (214) 747-2091
E-mail: walsh@fr.com

Harry L. Gillam, Jr.
Texas Bar No. 07921800
E-mail: gil@gillamsmithlaw.com
Melissa R. Smith
Texas Bar No. 24001351
E-mail: melissa@gillamsmithlaw.com
GILLAM & SMITH, L.L.P.
303 South Washington Avenue
Marshall, TX 75670
Telephone: (903) 934-8450
Facsimile: (903) 934-9257

Attorneys for Defendants GOOGLE INC. and
AOL LLC

By:  /s/ Richard S.J. Hung (by permission)
     Michael A. Jacobs (CA Bar No. 111664)
     Richard S. J. Hung (CA Bar No. 197425)
     MORRISON & FOERSTER
     425 Market Street
     San Francisco, CA 94105
     Telephone: 415-268-7000
     Facsimile: 415-268-7522
     Email: mjacobs@mofo.com
     Email: rhung@mofo.com

     Michael E. Jones
     Texas Bar No. 10929400
     Potter Minton, A Professional Corporation
     110 North College, Suite 500
     Tyler, Texas 75702
     Telephone: (903) 597-8311
     Facsimile: (903) 593-0846
     Email: mikejones@potterminton.com

     Attorneys for Defendant YAHOO! INC.

By:  /s/ Jennifer A. Kash (by permission)
     Claude M. Stern (CA Bar No. 96737)
     Jennifer A. Kash (CA Bar No. 203679)
     QUINN EMANUEL URQUHART
     OLIVER & HEDGES, LLP
     555 Twin Dolphin Drive, Suite 560
     Redwood Shores, CA 94065
     Telephone: (650) 801-5000
     Facsimile: (650) 801-5100
     Email: claudestern@quinnemanuel.com
     Email: jenniferkash@quinnemanuel.com

     Otis Carroll
     Tex. Bar No. 03895700
     Collin Maloney
     Tex. Bar No. 00794219
     IRELAND, CARROLL & KELLEY, P.C.
     6101 S. Broadway, Suite 500
     Tyler, Texas 75703
     Tel: (903) 561-1600
     Fax: (903) 581-1071
     Email: Fedserv@icklaw.com

     Attorneys for Defendants IAC SEARCH &
     MEDIA, INC. and LYCOS, INC.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document has been served via e-mail upon the following counsel of record this 10th day of November, 2008:

Lee L. Kaplan
SMYSER KAPLAN & VESELKA, L.L.P.
700 Louisiana, Suite 2300
Houston, Texas 77002


Victor G. Hardy
Andrew G. DiNovo
Adam Price
Jay D. Ellwanger
DINOVO PRICE ELLWANGER LLP
P.O. Box 201690
Austin, Texas 78720


S. Calvin Capshaw
Elizabeth L. DeRieux
CAPSHAW DERIEUX
1127 Judson Road, Suite 220
P.O. Box 3999
Longview, TX 75606-3999

Robert M. Parker
Robert C. Bunt
Charles Ainsworth
PARKER, BUNT & AINSWORTH, P.C.
100 East Ferguson, Suite 1114
Tyler, Texas 75702

/s/ Thomas B. Walsh, IV
Thomas B. Walsh, IV

## CERTIFICATION BY COUNSEL

The undersigned hereby certifies that the above document is filed under seal pursuant to the Agreed Protective Order (Dkt. No. 99-2) filed by all parties on November 4, 2008. The Agreed Protective Order has not yet been entered by the Court because there is one dispute among the parties that the Court has been asked to resolve, but this one dispute does not concern the authority to file documents containing protected information under seal.

/s/ Thomas B. Walsh, IV
Thomas B. Walsh, IV

A0557391

1632789 SURV

**CERTIFICATE OF OWNERSHIP**

**MERGING**

**SITE/TECHNOLOGIES/INC.**

**INTO**

SITE TECHNOLOGIES, INC.

**FILED** ELB
In the Office of the Secretary of State
of the State of California

DEC 2 9 2000

BILL JONES, Secretary of State

I, Jeff Ait, the Chief Executive Officer and Secretary of Site Technologies, Inc., do hereby certify:

1. That I am the Chief Executive Officer and Secretary of this corporation.

2. That this corporation is duly organized and existing under the laws of the State of California, the provisions of which permit a merger in the manner provided by Section 1110 of the California Corporations Code.

