# EXHIBIT D
# PART 4

Dockets.Justia.com

State of Delaware                    PAGE   1

Office of the Secretary of State

---

I, EDWARD J. FREEL, SECRETARY OF STATE OF THE STATE OF

DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT

COPY OF THE RESTATED CERTIFICATE OF "LIBERTECH INC.", FILED IN

THIS OFFICE ON THE THIRD DAY OF APRIL, A.D. 1995, AT 12:30

O'CLOCK P.M.

A CERTIFIED COPY OF THIS CERTIFICATE HAS BEEN FORWARDED TO

THE NEW CASTLE COUNTY RECORDER OF DEEDS FOR RECORDING.

**EXHIBIT 14**



Edward J. Freel, Secretary of State

2300985   8100                      AUTHENTICATION:        7460046

950073174                           DATE:

                                                           04-03-95

CONFIDENTIAL

STI_0005393

# RESTATED
## CERTIFICATE OF INCORPORATION
## OF
## LIBERTECH INC.

Libertech Inc., a corporation organized and existing under the laws of the State of Delaware, does hereby certify:

1.      The name of the corporation is Libertech, Inc. The original Certificate of Incorporation was filed with the Secretary of State of the State of Delaware on June 15, 1992.

2.      · The amendment and restatement herein set forth has been duly approved by the Board of Directors of the corporation and by the stockholders of the corporation pursuant to Section 242 of the General Corporation Law of the State of Delaware ("**Delaware Law**").

3.      The amendment and restatement herein set forth has been duly adopted pursuant to Section 245 of the Delaware Law. This Restated Certificate of Incorporation restates and integrates and further amends the provision of the corporation's Certificate of Incorporation as heretofore amended.

4.      The text of the Certificate of Incorporation is hereby restated and amended to read in its entirety as follows:

## ARTICLE I

The name of the corporation is Libertech Inc.

## ARTICLE II

The address of the registered office of the corporation in the State of Delaware is Corporation Trust Center, 1209 Orange Street, in the City of Wilmington, County of New Castle. The name of its registered agent at such address is The Corporation Trust Company.

## ARTICLE III

The purpose of the corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of Delaware.

STI_0005394

ARTICLE IV

(A)    <u>Classes of Stock</u>.  The corporation shall be authorized to issue two classes of stock to be designated, respectively, "**Preferred Stock**" and "**Common Stock**".  The number of shares of Preferred Stock authorized to be issued is Two Million (2,000,000) and the number of shares of Common Stock authorized to be issued is Twenty Million (20,000,000).  The Preferred Stock and the Common Stock shall each have a par value of $0.001 per share.

(B)    <u>Preferred Stock</u>.  The shares of Preferred Stock may be issued from time to time in one or more series pursuant to a resolution or resolutions providing for such issue duly adopted by the Board of Directors.  The Board of Directors of the corporation is expressly authorized, by filing a certificate pursuant to the applicable law of the State of Delaware, to: (i) establish from time to time the number of shares to be included in each such series; (ii) fix the voting powers, designations, powers, preferences and relative, participating, optional or other rights of the shares of each such series and the qualifications, limitations or restrictions thereof, including but not limited to the fixing or alteration of the dividend rights, dividend rate, conversion rights, conversion rate, voting rights, rights and terms of redemption (including sinking fund provisions), the redemption price or prices, and the liquidation preferences of any wholly unissued series of shares of Preferred Stock; and (iii) increase or decrease the number of shares of any series subsequent to the issue of shares then outstanding.  In case the number of shares of any series shall be so decreased, the number of shares constituting such decrease shall resume the status which they had prior to the adoption of the resolution originally fixing the number of shares of such series.  The first such series shall be designated "**Series A Preferred Stock**" and shall consist of Five Hundred Ninety-Six Thousand (596,000) shares.  The second such series shall be designated "**Series B Preferred Stock**" and shall consist of One Million (1,000,000) shares.  The rights, preferences, privileges and restrictions granted to or imposed upon the Series A Preferred Stock and the Series B Preferred Stock are as follows:

1.    <u>Dividend Provisions</u>.

(a)    <u>Dividend Rights of Series A Preferred Stock and Series B Preferred Stock</u>.  The holders of the outstanding Series A Preferred Stock and Series B Preferred Stock shall be entitled to receive dividends, when and as declared by the Board of Directors of the corporation, out of any assets at the time legally available therefor, at the rate of Six Cents $0.06 per share per annum, and $0.137 per share per annum, respectively, payable in preference and priority to any payment of any dividend on Common Stock and payable quarterly or as the Board of Directors may from time to time determine.  Such dividends shall not be cumulative (except in the case of a liquidation under Section 2) so that if such dividends in respect of any fiscal quarter of the corporation (calculated at said rate per share per annum) shall not have been paid on, or declared and set apart for, all shares of Series A Preferred Stock and Series B Preferred Stock at the time outstanding, no right shall accrue to the holders of Series A Preferred Stock and Series B Preferred Stock by reason of the fact that dividends on said shares

CONFIDENTIAL

STI_0005395

are not declared or paid with respect to any fiscal year of the corporation. No undeclared or unpaid dividends shall bear or accrue interest.

        (b)    <u>Dividend Rights of Common Stock</u>. Dividends may be declared and paid upon Common Stock in any fiscal year of the corporation if dividends shall have been paid or declared and set apart upon all shares of Series A Preferred Stock and Series B Preferred Stock at the annual rates set forth in Section 1(a) above for each quarter of such fiscal year of the corporation, including the fiscal quarter in which such dividends upon Common Stock are declared; provided, however, that if dividends are declared on Common Stock, dividends must likewise be declared at the same rate (assuming, for such purpose, the conversion of all outstanding shares of Series A Preferred Stock and Series B Preferred Stock into Common Stock as provided in Section 3 hereof) with respect to the outstanding Series A Preferred Stock and Series B Preferred Stock, and payment of any such dividends shall be made contemporaneously to the holders of Series A Preferred Stock, Series B Preferred Stock and Common Stock.

        (c)    <u>Consent</u>. Each holder of an outstanding share of Preferred shall be deemed to have consented to any distributions made by the corporation in connection with the repurchase of shares of Common issued to or held by officers, directors, employees or consultants of the corporation or its subsidiaries upon termination of their employment or services pursuant to agreements or as otherwise set forth in the Bylaws of the corporation providing for the right of said repurchase between the corporation and such persons.

        2.    <u>Liquidation Preference</u>. In the event of any liquidation, dissolution, or winding up of the corporation (or the deemed occurrence of such event pursuant to subsection (d) below), either voluntary or involuntary, distributions to the shareholders of the corporation shall be made in the following manner:

        (a)    <u>Amount of Liquidation Preference</u>. The holders of the Series A Preferred Stock and Series B Preferred Stock shall be entitled to receive, prior and in preference to any distribution of any of the assets or surplus funds of the corporation to the holders of the Common Stock by reason of their ownership of such stock, the amount of $1.00 per share for each share of Series A Preferred Stock then held by them and the amount of $2.283906 for each share of Series B Preferred Stock then held by them, adjusted for any combinations, consolidations, or stock distributions or dividends with respect to such shares and, in addition, an amount equal to all accrued but unpaid dividends on the Series A Preferred Stock and Series B Preferred Stock, respectively.

        If the assets and funds thus available for distribution among the holders of the Series A Preferred Stock and the Series B Preferred Stock shall be insufficient to permit the payment to such holders of their full aforesaid preferential amount, then the entire amount of the assets and funds of the corporation legally available for distribution shall be distributed ratably among the holders of the Series A Preferred Stock and Series B Preferred Stock in such a manner that the amount to be distributed to each holder of Series A Preferred Stock and Series B Preferred Stock

CONFIDENTIAL

STI_0005396

shall equal the amount obtained by multiplying the entire assets and funds of the corporation legally available for distribution hereunder by a fraction, the numerator of which shall be the sum of the products obtained by multiplying the number of shares of Series A Preferred Stock and Series B Preferred Stock then held by the holder by the respective liquidation preference of the Series A Preferred Stock and Series B Preferred Stock, and the denominator of which shall be the sum of the products obtained by multiplying the total number of shares of Series A Preferred Stock and Series B Preferred Stock then outstanding by the respective liquidation preference of the Series A Preferred Stock and the Series B Preferred Stock.

(b) <u>Distribution after Payment of Liquidation Preference</u>. After payment has been made to the holders of the Series A Preferred Stock and the Series B Preferred Stock of the full preferential amount set forth in Section 2(a) above, the entire remaining assets and funds of the corporation legally available for distribution, if any, shall be distributed ratably among the holders of the Series A Preferred Stock and Series B Preferred Stock, subject to the limitations set forth below, and the holders of Common Stock in a manner such that the amount distributed to each holder of the corporation's capital stock shall equal the amount obtained by multiplying the entire assets and funds of the corporation legally available for distribution pursuant to this Section 2(b) by a fraction, the numerator of which shall be the sum of the number of shares of Common Stock then held by the holder and the number of shares of Common Stock issuable upon conversion of the shares of the Series A Preferred Stock and Series B Preferred Stock then held by the holder, and the denominator of which shall be the sum of the total number of shares of Common Stock then outstanding and the total number of shares of Common Stock issuable upon conversion of the total number of shares of the Series A Preferred Stock and Series B Preferred Stock then outstanding; <u>provided</u>, <u>however</u>, that at such time as the distribution of liquidation preferences pursuant to this Article IV, Section 2 (including subsections (a) and (b) hereof) shall equal (i) $2.00 per share of Series A Preferred Stock or (ii) $4.567812 per share of Series B Preferred Stock, such holders of Series A Preferred Stock and Series B Preferred Stock, as the case may be, shall not be entitled to any further distribution pursuant to this subsection 2(b) with respect to shares of Series A Preferred Stock or Series B Preferred Stock, as the case may be. Thereafter, any remaining assets and funds legally available for distribution hereunder shall be distributed solely to the holders of the Common Stock in a manner such that the remaining amount distributed to each holder of Common Stock shall equal the amount obtained by multiplying the entire assets and funds of the corporation legally available for distribution hereunder by a fraction, the numerator of which shall be the number of shares of Common Stock then held by such holder, and the denominator of which shall be the total number of shares of Common Stock then outstanding.

(c) <u>Shares not Treated as Both Preferred Stock and Common Stock in any Distribution</u>. Shares of Preferred Stock shall not be entitled to be converted into shares of Common Stock in order to participate in any distribution, or series of distributions, as shares of Common Stock, without first foregoing participation in the distribution, or series of distributions, as shares of Preferred Stock.

CONFIDENTIAL

STI_0005397

(d)   <u>Events Deemed a Liquidation</u>. In the event of (i) a merger or consolidation of the corporation with or into any other corporation or any other person or entity, other than a wholly-owned subsidiary of the corporation, (ii) any other corporate reorganization, or (iii) a sale of all or substantially all of the assets of the corporation, unless shareholders of the corporation immediately prior to such a subsection (i), (ii) or (iii) transaction are holders of at least a majority of the voting securities of the surviving or acquiring corporation immediately thereafter, such event shall be treated as a liquidation, dissolution or winding up within the meaning of this Section 2.

3.   <u>Conversion</u>. The holders of the Series A Preferred Stock and Series B Preferred Stock shall have conversion rights as follows:

(a)   <u>Right to Convert and Automatic Conversion</u>.

(i)   The Series A Preferred Stock shall be convertible, at the option of the respective holders thereof, at any time at the office of this corporation or any transfer agent for such shares, into fully paid and non-assessable shares of Common Stock (calculated to the nearest one-hundredth of a share, fractions of less than one-hundredth of a share being disregarded) of this corporation, based upon the applicable Series A Conversion Price (as defined below) in effect at the time of conversion. The number of shares of Common Stock into which each share of Series A Preferred Stock may be converted shall be equal to $1.00 divided by the then current Series A Conversion Price. The price at which each share of Common Stock shall be deliverable upon conversion of the Series A Preferred Stock (herein sometimes referred to as the **"Series A Conversion Price"**) shall initially be $1.00. Such initial Series A Conversion Price shall be subject to adjustment from time to time in certain instances, as hereinafter provided in this Section 3. This corporation shall make no payment or adjustment on account of any declared but unpaid dividends on the shares of the Series A Preferred Stock surrendered for conversion.

(ii)   The Series B Preferred Stock shall be convertible, at the option of the respective holders thereof, at any time at the office of this corporation or any transfer agent for such shares, into fully paid and non-assessable shares of Common Stock (calculated to the nearest one-hundredth of a share, fractions of less than one-hundredth of a share being disregarded) of this corporation, based upon the applicable Series B Conversion Price (as defined below) in effect at the time of conversion. The number of shares of Common Stock into which each share of Series B Preferred Stock may be converted shall be equal to $2.283906 divided by the then current Series B Conversion Price. The price at which each share of Common Stock shall be deliverable upon conversion of the Series B Preferred Stock (herein sometimes referred to as the **"Series B Conversion Price"**) shall initially be $2.283906. Such initial Series B Conversion Price shall be subject to adjustment from time to time in certain instances, as hereinafter provided in this Section 3. This corporation shall make no payment or adjustment on account of any declared but unpaid dividends on the shares of the Series B

CONFIDENTIAL

STI_0005398

Preferred Stock surrendered for conversion. The Series A Conversion Price and the Series B Conversion Price are sometimes referred to herein, collectively, as the **"Conversion Prices"**.

(iii)     Each share of Series A Preferred Stock and Series B Preferred Stock shall automatically be converted into shares of Common Stock at the then effective Series A Conversion Price or Series B Conversion Price, if applicable, immediately upon the first to occur of the following: (A) the closing of an underwritten public offering covering the corporation's Common Stock pursuant to an effective registration statement under the Securities Act of 1933, as amended, where the gross proceeds to the corporation are at least $10,000,000 and the per share public offering price is at least $5.00, as presently constituted; or (B) at such time as the consent of the holders of at least a majority of the then-outstanding shares of Preferred Stock to such conversion has been obtained.

(b)     Mechanics of Conversion.  Before any holder of shares of the Preferred Stock shall be entitled to convert the same into shares of Common Stock, the holder shall surrender the certificate or certificates therefor, duly endorsed in blank or accompanied by proper instruments of transfer, at the office of this corporation or of any transfer agent for the shares of the Preferred Stock and shall give written notice to this corporation at such office that such holder elects to convert the same and shall state in writing therein the name or names in which such holder wishes the certificate or certificates for shares of Common Stock to be issued. This corporation shall, as soon as practicable thereafter, issue and deliver at such office to such holder of shares of the Preferred Stock or to such holder's nominee or nominees, certificates for the number of full shares of Common Stock to which such holder shall be entitled, as aforesaid, together with cash in lieu of any fraction of a share as hereinafter provided in this Section 3. Such conversion shall be deemed to have been made as of the date of such surrender of the shares of the Preferred Stock to be converted, and the person or persons entitled to receive the shares of Common Stock issuable upon such conversion shall be treated for all purposes as the record holder or holders of such shares of Common Stock on said date.

(c)     Adjustment for Stock Splits and Combinations.  If the corporation shall at any time or from time to time after the Issue Date (as defined below in this subsection (c) effect a subdivision of the outstanding Common Stock, the Conversion prices then in effect immediately before that subdivision shall be proportionately decreased, and conversely, if the corporation shall at any time or from time to time after the Issue Date combine the outstanding shares of Common Stock, the Conversion Prices then in effect immediately before the combination shall be proportionately increased.  Any adjustment under this subsection (c) shall become effective at the close of business on the date the subdivision or combination becomes effective.  **"Issue Date"** for Series A Preferred Stock and the Series B Preferred Stock shall mean the date of the filing of this Restated Certificate of Incorporation with the Delaware Secretary of State.

(d)     Adjustment for Certain Dividends and Distributions.  In the event the corporation at any time, or from time to time after the Issue Date shall make or issue, or fix

CONFIDENTIAL

STI_0005399

a record date for the determination of holders of Common Stock entitled to receive, a dividend or other distribution payable in additional shares of Common Stock, then and in each such event the Conversion Prices then in effect shall be decreased as of the time of such issuance or, in the event such a record date shall have been fixed, as of the close of business on such record date, by multiplying the Conversion Prices then in effect by a fraction:

          (i)    the numerator of which shall be the total number of shares of Common Stock issued and outstanding immediately prior to the time of such issuance or the close of business on such record date, and

          (ii)    the denominator of which shall be the total number of shares of Common Stock issued and outstanding immediately prior to the time of such issuance or the close of business on such record date plus the number of shares of Common Stock issuable in payment of such dividend or distribution; provided, however, that if such record date shall have been fixed and such dividend is not fully paid or if such distribution is not fully made on the date fixed therefor, the Conversion Prices shall be recomputed accordingly as of the close of business on such record date and thereafter Conversion Prices shall be adjusted pursuant to this subsection (d) as of the time of actual payment of such dividends or distributions.

          (e)    <u>Adjustments for Other Dividends and Distributions</u>.  In the event the corporation at any time or from time to time after the Issue Date shall make or issue, or fix a record date for the determination of holders of Common Stock entitled to receive, a dividend or other distribution payable in securities of the corporation other than shares of Common Stock, then and in each such event provision shall be made so that the holders of Preferred Stock shall receive upon conversion thereof in addition to the number of shares of Common Stock receivable thereupon, the amount of securities of the corporation which they would have received had their Preferred Stock been converted into Common Stock on the date of such event and had thereafter, during the period from the date of such event to and including the conversion date, retained such securities (together with any distributions payable thereon during such period) receivable by them as aforesaid during such period, giving application to all adjustments called for during such period under this Section 3 with respect to the rights of the holders of the Preferred Stock.

          (f)    <u>Adjustment for Reclassification, Exchange or Substitution</u>.  If the Common Stock issuable upon the conversion of the Preferred Stock shall be changed into the same or different number of shares of any other class or classes of stock, by capital reorganization, involving exchange, substitution, reclassification or otherwise (other than a subdivision or combination of shares or stock dividend provided for above, or a reorganization, merger, consolidation or sale of assets provided for below in this Section 3), then and in each such event the holder of each share of Preferred Stock shall have the right thereafter to convert each such share into the kind and amount of shares of stock and other securities and property receivable upon such reorganization, reclassification or other change, as holders of the number of shares of Common Stock into which such shares of Preferred Stock might have been

CONFIDENTIAL

STI_0005400

converted immediately prior to such reorganization, reclassification or change, all subject to further adjustment as provided herein.

(g)  Reorganization, Merger, Consolidation or Sale of Assets.  If at any time or from time to time there shall be a capital reorganization of the Common Stock (other than a subdivision, combination, reclassification or exchange of shares provided for elsewhere in this Section 3) or a merger or consolidation of the corporation with or into another corporation, or the sale of all or substantially all of the corporation's properties and assets to any other person, then, as a part of such reorganization, merger, consolidation or sale, provision shall be made so that the holders of the Preferred Stock shall thereafter be entitled to receive upon conversion of such Preferred Stock the number of shares of stock or other securities or property of the corporation, or of the successor corporation resulting from such reorganization, merger, consolidation or sale, to which a holder of Common Stock deliverable upon conversion would have been entitled on such capital reorganization, merger, consolidation or sale.  In any such case, appropriate adjustment shall be made in the application of the provisions of this Section 3 with respect to the rights of the holders of the Preferred Stock after the reorganization, merger, consolidation or sale to the end that the provisions of this Section 3 (including adjustment of the Conversion Prices then in effect and the number of shares receivable upon conversion of the Preferred Stock) shall be applicable after that event as nearly equivalent as may be practicable.

(h)  Sale of Shares Below Conversion Price.

(i)  If at any time or from time to time after the Issue Date the corporation shall issue or sell Additional Shares of Common Stock (as defined in Section 3(i) below), other than as a dividend or other distribution on any class of stock as provided in subsections (d) and (e) above and other than upon a subdivision or combination of shares of Common Stock as provided in subsection (c) above, for a consideration per share less than the then applicable Conversion Prices, then and in each case the Conversion Prices shall be reduced, as of the opening of business on the date of such issue or sale, to a price determined by multiplying the Conversion Prices by a fraction, the numerator of which shall be (x) the number of shares of Common Stock outstanding at the close of business on the day next preceding the date of such issue or sale, plus (y) the number of shares of Common Stock which the aggregate consideration received by the corporation for the total number of Additional Shares of Common Stock so issued would purchase at the Conversion Prices and the denominator of which shall be the number of shares of Common Stock outstanding at the close of business on the date of such issue or sale after giving effect to the issuance of such Additional Shares of Common Stock. For purposes of this Section 2(h) and except as provided below, references to "**Common Stock**" shall include Common Stock receivable upon conversion of Convertible Securities and upon exercise of all Options outstanding on the date immediately preceding date of the issuance of Additional Shares of Common Stock, except that shares of Common Stock subject to Options shall not be included to the extent that the per share exercise price is greater than the then-current fair market value of such Common Stock, as determined in good faith by the Board of Directors.