3. That this corporation owns 100 percent of the outstanding shares of site/technologies/inc. a corporation duly organized and existing under the laws of the State of Delaware, the provisions of which permit a merger in the manner provided by Section 1110 of the California Corporations Code.

4. That the following resolution was duly adopted and approved by the board of directors of this corporation:

RESOLVED, that Site Technologies, Inc. merge, and it hereby does merge into itself, site/technologies/inc., its subsidiary; and assumes all of its obligations pursuant to Section 1110 of the California Corporations Code.

The undersigned declares under penalty of perjury that the statements contained in the foregoing certificate are true of their own knowledge. Executed this twenty-first day of December, 2000.

Jeff Ait
Chief Executive Officer and Secretary

C: WINDOWS\TEMP\ATT502318.doc

**EXHIBIT 12**

CRAIG M. PRIM   (077820)
JANICE M. MURRAY (099996)
STEPHEN T. O'NEILL (115132)
MURRAY & MURRAY
A Professional Corporation
3030 Hansen Way, Suite 200
Palo Alto, CA  94304-1009
(650) 852-9000

Attorneys for Debtor

FILED

FEB 1 1 1999

United ... San Jose, California

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| In re: | Case No. 99-50736-JRG-11 |
| Site Technologies, Inc.,<br>dba DeltaPoint, Inc. | Chapter 11 |
| Debtor. | Date:   March 9, 1999<br>Time:   2:00 p.m.<br>Place:  Room 3020 |
| EIN No.: 77-0212760 | Judge:  Hon. James R. Grube |

## NOTICE OF MOTION AND MOTION TO ASSUME AND ASSIGN EXECUTORY CONTRACTS (11 U.S.C. §§ 365(a), (f))

### Affected Parties to Contracts:

Adaptec, Inc.
Anawave Software, Inc.
BlueSky Software Corp.
Claris Corporation
CNET Direct, Inc.
Cybersource Corporation (Software.net)
Data-Arts
Eclipse Marketing, Inc.
FairCom Corporation
Frame Technology Corporation
Global Entrepreneurs Net
Global Technologies Corp.
HomeCom
Installshield Software Corporation
International Business Machines Corp.
Internet Direct
Lotus Development Corp.
MacMillan Digital Publishing USA
McAffee Associates, Inc.
McLeod USA Telecommunications Services

Microsoft Corporation
Molly Penguin Software
Netcom, Inc.
NetNation Communication
Netscape Communications Corporation
Omnicrom Software Publishing Corporation
OpenCube Technologies
Preview Software, Inc.
Programmer's Paradise, Inc.
SCO
Site/technologies/inc.
Symantic Corporation
System Connect
TestDrive Corporation
Tidal Wave Communications, Inc.
Total Access Communications
Unisys Corporation
VisionTeq, Inc.
William G. Pryor

MURRAY & MURRAY
A Professional Corporation
3030 Hansen Way, Suite 200
Palo Alto, Ca  94304-1009
TELEPHONE (650) 852-9000 FACSIMILE (650) 852-9244
E-MAIL mail@murraylaw.com

JMM:slb-08
SITE\not-mot-assume.p\wpd

ORIGINAL

-1-

EXHIBIT 13

TO:     THE HONORABLE JAMES R. GRUBE, UNITED STATES BANKRUPTCY
        JUDGE

        COMES NOW Site Technologies, Inc., the Debtor and Debtor-In-Possession (the

"Debtor") who hereby moves for an Order approving the assumption and assignment of certain

executory contracts to StarBase Corporation ("StarBase") in connection with the sale of the

Debtor's core technology and related assets to StarBase for a purchase price consisting of

625,000 shares of StarBase common stock.  The purchase price is subject to adjustment at the

closing of the sale to cause the aggregate estimated value of the StarBase common stock to be

not less than $500,000 and not greater than $1,500,000.

## I.  NOTICE

        PLEASE TAKE NOTICE that a hearing will be held on March 9, 1999 at 2:00 p.m.

before the Honorable James R. Grube, United States Bankruptcy Judge, in Courtroom 3020,

United States Courthouse and Federal Building, 280 South First Street, San Jose, California, to

consider the MOTION TO ASSUME AND ASSIGN EXECUTORY CONTRACTS (11 U.S.C.