CONFIDENTIAL

STI_0005401

(ii)    For the purpose of making any adjustment in the Conversion Prices or number of shares of Common Stock receivable on conversion of Preferred Stock as provided in this subsection (h), the consideration received by the corporation for any issue or sale of securities shall:

(A)    to the extent it consists of cash, be computed at the amount of cash received by the corporation before deduction of any expenses payable by the corporation and any underwriting or similar commissions, compensations, or concessions paid or allowed by the corporation in connection with such issue or sale;

(B)    to the extent it consists of property other than cash, be computed at the fair value of that property as determined in good faith by the Board of Directors; and

(C)    if Additional Shares of Common Stock, Convertible Securities (as defined in paragraph (iii) below) or rights or options to purchase either Additional Shares of Common Stock or Convertible Securities are issued or sold together with other stock or securities or other assets of the corporation for a consideration which covers both, be computed as the portion of the consideration so received that may be reasonably determined in good faith by the Board of Directors to be allocable to such Additional Shares of Common Stock, Convertible Securities or rights or options.

(iii)    For the purposes of this subsection (h), the term **"Options"** shall mean rights, options or warrants to subscribe for, purchase, or otherwise acquire either Common Stock or Convertible Securities, as defined herein, and the term **"Convertible Securities"** shall mean any evidences of indebtedness, shares or other securities directly or indirectly convertible into or exchangeable for Common Stock.  In the event the corporation at any time or from time to time after the Issue Date shall issue any Options or Convertible Securities or shall fix a record date for the determination of holders of any class of securities entitled to receive any such Options or Convertible Securities, then the maximum number of shares (as set forth in the instrument relating thereto without regard to any provisions contained therein for a subsequent adjustment of such number) of Common Stock issuable upon the exercise of such Options or, in the case of Convertible Securities and Options therefor, the conversion or exchange of such Convertible Securities, shall be deemed to be Additional Shares of Common Stock issued as of the time of such issue or, in case such a record date shall have been fixed, as of the close of business on such record date, provided that Additional Shares of Common Stock shall not be deemed to have been issued unless the consideration per share (determined pursuant to paragraph (ii) hereof assuming the payment of all consideration required to effect the exercise or conversion of Options or Convertible Securities, as the case may be) of such Additional Shares of Common Stock would be less than the Conversion Prices in effect on the date of and immediately prior to such issue, or such record date, as the case may be, and provided further that in any such case in which Additional Shares of Common Stock are deemed to be issued:

NMG05K.W42(5P3)
03/28/95

-9-

STI_0005402

(A)     no further adjustment in the Conversion Prices shall be made upon the subsequent issue of Convertible Securities or shares of Common Stock upon the exercise of such Options or conversion or exchange of such Convertible Securities;

(B)     if such Options or Convertible Securities by their terms provide, with the passage of time or otherwise, for any increase in the consideration payable to the corporation, or decrease in the number of shares of Common Stock issuable, upon the exercise, conversion or exchange thereof, the Conversion Prices computed upon the original issue thereof (or upon the occurrence of a record date with respect thereto), and any subsequent adjustments based thereon, shall, upon any such increase or decrease becoming effective, be recomputed to reflect such increase or decrease insofar as it affects such Options or the rights of conversion or exchange under such Convertible Securities, which are outstanding at such time;

(C)     upon the expiration of any such Options or any rights of conversion or exchange under such Convertible Securities which shall not have been exercised, the Conversion Prices computed upon the original issue thereof (or upon the occurrence of a record date with respect thereto), and any subsequent adjustments based thereon, shall, upon such expiration, be recomputed as if:

(I)     in the case of Convertible Securities or Options for Common Stock, the only Additional Shares of Common Stock issued were the shares of Common Stock, if any, actually issued upon the exercise of such Options or the conversion or exchange of such Convertible Securities and the consideration received therefor was the consideration actually received by the corporation for the issue of all such Options, whether or not exercised, plus the additional consideration actually received by the corporation upon such exercise, or for the issue of all such Convertible Securities which were actually converted or exchanged, plus the additional consideration, if any, actually received by the corporation upon such conversion or exchange; and

(II)     in the case of Options for Convertible Securities, only the Convertible Securities, if any, actually issued upon the exercise thereof were issued at the time of issue of such Options, and the consideration received by the corporation for the Additional Shares of Common Stock deemed to have been then issued was the consideration actually received by the corporation for the issue of all such Options, whether or not exercised, plus the consideration deemed to have been received by the corporation (determined pursuant to paragraph (ii) above) upon the issue of the Convertible Securities upon the actual exercise of such Options.

(D)     no readjustment pursuant to clause (B) or (C) above shall have the effect of increasing the Conversion Prices, to an amount which exceeds the lower of: (i) the Conversion Prices on the original adjustment date, or (ii) the Conversion Prices that would have resulted from any other issuance of Additional Shares of Common Stock between the original adjustment date and such readjustment date; and

NMG05K.W42(5P3)
03/28/95                                            -10-

(E)    in the case of any Options which expire by their terms not more than thirty (30) days after the date of issue thereof, no adjustment of the Conversion Prices shall be made until the expiration or exercise of all such options, whereupon such adjustment shall be made in the same manner provided in clause (C) above.

(i)    Definition.  The term "**Additional Shares of Common Stock**" as used herein shall mean all shares of Common Stock issued by the corporation after the Issue Date, whether or not subsequently reacquired or retired by the corporation, other than: (i) shares of Common Stock issued upon conversion of the Preferred Stock; (ii) shares of Common Stock issued pursuant to stock option plans, stock purchase plans, stock bonus plans or other forms of stock incentive plans for officers, employees, consultants and/or directors of this corporation; (iii) shares of Common Stock issued as a dividend or distribution on Preferred Stock; (iv) shares of Common Stock or options or warrants to purchase Common Stock issued to equipment lessors or institutional lenders pursuant to leasing or other financing transactions approved by the Board of Directors, or (v) shares of Common Stock that are issued pursuant to options or warrants outstanding as of the Issue Date.

(j)    Minimum Adjustment.  No adjustment of the Conversion Prices, however, shall be made in amount less than $0.05, but any such lesser adjustments shall be carried forward and shall be made at the time together with the next subsequent adjustment which together with any adjustments so carried forward shall amount to $0.05 or more.

(k)    Certificate of Adjustment.  Upon the occurrence of each adjustment or readjustment of the Conversion Prices pursuant to this Section 3, this corporation shall promptly compute such adjustment or readjustment in accordance with the terms hereof and prepare and furnish to each holder of Preferred Stock, as applicable, a certificate, signed by the Chairman of the Board, the President or the Chief Financial Officer, setting forth such adjustment or readjustment and showing in detail the facts upon which such adjustment or readjustment is based.

(l)    Notices of Record Date.  If:

(i)    this corporation shall set a record date for the purpose of entitling the holders of its shares of Common Stock to receive a dividend, or any other distribution, payable otherwise than in cash;

(ii)    this corporation shall set a record date for the purpose of entitling the holders of its shares of Common Stock to subscribe for or purchase any shares of any class or to receive any other rights;

(iii)    there shall occur any capital reorganization of this corporation, reclassification of the shares of this corporation (other than a subdivision or combination of its outstanding Common Stock), consolidation or merger of this corporation with

CONFIDENTIAL

STI_0005404

or into another corporation, or conveyance of all or substantially all of the assets of this corporation to another corporation; or

> (iv)  there shall occur a voluntary or involuntary dissolution, liquidation, or winding up of this corporation;

then, and in each such case, this corporation shall cause notice to be given to the holders of record of the outstanding shares of the Preferred Stock in the manner provided in Section 7 hereof, at least twenty (20) days prior to the dates hereinafter specified, a notice stating the date which (x) has been set as the record date for the purpose of such dividend, distribution, or rights, or (y) such reclassification, reorganization, consolidation, merger, conveyance, dissolution, liquidation, or winding up is to take place and the date, if any is to be fixed, as of which holders of Common Stock of record shall be entitled to exchange their shares of Common Stock for securities or other property deliverable upon such reclassification, reorganization, consolidation, merger, conveyance, dissolution, liquidation, or winding up

> (m)  Fractional Shares.  No fractional shares of Common Stock shall be issued upon conversion of Preferred Stock.  In lieu of any fractional shares to which the holder would otherwise be entitled, the corporation shall pay cash equal to the product of such fraction multiplied by the fair market value of one share of the corporation's Common Stock on the date of conversion, as determined in good faith by the Board of Directors.

> (n)  Reservation of Stock Issuable Upon Conversion. This corporation shall at all times reserve and keep available, out of its authorized but unissued Common Stock, solely for the purpose of effecting the conversion of Series A Preferred Stock and the Series B Preferred Stock, the full number of shares of Common Stock deliverable upon the conversion of all shares of the Series A Preferred Stock and the Series B Preferred Stock from time to time outstanding.  This corporation shall from time to time, in accordance with the laws of the State of Delaware, increase the authorized amount of its Common Stock if at any time the authorized number of shares of Common Stock remaining unissued shall not be sufficient to permit the conversion of all of the shares of the Series A Preferred Stock and the Series B Preferred Stock at the time outstanding.

> (o)  Payment of Taxes.  The corporation shall pay any and all issue and other taxes that may be payable in respect of any issue or delivery of Common Stock on conversion of the Series A Preferred Stock and the Series B Preferred Stock pursuant hereto. This corporation shall not, however, be required to pay any tax which may be payable in respect of any transfer involved in the issue and delivery of Common Stock in a name other than that in which the Series A Preferred Stock or Series B Preferred Stock, as the case may be, so converted was registered, and no such issue or delivery shall be made unless and until the person requesting such issue has paid to this corporation the amount of any such tax.

NMG05K.W42(5P3)
03/28/95

-12-

CONFIDENTIAL

STI_0005405

(p)   No Impairment.  Except upon the affirmative vote of the holders of a majority of the outstanding shares of each series of Preferred Stock, this corporation will not, by amendment of its Certificate of Incorporation or through any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed hereunder by this corporation, but will at all times in good faith assist in the carrying out of all the provisions of this Section 3 and in the taking of all such action as may be necessary or appropriate in order to protect the conversion rights of the holders of the Preferred Stock against impairment.

> 4.   Voting Rights.

(a)   Except as otherwise required by law, the holder of each share of Common Stock issued and outstanding shall have one vote, and the holder of each share of Preferred Stock issued and outstanding shall be entitled to the number of votes equal to the number of shares of Common Stock into which such shares of Preferred Stock could be converted at the record date for determination of the stockholders entitled to vote on such matters or, if no such record date is established, at the date such vote is taken or any written consent of stockholders is solicited, such votes to be counted together with all other shares of stock of the corporation having general voting power and not separately as a class.

(b)   Notwithstanding anything to the contrary contained in subparagraph (a) above, so long as at least 200,000 shares (as adjusted for stock splits and like events) of Series A Preferred Stock are outstanding, the holders of the Series A Preferred Stock, voting as a single class, shall by majority vote be entitled to elect one (1) member to the Board of Directors of the corporation.  Except as otherwise provided by law such director may be removed only by a vote of the holders of a majority of the then outstanding Series A Preferred Stock.  A successor to fill the position on the Board of Directors which is elected exclusively by vote of the holders of the Series A Preferred Stock and which vacancy occurs for any reason shall be filled exclusively by a vote of the holders of a majority of the Series A Preferred Stock, voting as a single class.

(c)   Notwithstanding anything to the contrary contained in subparagraph (a) above, so long as at least 200,000 shares (as adjusted for stock splits and like events) of Series B Preferred Stock are outstanding, the holders of the Series B Preferred Stock, voting as a single class, shall by majority vote be entitled to elect two (2) members to the Board of Directors of the corporation.  Except as otherwise provided by law such directors may be removed only by a vote of the holders of a majority of the then outstanding Series B Preferred Stock.  A successor to fill a position on the Board of Directors which is elected exclusively by vote of the holders of the Series B Preferred Stock and which vacancy occurs for any reason shall be filled exclusively by a vote of the holders of a majority of the Series B Preferred Stock, voting as a single class.

CONFIDENTIAL

STI_0005406

5. <u>Protective Provisions</u>. So long as at least 100,000 shares (as adjusted for stock splits and like events) of Preferred Stock are outstanding, the corporation shall not, without first obtaining the approval (by vote or written consent, as provided by law) of the holders of at least a majority of the outstanding shares of Preferred Stock do anything which:

(i) adversely alters or changes the rights, preferences or privileges of the Preferred Stock,

(ii) creates any class or series of stock having any preference over or being on a parity with the Preferred Stock,

(iii) reclassifies any Common Stock into shares having preference over or being on a parity with the Preferred Stock,

(iv) applies any of the corporation's assets to the payment of dividends or the redemption of Common Stock other than repurchases of shares from employees or consultants upon termination of employment or services, or

(v) results in a consolidation or merger with or into any other corporation or the sale or other transfer in a single transaction or a series of related transactions of all or substantially all of the assets of this corporation, or otherwise results in the reorganization of this Corporation unless the stockholders or this corporation immediately prior to any such transaction are holders of a majority of the voting securities of the surviving or acquiring corporation immediately thereafter.

6. <u>Status of Converted Stock</u>. In case any shares of Preferred Stock shall be converted pursuant to Section 3 hereof, the shares so converted shall assume the status of authorized but undesignated and unissued shares of Preferred Stock.

7. <u>Notices</u>. Any notice required by the provisions of this Restated Certificate of Incorporation, except as otherwise specifically provided herein, to be given to the holders of shares of Preferred Stock or Common Stock shall be in writing and may be delivered by personal service or sent by telegraph or cable or sent by registered or certified mail, return receipt requested, with postage thereon fully prepaid. All such communications shall be addressed to each holder of record at its address appearing on the books of his corporation. If sent by telegraph or cable, a confirmed copy of such telegraphic or cabled notice shall promptly be sent by mail (in the manner provided above) to the holders. Service of any such communication made only by mail shall be deemed complete on the date of actual delivery as shown by the addressee's registry or certification receipt or at the expiration of the third (3rd) business day after the date of mailing, whichever is earlier in time.

NMG05K.W42(5P3)
03/28/95

-14-

CONFIDENTIAL

STI_0005407

(C)   Common Stock

1.   Relative Rights of Preferred Stock and Common Stock.  All preferences, voting powers, relative, participating, optional or other special rights and privileges, and qualifications, limitations, or restrictions of the Common Stock are expressly made subject and subordinate to those that may be fixed with respect to any shares of the Preferred Stock.

2.   Voting Rights.  Except as otherwise required by law or this Restated Certificate of Incorporation, each holder of Common Stock shall have one vote in respect of each share of stock held by him of record on the books of the corporation for the election of directors and on all matters submitted to a vote of stockholders of the corporation.

3.   Dividends.  Subject to the preferential rights of the Preferred Stock, the holders of shares of Common Stock shall be entitled to receive, when and if declared by the Board of Directors, out of the assets of the corporation which are by law available therefor, dividends payable either in cash, in property or in shares of capital stock.

## ARTICLE V

The corporation is to have perpetual existence.

## ARTICLE VI

In furtherance and not in limitation of the powers conferred by the laws of the State of Delaware:

(A)   The Board of Directors of the corporation is expressly authorized to adopt, amend or repeal the Bylaws of the corporation.

(B)   Elections of directors need not be by written ballot unless the Bylaws of the corporation shall so provide.

(C)   The books of the corporation may be kept at such place within or without the State of Delaware as the Bylaws of the corporation may provide or as may be designated from time to time by the Board of Directors of the corporation.

(D)   The number of directors which constitute the whole Board of Directors of the corporation shall be determined in accordance with the Bylaws of the corporation.

(E)   Subject to the provisions of Article IV, Section 4 hereof, vacancies created by the resignation of one or more members of the Board of Directors and newly created directorships,

NMG05K.W42(5P3)
03/28/95

-15-

STI_0005408

created in accordance with the Bylaws of this corporation, may be filled by the vote of a majority, although less than a quorum, of the directors then in office, or by a sole remaining director.

## ARTICLE VII

(a)    To the fullest extent permitted by the Delaware General Corporation Law as the same exists or as may hereafter be amended, a director of the corporation shall not be personally liable to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director.

(b)    The corporation may indemnify to the fullest extent permitted by law any person made or threatened to be made a party to an action or proceeding, whether criminal, civil, administrative or investigative, by reason of the fact that he, his testator or intestate is or was a director, officer or employee of the corporation or any predecessor of the corporation or serves or served at any other enterprise as a director, officer or employee at the request of the corporation or any predecessor to the corporation.

(c)    Neither any amendment nor repeal of this Article VII, nor the adoption of any provision of this corporation's Certificate of Incorporation inconsistent with this Article VII, shall eliminate or reduce the effect of this Article VII, in respect of any matter occurring, or any action or proceeding accruing or arising or that, but for this Article VII, would accrue or arise, prior to such amendment, repeal or adoption of an inconsistent provision.

## ARTICLE VIII

The corporation reserves the right to amend or repeal any provision contained in this Restated Certificate of Incorporation, in the manner now or hereafter prescribed by statute, and all rights conferred upon a stockholder herein are granted subject to this reservation."

CONFIDENTIAL

STI_0005409

THE UNDERSIGNED, being the President of this corporation, does make this Certificate, hereby declaring and certifying that this is his act and deed and the facts herein stated are true, and accordingly, has hereunto set his hand this 4th day of April, 1995.

LIBERTECH INC.

By: _____
Daniel Egger, President

Attest:

_____
Richard C. DeGolia, Secretary

NMG05K.W42(5P3)
03/28/95

CONFIDENTIAL

STI_0005410

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| SOFTWARE RIGHTS ARCHIVE, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | Civil Action No. 2:07-cv-511-TJW |
| v. | § | |
| | § | |
| GOOGLE INC., YAHOO! INC., | § | |
| IAC SEARCH & MEDIA, INC., AOL LLC, | § | **JURY TRIAL DEMANDED** |
| and LYCOS, INC., | § | |
| | § | |
| Defendants. | § | |

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS**

I.  SUMMARY OF ARGUMENT ................................................................................ 1

II.  STATEMENT OF FACTS .................................................................................... 2

    A.  In July 1997, Site/Tech, the undisputed owner of the patents-in-suit at the time, transferred the patents to Site Tech. ................................................ 3

    B.  After July 1997, Site Tech and Site/Tech merged corporate personalities. ............ 5

    C.  In September 1998, Site Tech sold and assigned the patents-in-suit to Egger, and Site/Tech was bound by the assignment. ............................................... 6

    D.  In December 2000, Site/Tech formally was merged into Site Tech and transferred all its remaining assets to Site Tech. ..................................................... 6

III.  ARGUMENT AND AUTHORITIES.................................................................... 7

    A.  Egger acquired the patents in September 1998.................................................... 7

        1.  Site Tech owned the patents in September 1998, having acquired them from Site/Tech in July 1997.............................................. 7

            a.  Site Tech acquired the patents by operation of law. ...................... 7

            b.  Site Tech acquired the patents by written conveyance................................................................................11

            c.  Site Tech acquired the patents by ratification...............................12

        2.  Even assuming Site Tech did not own the patents in September 1998, the subsidiary Site/Tech also was bound by the assignment to Egger. ..................................................13

            a.  Site/Tech was bound because it was the alter ego of Site Tech. ...................................................................................13

**EXHIBIT 15**

b. Site/Tech was bound to the assignment, because it had authorized Site Tech to assign the patents to Egger in Site Tech's name. ...........................................15

(i) Site Tech had the actual authority from Site/Tech to transfer the patents in its own name. .............................................................17

(ii) Site Tech also had the ostensible or apparent authority to transfer the patents-in-suit. ............................18

(iii) Site/Tech has ratified the 1998 and 2005 Assignments. ...................................................21

B. The undisputed facts demonstrate that, at the latest, Egger acquired the patents in December 2000. ...........................................21

C. Defendants misrepresent the February 2005 Assignment from Site/Tech to Egger. ...............................................................24

D. Defendants' assertion that the Site Tech bankruptcy extinguished Egger's rights to the patents-in-suit is wrong. ..............................25

1. If Site/Tech held the patents, then bankruptcy did not defeat Egger's rights. ..........................................................25

2. If Site Tech held the patents, then bankruptcy did not defeat Egger's rights. ..........................................................25

IV. CONCLUSION ....................................................................... 28

CERTIFICATE OF SERVICE .................................................................30

## <u>PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS</u>

Plaintiff Software Rights Archive, LLC ("Plaintiff" or "SRA") files this Response to Defendants' Motion to Dismiss, and shows the Court as follows:

### I.    SUMMARY OF ARGUMENT

For nearly 10 years, no one questioned that the patents-in-suit were the property of Daniel Egger (and, hence, the plaintiff, SRA). Now, in an effort to evade the jurisdiction of this Court, the Defendants seek to bootstrap an incomplete reading of corporate documents to undo an assignment that all parties intended, consummated, described publicly and have subsequently ratified. Defendants' motion to dismiss consciously disregards the contemporaneous documents demonstrating that Egger acquired the patents long before he assigned them to SRA. Defendants' motion to dismiss should be denied.