§§ 365(a), (f)) (the "Motion") filed by the Debtor.

        Any opposition to the Motion must be filed with the United States Bankruptcy Court,

United States Courthouse and Federal Building, 280 South First Street, Room 3035, San Jose,

CA 95113 and served on the Debtor's counsel, Janice M. Murray, Esq., Murray & Murray, A

Professional Corporation, 3030 Hansen Way, Suite 200, Palo Alto, CA 94304-1009, telephone

(650) 852-9000, facsimile (650) 852-9244 no later than February 23, 1999.

        The Debtor is serving a separate notice of this Motion on all creditors and parties in

interest concurrently herewith.  Further, the Debtor is serving this Motion on each party identified

as a non-debtor party to an executory contract which the Debtor seeks to assume and assign.

        **THE DEBTOR WILL REQUEST THE COURT TO DETERMINE THAT A**

**NON-DEBTOR PARTY TO AN EXECUTORY CONTRACT WHICH IS TO BE**

**ASSUMED AND ASSIGNED IS DEEMED TO HAVE CONSENTED TO SUCH**

**ASSUMPTION AND ASSIGNMENT AND TO HAVE AGREED THAT THE CURE**

**AMOUNT STATED IN EXHIBIT "A" CURES ALL OUTSTANDING MONETARY**

MURRAY & M
A Professional Cor... .ion
3030 Hansen Way, Suite 200
Palo Alto, Ca  94304-1009
TELEPHONE (650) 852-9000 FACSIMILE (650) 852-9244
E-MAIL mail@murraylaw.com

NOTICE OF MOTION AND MOTION TO ASSUME AND
ASSIGN EXECUTORY CONTRACTS (11 U.S.C. §§ 365(a), (f))

1  DEFAULTS UNLESS IT FILES AND SERVES AN OBJECTION TO THE MOTION

2  NO LATER THAN FEBRUARY 23, 1999.

3  ## II. SUMMARY OF RELIEF SOUGHT

4       1.     The Debtor requests an Order approving the assumption and assignment of various

5  executory contracts to StarBase in connection with the Debtor's motion to sell its core

6  technology and related assets to StarBase. The background and details of the proposed sale to

7  StarBase are more fully described in the notice which is being served concurrently herewith and

8  will not be restated here.

9  ## III. MOTION TO ASSUME AND ASSIGN
   ## EXECUTORY CONTRACTS (11 U.S.C. §§ 365(a), (f))

10

11      2.     The Debtor moves to assume the executory contracts listed on Exhibit "A"

12 attached hereto and incorporated herein by reference pursuant to § 365(a) of the Bankruptcy

13 Code and to assign all such contracts to StarBase pursuant to § 365(f) of the Bankruptcy Code.

14 All existing defaults are shown as the Cure Amount on Exhibit "A" and will be paid by the

15 Debtor as soon as practicable following closing of the sale and the Debtor's liquidation of the

16 StarBase common stock, unless the contracting party disputes the amount of the cure. If the

17 contracting party disputes the amount of the cure, the Debtor will reserve the full amount claimed

18 by such party and will file and serve on such party a motion to determine the amount of the cure

19 within ten (10) days of the closing of the sale.

20      3.     StarBase has substantial expertise in this area and intends to incorporate the

21 Debtor's core technology and related assets with its existing business. Accordingly, the Debtor

22 believes that upon the closing of the sale to StarBase, StarBase will have the requisite skill,

23 expertise and financial resources to fully perform all obligations under the executory contracts

24 and that such skill, expertise and financial resources provide adequate assurance of future

25 performance of the Debtor's obligations.

26      4.     The listing of a contract or agreement on Exhibit "A" attached hereto shall not be

27 deemed an admission by the Debtor that such contract or agreement is an executory contract.