Defendants' central contention—that Egger did not acquire the patents-in-suit before February 2005—is not only wrong, it is contradicted by numerous company documents, sworn SEC filings, emails, sworn declarations, and common sense. For multiple independent reasons, Egger acquired the patents before February 2005:

- In July 1997, Site/Technologies/Inc. ("Site/Tech")[1], the undisputed owner of the patents at the time, transferred the patents to its parent company Site Technologies, Inc. ("Site Tech").[2]  In September 1998, Site Tech assigned the patents to Daniel Egger through a bill of sale and assignment.  Egger thus acquired the patents in September 1998.

- Defendants claim that the true owner of the patents in September 1998 was Site/Tech, not Site Tech. Defendants are wrong, but even if Defendants were correct, Egger still would have acquired the patents in September 1998 because Site/Tech was bound by the September 1998 assignment to Egger.  The assignment was executed by the CEO

---

[1] Site/Technologies/Inc., the subsidiary, was known as "Libertech, Inc." prior to August 1996, when it was subsequently acquired by DeltaPoint, Inc.  For the sake of consistency, this brief refers to Libertech, Inc. and Site/Technologies/Inc. as "Site/Tech."

[2] Site Technologies, Inc., the parent, originally was known as "DeltaPoint, Inc."  It changed its name from "DeltaPoint, Inc." to "Site Technologies, Inc." in October 1997—three months after it acquired Site/Technologies/Inc.  For the sake of consistency, this brief refers to DeltaPoint, Inc. and Site Technologies, Inc. as "Site Tech."

of Site/Tech; Site/Tech was the alter ego of Site Tech; and Site/Tech had authorized Site Tech to assign the patents to Egger in Site Tech's name.

- Finally, even assuming that title was not transferred in September 1998, Egger undoubtedly acquired the patents at the latest in December 2000. By that time—Defendants themselves admit—Site Tech would have acquired the patents from its subsidiary Site/Tech even if it had not done so previously. Thus, by late 2000, Egger would have acquired the patents from Site Tech by operation of the after-acquired title doctrine.

Because Egger acquired the patents before February 2005, his transfer to SRA was effective.

As a final note, Defendants falsely accuse Egger of fraud and misconduct. Defendants' effort is irrelevant to their motion, and unavailing in any event. It is irrelevant because the February 2005 assignment from Site/Tech to Egger has nothing to do with the chain of title in this case. It is unavailing because that assignment, which merely functioned as replacement for a lost assignment, has been fully ratified by Site/Tech. In short, Defendants' attempts to smear Egger should be disregarded.

## II.    STATEMENT OF FACTS

Egger invented search engines employing link analysis, and SRA owns the patents-in-suit. The early history of the patents-in-suit is undisputed. In June 1993, Egger applied for what would become the '352 Patent. *Ex. 1.* In November 1993, Egger assigned the June 1993 patent application to Libertech, Inc. ("Libertech"). *Ex. 2.* In May 1996, Egger and two colleagues applied for what would become the '494 and '571 Patents. *Ex. 3.* In June 1996, Egger and his colleagues assigned the May 1996 patent application to Libertech. *Ex. 4.* In August 1996, Libertech changed its name to Site/Technologies/Inc. ("Site/Tech"). *Ex. 5.* Site/Tech was acquired by DeltaPoint, Inc. ("DeltaPoint"), which later changed its name to Site Technologies, Inc. and will be referred to herein as "Site Tech."

A.    **In July 1997, Site/Tech, the undisputed owner of the patents-in-suit at the time, transferred the patents to Site Tech.**

In July 1997, Site Tech acquired Site/Tech in what was intended to be a *de facto* merger transaction that placed all the stock and, separately, all of the assets of Site/Tech (including the patents-in-suit) in Site Tech.  For tax reasons, the parties structured the acquisition as a stock exchange with a distribution of assets into the parent, rather than as a formal merger.  *See Ex. 6* ("The transaction must be structured as a stock exchange, rather than a merger, to make it taxable.").  The parties, though, also intended to merge the operations and assets of Site/Tech into Site Tech, as confirmed by Site Tech's CEO and documents executed in connection with the transaction.  *See, e.g., Ex. 7*, ¶ 2 ("The purpose of this transaction was to merge the business of Site/Tech into DeltaPoint, Inc."); *Ex. 8* ("DeltaPoint intends to continue the business of Site after the date hereof and integrate such business into DeltaPoint's ongoing business.").

Because the parties intended to merge the operations of Site/Tech into Site Tech without a formal merger, just three days before the acquisition, Site/Tech amended its certificate of incorporation to make the anticipated stock exchange trigger the liquidation preferences and distribution provisions of Site/Tech.  *See Ex. 10* ("In the event of ... a sale of all or substantially all of ... the stock of the corporation, ... such event shall be treated as a liquidation ....."); *Ex. 9* (Site/Tech special board minutes, referencing liquidation); *Ex. 6* ("This will require an amendment to the company's articles to make it absolutely clear that an exchange is a liquidation.").  These provisions mandated "distributions to the shareholders of the corporation." *Ex. 10*.  Specifically, following payment of a sum of money to the preferred stockholders, "the entire remaining assets and funds of the corporation legally available for distribution, if any, shall be distributed ratably among the [preferred stock]holders .... Thereafter, any remaining assets and funds legally available for distribution hereunder shall be distributed solely to the

3

holders of the Common Stock." *Ex. 10*. The stock exchange agreement prescribed that Site

Tech (then still known as DeltaPoint) would become the sole stockholder of Site/Tech following

the stock exchange. *See Ex. 11*. Thus, Site/Tech's amended certificate of incorporation operated

to distribute its patents and other assets to its sole shareholder Site Tech upon consummation of

the stock exchange and subsequent stock distribution. *See Ex. 7, ¶ 2* ("In this transaction,

DeltaPoint directly acquired all outstanding stock of Site/Tech and all of the then-existing assets

of the company, including its patents and trademarks.").

After the acquisition, Site Tech repeatedly confirmed that it had acquired the patents from

Site/Tech. In five separate SEC filings, Site Tech reported: "On July 11, 1997, the Company

acquired the shares of Site/technologies/inc. ("Site") for an aggregate purchase price of

$638,000.... In exchange the Company's received *all outstanding assets* of Site." *See Exs. 12-16*

(emphasis supplied). Further, in each of three separate SEC filings, Site Tech repeated six times

that it had acquired specific technologies through its acquisition of Site/Tech. *See Exs. 13-15*;

*see also Ex. 16* (making four such statements). For example: "In July 1997, the Company

acquired Site/technologies/inc. ... pursuant to which the Company acquired, among other things,

SiteSweeper 1.0, a Web site quality control and maintenance product." *Exs. 13-16*. Likewise,

Site Tech updated its balance sheet to reflect its acquisition of Site/Tech's assets: "The pro forma

condensed balance sheet reflects the effects of the acquisition of Site based upon the fair market

value of *the acquired assets* and liabilities on July 11, 1997...." *Exs. 12-16* (emphasis supplied).

Most pointedly, in a 1998 SEC filing, Site Tech reported that it had acquired the patents-in-suit

as part of the Site/Tech acquisition: "[The] V-Search technology and related patents ... was

technology that the Company acquired in the Site Tech Acquisition." *Ex. 17*.

4

B.    **After July 1997, Site Tech and Site/Tech merged corporate personalities.**

Following the July 1997 acquisition, Site Tech and Site/Tech merged corporate personalities.  For starters, Site Tech changed its name from "DeltaPoint, Inc." to "Site Technologies, Inc.," effectively adopting the persona of the *de facto* merged subsidiary.  *Ex. 7, ¶ 2*; *Ex. 18*; *Ex. 23*.  Site Tech also adopted Site/Tech's trademarks, email addresses, web address, and developed and sold Site/Tech's former products as its own.  *Ex. 7, ¶ 2*.  The companies also merged principal offices; Site/Tech moved its principal office from North Carolina to Site Tech's principal office in California.  *Ex. 19*.

Site/Tech's operations also merged into Site Tech.  *Ex. 7, ¶ 2*.  Site/Tech no longer maintained adequate capitalization, having no significant assets or equity.  *See Ex. 20*.  Site/Tech took no money in loans, and its stock structure consisted of fewer than 1,000 shares—all owned by Site Tech.  *Ex. 21*; *Ex. 22*; *Ex. 7, ¶ 2*.  Site/Tech had no separate employees.  *Ex. 11*; *Ex. 7, ¶ 2*.  Instead, all of Site/Tech's employees prior to the stock exchange either left the company or became Site Tech employees following the stock exchange.  *Ex. 11*; *Ex. 7, ¶ 2*.  Site Tech conducted Site/Tech's few remaining business affairs on Site/Tech's behalf.  For example, Site Tech prepared and maintained Site/Tech's tax records.  *Ex. 7, ¶ 2*.  Site/Tech also did not segregate its corporate records from those of Site Tech.  *Ex. 7, ¶ 3*.  In fact, Site/Tech maintained no corporate records at all.  *Ex. 7, ¶ 3*.  Further, Site/Tech disregarded corporate formalities.  For example, it held no director meetings or shareholder meetings.  *Ex. 7, ¶ 3*.  It made no decisions, and took no actions, separate from Site Tech.  *Ex. 7, ¶ 3*.  Site/Tech also engaged in no business activity of its own.  *Ex. 7, ¶¶ 2, 3*.  It designed nothing, produced nothing, marketed nothing, and sold nothing.  *Ex. 7, ¶ 2*.  It had no significant costs or revenues.  *Ex. 7, ¶ 2*; *Ex. 20*.  Indeed, Site/Tech maintained no bank account separate from Site Tech's bank account.  *Ex. 7, ¶ 3*.  Site/Tech did not segregate any assets from Site Tech's assets.  *Ex. 7, ¶ 3*.

Finally, Site Tech exercised complete control over Site/Tech. Site Tech owned 100% of Site/Tech's stock. *Ex. 11*. Site Tech's directors and officers were Site/Tech's directors and officers. *Ex. 11*, ¶ 5.7; *Ex. 28*. In short, Site Tech made all of Site/Tech's decisions and took all of Site/Tech's actions. Site/Tech and Site Tech merged corporate personalities.

**C.    In September 1998, Site Tech sold and assigned the patents-in-suit to Egger, and Site/Tech was bound by the assignment.**

In September 1998, Site Tech and Egger entered into a Bill of Sale, Assignment and License Agreement ("the assignment"), to which Site/Tech also was bound, that sold and assigned the patents-in-suit to Egger. *Ex. 24*. Site Tech represented to Egger that Site Tech had specifically warranted in 1998 that it was transferring "good and marketable title," that it was the "sole owners," and that it had "full right to convey the entire interest" in the patents. *Ex. 24*. Egger executed the assignment on his own behalf. *Ex. 24*. Jeffrey Ait, the CEO of Site/Tech and Site Tech, executed the assignment on behalf of both companies. *Ex. 7*, ¶ 6. Indeed, Site/Tech had authorized Ait to assign the patents to Egger in Site Tech's name. *Ex. 7*, ¶ 6. The intent of all parties was to transfer the patents-in-suit to Daniel Egger, who paid $100,000 for the patents-in-suit. *Ex. 7*, ¶¶ 5-6. Ait later delivered the technology and physical property to Egger. *Ex. 17*; *Ex. 7*, ¶ 6. Neither Site/Tech nor Site Tech thereafter represented that it owned the patents-in-suit. *Ex. 7*, ¶ 6.

**D.    In December 2000, Site/Tech formally was merged into Site Tech and transferred all its remaining assets to Site Tech.**

In December 2000, Site/Tech formally was merged into Site Tech. *Exs. 29-31*. Site/Tech thereby transferred whatever assets it possessed at that point to Site Tech. Therefore, if Site/Tech still possessed the patents-in-suit in December 2000, Site Tech undoubtedly owned them from that point forward. Defendants agree. *See* Defendants' Motion at 5, 11.

## III.    ARGUMENT AND AUTHORITIES

**A.    Egger acquired the patents in September 1998.**

Egger acquired the patents in September 1998 in accordance with a Bill of Sale, Assignment and License Agreement. *Ex. 24.*

> 1.    Site Tech owned the patents in September 1998, having acquired them from Site/Tech in July 1997.

Site Tech acquired the patents from Site/Tech in connection with Site Tech's July 1997 acquisition of Site/Tech. Defendants incorrectly assert that the July 1997 acquisition involved only a stock transfer. *See* Defendants' Motion, at 9, n.9. To the contrary, Site/Tech also transferred its assets, including the patents. *See, e.g., Ex. 7,* ¶ 2.

> a.    Site Tech acquired the patents by operation of law.

Federal Circuit law recognizes that patents can be conveyed by operation of law:

> We conclude that the district court's focus solely on section 261 was erroneous. Section 154 of Title 35 states that "[e]very patent shall contain a short title of the invention and a grant to the patentee, his heirs or assigns, of the right to exclude others from making, using, offering for sale, or selling the invention throughout the United States...." 35 U.S.C. § 154(a)(1) (emphasis added). As both parties note, patent ownership may be transferred by assignment, and section 261 addresses such a transfer – requiring assignments to be in writing. See 35 U.S.C. § 261. However, there is nothing that limits assignment as the only means for transferring patent ownership. Indeed, the case law illustrates that ownership of a patent may be changed by operation of law.

*Akazawa v. Link New Tech. Int'l, Inc.*, 520 F.3d 1354, 1356 (Fed. Cir. 2008) (emphasis omitted).

In this case, Site/Tech transferred its patents to Site Tech by operation of law through its certificate of incorporation. Three days before the stock exchange between the two companies, Site/Tech's board amended Site/Tech's certificate of incorporation to make the sale of Site/Tech's stock to Site Tech a triggering event for purposes of distribution in accordance with the company's distribution preferences: "In the event of ... a sale of all or substantially all of ... the stock of the corporation, ... such event shall be treated as a liquidation, dissolution or winding

up within the meaning of this Section." *See Ex. 10.* The phrase "the stock of the corporation" previously was not present in Site/Tech's restated certificate of incorporation, and had to be added to make the upcoming stock acquisition by Site Tech a deemed "liquidation event" within the meaning of the certificate of incorporation.[3] *See Ex. 10.*

Site Tech's acquisition of Site/Tech's stock triggered a liquidation event under Site/Tech's amended certificate of incorporation, which in turn resulted in the distribution of Site/Tech's assets, including the patents-in-suit, to Site Tech.[4]  Several of Site Tech's contemporaneous SEC filings—all of which Defendants incorrectly and cavalierly dismiss as "inaccurate"—confirm that "[i]n exchange [Site Tech] received all outstanding assets of [Site/Tech]." *See, e.g., Ex. 12.*

The deemed liquidation event mandated a distribution of assets in accordance with the liquidation preferences of the certificate of incorporation, which provided:

> In the event of any liquidation, dissolution, or winding up of the corporation (or the deemed occurrence of such event pursuant to subsection (d) below), either voluntary or involuntary, *distributions to the shareholders* of the corporation *shall be made* in the following manner:

*Ex. 10* (emphasis supplied).  The Stock Exchange Agreement further provided that preferred stock and treasury stock of Site/Tech was cancelled, leaving the common stock transferred to Site Tech as the only stock left in the company.  *See Ex. 11.*  Since only common stock of Site/Tech remained, § IV.(B)2b of the Amended Certificate was invoked, resulting in a distribution of the assets to DeltaPoint, the sole common stockholder:

> (b)  Distribution after Payment of Liquidation Preferences.  Thereafter, *any remaining assets* and funds legally available for distribution hereunder *shall be*

---

[3] The amendment to the certificate of incorporation ("Amended Certificate") was included as an exhibit to the purchase agreement.  The Amended Certificate, with this new triggering mechanism, became effective on July 11, 1997—the same day Site Tech acquired Site/Tech's stock. *Ex. 10.*

[4] On July 3, 1997, Site/Tech's Steve Mendel wrote:  "The transaction must be structured as a stock exchange, rather than a merger, to make it taxable.  This will require an amendment to the company's articles to make it absolutely clear that an exchange is a liquidation." *Ex. 6.*

> *distributed* solely to the holders of the Common Stock in a manner such that the
> remaining amount distributed to each holder of Common Stock ...

*Ex. 10* (emphasis supplied). Thus, immediately after the stock exchange, Site/Tech distributed

its assets, including the patents-in-suit, to Site Tech.

A similar and recent case from this District applied the holding of *Akazawa* and found

that legal title to patents transferred by operation of state law in a foreclosure proceeding. *See*

*Sky Techs. LLC v. SAP AG*, 2008 WL 2775487, *1 (E.D. Tex. July 15, 2008). In denying the

defendants' motion to dismiss for lack of standing, Judge Folsom held that "ownership of a

patent may be changed by operation of law." *See Ex. 25, Sky Technologies LLC v. SAP AG*,

Civil Action No. 2:06-CV-440 (DF), Order dated June 4, 2008, at 10. Judge Folsom further

noted that the Federal Circuit's recent holding in *Akazawa* rejects the argument that a writing is

required to fully transfer legal title when an operation of law conveys title. *See id.* at 18.

Accordingly, the *Sky Technologies* court determined and found that a security agreement and

subsequent foreclosure transferred the patent by operation of law. *See id.*

In this case, the controlling Delaware law specifically provides that assets may be

transferred upon a distribution of the type provided in the Amended Certificate. Section 173 of

Delaware's General Corporate Law allows for the payment of dividends in kind. The statute

allows dividends to be paid "in cash, in property, or in shares of corporation's capital stock."

8 Del. C. 1953, § 173. In this case, the patents transferred by operation of law.

The distribution of Site/Tech's assets to Site Tech as part of the July 1997 transaction has

been confirmed numerous times in sworn, written certifications by Site/Tech's officers and by

Site Tech (at that time still named "DeltaPoint") in SEC filings, press releases, and in a declaration attached to this Response:[5]

- "On July 11, 1997, the Company acquired the shares of Site/technologies/inc. ("Site") for an aggregate purchase price of $638,000.... *In exchange the Company's received all outstanding assets of Site.* The Company will record the expense related to purchased in-process technology of approximately $500,000 during the third quarter of 1997." *Ex. 12* (emphasis supplied).

- "On July 11, 1997, the Company acquired the shares of Site/technologies/inc. ("Site") for an aggregate purchase price of $638,000.... In exchange the Company acquired all the outstanding shares *and assets* of Site." *Ex. 16* (emphasis supplied).

- "In exchange the Company acquired all the outstanding shares *and assets* of Site." *Ex. 13* (emphasis supplied).

- "In exchange the Company acquired all the outstanding shares *and assets* of Site." *Ex. 14* (emphasis supplied).

- "In exchange the Company acquired all the outstanding shares *and assets* of Site." *Ex. 15* (emphasis supplied).

- The SEC filings further call out specific assets that were acquired during the acquisition: "Increase in Accounts Receivable is equal to Site's accounts receivable of $8,000 at 7/11/97 *which Deltapoint acquired.*"; "Increase in Property and Equipment is equal to Site's property and equipment of $67,000 at 7/11/97 *which Deltapoint acquired.*" *Ex. 12* (emphasis supplied).

- "On September 30, 1998, [Site Tech] consummated the sale of its V-Search technology and related patents [i.e. the Patents]. *This was technology that the Company acquired in the [Site/Tech] Acquisition.* The Company sold the assets relating to V-Search in cash to Daniel Edgar [*sic*]. The Company received a cash payment of $100,000." *Ex. 17* (emphasis supplied).

Each of these SEC filings was certified by Jeffrey Ait, the Chief Executive Officer of both the parent Site Tech and the subsidiary Site/Tech.[6] *Ex. 7, ¶ 6.* These post-conveyance affirmations are strong evidence of the transfer. *See COR Mktg. & Sales, Inc. v. Greyhawk Corp.*, 994 F.

---

[5] For example: "In July 1997, the Company acquired Site/technologies/inc. . . . pursuant to which the Company acquired, among other things, SiteSweeper 1.0, a Web site quality control and maintenance product." *Exs. 13-16.* The assets were added to the balance sheet of Site Tech: "The pro forma condensed balance sheet reflects the effects of the acquisition . . . based upon the fair market value of the acquired assets and liabilities on July 11, 1997, as if such acquisition had been consummated on June 30, 1997." *Exs. 12-16.*

[6] The patents-in-suit were specifically listed as an asset in the schedules to the Stock Exchange Agreement. *Ex. 33.* Furthermore, Site Tech's 1998 sale of the V-Search technology and patents to Daniel Egger is also described in Site Tech's 10-QSB filed on September 30, 1998. *Ex. 17.*

Supp. 437, 444 (W.D.N.Y. 1998) (considering post-transaction statements as evidence of an assignment).