28 Accordingly, the Debtor reserves the right to make a determination as to the proper

MURRAY & M ... Y
A Professional Cor... ...on
3010 Hansen Way, Suite 200
Palo Alto, CA 94304-1009
TELEPHONE (650) 852-9000 FACSIMILE (650) 852-9244
E-MAIL mail@murraylaw.com

1   characterization of the agreements listed therein.  The Debtor desires to assume those executory

2   contracts set forth on Exhibit "A" to the extent, and only to the extent, that any such contract

3   constitutes an executory contract and to assign its rights and obligations under each such

4   executory contract to StarBase.  **The Debtor reserves the right to withdraw any of the**

5   **executory contracts or agreements from said list at any time up to the time of the conclusion**

6   **of the hearing on this Motion.**

7          5.     The Debtor believes that except for and to the extent of the amount listed on

8   Exhibit "A" as the "Cure Amount", the Debtor is not in default under any of the contracts listed

9   on Exhibit "A".  The Cure Amount will be paid to the respective parties to the executory

10  contracts to cure all defaults, if any, under such executory contracts.  The cure amount will be

11  paid by the Debtor as soon as practicable following closing of the sale and the Debtor's

12  liquidation of the StarBase common stock.

13                        IV.  **OBJECTIONS**

14         6.     Any party to an executory contract to be assumed which (i) objects to the

15  assumption and assignment of such contract to StarBase, or (ii) asserts arrearages in an amount

16  different from the amount stated in Exhibit "A" must file with the Court and **serve on the**

17  **Debtor's counsel an objection to such assumption no later than February 23, 1999.  The**

18  **Debtor will request the Court to determine that failure to timely file such an objection shall**

19  **constitute consent to the assumption and assignment of the executory contract, an**

20  **agreement to the cure on the terms provided for herein and an acknowledgment that (a) the**

21  **proposed assumption provides adequate assurance of future performance, and (b) no other**

22  **defaults exist under such executory contract except for the Cure Amounts listed on Exhibit**

23  **"A".**

24         7.     Section 365 of the Bankruptcy Code allows the Debtor to assume an executory

25  contract if there has been a default in the executory contract, if the Debtor cures or provides

26  adequate assurance that the default will be cured, compensates the other parties for any actual

27  pecuniary loss resulting from such default and provides adequate assurance of future

28  performance.  As set forth above, the existing defaults under the contracts listed on Exhibit "A"

MURRAY & MURRAY
A Professional Cor__ __on
3030 Hansen Way, Suite 200
Palo Alto, CA  94304-1009
TELEPHONE (650) 852-9000 FACSIMILE (650) 852-9244
E-MAIL mail@murraylaw.com

NOTICE OF MOTION AND MOTION TO ASSUME AND
ASSIGN EXECUTORY CONTRACTS (11 U.S.C. §§ 365(a), (f))

1   will be cured as soon as practicable following the closing of the StarBase transaction and the

2   assignment of such contracts to StarBase provides adequate assurance of future performance of

3   the Debtor's obligations thereunder.

4         8.     Inasmuch as the ability to cure existing defaults and provide adequate assurance of

5   future performance is contingent upon the closing of the sale to StarBase, the Debtor requests

6   that the assumption and assignment of the contracts listed on Exhibit "A" be effective as of the

7   closing under the StarBase sale agreement.

8       **WHEREFORE**, the Debtor prays that this Court enter its Order authorizing the Debtor

9   to assume the executory contracts listed on Exhibit "A" hereto and to assign the same to StarBase

10   effective as of the closing under the StarBase sale agreement.

11

12   Dated: February 9, 1999          MURRAY & MURRAY
                                  A Professional Corporation

13

14                             By:

15                             JANICE M. MURRAY
                            Attorneys for Debtor

16

17

18

19

20

21

22

23

24

25

26

27

28

MURRAY & MURRAY
A Professional Corporation
3030 Hansen Way, Suite 200
Palo Alto, Ca 94304-1009
TELEPHONE (650) 852-9000 FACSIMILE (650) 852-9244
E-MAIL mail@murraylaw.com

JMM:slb-08
SITE\not-mot-assume.p\wpd

-5-

EXHIBIT "A"

MOTION TO ASSUME AND ASSIGN EXECUTORY CONTRACTS
EXECUTORY CONTRACTS TO BE ASSUMED AND ASSIGNED
TO STARBASE CORPORATION

## Schedule 2.01 (c)

Section 2.01(c) shall be limited to the following assets and properties:

| | Cure Amount |
|---|---|
| Sales Team Act Database & Act Software License | $0.00 |
| Point of Sales Filemaker Databases & Filemaker Software License | $0.00 |