Site Tech also warranted that it had legal title to the patents-in-suit in two further documents: the 1998 Bill of Sale to Daniel Egger and the 1998 Assignment to Daniel Egger. *See Ex. 24.* Both warranties further corroborate the SEC filings that the assets, including the patents-in-suit, were transferred from the subsidiary to the parent in connection with the 1997 acquisition.[7]

      b.      <u>Site Tech acquired the patents by written conveyance.</u>

Further, even if Section 261's writing requirement did apply, it was satisfied because the distribution clause in the certificate of incorporation constitutes a written conveyance instrument. The Federal Circuit has specifically stated that written transfers of patents through stock ownership and other successorship transactions satisfy Section 261:

> 35 U.S.C. § 261 provides that "applications for patent, patents, or any interest therein" are assignable "by an instrument in writing." The patent statutes allow the instrument that assigns "any interest" to take the form of a patent license or any other written instrument that transfers patent rights. The type of written instrument (e.g., license or assignment agreement, *dissolution agreement*, or *merger agreement*) and the factual context in which the instrument is created is irrelevant—this does not provide a basis for divorcing the standing analysis from the patent statutes.

*Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1338 n.3 (Fed. Cir. 2007) (emphasis supplied).

Here, the written instrument stated as follows:

> In the event of any liquidation, dissolution, or winding up of the corporation (or the deemed occurrence of such event pursuant to subsection (d) below), either voluntary or involuntary, *distributions to the shareholders* of the corporation *shall be made* in the following manner ... *any remaining assets* [after satisfying

---

[7] The 1998 Bill of Sale to Egger warranted, "Seller [Site Tech] warrants that it hereby transfers good and marketable title to the Purchased Assets, free and clear of all liabilities, mortgages, liens, pledges, charges, security interests, encumbrances, or title retention agreements of any kind or nature." *Ex. 24.* The 1998 Assignment warranted: "[Assignor] is the sole owner of Patent number 5,544,352," and "THE UNDERSIGNED HEREBY covenants and agrees that it has full right to convey the entire interest herein assigned, and that it has not executed, and will not execute, any agreement in conflict herewith." *Ex. 24.*

11

liquidated preferences] and funds legally available for distribution hereunder *shall be distributed* solely to the holders of the Common Stock…

*Ex. 10.*[8]

The patents-in-suit were transferred in 1997 from Site/Tech to Site Tech by an operation of law endorsed by *Akazawa* and through the writing requirement satisfied by the distribution clause of the certificate of incorporation as evidenced by the subsequent SEC filing.

### c.    Site Tech acquired the patents by ratification.

Alternatively, Site/Tech transferred the patents to Site Tech in connection with the July 1997 acquisition by virtue of the ratification doctrine. Under this doctrine, where a board of directors has notice of a transfer, does not object to the transfer, and retains the fruits of the transfer, it is held as a matter of law to have approved the transfer by ratification. *See Hannigan v. Italo Petrol. Corp. of Am.*, 47 A.2d 169, 171-72 (Del. 1945). Here, all the parties to the July 1997 acquisition, including Site/Tech's board, intended that Site/Tech would distribute all its assets as a dividend to the common stockholder, which was Site Tech, as part of the acquisition. Indeed, the Site/Tech board of directors amended its certificate of incorporation to achieve this very purpose. Further, it is undisputed that Site/Tech did not object to the transfer—which is hardly surprising, as the board members were the same for both companies—when Site Tech repeatedly represented in public filings that it had acquired the patents from Site/Tech. *Ex. 11,* ¶ 5.7. Finally, it is undisputed that the Site/Tech board retained the fruits of the acquisition. Thus, the Site/Tech board ratified the July 1997 transfer of the patents from Site/Tech to Site Tech. *See, e.g., CarrAmerica Realty Corp. v. Kaidanow*, 321 F.3d 165, 173 (D.C. Cir. 2003)

---

[8] General conveyances of "all assets" of a company are operative to convey patents. *See, e.g., CMS Indus., Inc. v. L.P.S. Int'l, Ltd.*, 643 F.2d 289, 292 (5th Cir. 1981) ("In February 1973, all assets of Stoplifter were transferred to Stop-Loss, Inc. (Stop-Loss) another majority-held subsidiary of SEE. It is undisputed that whatever rights in the patents existed in Stoplifter were validly transferred to Stop-Loss."); *Intel Corp. v. Broadcom*, 173 F. Supp. 2d 201, 209 (D. Del. 2001); *Surfer Internet Broadcasting of Mississippi v. XM Satellite Radio, Inc.*, 2008 WL 1868426, *1 (N.D. Miss. 2008); *Mechmetals Corp. v. Telex Comp. Prods., Inc.*, 709 F.2d 1287, 1290 (9th Cir. 1983).

(applying Delaware law, the Court held "that the Board took necessary steps to ratify the issuance of the shares at the December 1998 Board meeting, at least through implied ratification.").

2.    Even assuming Site Tech did not own the patents in September 1998, the subsidiary Site/Tech also was bound by the assignment to Egger.

Even if Defendants were correct that Site/Tech, not Site Tech, was the owner of the patents in September 1998, it makes no difference because Site/Tech was bound to Site Tech's September 1998 sale and assignment to Egger.

a.    Site/Tech was bound because it was the alter ego of Site Tech.

Site/Tech was bound to the 1998 Bill of Sale and Assignment because Site/Tech and Site Tech were in substance the same entity. Alter ego is determined under the law of the state of incorporation. *See Davaco, Inc. v. AZ3, Inc.*, 2008 WL 2243382, *1 (N.D. Tex. May 30, 2008). In this case, Delaware law provides that separate corporate entities will be disregarded "in the interest of justice, when such matters as fraud, contravention of law or contract, public wrong, or where equitable consideration among members of the corporation require it...." *Pauley Petrol. Inc. v. Continental Oil Co.*, 239 A.2d 629, 633 (Del. 1968). Delaware applies the same factors to determine alter ego that have been applied in the Fifth Circuit and other jurisdictions. *Compare Alberto v. Diversified Group, Inc.*, 55 F.3d 201, 205-06 (5th Cir. 1995) (applying Delaware alter ego factors) *and TIP Sys., LLC v. SBC Operations, Inc.*, 536 F. Supp. 2d 745, 754-55 (S.D. Tex. 2008) (alter ego factors applied in patent case).

Here, Site/Tech and Site Tech had an alter ego relationship after the July 1997 *de facto* merger; the following factors overwhelmingly demonstrate the alter ego relationship:

- Site/Tech was wholly-owned by Site Tech. *Ex. 11*.

- Site Tech and Site/Tech had *identical* directors and officers. *Id.*

13

- Site Tech and Site/Tech had the same business department. *Ex. 7,* ¶ 2. Site/Tech had no employees or operations of its own; instead, all of Site/Tech's operations were conducted through Site Tech. *Id.*

- Site Tech and Site/Tech filed consolidated financial statements and Site Tech filed Site/Tech's tax returns on its behalf. *Id.*

- Site Tech financed Site/Tech. *Id.* In fact, Site/Tech had negligible assets from which to operate. *See Ex. 20; Ex. 7,* ¶ 2.

- Site Tech did not cause Site/Tech's incorporation. However, Site/Tech wholly owned Site Tech and turned it into a shell entity after acquiring it. *Ex. 11.*

- Site/Tech had essentially no assets, it had no equity, it took no money in loans, and its stock structure consisted of fewer than 1,000 shares—all owned by Site Tech. *Ex. 7,* ¶ 2; *Exs. 20-22.*

- Site Tech directly employed all of Site/Tech's former employees and paid virtually all its expenses. *Ex. 7,* ¶ 2.

- Site/Tech did not receive any independent business; its sole source of revenue in fact was royalties paid it by Site Tech. Site/Tech had no further business—it designed nothing, produced nothing, marketed nothing, and sold nothing. *Id.* It had no significant costs or revenues. *Id.*

- Site Tech used, and represented that it owned, all of Site/Tech's assets. *Id.*

- Site/Tech had no independent daily operations; all its daily operations were assumed by Site Tech following the stock exchange. *Id.*

- Site/Tech failed to observe such formalities; it neither kept separate books and records nor held shareholder meetings nor held board meetings. *Id.* ¶ 3.

- Site/Tech's directors and officers took orders from Site Tech and acted in Site Tech's interest; the companies had the same directors and officers. *Ex. 11.*

- The person who signed the bill of sale and assignment was Jeffrey Ait, a director and the CEO of both Site Tech and Site/Tech. *Ex. 7,* ¶ 1.

- Site Tech changed its name from "DeltaPoint" to "Site Technologies, Inc." to adopt the persona of "Site/Technologies/Inc." *Ex. 7,* ¶ 2; *Ex. 18; Ex. 23.* Site Tech and Site/Tech employed the same website and email addresses. *Ex. 7,* ¶ 2.

- Site Tech and Site/Tech had the same bank account. *Ex. 7,* ¶ 3.

- Site Tech represented that it was liable for the debts of Site/Tech and assumed Site/Tech's liabilities in connection with the stock exchange. *Exs. 12-16.*

14

- Site/Tech moved its principal office from North Carolina to Site Tech's office in California. *Ex. 19.*

In short, the two entities were "one and the same." *Cf. Equitable Trust Co. v. Gallagher*, 99 A.2d 490, 493 (Del. 1953). Therefore, the patents-in-suit were transferred to Egger by the 1998 bill of sale and assignment, or any of the subsequent acts confirming the transfer of the patents-in-suit to Egger.

Further, if this Court were to disregard the evidence demonstrating that the parent Site Tech owned the patents when it sold them to Egger, finding an alter ego relationship would be necessary to prevent an injustice to Egger. Site Tech represented and warranted to Egger that it had and was transferring title to the patents. *Ex. 24.* The assignment benefited all three parties. For Site Tech and Site/Tech, it provided $100,000 in needed funds. *Ex. 17.* For Egger, it returned to him the rights to his inventions, into which he had invested his personal funds and years of his life. The assignment also harmed no one's interests. In other words, it created net social value. All three entities also intended the assignment—and still intend it today. *See Ex. 7,* ¶ 6. From 1998 to today, nobody has ever disputed the assignment, except for Defendants.

The alter ego doctrine and the interests of justice dictate that Site/Tech was bound by the Bill of Sale and Assignment and subsequent confirmations.

      b.    <u>Site/Tech was bound to the assignment, because it had authorized Site Tech to assign the patents to Egger in Site Tech's name.</u>

Agency principles also dictate that Site/Tech was bound by the 1998 Bill of Sale and Assignment. Specifically, Site/Tech had authorized Site Tech to assign the patents to Egger in Site Tech's name.

Patent assignments are subject to rules of construction that apply to contracts generally, and the manifest intention of the parties is of primary concern in construing the assignment. *See Nicolson Pavement Co. v. Jenkins*, 81 U.S. 452, 456 (1871) ("An assignment of an interest in an

invention secured by letters-patent, is a contract, and like all other contracts is to be construed so as to carry out the intention of the parties to it."); *Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.*, 944 F.2d 870, 874 (Fed. Cir. 1991).

Jeffrey Ait, as the CEO of Site/Tech and as a director of Site/Tech, was an authorized agent for Site/Tech. *See Ex. 7,* ¶ 6.    Furthermore, Ait was explicitly authorized by both the parent Site Tech and the subsidiary Site/Tech to sell the patents-in-suit to Daniel Egger in either party's name. *See Id.* Ait regularly exercised control over the former property of the subsidiary Site/Tech, and engaged in more than one transaction in the name of Site Tech disposing of assets that were obtained during the acquisition of Site/Tech. *See Id.* As an agent of the subsidiary Site/Tech, Ait's knowledge and his acts concerning this transaction are imputed to Site/Tech.

Because Ait's knowledge and acts are imputed to Site/Tech, Site/Tech made repeated representations to Daniel Egger and to the public at large that the parent company Site Tech owned the patents, and therefore had the authority to sell the patents:

- In multiple SEC filings and accounting statements, Ait represented that Site Tech, acquired all assets, including the patents, of Site/Tech and described assets allegedly belonging to Site/Tech as assets of Site Tech. *Ex. 12-16.*

- Ait executed a warranty of title in the Bill of Sale indicating that the parent corporation Site Tech owned the patents and was transferring valid title to Daniel Egger. *Ex. 24.*

The actions of the agents of both Site Tech and Site/Tech also give rise to an agency relationship between Site/Tech and Site Tech with respect to the sale of the patents-in-suit to Egger.    As such, Site/Tech would be bound to the 1998 Assignments as a party under the doctrines of actual authority, apparent authority, and ratification.

     (i)     *Site Tech had the actual authority from Site/Tech to transfer the patents in its own name.*

An agency relationship need not be an explicit agreement, but also is found when there are facts and circumstances giving rise to a relationship that should affect the legal relations of the parties. Under California law, an agent need not hold himself out as an agent to bind a principal. *Porter v. Arthur Murray, Inc.*, 249 Cal. App. 2d 410, 420 (Cal. Ct. App. 1967) ("one may be the agent of another without holding himself out to be such agent."). Similarly, a contract is enforceable against a principal even though the principal is not a named party to the instrument.[9]

California Civil Code § 2299 provides: "[A]n agency is actual when the agent is really employed by the principal."[10] Actual authority "is such as a principal intentionally confers upon the agent, or intentionally, or by want of ordinary care, allows the agent to believe himself to possess." Cal. Civ. Code § 2316 (2008).

Ait, the CEO and a director of the subsidiary Site/Tech as well as the parent company Site Tech, executed a conveyance transferring the patents-in-suit to Egger. *Ex. 24.* This represents an explicit written directive from an authorized agent of Site/Tech for Site Tech to convey the patents in the name of Site Tech to Egger, thereby creating a special agency between

---

[9] The fact that the 1998 Bill of Sale and Assignment is in the name of Site Tech is not an obstacle to applying California agency law to bind Site/Tech. *Sterling v. Taylor*, 152 P.3d 420, 430 (Cal. 2007) (omission of the actual owner of the properties from contract for the sale of land was permissible because a contract made in the name of an agent may be enforced against an undisclosed principal); *Sumner v. Flowers*, 279 P.2d 772, 774 (Cal. Ct. App. 1955) ("'The contract of the agent is the contract of the principal, and he may sue or be sued thereon, though not named therein....,'" quoting *Ford v. Williams*, 62 U.S. 287, 289 (1858)). California law has no prohibition against allowing agents to transact in their own name in cases of special agencies—and the agency at issue is a special agency to sell the patents-in-suit, not one of general terms. Cal. Civ. Code §§ 2297, 2322 (2008). Furthermore, when an agent is vested with control over the property and the right to receive payment for that property, the agent has "ostensible authority to deal with the property of his principal as his own," including transacting in his own name. Cal. Civ. Code §§ 2026, 2069 (2008); *see Pacific Fin. Corp. v. Foust*, 285 P.2d 632, 634-35 (Cal. 1955) (finding that the principal is bound under California Civil Code Section 2069 despite the agent's transacting in his own name). Accordingly, under agency principles, Site/Tech was bound as a party to the 1998 Bill of Sale and Assignment and transferred legal title to Daniel Egger.

[10] Because Site Tech was a California company, California law applies to determine agency. Restatement (Second) of Conflicts of Laws § 292(2) ("local law of the state where the agent dealt with the third person").

the entities for the purpose of selling the patents.[11]  *See id.* §§ 2297, 2299.  Furthermore, Ait has

declared that it was the intent of both entities to transfer the patents to Daniel Egger and that

Site/Tech had authorized Site Tech to convey the patents to Egger in its own name through the

1998 Bill of Sale.  *Ex. 7*, ¶¶ 6-7.  As such, Site/Tech is bound as a party to the 1998 Bill of Sale

and Assignment, and the patents-in-suit were conveyed to Egger.  *See Kothmann Enters., Inc. v.*

*Trinity Indus., Inc.*, 394 F. Supp. 2d 923, 941-42 (S.D. Tex. 2005).[12]

Furthermore, Site Tech owned 100% of the outstanding stock of Site/Tech.  *Ex. 21*; *Ex.*

*22*; *Ex. 7*, ¶ 2.  Thus, Site Tech, as a 100% shareholder, had the power and authority to transfer

the assets of Site/Tech, further strengthening the conclusion that Site Tech was an agent for

Site/Tech.  *See also* Del. Code Ann. tit. 8, § 271(a) & (c) (2008)[13] (indicating that every

corporation has the right to "lease or exchange all or substantially all of [the] property and

assets" of its wholly owned subsidiaries).[14]

> (ii)    *Site Tech also had the ostensible or apparent authority to transfer*
> *the patents-in-suit.*

Site/Tech also is bound to the 1998 Bill of Sale and Assignment under the doctrine of

ostensible or apparent authority.

California Civil Code Section 2317 provides: "Ostensible authority is such as a principal,

intentionally or by want of ordinary care, causes or allows a third person to believe the agent to

---

[11] At a minimum, it would also represent a failure of ordinary care by Site/Tech allowing Site Tech to believe it had the authority of Site/Tech to transfer the patents to Daniel Egger, which would also create actual authority by the subsidiary for the parent to transfer the patents to Daniel Egger.

[12] Courts have bound a corporation to the acts of an affiliated company if the intent of the parties was clear.  In *Kothmann Enterprises*, the Court granted summary judgment in favor of the plaintiff regarding ownership of a patent, even though the plaintiff had obtained a written assignment of rights from an affiliated corporation that did not yet possess legal title.  394 F. Supp. 2d at 941-42.  The court relied on evidence that both corporations had a single, common owner, and it was clear from the documents that the owner intended to transfer rights in patent to plaintiff.  Here, the same intent of the parties is clear:  Egger was to receive full legal title to the patents-in-suit in exchange for $100,000.  *See Ex. 7*, ¶ 6.

[13] Delaware law applies because Site/Tech is a corporation duly formed and incorporated in Delaware.

[14] Further, "the property and assets of the corporation include the property and assets of any subsidiary of the corporation . . ." Del. Code Ann. tit. 8, §271(c) (2008).

possess." Under California law, a principal is bound by the acts of his agent, under a merely

ostensible authority, to those persons only who have in good faith, and without want of ordinary

care, incurred a liability or parted with value, upon the faith thereof. Cal. Civ. Code § 2334

(2008).

Under the doctrine of apparent authority, a principal may be bound to a contract entered

into by an actor who was not considered an agent by the principal at the time if the principal

made manifestations that would cause a third party to reasonably believe that the actor had

authority to enter into the transaction.[15]

Site/Tech's repeated representations through Ait, Site/Tech's CEO, that Site Tech owned

the patents-in-suit and had the authority to transfer those patents in its name created a reasonable

belief by Egger that Site Tech had both the authority and the right to transfer the patents in its

name. Having cloaked Site Tech with the authority to sell the patents in the 1998 Bill of Sale

and Assignment, Site/Tech is bound to the 1998 Bill of Sale and Assignment. *See People*

*Express Pilot Merger Comm. v. Texas Air Corp.*, 1987 WL 18450, *4 (D.N.J. 1987), *aff'd*, 958

F.2d 364 (3d Cir.), *cert. denied*, 506 U.S. 864 (1992) (finding that two parent companies acted

---

[15] Restatement of Agency (Third) § 2.03 (emphasis added) provides:

> Apparent authority is the power held by an agent *or other actor* to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations. . . . *The definition in this section does not presuppose the present or prior existence of an agency relationship as defined in § 1.01.*

*See also Borders Online, LLC v. State Bd. of Equalization*, 129 Cal. App. 4th 1179, 1191 (Cal. Ct. App. 2005) (principal is bound by agency relationship regardless of its "subjective belief"); *Scholastic Book Clubs, Inc. v. State Bd. of Equalization*, 207 Cal. App. 3d 734, 737-38 (Cal. Ct. App. 1989) ("based on conduct and circumstances" agent acted with apparent authority by distributing offer sheets and forwarding orders to principal); *Dep't of Banking & Fin. v. Davis*, 416 N.W.2d 566, 569-70 (Neb. 1987) (undisclosed principal, the assignee of a mortgage, granted "the apparent authority to act as its agent" to original mortgagee by allowing original mortgagee "to represent itself as mortgagee with full ownership of the mortgage and the secured debt and full authority to service the debt"); *McDaniel v. Hensons', Inc.*, 493 S.E.2d 529, 530 (Ga. Ct. App. 1997) (jury question whether agent had either actual or apparent authority on behalf of undisclosed principal in contracting for improvements to land owned by principal); *Handy v. C.I.T. Corp.*, 197 N.E. 64, 67 (Mass. 1935) (automobile dealer who was in fact agent of undisclosed principal had apparent authority as to transactions in usual and ordinary course of business conducted with third party who reasonably believed agent to be owner).

19

with apparent authority to bind their subsidiaries because, in one instance, the negotiator was

president of both the parent and the subsidiary, and in the other, the parent and the subsidiary had

"sufficiently overlapping directorship, management, and employee staff.").