Point of Sales Filemaker Databases & Filemaker Software License
       POS 1st Quarter 1998
       POS 1st Quarter 1997
       POS 2nd Quarter 1998
       POS 2nd Quarter 1997
       POS 3rd Quarter 1997
       POS 4th Quarter 1997
       Product Codes
       Product Codes 1st Quarter 1998
       Product Registration
       Purchase Order Log 8
       Purchase Order Log 7
       Purchase Order Log 6
       RMA Log 1998
       TS Call log
       Customer List

License Agreements

    Active Outbound Agreements:

        Seller entered into an Electronic and Packaged Goods Distribution Agreement with Anawave Software, Inc., on December 5, 1997 and an Amendment #1 to this Agreement on May 15, 1998.  The agreement allows for Anawave Software, Inc. to distribute Seller's products QuickSite 2.5, QuickSite 3.0 ESD, WebAnimator 1.1 ESD, a Promo Bundle and SiteSweeper 2.0 Boxed Product.  This agreement automatically renews unless terminated with thirty (30) days written notice by either party.      $0.00

        Seller entered into a Software Commerce Agreement with CNET Direct, Inc., dated June 23, 1997, by which CNET Direct, Inc. will act as an agent to accept payment for such software from customers pursuant to CNET's developer advocate program.  This agreement remains in effect until terminated by either party with thirty (30) days notice by either party.      $0.00

EXHIBIT _A_

Page _1_ Of _9_

Schedule 2.01 (c) continued

| | Cure Amount |
|---|---|

Seller entered into an Electronic Software Reseller Agreement with Cybersource Corporation (Software.net), dated August 6, 1996, by which Cybersource Corporation will electronically package and distribute Seller's software products to end-user customers. This agreement automatically renews annually but may be terminated upon ninety (90) days written notice by either party.

$0.00

Seller entered into an Agreement with MacMillan Digital Publishing on June 4, 1997 which allowed MacMillan Digital Publishing to ship Seller's software, DeltaPoint QuickSite Express 2.5, in the MacMillan Digital Publishing product Professional Web Design Kit 2.0 (ISBN #1-562-05737-5). This agreement is for an eighteen (18) month period and automatically terminates on December 4, 1998.

$0.00

Seller entered into an Agreement with MacMillan Digital Publishing USA on February 17, 1998 and an addendum to this agreement on March 31, 1998 which allowed MacMillan Digital Publishing to ship the Seller's software QuickSite 2.5x and QuickSite 3.0x in the MacMillan Digital Publishing products Web Page Construction Kit 4.0 (ISBN # 1-57595-075-8) and Web Page Construction Kit Deluxe (ISBN # 1-57595-097-9). The term of the agreement is two years from date of signing and will automatically terminate on February 17, 2000.

$0.00

Seller entered into a Dealer Agreement with Programmer's Paradise, Inc. on November 7, 1996 which allowed Programmer's Paradise to resell Seller's SiteSweeper 1.0 product. This agreement automatically renews annually and may be terminated with ninety (90) days written notice by either party.

$0.00

Seller entered into an Electronic Distribution Services Agreement with TestDrive Corporation on February 20, 1998. This agreement allows TestDrive Corporation to electronically distribute Seller's SiteSweeper 2.0, QuickSite 3.0 and WebAnimator 1.1 products on their Internet store sites. This agreement will automatically terminate on February 20, 1999.

$0.00

Seller entered into a Software License Agreement with William G. Pryor on September 16, 1997, which grants Mr. Pryor a perpetual license to manufacture, copy, modify create derivative work of, sublicense, transfer and distribute the executable binary object code of Seller's QuickSite version 2.x. This agreement may only be terminated by certain conditions that are addressed in Section 10 of the Software License Agreement.