In a similar case, *Regency Centers, L.P. v. Civic Partners Vista Village I, LLC*, California

law was applied to find an implied agency relationship to manifest the parties' intentions. 2008

WL 2358860, at *13 (Cal. Ct. App. June 11, 2008). In that case, Regency Centers, L.P. intended

to exercise an option granted to it by Civic, and Civic was aware of Regency Centers, L.P.'s

intentions. *Id.* Regency Centers, L.P. sent a letter to Civic on "Regency Centers *Corporation*"

letterhead, however, exercising the option in the name of "RRG" – Regency *Realty Group, Inc.*,

an affiliate of Regency Centers, L.P. *Id.* Civic argued that Regency Centers, L.P. was not a

party to the contract. *Id.* The trial court disagreed, and the California Court of Appeals affirmed.

Both courts looked beyond the specific names in the contract to the intentions of the parties and

the surrounding circumstances. As the trial court stated,

> Here, RRG exercised the option RCLP had been assigned the real property, and I
> believe that, in effect, that would be tantamount to a typographical error.... Here,
> in effect, I would find that RRG was an implied agent of RCLP. There was no
> confusion, no surprise, no effect upon the defendants whatsoever, and otherwise,
> it would elevate form over substance beyond belief.

*Id.* Affirming the trial court, the court of appeals continued,

> The trial court's reformation of the notice of intent to exercise the option did not
> change the agreement. The court merely corrected the notice to reflect the
> agreement and assumption that the Regency entity which owned the interest in the
> company, RCLP, sent notice it intended to exercise the option.

*Id.* at *14. In this case, Site/Tech is bound to the Bill of Sale and Assignment under agency

principles given the authority that Site/Tech invested in Site Tech.

>        (iii)    *Site/Tech has ratified the 1998 and 2005 Assignments.*

Under California law, "[a]n agency may be created, and an authority may be conferred, by ... a subsequent ratification." Cal. Civ. Code § 2307 (2008). In addition to having an agent of the corporation signing the instrument warranting title of the patents-in-suit in the parent, Ait (and therefore Site/Tech) physically delivered the V-Search computer code and other goods that were the subject of the 1998 Bill of Sale to Daniel Egger, thereby evidencing a ratification by Site/Tech of the 1998 Bill of Sale and Assignment.[16] Ait also has declared that Site/Tech believed it was bound by the 1998 Bill of Sale and Assignment and had ratified the acts of Site Tech and the obligations of the 1998 Bill of Sale and Assignment. *Ex. 7*, ¶¶ 5, 6, 7. Ait also has explicitly ratified the 1998 Assignments and the 2005 Assignment in writing. *Ex. 7*, ¶ 7; *see also* SEC statements, *Ex. 17*. As such, Site/Tech is bound as a party to the Bill of Sale and the Assignment, and the patents-in-suit were conveyed to Egger.

**B.    The undisputed facts demonstrate that, at the latest, Egger acquired the patents in December 2000.**

Site/Tech was merged into Site Tech on December 21, 2000, when it was formally merged into Site Tech. *See Exs. 29-31.* This merger operated to convey any assets remaining in Site/Tech into Site Tech, including any residual rights in the patents-in-suit, if they existed.[17] Even Defendants explicitly concede in their Motion that the assets of Site/Tech—specifically

---

[16] California Civil Code Section 2311 states, "RATIFICATION OF PART OF A TRANSACTION. Ratification of part of an indivisible transaction is a ratification of the whole." Cal. Civ. Code § 2311 (2008); *Scholastic Book Clubs*, 207 Cal. App. 3d at 737 ("By accepting the orders, the payment and shipping the merchandise shipping the merchandise appellant clearly and unequivocally ratified the acts of the teachers [implied agents] and confirmed their authority as appellant's agents or representatives.").

[17] *See Morrow*, 499 F.3d at 1338 n.3 (Fed. Cir. 2007) ("The patent statutes allow the instrument that assigns 'any interest' to take the form of a patent license or any other written instrument that transfers patent rights. The type of written instrument (e.g., license or assignment agreement, dissolution agreement, or *merger agreement*) and the factual context in which the instrument is created is irrelevant-this does not provide a basis for divorcing the standing analysis from the patent statutes.") (emphasis supplied).

including the patents-in-suit—were transferred in full to Site Tech pursuant to this 2000 merger, and resided in Site Tech as of December 2000:

- "As a consequence of the December 2000 merger documents, all the assets of [Site/Tech] – including title to the patents-in-suit – would have become the property of the surviving entity, [Site Tech]." Defendants' Motion, at 5.

- "Furthermore, all of Libertech's property would have been subsumed by the entity emerging from the merger, Deltapoint, a California corporation. *See* Cal. Corp. Code § 1107(a) and at page 5 above. Thus, after the merger on December 21, 2000, Deltapoint (a.k.a. Site Technologies, Inc.) would have owned the patents-in-suit." *Id.*, at 11.

Under the longstanding doctrine of after-acquired title, where an assignor of patents later acquires legal title to them, the patents immediately convey to the assignee upon the assignor's subsequent acquisition of the patents. This has been the law for well over a century. In *Gottfried v. Miller*, the assignor sold the assignee a patented machine, thereby "warrant[ing] not only the title to the machine itself, but the right to use it." 104 U.S. 521, 527 (1881). The assignor "did not acquire any interest in the patent until long after the date of his sale to [the assignee]," however. *Id.* The Supreme Court held that the assignor's after-acquired title inured to the assignee. *See id.* The Supreme Court held that the assignor's "previous sale to [the assignee] of a machine embodying his patented invention ... estopped him from prosecuting [the assignee] for an infringement of the patent by the use of the machine.... [The assignee] ... acquired a right to use the machine which could not have been controverted by [the assignor]." *Id.*

Similarly, in the 1951 case of *Taylor Engines, Inc. v. All Steel Engines, Inc.*, the assignors assigned an exclusive license to the assignee. 192 F.2d 171, 173 (9th Cir. 1951). Only later did the assignors acquire the actual right to exclusively license the patents. *Id.* The Ninth Circuit held that the assignor's after-acquired title inured to the assignee.

We ... base our decision on the broad equitable principle that where one purports, for value, to convey title to personal property which he does not own, ... [and] the

22

grantor subsequently acquires such title to personalty[,] equity will enforce the grantee's interest to prevent unjust enrichment of the grantor.

*Id.* at 174.

This principle has been consistently recognized. *See, e.g., Brush Elec. Co. v. Cal. Elec. Light Co.*, 52 F. 945, 963-64 (9th Cir. 1892) ("The sale of a patent right contains an implied warranty as to title, and an after-acquired title obtained by the vendor inures to the vendee."); *Faulks v. Kamp*, 3 F. 898, 901-02 (S.D.N.Y. 1880) ("It is a familiar law, and has been for a long time, that a warranty of title or right draws to it any after-acquired right or title of the warrantor, and carries it to the benefit of the person to whom the warranty runs. So whatever right, if any, the defendants acquired to the invention covered by this patent, enured directly to the benefit of the [buyers]."); *Curran v. Burdsall*, 20 F. 835, 836 (N.D. Ill. 1883) (following *Gottfried* and *Faulks*); *cf. Mills Novelty Co. v. Monarch Tool & Mfg. Co.*, 49 F.2d 28, 31 n.3 (6th Cir.) ("where a pending- or contemplated-patent application is assigned, but later the patent somehow issues to the inventor assignor, he would hold the legal title in trust for the earlier assignee, particularly as the monopoly was not in existence when the first assignment was made; and there are many cases applying this principle to rights in inventions."), *cert denied*, 284 U.S. 662 (1931). In 125 years, this principle has never been overruled.

Thus, even assuming this Court rejected all the previously discussed independent grounds for finding that Site Tech transferred the patents in 1998, and instead agreed with Defendants that Site Tech first acquired the patents in December 2000, Egger acquired the patents at that time—over four years before he conveyed them to SRA. Site Tech had specifically warranted in 1998 that it was transferring "good and marketable title," that it was the "sole owners," and that it had "full right to convey the entire interest" in the patents. *Ex. 24.* This result is consistent with the principles of estoppel and fraud underlying the after-acquired title doctrine—were Site

23

Tech permitted to take $100,000 from Daniel Egger, warrant title and nonetheless keep title following the merger, the result would be an injustice on the parties, and intended by none of them.  If, as Defendants assert, the 1997 acquisition itself did not convey title to Site Tech, as intended by the officers, directors and shareholders of Site/Tech and Site Tech, the 2000 merger did.  Upon the merger of Site/Tech into Site Tech, any remaining rights in the patents-in-suit conveyed immediately to Egger.  Accordingly, Egger unquestionably obtained full legal title as of December 2000, well before his assignment to SRA in 2005 and the filing of this lawsuit. SRA thus has full legal standing, and Defendants' Motion should be denied.

**C.     Defendants misrepresent the February 2005 Assignment from Site/Tech to Egger.**

Defendants accuse Daniel Egger of fraud and improper intent regarding the execution of and claimed reliance on an assignment between Site/Tech and Egger executed on February 11, 2005 (the "2005 Assignment").  As a threshold matter, this assignment is irrelevant to the issues raised by Defendants' motion, because SRA does not rely on it to establish its chain of title.

But moreover, the 2005 Assignment was fully approved and ratified by Site/Tech, and it has been confirmed by Site/Tech that the 2005 Assignment fairly represented the intent of the parties and the transaction. *See Ex. 7*, ¶¶ 7-8.  Defendants' reckless allegations of fraud relating to the 2005 Assignment are also directly contradicted by the sworn testimony of Christopher Lynch, the attorney who drafted and advised Egger to execute and file the 2005 Assignment. *Ex. 32*, ¶¶ 2-6.  The purpose of filing the 2005 Assignment was not to correct any defect in the name of the party on the instrument, as Defendants erroneously allege. *Id.*, ¶ 3.  Neither Lynch nor Egger recognized any defect at the time of the 2005 Assignment. *Id.*  Rather, the 2005 Assignment was filed and recorded as replacement for the then-lost 1998 Assignment.  When the 1998 bill of sale and assignment was eventually located, it was filed in July 2006. *Id.*

**D.**   **Defendants' assertion that the Site Tech bankruptcy extinguished Egger's rights to the patents-in-suit is wrong.**

Defendants appear to assert that Egger's rights to the patents-in-suit were somehow extinguished during Site Tech's bankruptcy proceedings. This assertion also is incorrect for multiple reasons:

1.   If Site/Tech held the patents, then bankruptcy did not defeat Egger's rights.

Assuming that Defendants are correct that the subsidiary Site/Tech held the patents during 1999 and through June 15, 2000, the patents were not part of the Site Tech bankruptcy estate; a wholly-owned subsidiary's property is not part of the parent's estate for bankruptcy purposes, where only the parent is in bankruptcy. *See In re Holywell Corp.*, 118 B.R. 876, 879 (S.D. Fla. 1990) ("In general, and absent unusual circumstances, the property of a debtor's subsidiary is not considered property of the debtor by virtue of the debtor's sole ownership of the subsidiary."). Following the merger in December 2000, the assets of Site Tech's subsidiary (which was not a debtor in the bankruptcy case) would not have become property of the estate, subject to the jurisdiction of the bankruptcy court. *In re Network Cancer Care, L.P.* 197 Fed. Appx. 284, 285 (5th Cir. 2006) (finding that a bankruptcy court's jurisdiction is more limited post-confirmation and generally exists for "matters pertaining to the implementation or execution of the plan").

2.   If Site Tech held the patents, then bankruptcy did not defeat Egger's rights.

Assuming that the parent Site Tech had held the patents before bankruptcy, the 1998 sale and assignment already had occurred and Site Tech (and Site/Tech) no longer owned the patents-in-suit. In numerous contexts, from SEC filings to its bankruptcy schedules, Site Tech represented that it did not own the patents, but rather, had assigned them to Daniel Egger. Indeed, the Disclosure Statement to the Plan that Defendants rely upon to argue that the

bankruptcy divested Egger of his ownership rights explicitly recognized the transfer to Daniel Egger. *Ex. 26; see Ex. 34* ("In September, the Company also sold its V-Search technology and related patents."). Similarly, the Schedules did not list the patents as property of the estate, even though it listed nearly every other IP asset that the company owned. *Ex. 35.* Likewise, Site Tech bankruptcy documents expressly listed all the "core technology assets" the company owned; the list nowhere included the patents-in-suit. *Ex. 36.* This further evidences an intent to abandon the property to Daniel Egger. Confirmation of the plan is *res judicata* that the property was not in the estate and had belonged to Daniel Egger. Furthermore, Egger, who would have been a creditor of Site Tech's given Defendants' allegations, had no notice whatsoever that Site Tech purportedly contested its conveyance to him—which it did not—and claimed to still own the patents-in-suit. The patents-in-suit were not part of Site Tech's bankruptcy estate.

In addition, Egger was not given notice of the bankruptcy as a creditor, and the patents were not listed on the bankruptcy schedules as assets of the bankruptcy estate. Under those circumstances, the bankruptcy proceeding cannot act to divest Egger of rights under the bill of sale and assignment. It is well-settled that "the bankruptcy code cannot be construed to effectively divest someone of property which is rightfully theirs." *Curtis Mfg. Co., Inc. v. Plasti-Clip Corp.*, 933 F. Supp. 107, 114 (D.N.H. 1995), *rev'd on other grounds*, 135 F.3d 778 (Fed. Cir. 1998) (internal modifications omitted). Under 11 U.S.C. § 541, a debtor cannot bring into the estate equitable title to a patent that it does not own. *See id.* "Because the debtor does not own an equitable interest in property he holds in trust for another, that interest is not 'property of the estate.'" *Begier v. IRS*, 496 U.S. 53, 59 (1990); *see also* 11 U.S.C. § 541(d); *In re Shepard*, 29 B.R. 928, 932 (Bankr. M.D. Fla. 1983) ("[W]here a debtor holds only bare legal title to property without any equitable interest, bare legal title is all that becomes property of the estate.").

In 1999 and through June 15, 2000, Site Tech did not hold both legal and equitable title to the patents-in-suit. Specifically, because Site Tech already had contracted and conveyed the patents-in-suit to Egger, Site Tech had transferred equitable title to Egger. Under such circumstances, nothing in Site Tech's bankruptcy proceedings could have extinguished Egger's rights to the patents-in-suit. As one court put it, "a bankruptcy court's jurisdiction [to determine rights] does not extend to property that is not part of a debtor's estate." *Rutherford Hosp., Inc. v. RNH P'ship*, 168 F.3d 693, 699 (4th Cir. 1999).

Further, in their Motion, Defendants emphasize that Section 14.2 of the Plan provides that the Debtors' assets again vested "free and clear of any liens, claims, encumbrances, Claims of Creditors and Interests of Equity Security Holders." The relevant language provides only that no claims or liens attach to the property itself. *See In re Penrod*, 50 F.3d 459, 463 (7th Cir.1995) (holding that section 1141(c) covers liens and "that unless the plan of reorganization, or the order confirming the plan, says that a lien is preserved, it is extinguished by the confirmation"); *In re Worldcom Corp.*, 382 B.R. 610 (Bankr. S.D.N.Y. 2008) (same); *In re Regional Bldg. Sys.*, 251 B.R. 274, 287 n.21 (Bankr. D.Md. 2000) ("discharge impacts only the collection of the debt 'as a personal liability of the debtor,'" whereas § 1141(c) restricts "collection of the debt via enforcement of a lien"). The Plan does not provide that claims are voided against a debtor. Given that Site Tech did not have title to the patents during the bankruptcy, having transferred title to Egger, the only relevant property of the estate would be the underlying contracts. SRA does not assert a lien on those rights. It merely seeks to assert that *in personam* rights exist against the post-confirmation debtor.

Moreover, Egger's claim to the patents-in-suit would survive the bankruptcy under the very terms of Site Tech's plan of reorganization. Section 14.3 of that plan stated, "Due to the liquidating nature of this Plan and pursuant to Bankruptcy Code 1141(d)(3), the entry of the

Confirmation Order shall not act as a discharge of any debt of the Debtor that arose prior to Confirmation, except to the extent that such debt is paid under the Plan." *Ex. 27.* In other words, contrary to Defendants' supposition, Egger's claim to the patents was not discharged by the bankruptcy.[18] To the extent that the claim was not paid under the plan—which it indisputably was not—it survived the bankruptcy.

Finally, even if the bill of sale and assignment were somehow rejected in the bankruptcy proceeding, "the parties to the contract can waive the breach and reinstate the contract, just as they could under state law." *In re Lockwood*, 2008 WL 943025, *4 n.5 (Bankr. N.D. Cal. Apr. 7, 2008). In this case, and after the bankruptcy, Site Tech has confirmed by its actions and the declaration of its CEO that its intent was to sell and assign the patents-in-suit to Egger. *Ex. 7*, ¶¶ 5 and 6.

Thus, Egger acquired the patents-in-suit no later than December 2000.

## IV.    CONCLUSION

Defendants' Motion is without merit; the patents-in-suit were properly transferred, and SRA has full legal standing to bring this action. In essence, the Motion asks the Court to undo a host of transactions. It is more than an assertion of a technical defect in title—it avers that the patents-in-suit have somehow dissipated into the ether, so that Defendants' infringement can never be challenged. Such claims should be rejected, and have been rejected when raised elsewhere:

> [The accused infringer's] only defense states that before the '994 patent issued, [the inventor] assigned equitable future rights in his invention to his research laboratory, and that those equitable rights got lost when [the laboratory] dissolved. It would be unfair to allow [the accused infringer] to hide behind the

---

[18] Defendants make much of the fact that, under Section 14.2 Site Tech's plan of reorganization, "[a]ll property of the Debtor, *except as otherwise provided in this Plan*, shall be free and clear of any liens, claims, encumbrances, Claims of Creditors and Interests of Equity Security Holders." This provision does not contradict Section 14.3 of Site Tech's plan of reorganization. To the contrary, it expressly carves out an exception for the rights "otherwise provided in this Plan," including debts not paid under the plan.

putative rights of a nonparty, especially where, as here, neither side contends that such a party exists.

The law favors ownership of patents, and while that ownership may be gossamer as in the case at bar, it has not devolved, as [the accused infringer] says, on an unidentified third party.

*Kahn v. Gen. Motors Corp.*, 33 U.S.P.Q.2d 2011, 2014 (S.D.N.Y. 1995), *aff'd*, 77 F.3d 457 (Fed. Cir. 1996).

For the reasons enumerated above, SRA asks that Defendants' Motion be denied in its entirety, and for such other and further relief to which it may show itself entitled.

Respectfully submitted,

Lee L. Kaplan
LEAD ATTORNEY
State Bar No. 11094400
SMYSER KAPLAN & VESELKA, L.L.P.
700 Louisiana, Suite 2300
Houston, Texas 77002
(713) 221-2323
(713) 221-2320 (fax)
lkaplan@skv.com

Victor G. Hardy
State Bar No. 00790821
(Requesting Admission *Pro Hac Vice*)
Andrew G. DiNovo
State Bar No. 00790594
Adam G. Price
State Bar No. 24027750
Jay D. Ellwanger
State Bar No. 24036522
DINOVO PRICE ELLWANGER LLP
P.O. Box 201690
Austin, Texas 78720
(512) 681-4060
(512) 628-3410 (fax)
vhardy@dpelaw.com

[8-Jul-97 3:54p]

# STOCK EXCHANGE AGREEMENT

This STOCK EXCHANGE AGREEMENT (this "Agreement") is made and entered into as of July ___, 1997 among (i) DeltaPoint, Inc., a California corporation ("DeltaPoint"), (ii) Site/technologies/inc., a Delaware corporation ("Site"), (iii), only for the purpose of Articles I, VI and VII of this Agreement, those persons or entities listed on the signature pages hereof under the caption Principal Site Stockholders (the "Principal Site Stockholders"), and (iv), only for the purpose of agreeing to the terms of Articles I and VII of this Agreement, those persons or entities listed on the signature pages hereof under the caption Other Site Stockholders (the "Other Site Stockholders").

## RECITALS

A.     The Boards of Directors of each of Site and DeltaPoint believe it is in the best interests of each company and their respective stockholders that DeltaPoint acquire all of the capital stock of Site on the terms set forth herein (the "Acquisition") and, in furtherance thereof, have approved the Acquisition.

B.     The stockholders of Site have approved the Acquisition.

C.     Pursuant to the Acquisition, among other things, and subject to the terms and conditions of this Agreement, all of the issued and outstanding shares of capital stock of Site shall be converted into the right to receive certain shares of voting Common Stock of DeltaPoint ("DeltaPoint Common Stock") and certain cash.

D.     Site, DeltaPoint and the Principal Site Stockholders desire to make certain representations and warranties and other agreements in connection with the Acquisition.