$0.00

EXHIBIT A
Page 2 of 9

Schedule 2.01 (c) continued

Inactive Outbound Agreements (These agreements have been entered into by Seller but
have had no current activity on them.  Neither party has sent any termination notice):

Seller entered into a binding Letter of Intent with <u>Data-Arts</u> on July 15, 1996 by
which Data-Arts would provide Seller's QuickSite customers a free 30 day trial
hosting service and thereafter pay the Seller a 20% finders fee for ongoing monthly
service revenue for any QuickSite customers.  Either party can terminate this
agreement with thirty (30) days advance notice.
$0.00

Seller entered into a binding Letter of Intent with <u>Eclipse Marketing Inc.</u> on July
15, 1996 by which Eclipse Marketing Inc. would provide Seller's QuickSite
customers a free 60 day trial hosting service and thereafter pay Seller a 20%
finders fee for ongoing monthly service revenue for any QuickSite customers.
Either party can terminate this agreement with thirty (30) days advance notice.
$0.00

Seller entered into a binding Letter of Intent with <u>Global Entrepreneurs Net</u> on
July 15, 1996 by which Global Entrepreneurs Net would provide Seller's
QuickSite customers a free 30 day trial hosting service and thereafter pay Seller a
30% finders fee for ongoing monthly service revenue for any QuickSite customers.
Either party can terminate this agreement with thirty (30) days advance notice.
$0.00

Seller entered into a binding Letter of Intent with <u>HomeCom</u> on November 5,
1996 that allows HomeCom to receive the QuickSite product at a discounted rate.
Either party can terminate this agreement with thirty (30) days advance notice.
$0.00

Seller entered into a Software License Agreement with <u>International Business
Machines Corp</u> ("IBM") on September 6, 1996.  This agreement allows IBM to
market and distribute a customized version of QuickSite.  This agreement may be
terminated by IBM with sixty (60) days' written notice and by Seller with six (6)
months written notice.
$0.00

Seller entered into a Term Sheet with <u>Internet Direct</u> on July 30, 1996 by which
Seller provided a special 30 day trial edition of QuickSite for free distribution by
Internet Direct. In addition, Internet Direct has the right to include and distribute a
copy of the QuickSite 2.5 software in its GoSite client software.  The agreement
automatically renews annually unless either party provides thirty (30) days written
notice.
$0.00

EXHIBIT     A
Page    3    Of    9

Schedule 2.01 (c) continued

Cure
Amount

Seller entered into a Distribution Agreement with <u>McAFEE Associates, Inc.</u> on September 5, 1996 by which McAFEE Associates, Inc. would electronically distribute Seller's products. This agreement automatically renews unless terminated by thirty (30) days written notice.

$0.00

Seller entered into a binding Letter of Intent with <u>NetNation Communication</u> on November 26, 1996 by which NetNation Communication provides Seller's QuickSite customers a free 30 day trial hosting service and thereafter pays Seller a 10% finders fee for ongoing monthly service revenue for any QuickSite customers. Either party can terminate this agreement with thirty (30) days advance notice.

$0.00

Seller entered into an Agreement with <u>Netcom Interactive</u> on July 16, 1996 by which Seller and Netcom Interactive agreed to cooperate in the marketing, sales, licensing and distribution of their respective products. This agreement automatically renews and may terminate upon sixty (60) days advance notice.

$0.00

Seller entered into a binding Letter of Intent with <u>System Connect</u> on November 4, 1996 that allows System Connect to receive the QuickSite product at a discounted rate. Either party can terminate this agreement with thirty (30) days advance notice.

$0.00

Seller entered into a binding Letter of Intent with <u>Tidal Wave Communications, Inc.</u> on October 5, 1996 by which Tidal Wave Communications, Inc. provides Seller's QuickSite customers a free 30 day trial hosting service and thereafter pays Seller a 30% finders fee for ongoing monthly service revenue for any QuickSite customers. Either party can terminate this agreement with thirty (30) days advance notice.

$0.00

Seller entered into a binding Letter of Intent with <u>Total Access Communications</u> on October 10, 1996 by which Total Access Communications provides Seller's QuickSite customers a free 30 day trial hosting service and thereafter pays Seller a 30% finders fee for ongoing monthly service revenue for any QuickSite customers. Either party can terminate this agreement with thirty (30) days advance notice.

$0.00

Seller entered into a binding Letter of Intent with <u>VisionTeq, Inc.</u> on July 15, 1996 by which VisionTeq, Inc. provides Seller's QuickSite customers a free 30 day trial hosting service and thereafter pays Seller a 30% finders fee for ongoing monthly service revenue for any QuickSite customers. Either party can terminate this agreement with thirty (30) days advance notice.

$0.00

EXHIBIT A
Page 4 Of 9