NOW, THEREFORE, in consideration of the covenants, promises and representations set forth herein, and for other good and valuable consideration, intending to be legally bound hereby the parties agree as follows:

## ARTICLE I
## THE ACQUISITION

1.1     Effect on Capital Stock.  Subject to the terms and conditions of this Agreement, by virtue of the Acquisition and without any action on the part of Site or the holder of any shares of Site Common Stock, the following shall occur upon the signing of this Agreement by all of the parties hereto:

(a)     Conversion of Site Series B Preferred Stock.  Each share of Series B Preferred Stock of Site (collectively, the "Site Series B Stock") issued and outstanding immediately at such time will be canceled and extinguished and be converted automatically into the right to receive (i) that number of shares of DeltaPoint Common Stock equal to the Series B Exchange Ratio (as defined below in this Section 1.1), upon surrender of the certificate representing such share of Site Series B Stock in the manner provided in Section 1.2 and (ii) that amount of cash (payable by check) equal to $100 divided by the Aggregate Series B Number (as defined below in this Section 1.1).

(b)     Conversion of Site Series A Preferred Stock.  Each share of Series A Preferred Stock of Site (collectively, the "Site Series A Stock") issued and outstanding immediately at such time will be canceled and extinguished and be converted automatically into the right to receive (i) that number of shares

EXHIBIT 16          INT_EGG_000031

of DeltaPoint Common Stock equal to the Series A Exchange Ratio (as defined below in this Section 1.1), upon surrender of the certificate representing such share of Site Series A Stock in the manner provided in Section 1.2 and (ii) that amount of cash (payable by check) equal to $100 divided by the Aggregate Series A Number (as defined below in this Section 1.1).

        (c)    <u>Cancellation of Site Common Stock</u>. In light of the preferences provided to the Site Series A Stock and Site Series B Stock and the aggregate consideration to be provided to the Principal Site Stockholders pursuant to this Article I, each share of Common Stock of Site (collectively, the "<u>Site Common Stock</u>," together with the Site Series A Stock and the Site Series B Stock, the "<u>Site Stock</u>") issued and outstanding immediately at such time will be canceled and extinguished without any conversion thereof.

        (d)    <u>Cancellation of DeltaPoint-Owned and Site-Owned Stock</u>. Each share of Site Stock owned by DeltaPoint, Site or any direct or indirect wholly-owned subsidiary of DeltaPoint or Site immediately prior to the Acquisition shall be canceled and extinguished without any conversion thereof.

        (e)    <u>Fractional Shares</u>. No fraction of a share of DeltaPoint Common Stock will be issued. Rather, in lieu thereof, each holder of shares of Site Stock who would otherwise be entitled to a fraction of a share of DeltaPoint Common Stock (after aggregating all fractional shares of DeltaPoint Common Stock to be received by such holder) shall be entitled to receive from DeltaPoint an amount of cash (rounded to the nearest whole cent) equal to the product of such fraction multiplied by DeltaPoint Closing Price.

        (f)    <u>Definitions</u>.

        (i)    <u>Aggregate Series A Number</u>. The "Aggregate Series A Number" shall mean the aggregate number of shares of Site Series A Stock outstanding immediately prior to the Acquisition.

        (ii)    <u>Aggregate Series B Number</u>. The "Aggregate Series B Number" shall mean the aggregate number of shares of Site Series B Stock outstanding immediately prior to the Acquisition.

        (iii)    <u>Series A Exchange Ratio</u>. The "Series A Exchange Ratio" shall mean the quotient obtained by dividing (x) the 105,126[1] by (y) the Aggregate Series A Number.

        (iv)    <u>Series B Exchange Ratio</u>. The "Series B Exchange Ratio" shall mean the quotient obtained by dividing (x) the 396,121[2] by (y) the Aggregate Series B Number.

        (v)    <u>DeltaPoint Closing Price</u>. The "DeltaPoint Closing Price" shall be the average daily closing price per share of DeltaPoint Common Stock for the 30 consecutive Nasdaq OTC Bulletin Board trading days the last of which precedes the Closing Date by two trading days.

---

[1]    Assumes a DeltaPoint Closing Price of $1.50 for purposes of calculating the number of shares to pay the remaining Allan Kaplan Investments fee.

[2]    Assumes a DeltaPoint Closing Price of $1.50 for purposes of calculating the number of shares to pay the remaining Allan Kaplan Investments fee.

KS2::ODMA\PCDOCS\SQL2\338978\15

INT_EGG_000032

8-JUL-97 31:34p

1.2   Surrender of Certificates.

(a)   Exchange Agent. Prior to the date hereof, DeltaPoint shall designate the exchange agent for the DeltaPoint Common Stock or a suitable alternative agent to act as exchange agent (the "Exchange Agent") for the Acquisition.

(b)   DeltaPoint to Provide Common Stock and Checks. Promptly after the date hereof, DeltaPoint shall make available to the Exchange Agent for exchange in accordance with this Article I, the aggregate number of shares of DeltaPoint Common Stock and checks for the amounts of cash issuable pursuant to Section 1.1 in exchange for outstanding shares of Site Stock.

(c)   Exchange Procedures. Promptly after the date hereof, DeltaPoint shall cause to be mailed to each holder of record of a certificate or certificates (the "Certificates") which immediately prior to the date hereof represented outstanding shares of Site Stock and which shares were converted into the right to receive shares of DeltaPoint Common Stock in accordance with the terms of Section 1.1, (i) a letter of transmittal (which shall specify that delivery shall be effected, and risk of loss and title to the Certificates shall pass, only upon delivery of the Certificates to the Exchange Agent and which shall be in such form and have such other provisions as DeltaPoint may reasonably specify) and (ii) instructions for use in effecting the surrender of the Certificates in exchange for cash and certificates representing shares of DeltaPoint Common Stock in the amounts determined in accordance with the terms of Section 1.1. Upon surrender of a Certificate for cancellation to the Exchange Agent, together with such letter of transmittal, duly completed and validly executed in accordance with the instructions thereto, the holder of such Certificate shall be entitled to receive in exchange therefor (A) the amount of cash compensation determined in accordance with the terms of Section 1.1 and (B) a certificate representing the number of whole shares of DeltaPoint Common Stock to which such holder is entitled pursuant to Section 1.1, and the Certificate so surrendered shall forthwith be canceled. Until so surrendered, each outstanding Certificate that, prior to the date hereof, represented shares of Site Stock will be deemed from and after the date hereof, for all corporate purposes, subject to Section 1.2(d) as to the payment of dividends or other distributions, to evidence the ownership of the number of full shares of DeltaPoint Common Stock into which such shares of Site Stock shall have been so converted and the right to receive an amount in cash in accordance with Section 1.1.

(d)   Distributions With Respect to Unexchanged Shares. No dividends or other distributions with respect to DeltaPoint Common Stock declared or made after the Acquisition and with a record date after the Acquisition will be paid to the holder of any unsurrendered Certificate with respect to the shares of DeltaPoint Common Stock represented thereby until the holder of record of such Certificate shall surrender such Certificate. Subject to applicable law, following surrender of any such Certificate, there shall be paid to the record holder of the certificates representing whole shares of DeltaPoint Common Stock issued in exchange therefor, without interest, at the time of such surrender, the amount of dividends or other distributions with a record date after the Acquisition theretofore payable with respect to such whole shares of DeltaPoint Common Stock.

(e)   Transfers of Ownership. If any certificate for shares of DeltaPoint Common Stock is to be issued in a name other than that in which the Certificate surrendered in exchange therefor is registered, it will be a condition of the issuance thereof that the Certificate so surrendered will be properly endorsed and otherwise in proper form for transfer and that the person requesting such exchange will have paid to DeltaPoint or any agent designated by it any transfer or other taxes required by reason of the issuance of a certificate for shares of DeltaPoint Common Stock in any name other than that of the registered holder of the

07-08-97  15:18          ' A00A    AF 'C 'E 8 E. — WILSON SONSINI    NO.591  P004

INT_EGG_000033

8-JUL-97 31:34p

Certificate surrendered, or established to the satisfaction of DeltaPoint or any agent designated by it that such tax has been paid or is not payable.

       (f)   No Liability. Notwithstanding anything to the contrary in this Section 1.2, no party hereto or its agents (including, without limitation, the Exchange Agent) shall be liable to a holder of shares of DeltaPoint Common Stock, Site Common Stock, Site Series A Stock or Site Series B Stock for any amount properly paid to a public official pursuant to any applicable abandoned property, escheat or similar law.

     1.3   No Further Ownership Rights in Site Stock. All cash and shares of DeltaPoint Common Stock issued upon the surrender for exchange of shares of Site Common Stock, Site Series A Stock and Site Series B Stock in accordance with the terms hereof shall be deemed to have been issued in full satisfaction of all rights pertaining to such shares of Site Common Stock, Site Series A Stock or Site Series B Stock, as the case may be, and there shall be no further registration of transfers on the records of Site of shares of Site Common Stock, Site Series A Stock or Site Series B Stock which were outstanding immediately prior to the Acquisition. If, after the Acquisition, Certificates are presented to DeltaPoint for any reason, they shall be canceled and exchanged as provided in this Article I.

     1.4   Lost, Stolen or Destroyed Certificates. In the event any Certificates evidencing shares of Site Common Stock, Site Series A Stock or Site Series B Stock shall have been lost, stolen or destroyed, DeltaPoint shall issue in exchange for such lost, stolen or destroyed Certificates, upon the making of an affidavit of that fact by the holder thereof, such shares of DeltaPoint Common Stock and cash as may be required pursuant to Section 1.1; provided, however, that DeltaPoint may, in its discretion and as a condition precedent to the issuance thereof, require the owner of such lost, stolen or destroyed Certificates to deliver a bond in such sum as it may reasonably direct as indemnity against any claim that may be made against DeltaPoint with respect to the Certificates alleged to have been lost, stolen or destroyed.

## ARTICLE II
## REPRESENTATIONS AND WARRANTIES OF SITE

     Site hereby represents and warrants to DeltaPoint that, as of the date of this Agreement and subject to such exceptions as are specifically disclosed, with reference to the appropriate section number, in the Site Disclosure Schedule provided to DeltaPoint on the date hereof (the "Site Disclosure Schedule"), as follows:

     2.1   Organization of Site. Site is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware. Site has the corporate power to own its properties and to carry on its business as now being conducted and as proposed to be conducted by Site. Site is duly qualified to do business and in good standing as a foreign corporation in each jurisdiction in which the failure to be so qualified would have a Material Adverse Effect (as used in this Agreement, the term "Material Adverse Effect" means a material adverse effect on the business, assets (including intangible assets), financial condition or results of operations of Site or DeltaPoint, as applicable)  Attached hereto as Exhibits A and B are true and correct copies of Site's Certificate of Incorporation and Bylaws, respectively, each as amended to date.

07.08.'97  15:18  WILSON SONSINI → 6 E. CA 60 .  ЯООЯ '  NO.591  P005

INT_EGG_000034

[8-JUL-97 3:34p]

**2.2**   Site Capital Structure.

(a)   The authorized capital stock of Site consists only of 20,000,000 shares of authorized Site Common Stock, of which 2,250,000 shares are issued and outstanding, and 2,000,000 shares of authorized Preferred Stock, 596,000 shares of which has been designated Series A Preferred Stock, all of which are outstanding, and 1,000,000 shares of which has been designated Series B Preferred Stock, 983,296 shares of which are outstanding. The Site Stock is held of record by the persons, with the addresses of record and in the amounts set forth on the Site Disclosure Schedule. All outstanding shares of Site Stock are duly authorized, validly issued, fully paid and non-assessable and not subject to preemptive rights created by statute, the Certificate of Incorporation or Bylaws of Site or any agreement to which Site is a party or by which it is bound.

(b)   Site has reserved 700,000 shares of Common Stock for issuance to employees, officers, directors and consultants pursuant to its 1994 Stock Plan, of which, options are outstanding to purchase an aggregate of 464,750 shares of Common Stock and 235,250 shares of Common Stock remain available for future grant. There are no other options, warrants, calls, rights, commitments or agreements of any character, written or oral, to which Site or any stockholder of Site is a party or by which Site is bound obligating Site to issue, deliver, sell, repurchase or redeem, or cause to be issued, delivered, sold, repurchased or redeemed, any shares of the capital stock of Site.

**2.3**   Subsidiaries. Site does not have and has never had any subsidiaries or affiliated companies and does not otherwise own and has never otherwise owned any shares of capital stock or any interest in, and does not control, directly or indirectly, any business entity.

**2.4**   Authority. Site has all requisite corporate power and authority to enter into this Agreement and to consummate the transactions contemplated hereby. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all necessary corporate action on the part of Site, including approval by the requisite number of stockholders of Site (including all holders of Site Stock except for those listed on the Site Disclosure Schedule) of the Acquisition and any other transactions contemplated hereby for which approval of the Principal Site Stockholders is required under applicable law. Site's Board of Directors has approved the Acquisition and this Agreement. This Agreement has been duly executed and delivered by Site and constitutes the valid and binding obligation of Site, enforceable in accordance with its terms. The execution and delivery of this Agreement by Site does not, and the consummation of the transactions contemplated hereby will not, conflict with, or result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to a right of termination, cancellation, modification or acceleration of any material obligation or loss of any material benefit under (any such event, a "Conflict") (i) any provision of the Certificate of Incorporation or Bylaws of Site or (ii) any mortgage, indenture, lease, contract or other agreement or instrument, permit, concession, franchise, license, judgment, order, decree, statute, law, ordinance, rule or regulation applicable to Site or its properties or assets. No consent, waiver, approval, order or authorization of, or registration, declaration or filing with any court, administrative agency or commission or other federal, state, county, local or foreign governmental authority, instrumentality, agency or commission ("Governmental Entity") or any third party, including a party to any agreement with Site (so as not to trigger any Conflict) is required by or with respect to Site in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby, except for those consents that have been previously obtained and are listed on the Site Disclosure Schedule.

87-08-97   15:18   WILSON SONSINI → G.E., CA 60   +604   · 60 AO 68   INISNOS NOSLIM   81:51   26-80-20   . PO06   165.521   NO.521   P006

INT_EGG_000035

2.5     Site Financial Information and Statements.  The Site Disclosure Schedule sets forth Site's material assets and liabilities as of the date hereof.  Such information is complete and correct in all material respects and present fairly the financial condition of Site.  The Site Disclosure Schedule sets forth the Company's audited balance sheets as of December 31, 1994 and December 31, 1995 (the "Balance Sheets") and the audited related statements of operations and cash flows for the years then ended (collectively, the "Company Financials").  The Company Financials are complete and correct in all material respects and have been prepared in accordance with generally accepted accounting principles ("GAAP") applied on a basis consistent throughout the periods indicated and consistent with each other.  The Company Financials present fairly the financial condition and operating results of the Company as of the dates and during the periods indicated therein.

2.6     No Undisclosed Liabilities.  Site does not have any liability, indebtedness, obligation, expense, claim, deficiency, guaranty or endorsement of any type, whether accrued, absolute, contingent, matured, unmatured or other (whether or not required to be reflected in financial statements in accordance with generally accepted accounting principles), which individually or in the aggregate, has not been reflected in the Site Disclosure Schedule.

2.7     Tax and Other Returns and Reports.

(a)     Tax Returns and Audits.

(i)     Site as of the Acquisition will have prepared and filed all required federal, state, local and foreign returns, estimates, information statements and reports ("Returns") relating to any and all taxes concerning or attributable to Site or its operations and such Returns are true and correct in all material respects and have been completed in all material respects in accordance with applicable law.

(ii)     Site has (A) paid or accrued all taxes it is required to have paid or accrued and (B) withheld with respect to its employees all federal and state income taxes, The Federal Insurance Contribution Act ("FICA"), the Federal Unemployment Tax Act ("FUTA") and other taxes required to have been withheld.

(iii)     Site has not been delinquent in the payment of any tax nor is there any tax deficiency outstanding, proposed or assessed against Site, nor has Site executed any waiver of any statute of limitations on or extending the period for the assessment or collection of any tax.

(iv)     No audit or other examination of any Return of Site is currently in progress, nor has Site been notified of any request for such an audit or other examination.

(v)     Site does not have any material (individually or in the aggregate) liabilities for unpaid federal, state, local and foreign taxes, whether asserted or unasserted, contingent or otherwise, and Site has no knowledge of any basis for the assertion of any such material (individually or in the aggregate) liability attributable to Site, its assets or operations.

(vi)     Site has provided to DeltaPoint copies of all federal and state income and all state sales and use Tax Returns for all periods since the date of Site's incorporation.

KS2::ODMA\PCDOCS\SQL2\38978\1\5                    -6-

INT_EGG_000036

8-JUL-97 3:34p

(vii)    There are (and as of immediately following the Effective Date there will be) no material (individually or in the aggregate) liens, pledges, charges, claims, security interests or other material (individually or in the aggregate) encumbrances of any sort ("Liens") on the assets of Site relating to or attributable to taxes.

(viii)    Site has no knowledge of any basis for the assertion of any claim relating or attributable to taxes which, if adversely determined, would result in any material (individually or in the aggregate) Lien on the assets of Site.

(ix)    None of Site's assets are treated as "tax-exempt use property" within the meaning of Section 168(h) of the Internal Revenue Code of 1986, as amended (the "Code").

(x)    As of the Acquisition, there will not be any contract, agreement, plan or arrangement, including, but not limited to, the provisions of this Agreement, covering any employee or former employee of Site that, individually or collectively, could give rise to the payment of any amount that would not be deductible pursuant to Section 280G or 162 of the Code.

(xi)    Site has not filed any consent agreement under Section 341(f) of the Code or agreed to have Section 341(f)(2) of the Code apply to any disposition of a subsection (f) asset (as defined in Section 341(f)(4) of the Code) owned by Site.

(xii)    Site is not a party to a tax sharing or allocation agreement nor does Site owe any amount under any such agreement.

(xiii)    Site is not, and has not been at any time, a "United States real property holding corporation" within the meaning of Section 897(c)(2) of the Code.

(xiv)    Site's tax basis in its assets for purposes of determining its future amortization, depreciation and other federal income tax deductions is accurately reflected on Site's tax books and records.

2.8    Restrictions on Business Activities. There is no agreement (noncompete or otherwise), commitment, judgment, injunction, order or decree to which Site is a party or otherwise binding upon Site which has or reasonably could be expected to have the effect of prohibiting or impairing any business practice of Site, any acquisition of property (tangible or intangible) by Site or the conduct of business by Site. Without limiting the foregoing, Site has not entered into any agreement under which Site is restricted from selling, licensing or otherwise distributing any of its current, planned or proposed products or services to any class of customers, in any geographic area, during any period of time or in any segment of the market.

2.9    Title to Properties; Absence of Liens and Encumbrances.

(a)    Site owns no real property, nor has it ever owned any real property. The Site Disclosure Schedule sets forth a list of all real property currently, or at any time in the past, leased by Site, the name of the lessor, the date of the lease and each amendment thereto and, with respect to any current lease, the aggregate annual rental and/or other fees payable under any such lease. All such current leases are in full force and effect, are valid and effective in accordance with their respective terms, and there is not,

INT_EGG_000037

under any of such leases, any existing default or event of default (or event which with notice or lapse of time, or both, would constitute a default).

(b)     Site has good and valid title to, or, in the case of leased properties and assets, valid leasehold interests in, all of its material tangible properties and assets, real, personal and mixed, used or held for use in its business, free and clear of any Liens, except as reflected on Site Disclosure Schedule and except for liens for taxes not yet due and payable and such imperfections of title and encumbrances, if any, which are not material in character, amount or extent, and which do not materially detract from the value, or materially interfere with the present use, of the property subject thereto or affected thereby.

2.10     Intellectual Property.

(a)     Site owns, or is licensed or otherwise possesses legally enforceable rights to use, all patents, trademarks, trade names, service marks, copyrights, and any applications therefor, net lists, schematics, technology, know-how, computer software programs or applications (in both source code and object code form), and tangible or intangible proprietary information or material that are used in the business of Site as currently conducted or as proposed to be conducted by Site (the "Site Intellectual Property Rights").

(b)     The Site Disclosure Schedule sets forth a complete list of all patents, registered and material unregistered trademarks, registered copyrights, trade names and service marks, and any applications therefor, included in Site Intellectual Property Rights, and specifies, where applicable, the jurisdictions in which each such Site Intellectual Property Right has been issued or registered or in which an application for such issuance and registration has been filed, including the respective registration or application numbers and the names of all registered owners. The Site Disclosure Schedule sets forth a complete list of all licenses, sublicenses and other agreements as to which Site is a party (other than commercially available software subject to shrink-wrap licenses) and pursuant to which Site or any other person is authorized to use any Site Intellectual Property Right or trade secret of Site, and includes the identity of all parties thereto, a description of the nature and subject matter thereof, the applicable royalty or other fees and the term thereof. The execution and delivery of this Agreement by Site, and the consummation of the transactions contemplated hereby, will neither cause Site to be in violation or default under any such license, sublicense or agreement, nor entitle any other party to any such license, sublicense or agreement to terminate or modify such license, sublicense or agreement. Site is the sole and exclusive owner or licensee of, with all right, title and interest in and to (free and clear of any liens or encumbrances), Site Intellectual Property Rights, and has sole and exclusive rights (and is not contractually obligated to pay any compensation to any third party in respect thereof) to the use thereof or the material covered thereby in connection with the services or products in respect of which Site Intellectual Property Rights are being used.

(c)     No claims with respect to Site Intellectual Property Rights have been asserted or are threatened by any person, nor, to the best of Site's knowledge, are there any valid grounds for any *bona fide* claims, (i) to the effect that the manufacture, sale, licensing or use of any of the products of Site infringes on any copyright, patent, trade mark, service mark, trade secret or other proprietary right of others, (ii) against the use by Site of any trademarks, service marks, trade names, trade secrets, copyrights, maskworks, patents, technology, know-how or computer software programs and applications used in Site's business as currently conducted or as proposed to be conducted by Site, or (iii) challenging the ownership by Site or the validity or effectiveness of any of Site Intellectual Property Rights. All registered trademarks, service marks and copyrights held by Site are valid and subsisting.  Site has not infringed, and the business of Site as currently

KS2::ODMA\PCDOCS\SQL2\38978\15                          -8-

INT_EGG_000038

B-JUL-97 3:34p

conducted or as proposed to be conducted does not infringe, any copyright, patent, trademark, service mark, trade secret or other proprietary right of any third party. To the best of Site's knowledge, there is no material unauthorized use, infringement or misappropriation of any of Site Intellectual Property Rights by any third party, including any employee or former employee of Site. No Site Intellectual Property Right or product of Site is subject to any outstanding decree, order, judgment, or stipulation restricting in any manner the licensing thereof by Site. Each employee, consultant or contractor of Site has executed a proprietary information and confidentiality agreement substantially in Site's standard forms. All software included in Site Intellectual Property Rights is original with Site and has been either created by employees of Site on a work-for-hire basis or by consultants or contractors who have created such software themselves and have assigned all rights they may have had in such software to Site.

     2.11    <u>Agreements, Contracts and Commitments</u>. Site does not have, is not a party to nor is it bound by:

         (i)    any fidelity or surety bond or completion bond and any agreement of indemnification or guaranty,

         (ii)    any leases of personal property having a value, individually or in the aggregate, in excess of $10,000,

         (iii)    any agreement, contract or commitment containing any covenant limiting the freedom of Site to engage in any line of business or to compete with any person,

         (iv)    any agreements, contracts or commitments relating to capital expenditures and involving, individually or in the aggregate, future payments in excess of $10,000,

         (v)    any agreement, contract or commitment relating to the disposition or acquisition of assets or any interest in any business enterprise outside the ordinary course of Site's business,

         (vi)    any mortgages, indentures, loans or credit agreements, security agreements or other agreements or instruments relating to the borrowing of money or extension of credit, including guaranties referred to in clause (i) hereof,

         (vii)    any purchase orders or contracts for the purchase of raw materials involving, individually or in the aggregate, $10,000 or more,

         (viii)    any construction contracts,

         (ix)    any distribution, joint marketing or development agreement,

         (x)    any agreement pursuant to which Site has granted or may grant in the future, to any party, a source-code license or option or other right to use or acquire, contingent or otherwise, source-code,

         (xi)    any management, employment, severance, consulting, relocation, repatriation, expatriation, visas, work permit or similar agreement or contract between Site or any affiliate

07/08/97  15:18    WILSON SONSINI → G E. CA &omega;  Rook    NO.591 P010

INT_EGG_000039

thereof and any consultant or any current, former, or retired employee, officer, or director of Site or any affiliate thereof, or

(xii) any other agreements, contracts or commitments that involve, individually or in the aggregate, $10,000 or more or is not cancelable without penalty within thirty (30) days.

Site has not materially breached, violated or defaulted under, or received notice that it has breached, violated or defaulted under, any of the terms or conditions of any agreement, contract or commitment to which it is bound (including those set forth in any of the Site Disclosure Schedule) (any such agreement, contract or commitment, a "Contract"). Each Contract is in full force and effect and is not subject to any default thereunder of which Site has knowledge by any party obligated to Site pursuant thereto.

2.12 Interested Party Transactions. No officer, director or stockholder of Site (nor any ancestor, sibling, descendant or spouse of any of such persons, or any trust, partnership or corporation in which any of such persons has or has had an interest), has or has had, directly or indirectly, (i) an economic interest in any entity which furnished or sold, or furnishes or sells, services or products similar to those Site furnishes or sells, or proposes to furnish or sell, (ii) an economic interest in any entity that purchases from or sells or furnishes to Site any goods or services or (iii) a beneficial interest in any Contract; provided, that ownership of no more than one percent (1%) of the outstanding voting stock of a publicly-traded corporation shall not be deemed an "economic interest in any entity" for purposes of this Section 2.12.

2.13 Compliance with Laws. Site has complied in all material respects with, is not in material violation of, and has not received any notices of violation with respect to, any foreign, federal, state or local statute, law or regulation.

2.14 Litigation. There is no action, suit or proceeding of any nature pending or, to Site's knowledge, threatened against Site, its properties or any of its officers or directors (in their respective capacities as such). There is no investigation pending or threatened against Site, its properties or any of its officers or directors by or before any governmental entity. The Site Disclosure Schedule sets forth with respect to any pending or threatened action, suit, proceeding or investigation, the forum, the parties thereto, the subject matter thereof and the amount of damages claimed or other remedy requested. No governmental entity has at any time challenged or questioned the legal right of Site to manufacture, offer or sell any of its products in the present manner or style thereof. The Site Disclosure Schedule also lists all suits and legal actions initiated by Site.

2.15 Insurance. With respect to the insurance policies and fidelity bonds covering the assets, business, equipment, properties, operations, employees, officers and directors of Site, there is no material claim by Site pending under any of such policies or bonds as to which coverage has been questioned, denied or disputed by the underwriters of such policies or bonds. All premiums due and payable under all such policies and bonds have been paid, and Site is otherwise in material compliance with the terms of such policies and bonds (or other policies and bonds providing substantially similar insurance coverage) Site has no knowledge of any threatened termination of, or material premium increase with respect to, any of such policies. Such policies of insurance and bonds are the type and in the amounts customarily carried by persons conducting businesses similar to those of Site.

KS2:ODMA\PCDOCS\SOL\38978\\3                        -10-

INT_EGG_000040

[8-JUL-97 3:34p]

2.16   Minute Books. The minute books of Site made available to counsel for DeltaPoint are the only minute books of Site and contain an accurate summary of all meetings of directors (or committees thereof) and stockholders or actions by written consent since the time of incorporation of Site

2.17   Environmental Matters. Site has not operated any underground storage tanks, and has no knowledge of the existence, at any time, of any underground storage tank (or related piping or pumps), at any property that Site has at any time owned, operated, occupied or leased. Site has not released any amount of any substance that has been designated by any Governmental Entity or by applicable federal, state or local law to be radioactive, toxic, hazardous or otherwise a danger to health or the environment, including, without limitation, PCBs, asbestos, oil and petroleum products, urea-formaldehyde and all substances listed as a "hazardous substance," "hazardous waste," "hazardous material" or "toxic substance" or words of similar import, under any law, including but not limited to, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended; the Resource Conservation and Recovery Act of 1976, as amended; the Federal Water Pollution Control Act, as amended; the Clean Air Act, as amended, and the regulations promulgated pursuant to such laws (a "Hazardous Material"). No Hazardous Materials are present as a result of the actions or omissions of Site, or, to Site's knowledge, as a result of any actions of any third party or otherwise, in, on or under any property, including the land and the improvements, ground water and surface water thereof, that Site has at any time owned, operated, occupied or leased.

2.18   Brokers' and Finders' Fees; Third Party Expenses. Site has not incurred, nor will incur, directly or indirectly, any liability for brokerage or finders' fees or agents' commissions or any similar charges in connection with this Agreement or any transaction contemplated hereby other than as to be satisfied pursuant to the terms of Section 5.8 hereof. The Site Disclosure Schedule sets forth Site's current reasonable estimate of all Third Party Expenses (as defined in Section 5.1) expected to be incurred by Site in connection with the negotiation and effectuation of the terms and conditions of this Agreement and the transactions contemplated hereby.

2.19   Employee Matters and Benefit Plans.

(a)   Definitions. With the exception of the definition of "Affiliate" set forth in Section 2.19(a)(i) below (which definition shall apply only to this Section 2.19), for purposes of this Agreement, the following terms shall have the meanings set forth below:

(i)   "Affiliate" shall mean any other person or entity under common control with Site within the meaning of Section 414(b), (c), (m) or (o) of the Code and the regulations thereunder;

(ii)   "ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended;

(iii)   "Site Employee Plan" shall refer to any plan, program, policy, practice, contract, agreement or other arrangement providing for compensation, severance, termination pay, performance awards, stock or stock-related awards, fringe benefits or other employee benefits or remuneration of any kind, whether formal or informal, currently in effect or previously in effect, funded or unfunded and whether or not legally binding, including without limitation, each "employee benefit plan", within the meaning of Section 3(3) of ERISA which is or has been maintained, contributed to, or required to be contributed to, by Site or any Affiliate for the benefit of any "Employee" (as defined below), and pursuant to which Site or any Affiliate has or may have any material liability contingent or otherwise;

KS2::ODMA\PCDOCS\SQL203997811\5                    -11-

INT_EGG_000041

8-JUL-97  3:34p

(iv)  "Employee" shall mean any current, former, or retired employee, officer, or director of Site or any Affiliate;

(v)  "IRS" shall mean the Internal Revenue Service;

(vi)  "Multiemployer Plan" shall mean any "Pension Plan" (as defined below) which is a "multiemployer plan", as defined in Section 3(37) of ERISA; and

(vii)  "Pension Plan" shall refer to each Site Employee Plan which is an "employee pension benefit plan", within the meaning of Section 3(2) of ERISA.

(b)  Schedule.  The Site Disclosure Schedule contains an accurate and complete list of each Site Employee Plan.  Site does not now, nor has it ever, maintained, established, sponsored, participated in, or contributed to, (i) any Pension Plan which is subject to Part 3 of Subtitle B of Title I of ERISA, Title IV of ERISA or Section 412 of the Code or (ii) any plan under Section 401(k) of the Code.  At no time has Site contributed to or been requested to contribute to any Multiemployer Plan.

(c)  Documents.  Site has provided to DeltaPoint (i) correct and complete copies of all documents embodying each Site Employee Plan, including summary plan descriptions and including all amendments thereto and written interpretations thereof; and (ii) all material written agreements and contracts relating to each Site Employee Plan, including, but not limited to, administration service agreements, group annuity contracts and group insurance contracts.

(d)  Employee Plan Compliance.  Site has performed in all material respects all obligations required to be performed by it under, is not in default or violation of, and has no knowledge of any default or violation by any other party of any Company Employee Plan, Site Employee Plan, and each Site Employee Plan has been established and maintained in all material respects in accordance with its terms and in compliance with all applicable laws, statutes, orders, rules and regulations, including but not limited to ERISA or the Code.

(e)  No Post-Employment Obligations.  No Site Employee Plan provides, or has any liability to provide, life insurance, medical or other employee benefits to any Employee upon his or her retirement or termination of employment for any reason, except as may be required by the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA") or any other applicable statute, and Site has never represented, promised or contracted (whether in oral or written form) to any Employee (either individually or to Employees as a group) that such Employee(s) would be provided with life insurance, medical or other employee welfare benefits upon their retirement or termination of employment, except to the extent required by statute.

(f)  COBRA Requirements.  Neither Site nor any Affiliate has, in any material respect, violated any of the health care continuation requirements of COBRA or any similar provisions of state law applicable to its employees.

(g)  Effect of Transaction.

(i)  The execution of this Agreement and the consummation of the transactions contemplated hereby will not (either alone or upon the occurrence of any additional or subsequent events)

07/08/97  15:19    WILSON SONSINI + B E, CA 60    Room,    NO.591  P013

INT_EGG_000042

constitute an event under any Site Employee Plan or trust or loan that will or may result in any payment (whether of severance pay or otherwise), acceleration, forgiveness of indebtedness, vesting, distribution, increase in benefits or obligation to fund benefits with respect to any Employee.

          (ii)     No payment or benefit which will or may be made by Site or DeltaPoint or any of their respective affiliates with respect to any Employee will be characterized as an "excess parachute payment", within the meaning of Section 280G(b)(1) of the Code.

          (h)     <u>Employment Matters</u>. Site (i) is in compliance in all material respects with all applicable foreign, federal, state and local laws, rules and regulations respecting employment, employment practices, terms and conditions of employment and wages and hours, in each case, with respect to Employees; (ii) has withheld all amounts required by law or by agreement to be withheld from the wages, salaries and other payments to Employees; (iii) is not liable for any arrears of wages or any taxes or any penalty for failure to comply with any of the foregoing; and (iv) is not liable for any payment to any trust or other fund or to any governmental or administrative authority, with respect to unemployment compensation benefits, social security or other benefits or obligations for Employees (other than routine payments to be made in the normal course of business and consistent with past practice).

          (i)     <u>Labor</u>. No work stoppage or labor strike against Site is pending or, to the best knowledge of Site, threatened. Site is not involved in or, to the knowledge of Site, threatened with, any labor dispute, grievance, or litigation relating to labor, safety or discrimination matters involving any Employee, including, without limitation, charges of unfair labor practices or discrimination complaints, which, if adversely determined, would, individually or in the aggregate, result in material liability to Site. Neither Site nor any of its subsidiaries has engaged in any unfair labor practices within the meaning of the National Labor Relations Act which would, individually or in the aggregate, directly or indirectly result in a material liability to Site. Site is not presently, nor has it been in the past, a party to, or bound by, any collective bargaining agreement or union contract with respect to Employees and no collective bargaining agreement is being negotiated by Site.

    2.20    <u>Representations Complete</u>. None of the representations or warranties made by Site (as modified by the Site Disclosure Schedule), nor any written statement made in any schedule or certificate furnished by Site pursuant to this Agreement, contains any untrue statement of a material fact, or omits to state any material fact necessary in order to make the statements contained herein or therein, in the light of the circumstances under which made, not misleading.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF PRINCIPAL SITE STOCKHOLDERS

    Each of the Principal Site Stockholders hereby represents and warrants to DeltaPoint, subject to such exceptions as are specifically disclosed, with reference to the appropriate section number, in the Site Disclosure Schedule provided to DeltaPoint on the date hereof (the "<u>Site Disclosure Schedule</u>"), as follows:

    3.1    <u>Site Stockholder Shares</u>.

          (a)     Such Site Stockholder owns of record and beneficially all shares of Site Stock set forth opposite such Site Stockholder's name under Section 2.2 of the Site Disclosure Schedule; and

INT_EGG_000043

(b)     Such Site Stockholder has good and marketable title to such shares of Site Stock free and clear of all liens, claims, security interests, charges, options, or other encumbrances of any kind.

3.2     Authority. Such Site Stockholder has all requisite power and authority to enter into this Agreement (and any agreement referenced in Article V hereto to which such Site Stockholder is a party to) and to consummate the transactions contemplated hereby (and thereby) This Agreement, and any agreement referenced in Article V hereto to which such Site Stockholder is a party to, have been duly executed and delivered by such Principal Site Stockholders, and constitutes the legally valid and binding obligations of such Site Stockholder. The execution and delivery of this Agreement, and any agreement referenced in Article V hereto to which such Site Stockholder is a party to, by such Site Stockholder does not, and the consummation of the transactions contemplated hereby and thereby will not, conflict with, or result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to a right of termination, cancellation, modification or acceleration of any obligation or loss of any benefit under (any such event, a "SH Conflict") any mortgage, indenture, lease, contract or other agreement or instrument, permit, concession, franchise, license, judgment, order, decree, statute, law, ordinance, rule or regulation applicable to such Site Stockholder. No consent, waiver, approval, order or authorization of, or registration, declaration or filing with any Governmental Entity or any third party, including a party to any agreement with such Site Stockholder (so as not to trigger any SH Conflict) is required by or with respect to such Site Stockholder in connection with the execution and delivery of this Agreement, and any agreement referenced in Article V hereto to which such Site Stockholder is a party to, or the consummation of the transactions contemplated hereby or thereby, except for those consents that have been previously obtained and are listed on the Site Disclosure Schedule.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF DELTAPOINT

DeltaPoint represents and warrants to Site, subject to such exceptions as are specifically disclosed, with reference to the appropriate section number, in the DeltaPoint Disclosure Schedule provided to Site on the date hereof (the "DeltaPoint Disclosure Schedule"), as follows:

4.1     Organization. Standing and Power. DeltaPoint is a corporation duly organized, validly existing and in good standing under the laws of the State of California. DeltaPoint has the corporate power to own its properties and to carry on its business as now being conducted and as proposed to be conducted by DeltaPoint. DeltaPoint is duly qualified to do business and in good standing as a foreign corporation in each jurisdiction in which the failure to be so qualified would have a Material Adverse Effect.

4.2     Authority. DeltaPoint has all requisite corporate power and authority to enter into this Agreement and to consummate the transactions contemplated hereby. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all necessary corporate action on the part of DeltaPoint. This Agreement have been duly executed and delivered by DeltaPoint and constitutes the valid and binding obligation of DeltaPoint, enforceable in accordance with its terms. The execution and delivery of this Agreement by DeltaPoint does not, and the performance by DeltaPoint of its obligations hereunder will not, conflict with (i) any provision of the Certificate of Incorporation or Bylaws of DeltaPoint or (ii) any mortgage, indenture, lease, contract or other agreement or instrument, permit, concession, franchise, license, judgment, order, decree, statute, law, ordinance, rule or regulation applicable to DeltaPoint or its properties or assets, except where such conflict would not have a

K82:ODMA\PCDOCS\SQL2\39978\15                      -14-

INT_EGG_000044

Material Adverse Effect. No consent, waiver, approval, order or authorization of, or registration, declaration or filing (the lack of which would have a Material Adverse Effect) with any Governmental Entity or any third party is required by or with respect to DeltaPoint in connection with the execution and delivery of this Agreement or the performance by DeltaPoint of their respective obligations hereunder, except for those obtained prior to the Acquisition

4.3     SEC Documents; DeltaPoint Financial Statements. DeltaPoint has furnished or made available to Site true and complete copies of all reports or registration statements filed by it with the U.S. Securities and Exchange Commission (the "SEC") since December 19, 1995, all in the form so filed (all of the foregoing being collectively referred to as the "SEC Documents"). As of their respective filing dates, the SEC Documents complied in all material respects with the requirements of the Securities Act of 1933, as amended (the "Securities Act") or the Securities Exchange Act of 1934, as amended (the "Exchange Act"), as the case may be, and none of the SEC Documents contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances in which they were made, not misleading, except to the extent corrected by a document subsequently filed with the SEC. The financial statements of DeltaPoint, including the notes thereto, included in the SEC Documents (the "DeltaPoint Financial Statements") comply as to form in all material respects with applicable accounting requirements and with the published rules and regulations of the SEC with respect thereto, have been prepared in accordance with GAAP consistently applied (except as may be indicated in the notes thereto or, in the case of unaudited statements, as permitted by Form 10-Q of the SEC) and present fairly the consolidated financial position of DeltaPoint at the dates thereof and the consolidated results of its operations and cash flows for the periods then ended (subject, in the case of unaudited statements, to normal audit adjustments).

4.4     No Material Adverse Change. Since the date of the balance sheet included in DeltaPoint's most recently filed report on Form 10-K or 10-Q, DeltaPoint has conducted its business in the ordinary course and there has not occurred: (a) any material adverse change in the financial condition, liabilities, assets or business of DeltaPoint and its subsidiaries, taken as a whole; (b) any amendment or change in the Certificate of Incorporation or Bylaws of DeltaPoint (other than restatements of the Certificate of Incorporation which did not require stockholders' approval); or (c) any damage to, destruction or loss of any assets of DeltaPoint, (whether or not covered by insurance) that materially and adversely affects the financial condition or business of DeltaPoint and its subsidiaries, taken as a whole.

4.5     Litigation. There is no action, suit, proceeding, claim, arbitration or investigation pending, or as to which DeltaPoint has received any notice of assertion against DeltaPoint, which in any manner challenges or seeks to prevent, enjoin, alter or materially delay any of the transactions contemplated by this Agreement or, if adversely determined, is reasonably likely to have a material adverse effect on the financial condition or business of DeltaPoint as a whole.

4.6     Brokers and Finders' Fees. DeltaPoint has not incurred, now will incur, directly or indirectly, any liability for brokerage or finders' fees or agents' commissions or any similar charges in connection with this Agreement or any transaction contemplated hereby other than as to be satisfied pursuant to the terms of Section 5.8 hereof.

4.7     Securities Law Compliance; Due Issuance. The issuance of the shares of DeltaPoint Common Stock pursuant to this Agreement are transactions exempt from the registration provisions under the Securities Act of 1933, as amended, and applicable state securities laws. Upon issuance of the shares of

KS2::ODMA\PCDOCS\SQL203897\1\5

-15-

INT_EGG_000045

8-JUL-97 3:34p

DeltaPoint Common Stock to be issued hereunder in accordance with the terms of this Agreement, such shares shall be duly authorized, validly issued, fully paid and non-assessable by DeltaPoint and not subject to preemptive rights created by statute, DeltaPoint's Articles of Incorporation or Bylaws or any agreement to which DeltaPoint is a party or by which it is bound.

## ARTICLE V
## COVENANTS

5.1     Expenses. All fees and expenses incurred in connection with the Acquisition, including without limitation, all legal, accounting, financial advisory, consulting and all other fees and expenses of third parties ("Third Party Expenses") incurred by DeltaPoint or Site (but not its stockholders) other than as to be satisfied pursuant to the terms of Section 5.8 hereof shall be the obligation of DeltaPoint; provided, however, that DeltaPoint shall not be responsible for reasonable Third Party Expenses for actual billed time and expenses of Site exceeding $[0 to 40,000]². The Principal Site Stockholders shall be responsible for, pro rata with respect to their relative ownership of Site capital stock immediately prior to the Acquisition, all other Third Party Expenses.

5.2     Noncompetition Agreements. Concurrent with the execution and delivery of this Agreement, DeltaPoint and each of Ron Sauers, Shawn Cannon and Anil Peres-Da-Silva are entering into a Noncompetition Agreement substantially in the form of Exhibit C hereto.

5.3     Registration Rights Agreement. Concurrent with the execution and delivery of this Agreement, DeltaPoint, Allan Kaplan Investments, Ron Sauers, Shawn Cannon, Anil Peres-Da-Silva and each of those other persons or entities who or which were preferred stockholders of Site immediately prior to the Acquisition shall enter into a Registration Rights Agreement substantially in the form of Exhibit D hereto.

5.4     Employment of Site Employees. Concurrent with the execution and delivery of this Agreement, DeltaPoint agrees to enter into employment agreements with Ron Sauers, Shawn Cannon and Anil Peres-Da-Silva (the "Employees") on terms mutually satisfactory to such Employees and DeltaPoint. Such employment agreements shall provide that DeltaPoint will provide office space located in or about Raleigh, North Carolina for such Employees that remain in Site's or DeltaPoint's employ and fund Site's operations in such location sufficiently to permit the employment of such employees that remain in Site's or DeltaPoint's employ until the later of (i) the first anniversary of this Agreement or (ii) the date occurring three months after DeltaPoint gives written notice to such Employees of its intent to re-locate the place of their employment.

5.5     Appointment to DeltaPoint Board. Concurrent with the execution and delivery of this Agreement, Stephen Mendel is being appointed to serve as a member of the Board of Directors of DeltaPoint until his successor is elected and qualified.

---

²     Open issue - proposed by Site to be $40,000.

07/08/97  15:19        WILSON SONSINI -> 6 E. CA 60      Room         NO.591  P017

INT_EGG_000046

[8-JUL-97 3:34p]

5.6    Royalty.

(a)    DeltaPoint agrees that for the first 12 months after First Customer Shipment (as defined below) of SiteSweeper 2 by DeltaPoint or Site, it or Site will pay to those who receive shares of DeltaPoint Common Stock pursuant to this Agreement (the "Holders") aggregate royalties calculated at the rate of 5% of net revenues, if any, received by DeltaPoint for units of SiteSweeper 2 or successor products sold, licensed, sublicensed or distributed by DeltaPoint, Site or any of their related or affiliated entities to unaffiliated third parties.  Such royalties shall be paid to the Holders pro rata in accordance with the respective number of shares of DeltaPoint Common Stock received by the Holders pursuant to this Agreement.  For purpose of this Section 5.6, the term "First Customer Shipment" shall mean the first commercial shipment of SiteSweeper 2 by DeltaPoint or its agents or customers to any retail distributor or other customer that is:  (i) paying a license fee or purchase price therefor, (ii) not an alpha or beta site evaluation customer of such product and (iii) not a purchaser of the product through sales over the Internet or from DeltaPoint's web site.  For the purpose of this Section 5.6, the term "net revenues" shall mean actual cash receipts less taxes, duties, excises, other governmental charges and fees of any kind, refunds, credits and returns.

(b)    Within forty-five (45) days after the end of each fiscal quarter during the twelve months after the First Customer Shipment of SiteSweeper 2, DeltaPoint or Site will provide each of the Holders with a statement of net revenues and the royalties due to the Holders calculated at a rate of 5% of such net revenues, if any, received by DeltaPoint for units of SiteSweeper 2 or successor products sold, licensed, sublicensed or distributed by DeltaPoint, Site or any of their related or affiliated entities to unaffiliated third parties, during the first year after First Customer Shipment of SiteSweeper 2 (the "Royalty Statement").  In conjunction with any such Royalty Statement, DeltaPoint or Site will pay each Holder the royalties determined to be due as a result of such sales in cash or check by wire transfer.  The Holders shall have the right, at their cost, to have an independent auditor of the Holders' choice perform an audit of the books and financial records of DeltaPoint, Site or any of their related or affiliated entities to verify the accuracy and completeness of payments pursuant to this Section 5.6 on reasonable notice to DeltaPoint during DeltaPoint's business hours at the expense of the Holders, provided that such audit shall occur not later than 180 days following the end of the first anniversary of the date of First Customer Shipment of SiteSweeper 2.  If such audit determines that there has been an underpayment to the Holders, DeltaPoint shall remit such amount pro-rata to the Holders and if such amount is greater than 10% of the royalties originally paid, then DeltaPoint shall reimburse the Holders for the reasonable cost of the audit.

(c)    The payments made under this Section 5.6 to Ron Sauers, Shawn Cannon and Anil Peres-Da-Silva are being made in satisfaction of certain salary amounts owed to such persons and shall be subject to and conditioned upon proper withholding of taxes for such payments, which withholdings shall be (i) paid by such respective persons to Site and/or DeltaPoint or (ii) deducted from other amounts to be paid to such respective persons by Site and/or DeltaPoint.

5.7    Officers and Directors.  Effective upon the signing and delivery of this of the Agreement, the officers and directors of Site, pursuant to resignations and appointments accomplished by Site prior to but effective upon such time, shall be identical to the officers and directors of DeltaPoint then in office.

5.8    Certain Fees.  Upon the signing and delivery of this of the Agreement and in full satisfaction of any finder's fees, financial advisory fees or other fees due to Allan Kaplan Investments in connection with the transactions contemplated by this Agreement, DeltaPoint shall, subject to Allan Kaplan Investments

07/08/97  15:19      WILSON SONSINI → G E. CA 60     ROOM .     NO. 591  P018

INT_EGG_000047

executing and delivering to DeltaPoint a release in the form of Exhibit E hereto, issue to Allan Kaplan Investments 33,250 shares of DeltaPoint Common Stock.

  5.9  Payment of Salaries. Upon the signing and delivery of this of the Agreement and in satisfaction of certain salary amounts owed to Ron Sauers, Shawn Cannon and Anil Peres-Da-Silva, DeltaPoint shall issue to Ron Sauers, Shawn Cannon and Anil Peres-Da-Silva [_____, _____ and _____][4] shares, respectively, of DeltaPoint Common Stock, subject to and conditioned upon proper withholding of taxes for such payments, which withholdings shall be (i) paid by such respective persons to Site and/or DeltaPoint or (ii) deducted from other amounts to be paid to such respective persons by Site and/or DeltaPoint.

<br>

# ARTICLE VI
## SURVIVAL OF REPRESENTATIONS AND WARRANTIES; INDEMNIFICATION

  6.1  Survival of Representations and Warranties; Indemnification. All of the representations and warranties in this Agreement shall survive the Acquisition and continue until 5:00 p.m., California time, on the date which is one year following the date of this Agreement. The Principal Site Stockholders, jointly and severally, agree to indemnify and hold harmless each of DeltaPoint, Site and their affiliates for any claims, losses, liabilities, damages, deficiencies, costs and expenses, including reasonable attorneys' fees and expenses, and expenses of investigation and defense (hereinafter individually a "Loss" and collectively "Losses") incurred by DeltaPoint, Site, their officers, directors, or affiliates directly or indirectly within one year of the date of this Agreement as a result of (A) any inaccuracy or breach of a representation or warranty of Site and/or Principal Site Stockholders contained herein, (B) any failure by Site or Principal Site Stockholders to perform or comply with any covenant contained herein or (C) any failure of a Stockholder of Site to enter into this Agreement as a Principal Site Stockholder or an other Site Stockholder; provided (i) that the indemnification obligation of each Site Stockholder under this Section 6.1 shall be limited to the total consideration received by such party pursuant to this Agreement if such Site Stockholder's willful conduct or fraud did not cause the presence of such Losses; provided (ii) that Principal Site Stockholders shall have no indemnification obligations under this Section 6.1 until the aggregate Losses exceed $25,000, at which time Principal Site Stockholders shall indemnify for all Losses subject only to the limitation imposed by provision (i) above. As defined above, "Loss" and "Losses" shall exclude the amount of any tax benefit actually received by the indemnified party as a result of such Losses, after taking into account the tax consequences of any related indemnification payment made under this Article VI in relation to such Losses. If such benefits have not yet been actually received at the time for the payment of indemnification hereunder, then the related Losses shall not exclude such benefit, but such benefit, when received, shall be refunded to the indemnifying party.

  6.2  DeltaPoint's Knowledge of Breaches. DeltaPoint shall not be barred from receiving indemnification under this Article VI because it had knowledge, prior to the date of this Agreement or at any other time, of a breach of representation, warranty or covenant of Site or a Site Stockholder.

<br>

---

  [4]  The blanks appearing in 5.9 shall total 15,503.

KS2:\ODMA\PCDOCS\SQL2\038978\1\5       -18-

INT_EGG_000048

6.3    **Materiality.** For the purposes of determining the amount of Losses under this Article VI, all representations and warranties of Site or a Site Stockholder contained herein or in any instrument, document or agreement contemplated hereby shall be deemed to be without any materiality or material adverse effect exceptions or qualifications or any similar exceptions or qualifications that may be present in such representations and warranties.

6.4    **No Right of Contribution.** The Principal Site Stockholders shall have no right of contribution against Site for any Losses.

6.5    **Third-Party Claims.** In the event DeltaPoint becomes aware of a third-party claim which DeltaPoint believes may result in Losses, DeltaPoint shall notify the Principal Site Stockholders of such claim, and the Principal Site Stockholders shall be entitled, at their expense, to participate in any defense of such claim. DeltaPoint shall have the right in its sole discretion, using reasonable business judgment, to settle any such claim; provided, however, that except with the consent of the Principal Site Stockholders, the amount of the settlement of any such claim with third-party claimants shall not be determinative of the amount of any claim under this Article VI. In the event that the Principal Site Stockholders have consented to any such settlement, the Principal Site Stockholders shall have no power or authority to object under any provision of this Agreement to the amount of any claim by DeltaPoint under this Article VI with respect to such settlement to the extent that such amount is consistent with the terms of such settlement.

6.6    **Indemnification of Principal Site Stockholders.** DeltaPoint agrees to indemnify and hold harmless the stockholders of Site (including the Principal Site Stockholders) for any Losses incurred by them directly or indirectly within one year of the date of this Agreement as a result of (A) any inaccuracy or breach of a representation or warranty of DeltaPoint contained herein or in any instrument, document or agreement contemplated hereby or (B) any failure by DeltaPoint to perform or comply with any covenant contained herein; provided (i) that the indemnification obligation of DeltaPoint under this Section 6.6 shall be limited to the total consideration, in the form of cash and shares of DeltaPoint Common Stock, that the stockholders of Site are entitled to pursuant to Section 1.1 of this Agreement if willful misconduct or fraud by DeltaPoint did not cause the presence of Losses and (ii) that DeltaPoint shall have no indemnification obligations under this Section 6.6 until the aggregate Losses exceed $25,000, at which time DeltaPoint shall indemnify for all Losses subject only to the limitation imposed by provision (i) above.

6.7    **Site Stockholder Representative.** Steven Fingerhood (the "Site Shareholder Representative") is hereby irrevocably appointed as agent of the Site Shareholders to make all determinations and decisions under or relating to this Article VI that would otherwise be made by the Site Shareholders on their own behalf. The Site Shareholder Representative shall have full authority to take all actions on behalf of the Site Shareholders with respect to any indemnification claims by or against them pursuant to this Article VI including, but not limited to, any actions relating to settlement discussion, negotiations or agreements. The foregoing shall be deemed a full and irrevocable power of attorney coupled with an interest.

INT_EGG_000049

# ARTICLE VII
# GENERAL PROVISIONS

7.1 **Amendment; Waiver.** This Agreement may be amended by the parties hereto at any time by execution of an instrument in writing signed on behalf of each of the parties hereto. Any agreement on the part of a party hereto to any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of such party.

7.2 **Interpretation.** The words "include," "includes" and "including" when used herein shall be deemed in each case to be followed by the words "without limitation." The table of contents and headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

7.3 **Counterparts.** This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other party, it being understood that all parties need not sign the same counterpart.

7.4 **Entire Agreement; Assignment.** This Agreement, the Schedules and Exhibits hereto, and the documents and instruments and other agreements among the parties hereto referenced herein: (a) constitute the entire agreement among the parties with respect to the subject matter hereof and supersede all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof; (b) are not intended to confer upon any other person any rights or remedies hereunder; and (c) shall not be assigned by operation of law or otherwise except as otherwise specifically provided, except that DeltaPoint and Site may assign their respective rights and delegate their respective obligations hereunder to their respective affiliates.

7.5 **Severability.** In the event that any provision of this Agreement or the application thereof becomes or is declared by a court of competent jurisdiction to be illegal, void or unenforceable, the remainder of this Agreement will continue in full force and effect, and the application of such provision to other persons or circumstances will be interpreted so as reasonably to effect the intent of the parties hereto. The parties further agree to replace such void or unenforceable provision of this Agreement with a valid and enforceable provision that will achieve, to the extent possible, the economic, business and other purposes of such void or unenforceable provision.

7.6 **Other Remedies.** Except as otherwise provided herein, any and all remedies herein expressly conferred upon a party will be deemed cumulative with and not exclusive of any other remedy conferred hereby, or by law or equity upon such party, and the exercise by a party of any one remedy will not preclude the exercise of any other remedy.

7.7 **Governing Law; Forum.** This Agreement shall be governed by and construed in accordance with the laws of the State of California, regardless of the laws that might otherwise govern under applicable principles of conflicts of laws thereof. Each of the parties hereto agrees that process may be served upon them in any manner authorized by the laws of the State of California for such persons and waives and covenants not to assert or plead any objection which they might otherwise have to such jurisdiction and such process. The parties expressly stipulate that any litigation under this Agreement shall be brought in the state

KS1-ODMA\PCDOCS\SQL2\38978\5          **-20-**

INT_EGG_000050

courts of the County of Santa Clara, California and in the United States District Court for the Northern District of California. The parties agree to submit to the jurisdiction and venue of those courts.

      7.8    Rules of Construction. The parties hereto agree that they have been represented by counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any law, regulation, holding or rule of construction providing that ambiguities in an agreement or other document will be construed against the party drafting such agreement or document.

      7.9    Specific Performance. The parties hereto agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in any court of the United States or any state having jurisdiction, this being in addition to any other remedy to which they are entitled at law or in equity.

      7.10    Further Assurances. If, at any time after the Acquisition, any such further action is necessary or desirable to carry out the purposes of this Agreement, the parties hereto will take all such lawful and necessary action.

      7.11    Waiver of Jury Trial. EACH OF THE PARTIES HERETO EXPRESSLY WAIVES ANY RIGHT TO A TRIAL BY A JURY IN ANY ACTION OR PROCEEDING RELATED TO OR TO ENFORCE OR DEFEND ANY RIGHT, POWER OR REMEDY UNDER, IN RESPECT OF, RELATED TO OR CONTEMPLATED BY THIS AGREEMENT OR ANY AMENDMENT, SUPPLEMENT, AGREEMENT, INSTRUMENT OR DOCUMENT DELIVERED IN CONNECTION HEREWITH OR THEREWITH OR ARISING FROM ANY RELATIONSHIP EXISTING IN CONNECTION WITH OR ARISING OUT OF THIS AGREEMENT, AND AGREES THAT ANY SUCH ACTION SHALL BE RESOLVED BEFORE A COURT AND NOT A JURY.

      7.12    No Third-Party Beneficiaries. This Agreement shall not confer any rights or remedies upon any person or entity other than the parties hereto and their respective successors and permitted assigns, other than as set forth in Article VI hereof.

      7.13    Notices. Any and all notices permitted or required to be given under this Agreement must be in writing. Notices will be deemed given (i) when personally received or when sent by facsimile transmission (to the receiving party's facsimile number), (ii) on the first business day after having been sent by commercial overnight courier with written verification of receipt, or (iii) on the third business day after having been sent by registered or certified mail from a location on the United States mainland, return receipt requested, postage prepaid, whichever occurs first, at the address set forth below or at any new address, notice of which will have been given in accordance with this Section:

If to DeltaPoint:            DeltaPoint, Inc.
                           22 Lower Ragsdale Drive
                           Monterey, CA 93940
                           Attn: Jeffrey F. Ait

KSZ.:ODMA\PCDOCS\SQL2\03597\U5               -21-

INT_EGG_000051

[8-JUL-97  3:34p]

With a copy to:           Wilson Sonsini Goodrich & Rosati
650 Page Mill Road
Palo Alto California 94304-1050
Attn: Jeffrey D. Saper, Esq.

If to a Site Stockholder, at such Site Stockholder's address set forth on the signature page of this Agreement beneath such Site Stockholder's name or at such other address provided to DeltaPoint by such Site Stockholder.

    7.14    <u>Independent Counsel</u>.

        (a)    The Site Shareholders have had the opportunity to be represented by counsel of their choosing in the negotiation and execution of this Agreement and have not relied upon counsel for Site, General Counsel Associates LLP and Dorsey & Whitney, or counsel for DeltaPoint, Wilson Sonsini Goodrich & Rosati, P.C., with respect to any matter relating hereto.

        (b)    Site has been represented by General Counsel Associates LLP and Dorsey & Whitney in the negotiation and execution of this Agreement and has not relied on any other legal counsel with respect to any matter relating thereto.  DeltaPoint has been represented by Wilson Sonsini Goodrich & Rosati, P.C., in the negotiation and execution of this Agreement and has not relied on any other legal counsel with respect to any matter relating thereto.

INT_EGG_000052

8-JUL-97 3:35p

IN WITNESS WHEREOF, DeltaPoint, Site and Principal Site Stockholders have caused this Agreement to be signed (by their duly authorized respective officers, as applicable), all as of the date first written above.

**DELTAPOINT, INC.:**                    **SITE/TECHNOLOGIES/INC.:**

By_____               By_____
Name:_____               Name:_____
Title:_____               Title:_____

For the purposes of Articles I, VI and VII of the Agreement only:
**PRINCIPAL SITE STOCKHOLDERS:**

SLF Partners II, L.P.:

By:_____
    Name:_____
    Title:_____
    Address:_____

SLF Partners III, L.P.:

By:_____
    Name:_____
    Title:_____
    Address:_____

JG Partnership Ltd.:

By:_____
    Name:_____
    Title:_____
    Address:_____

Chrysalis Ventures Limited Partnership:

By:_____
    Name:_____
    Title:_____
    Address:_____

07/08/97  15:19  WILSON SONSINI → 6 E. CA 6a  R90A .  NO.591  P024

INT_EGG_000053

Windcrest Partners:

By:_____
    Name:_____
    Title:_____
    Address:_____
           _____


For the purposes of Articles I and VII of the Agreement only:
**OTHER SITE STOCKHOLDERS:**


_____
Matthew Adler
Address:_____
        _____


_____
Benjamin B. Brodey, M.D.
Address:_____
        _____


_____
Darrell J. Cannon
Address:_____
        _____


_____
Sallie Van Dyke DeGolia
Address:_____
        _____


_____
Richard DeGolia
Address:_____
        _____


KS2:ODMA\PCDOCS\SQL2\3897811\5          -24-

INT_EGG_000054

B-JUL-97 3:34p

Daniel Egger
Address: 2027 W. Club Blvd.
Durham, NC 27705


Gordon Link
Address:_____


Todd Schafer
Address:_____


WS Investment Company

By:_____
   Name:_____
   Title (if applicable:)_____
   Address:_____

07/08/97   15:20   WILSON SONSINI → 6 & E, CA &③   ANAMA   NO. 591   P026

INT_EGG_000055

[8-JUL-97 3:34p]

## INDEX OF EXHIBITS

**Exhibit**       **Description**
Exhibit A         Site Certificate of Incorporation
Exhibit B         Site Bylaws
Exhibit C         Form of Non-Compete Agreement
Exhibit D         Form of Registration Rights Agreement
Exhibit E         Form of Release

07.08.97  15:20    WILSON SONSINI → 6 E. CA 60    RODA ·           NO.591  P029

INT_EGG_000056