# EXHIBIT D
# PART 5

Dockets.Justia.com

Case 2:07-cv-00511-TJW-CE   Document 66-9   Filed 07/16/2008   Page 1 of 2

Page 1

Copyright 1997 Business Wire, Inc.
Business Wire

August 25, 1997, Monday

**DISTRIBUTION:** Business Editors & Computer Writers

**LENGTH:** 1154 words

**HEADLINE:** DeltaPoint and Site/technologies/inc. Deliver SiteSweeper 2.0 for Web Site Quality Control; Newest Version of Web Site Quality Assurance Software Offers Enhanced Reporting, Scalability, Configuration, and Performance for Web Professionals

**DATELINE:** MONTEREY, Calif.

**BODY:**

   Aug. 25, 1997-- Site/technologies/inc., a wholly owned subsidiary of DeltaPoint, Inc. (OTC BB:DTPT), today announced the release of SiteSweeper 2.0, the latest version of its Web site quality control software.

   SiteSweeper gives Web professionals an arsenal of configurable analysis tools and reports for ensuring the efficiency, effectiveness, and overall quality of their web sites.

   SiteSweeper can save busy Web professionals significant time by automatically generating customized Web site reports on a full range of quality control issues, with optimum multiple-server product performance, improved scalability and custom configuration.

   "Anyone who wants to attract, and keep, visitors to their Web site needs to pay attention to potential quality control problems," said Song Huang, VP of Product Management at DeltaPoint. "SiteSweeper is a powerful application for Web professionals responsible for maintaining Web site quality and integrity. SiteSweeper identifies quality issues such as missing files, slow pages, broken links, and distorted images and simplifies the considerable task of improving the speed and navigation of the Web site."

   "SiteSweeper is all about enhancing Web sites to increase productivity and profitability," commented Scott Allen, VP of Channel Marketing at DeltaPoint. "Everyone from Web content creators to Web masters to visitors will benefit from maximizing the information presentation and distribution from a Web site. The better and faster a company delivers information on their Web site, the better the perception in the mind of the customer."

Web Quality Control Application

   SiteSweeper can help Web managers improve the quality of their sites by providing reports on the number of broken links, slow pages caused by large images and excessive information, missing ALT attributes, missing image definitions, distorted images, problem page titles, and missing Meta tags.

Optimized Performance, Scalability, and Configuration Power

   SiteSweeper can sweep multiple sites on multiple servers (UNIX, OS2, Windows NT) in one session, including secure and proxy servers. SiteSweeper also understands HTTP, HTTPS, FTP and Gopher protocols, which allows the product to sweep a broad range of Web servers.

   Unlike other tools that require the user to invoke an analysis report manually, SiteSweeper can begin automatically sweeping a Web site at specified intervals and at specified times -- during off-peak hours -- to avoid overloading Web servers. SiteSweeper can parallel process to provide faster "sweeping," and users can specify up to 20 threads -- or different data gathering streams -- simultaneously for optimized performance. Able to sweep even larger sites than before, SiteSweeper is suited for environments scaling from small and medium businesses to corporate departments.

   SiteSweeper allows the Web professional to define customer quality configurations specific to each environment. For example, corporate users sweeping an Intranet site where everyone is on a high-bandwidth T1 line may not be concerned about large-sized Web pages that could take a long time to download. Web managers can define new limits if

**EXHIBIT 17**

Page 2
DeltaPoint and Site/technologies/inc.  Deliver SiteSweeper 2.0 for Web Site Quality Control; Newest Version of Web
Site Quality Assurance Software Offers Enhanced Reporting, Scalability, Configuration

desired and can customize reports for site-specific use.  If Web professionals find it necessary to sweep sites with different quality standards, SiteSweeper can save configurations so that complete analysis can be performed on these sites with little or no user intervention.

Extensive Reporting Capability

Web professionals now have the significant advantage of SiteSweeper's enhanced reporting features, which give them extensive site information at a glance, regardless of their operating platform. Java-based navigation allows users to view the platform-independent HTML reports in any browser, as well as share the reports.

In addition, Visual Quality Indicator charts graphically depict the information produced by the "sweep." A Site Atlas maps out the entire site structure and shows resource utilization such as server type, total Web site size, plus multiple views with active hyperlinks to all components of the Web site.  SiteSweeper contains an image catalog that lets users see at a glance a thumbnail of all images, organized by pages, that are in their Web site. Users can review images on their sites by browsing the SiteSweeper image catalog and can view images for content, copyright infringements, or quality control.  Plus, SiteSweeper's advanced reports analyze dynamic pages, forms and queries and note whether these requests elicit a response.

SiteSweeper Distribution

SiteSweeper 2.0 runs on Windows 95, Windows 3.1 and Windows NT, and is listed at $ 495.  An upgrade from SiteSweeper 1.0 is available for $ 249.  DeltaPoint plans to release SiteSweeper 2.0 on the company's Web site in Q3 with full-packaged product shipping shortly thereafter.

About DeltaPoint

Founded in 1989, DeltaPoint, Inc. is a provider of Web site creation, management, and quality assurance tools for Web-based business environments of all sizes.  The Company has business relationships in the Web tools arena with many vendors, including Sony, Earthlink, Compaq, MacMillan Press, Anawave, the Internet Mall and McGraw-Hill. DeltaPoint products are available through distribution, major retail stores and catalog merchants, as well as corporate resellers, international distributors and directly from the company.  Headquartered in Monterey, DeltaPoint can be reached at 800/446-6955 or through the World Wide Web at http://www.deltapoint.com . -0-

This press release contains forward-looking statements that involve risks and uncertainties.  DeltaPoint's actual results may differ from the results discussed or forecasted in the forward-looking statements due to factors that include, but are not limited to, risks associated with DeltaPoint's Internet strategy and DeltaPoint's recent completed and pending acquisitions.  Further information on potential factors that could affect the financial results of DeltaPoint are included in DeltaPoint's Report on Form 10-K for the year ended Dec. 31, 1996 and the report of Form 10-Q for the period ended June 30, 1997, each of which is on file with the Securities and Exchange Commission.

CONTACT: DeltaPoint, Inc.
        Scott Allen, 408/648-4000
        scott_allen@deltapoint.com
        or
        Stapleton Communications
        Ellen Brook, 415/988-9207 (Financial Media)
        ellen@stapleton.com

LOAD-DATE: August 26, 1997

## Bill of Sale, Assignment and License Agreement

This Bill of Sale, Assignment, and License Agreement is made this 16th day of September, 1998 (the "Effective Date"), by and between Site Technologies, Inc., a Corporation doing business in California ("Seller"), and Daniel Egger, a resident of the State of North Carolina ("Buyer").

WHEREAS Seller has agreed to sell and assign to Buyer and Buyer has agreed to purchase and accept from Seller, certain intellectual property, software, databases, and physical assets, defined below, for the consideration and terms set forth herein; and

WHEREAS Seller has in addition agreed to license certain software, defined below, as to which Seller desires to retain ownership but is willing to grant Buyer a perpetual, nonexclusive license, for the consideration and terms set forth herein;

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is hereby agreed as follows:

1.  <u>Purchased Assets</u>. The "Purchased Assets" shall include the following:

    (a)  PATENTS: U.S. Patent Number 5,544,352, filed June 14, 1993 (i.e., the "V-Search Patent"), and any additions, continuations, continuations in part, divisions, or extensions, reissues, renewals, or substitutions of such patent (including the "Aha Patent"), and any foreign counterpart of any of the foregoing, as well as all related documents and diagrams in the files of patent counsel;

    (b)  TRADEMARKS and COPYRIGHTS: All Seller's rights in "V-Search," "Aha," "Libertech," and any terms used in or associated with the "V-Search Publisher's Toolkit," as well as all logos and marketing and promotional material incorporating such marks;

    (c)  SOFTWARE and DATABASES: all software, whether source code or compiled, and all databases, associated with the V-Search data-visualization system or the Aha technology, including but not limited to all files contained on Drive D of the computer being conveyed as part of the sale (and reproduced in a separate set of tape backups), and enumerated in the memo prepared by Ron Sauers entitled "HIGH-LEVEL SUMMARY OF THE FILES CONTAINED ON DRIVE D:," attached hereto as Exhibit B and hereby incorporated by reference into this document;

    (d)  THIRD-PARTY LICENSES: rights to all license agreements, including the Folio Infobase license, obtained to generate and use the SOFTWARE and DATABASES enumerated above;

    (e)  PHYSICAL ASSETS: Extant copies of CD-ROMs and disks prepared for demonstrations of the V-Search technology, extant copies of the V-Search Publisher's Toolkit, extant

CASC:\WINDOWS\TEMP\SiteTech.assignment.doc

**PATENT**
**REEL: 018160 FRAME: 0501**

**EXHIBIT 18**

marketing materials, sales notebooks, etc., relating exclusively to the V-Search and Aha technologies - as well as the computer and backup tapes upon which the SOFTWARE and DATABASES enumerated above reside, and

        (f)   GOODWILL and CLAIMS: Any and all goodwill, and all claims and potential claims, relating to the Purchased Assets described above.

    2.   Seller warrants that it hereby transfers good and marketable title to the Purchased Assets, free and clear of all liabilities, mortgages, liens, pledges, charges, security interests, encumbrances or title retention agreements of any kind or nature,

    3.   Except for the foregoing warranty of title, THE PURCHASED ASSETS AND THE LICENSED SOFTWARE ARE PROVIDED "AS IS - WHERE IS" AND WITHOUT ANY WARRANTY OF ANY NATURE WHATSOEVER, IT BEING EXPRESSLY UNDERSTOOD AND AGREED THAT SELLER DISCLAIMS ALL OTHER WARRANTIES INCLUDING, BUT NOT LIMITED TO, WARRANTIES OF MERCHANTABILITY, NONINFRINGEMENT AND FITNESS FOR A PARTICULAR PURPOSE.

    4.   Buyer assumes no liabilities of Seller associated with the Purchased Assets or Licensed Software or the operation of the businesses related thereto prior to the Effective Date. Seller agrees to defend, indemnify, and hold Buyer harmless against any and all liabilities associated with the Purchased Assets or Licensed Software that arise prior to the Closing that may be asserted against Buyer after the Effective Date, provided (i) Buyer notifies Seller promptly in writing of such claim, (ii) Seller has sole control of the defense and all related settlement negotiations, and (iii) Buyer provides Seller with all reasonably necessary assistance to perform the foregoing. In no event shall Seller be liable under the foregoing for a claim based on modifications, adaptations or changes to the Licensed Software not made by Seller or for combinations of the Licensed Software with materials not furnished by Seller if such infringement would have been avoided but for such combination. Buyer agrees to defend, indemnify, and hold Seller harmless against any and all liabilities associated with the Purchased Assets that arise after the Effective Date, provided (i) Seller notifies Buyer promptly in writing of such claim, (ii) Buyer has sole control of the defense and all related settlement negotiations, and (iii) Seller provides Buyer with all reasonably necessary assistance to perform the foregoing.

    5.   IN NO EVENT SHALL THE MAXIMUM LIABILITY OF EITHER PARTY ARISING UNDER THIS AGREEMENT EXCEED THE AMOUNT PAID BY BUYER HEREUNDER. IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY LOST DATA OR CONTENT, LOST PROFITS OR FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL, EXEMPLARY OR PUNITIVE DAMAGES ARISING OUT OF OR RELATING TO THE PURCHASED ASSETS OR LICENSED SOFTWARE PROVIDED HEREUNDER, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, AND NOTWITHSTANDING THE FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY.

    6.   Purchase Price. In consideration of the Purchased Assets and the Licensed Software provided hereunder, Buyer shall pay Seller $100,000, payable in full on the Effective Date hereof.

**PATENT
REEL: 018160 FRAME: 0502**

7.    Licensed Software.  Buyer and Seller are aware that several components of Seller's software known as "SiteSweeper" are shared with the Purchased Assets.

Seller hereby grants Buyer a perpetual, worldwide, fully paid, nonexclusive license to copy, display, perform, create derivative works, distribute and otherwise use the Licensed Software, in source code form, solely in conjunction with the Purchased Assets. "Licensed Software" shall mean:

(a)    The "crawler" used to build Aha databases;

(b)    HTML Reporter - the reporter engine plus ISAPI extension; and

(c)    Miscellaneous utility files used by V-Search and/or Aha and also found in SiteSweeper.

Seller shall retain ownership of all copyrights and other rights in the Licensed Software, except that, although the Licensed Software is used in certain of the Purchased Assets, Seller shall have no ownership interest in such Purchased Assets.

8.    Further Assurances.

(a)    Seller agrees to instruct patent counsel, Dorsey and Whitney of Washington, D.C., that Seller has assigned to Buyer all such patent rights described above and such counsel is authorized and directed to make available and/or to deliver to Buyer all Seller's records relating to such patent rights.  Buyer may provide a copy of this Agreement to such counsel and this Agreement shall constitute Seller's authorization to release such files to Buyer.

(b)    Seller agrees from time to time, upon the request of the Buyer, to execute, acknowledge, and deliver all such further instruments, or perform such further acts, as may be necessary, in the opinion of the Buyer, in connection with the sale, assignment, conveyance, transfer and delivery of the Purchased Assets or the Licensed Software.

9.    Termination.  Either party may terminate this Agreement in the event of any material breach of the terms and conditions of this Agreement by the other party, which default continues in effect after the defaulting party has been provided with written notice of default and thirty (30) days to cure such default. Sections 1, 3, 4, 5, 6, 9 and 10 shall survive any termination of this Agreement.

10.    This Agreement, including the exhibits attached hereto, constitute the entire agreement and understanding of the parties with respect to the subject matter contained herein and supersede or cancel all prior agreements respecting such subject matter.  This Agreement may be amended only by a written instrument executed by all the parties or their successors or assigns.  This Agreement shall inure to the benefit of and be binding upon the parties hereto and their successors and assigns.  In the event any provision of this Agreement shall be held to be invalid, the remaining provisions of this Agreement shall be unimpaired and the parties will substitute a new enforceable provision of like economic intent and effect.  This Agreement may be executed in one or more counterparts and each counterpart deemed an original.  This Agreement may also be executed and

**PATENT**
**REEL: 018160 FRAME: 0503**

delivered in counterparts executed and delivered via facsimile transmission, and any such counterpart shall be deemed an original for all intents and purposes.

IN WITNESS HEREOF, the parties have caused this Agreement to be executed as of the Effective Date:

Buyer: _____     Seller: _____
        Daniel Egger                           Site Technologies
                                               Jeff Ait, Chief Executive Officer

Date: Sept. 16 '98                     Date: Sept 15, 1998

PATENT
REEL: 018160 FRAME: 0504

SITE TECHNOLOGIES, INC.                          Case No. 99-50736-1racz
_____                    _____
            Debtor                                          (If known)

## SCHEDULE G - EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Describe all executory contracts of any nature and all unexpired leases of real or personal property. Include any timeshare interests.

State nature of debtor's interest in contract, i.e., " Purchaser, " " Agent, " etc. State whether debtor is the lessor or lessee of a lease.

Provide the names and complete mailing addresses of all other parties to each lease or contract described.

NOTE:  A party listed on this schedule will not receive notice of the filing of this case unless the party is also scheduled in the appropriate schedule of creditors.

☐ Check this box if debtor has no executory contracts or unexpired leases.

| NAME AND MAILING ADDRESS, INCLUDING ZIP CODE, OF OTHER PARTIES TO LEASE OR CONTRACT | DESCRIPTION OF CONTRACT OR LEASE AND NATURE OF DEBTOR'S INTEREST.  STATE WHETHER LEASE IS FOR NONRESIDENTIAL REAL PROPERTY.  STATE CONTRACT NUMBER OF ANY GOVERNMENT CONTRACT |
|---|---|
| See Attached | |

Form 89G
(12/95)

EXHIBIT 19

Schedule G – Executory Contracts and Unexpired Leases

| Name & address | Description of Contract | Nature of Debtor Interest |
|---|---|---|
| 1 Pitney Bowes Credit Corp<br>PO Box 85460<br>Louisville, KY 40285 | Mail Equipment Lease | Lessee |
| 2 Ge Capital<br>PO Box 3083<br>Cedar Rapids, IA 52406 | Fax & Copy Machine Lease | Lessee |
| 3 Sprint Tellmaging<br>PO Box 6167<br>Carol Stream, IL 60197 | Voicemail System Lease | Lessee |
| 4 DFS Acceptance<br>PO Box 99200<br>Chicago, IL 60693 | Dell Computer Leases (2 machines) | Lessee |
| 5 First Alarm Security System<br>1111 Estates Drive<br>Seacliff, CA 95003 | Security System | Lessee |
| 6 Jeffrey F. Alt<br>337 Kingsbury Dr.<br>Aptos, CA 95003 | Employment Agreement | Employer |
| 7 Sharon L. Fugitt<br>1268 Adobe Lane<br>Pacific Grove, CA 93950 | Employment Agreement | Employer |
| 8 Carbonaro Creek Associates<br>PO Box 670<br>Cupertino, CA 95015 | Non Residential Real Property Lease | Lessee |

| | | |
|---|---|---|
| 9 FaultLine Corp.<br>380 El Pueblo Rd<br>Scotts Valley, CA 95066 | Non Residential Real Property Sub Lease | Sub Lessor |
| 10 Global Technologies<br>William French<br>155 Snowberry Lane<br>Dillon, CO 90435 | Assignment Agreement for QuickSite Product Line | Purchaser |
| 11 Global Technologies<br>William French<br>155 Snowberry Lane<br>Dillon, CO 90435 | Assignment Agreement for WebTools | Purchaser |
| 12 Unisys Corporation<br>General Patent & Technology Council<br>PO Box 500<br>Blue Bell, PA 19424 | GIF-LZW Software Patent License Agreement | Purchaser |
| 13 Molly Penguin<br>Todd C. Wilson<br>1569 Meadow Road<br>Columbus, OH 43212 | Map This License Agreement | Purchaser |
| 14 Omnicron Software Publishing Corp.<br>John Stolte<br>14 High Street<br>Cartersville, VA 23027 | Omnicron Spell Checker License Agreement | Purchaser |
| 15 FairCom Corporation<br>4006 West Broadway<br>Columbia, MO 65203 | C-Tree Plus License Agreement Serial # 472432 | Purchaser |
| 16 McLeodUSA Telecommunications Svcs<br>Mr. Randy Rings | Inlet Divestiture Corporation Acquisition 11/97 | Purchaser |

Atlanta, GA 30305

| | | |
|---|---|---|
| 24 | International Business Machines Corp.<br>Peter Schwarz<br>150 Kettletown Road MS 303<br>Southbury, CT 06488 | Software License Agreement #L96380 | Seller |
| 25 | Internet Direct<br>Paul Kraajvanger<br>544 Jersey Street #1<br>San Francisco, CA 94114 | Term Sheet - Distribution Agreement | Seller |
| 26 | MacMillan Digital Publishing USA<br>Richard Swadley<br>201 W. 103rd Street<br>Indianapolis, IN 46290 | Distribution Agreement | Seller |
| 27 | McAfee Associates, Inc.<br>Vice President Electronic Commerce<br>2710 Walsh Avenue<br>Santa Clara, CA 95051 | Distribution Agreement | Seller |
| 28 | NetNation Communication<br>Joseph Kibur<br>322-425 Carrall St.<br>Vancouver, BC V6B 6E3 | Binding Letter of Intent —Electronic Distribution Agrmt | Joint Agreement |
| 29 | Netcom, Inc.<br>Scott Brothers<br>1607 Luna Road<br>Dallas, TX | Partnership Agreement | Joint Agreement |
| 30 | Programmers Paradise, Inc.<br>1163 Shrewsbury Ave<br>Shrewbury, NJ 07702 | Dealer Agreement | Seller |

| | 6400 C. Street SW<br>Cedar Rapids, IA 52406 | | |
| 17 | Anawave Software, Inc.<br>Mr. Paul Summers<br>1300 Bristol North, Ste 220<br>Newport Beach, CA 92660 | Electronic & Package Goods Distribution Agrmt | Seller |
| 18 | CNET Direct, Inc.<br>1001 SW Fifth St, Ste 1100<br>Portland, OR 97204 | Software Commerce Agreement | Seller |
| 19 | CyberSource Corporation<br>Blake Burke<br>1050 Chestnut Street Ste 201<br>Menlo Park, CA 94025 | Electronic Software Reseller Agreement | Seller |
| 20 | Data Arts<br>Carol Bowlin<br>50 San Benito<br>Novato, CA 94945 | Binding Letter of Intent — Electronic Distrubition Agrmt | Joint Agreement |
| 21 | Eclipse marketing, Inc.<br>Pat Koberlein<br>16104 SW 22nd Ave<br>Portland, OR 97224 | Binding Letter of Intent — Electronic Distrubition Agrmt | Joint Agreement |
| 22 | Global Enterpreneurs Net<br>Mr. Halmann<br>100 North Tampa St.<br>Tampa, FL 33602 | Binding Letter of Intent — Electronic Distrubition Agrmt | Joint Agreement |
| 23 | HomeCom<br>Mike Hall<br>3535 Peldmont Rd. | Letter of intent — Partnership Agreement | Joint Agreement |

| | | |
|---|---|---|
| 31 System Connect<br>Mr. St. Arnaud<br>601 East 66th St, Ste 201<br>Savannah, GA 31405 | Binding Letter of Intent — Electronic Distribution Agrmt | Joint Agreement |
| 32 TestDrive Corporation<br>1397 Charleston Road<br>Mountain View, CA 94043 | Electronic Distribution Services Agreement | Seller |
| 33 Tidal Wave Communications, Inc.<br>Mr. Brian Bird<br>678 Jenny Leigh Ct.<br>Centerville, VA 22020 | Binding Letter of Intent — Electronic Distribution Agrmt | Joint Agreement |
| 34 Total-Access Communications<br>Mr. Darwish<br>2950 Thousand Oaks Blvd.<br>San Antonio, TX 78247 | Binding Letter of Intent — Electronic Distribution Agrmt | Joint Agreement |
| 35 VisionTeq, Inc.<br>Mr. Rothken<br>77 Mark Dr. Ste 4<br>San Rafael, CA 94903 | Binding Letter of Intent — Electronic Distribution Agrmt | Joint Agreement |
| 36 Mr. William G. Pryor<br>22610 Gallant Fox Road<br>Monterey, CA 93940 | Software License Agreement | Licensor |
| 37 Knowledge Vision<br>268 Patterson Dr.<br>Myrtle Beach, SC 29572 | Asset Purchase Agreement - WebAnimator Technology<br>November 1995 | Purchaser |
| 38 Site/Technologies/Inc.<br>380 El Pueblo Rd. | Stock Exchange Agreement to purchase<br>site/technologies/inc. corporation in July 1997 | Purchaser |

Scotts Valley, CA 95066

39 SPSS, Inc.

| | | |
|---|---|---|
| Asset Purchase Agreement - Deltagraph Product Line | Sale of Deltagraph product line in June 1997 | Seller |

40 Daniel Egger
2027 West Club Blvd
Durham, NC 27705

| | | |
|---|---|---|
| Asset Purchase Agreement -V Search Technology | September 1998 | Seller |

41 Altura Software
510 Lighthouse, Ave
Pacific Grove, CA 93950

| | | |
|---|---|---|
| Porting and Royalty License Agreement | Webanimtor for Windows Product Line | Purchaser |

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

SOFTWARE RIGHTS ARCHIVE, LLC

v.                                                      Civil Case No. 2:07-cv-511 (TJW)

GOOGLE INC., YAHOO! INC., IAC
SEARCH & MEDIA, INC., AOL, LLC,
AND LYCOS, INC.

DEFENDANTS' MOTION TO DISMISS FOR LACK OF STANDING

EXHIBIT 20

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................ I

TABLE OF AUTHORITIES .................................................................................................... II

I.      SUMMARY OF THE ARGUMENT .......................................................................... 1

II.     FACTS .......................................................................................................................... 2

        A.      The Inventors Assigned All Their Rights To Libertech ................................. 2

        B.      Libertech (a.k.a. Site/Technologies/Inc.) Never Assigned Its
                Rights To Egger ................................................................................................. 3

        C.      Egger's 2005 Assignment To Himself Was A Nullity And A
                Fraud ................................................................................................................... 5

        D.      SRA Acquired No Rights From Egger But Nonetheless Relied
                On The Void 2005 Assignment ......................................................................... 6

III.    ARGUMENT ................................................................................................................ 8

        A.      Applicable Law .................................................................................................. 8

        B.      SRA And Egger Never Acquired The Patents-In-Suit ................................... 9

                1.      The 1998 Assignment Did Not Transfer Title ................................... 9

                2.      The 2005 Assignment Transferred No Rights ................................ 11

                3.      No Document Grants SRA Title ....................................................... 12

IV.     CONCLUSION .......................................................................................................... 12

## TABLE OF AUTHORITIES

**Federal Cases**

*Crown Die & Tool Co. v. Nye Tool & Mach. Works*, 261 U.S. 24 (1923) ................................... 1

*Dole Food Co. v. Patrickson*, 538 U.S. 468 (2003) ................................................................... 10

*Enzo APA & Son, Inc. v. Geapag AG*, 134 F.3d 1090 (Fed. Cir. 1998) ................................... 1

*FilmTec Corp. v. Allied-Signal Inc.*, 939 F.2d 1568 (Fed. Cir. 1991) .................................... 8

*Howery v. Allstate Ins. Co.*, 243 F.3d 912 (5th Cir. 2001) ...................................................... 9

*Intellectual Prop. Dev., Inc. v. TCI Cablevision of CA, Inc.*, 248 F.3d 1333
    (Fed. Cir. 2001) ............................................................................................................ 8, 12

*Lans v. Digital Equip. Corp.*, 252 F.3d 1320 (Fed. Cir. 2001) ........................................... 8, 10

*LDM Techs., Inc. v. Rowen-Waters Group, LLC*, No. 02-73520, 2005 WL
    2449300 (E.D. Mich. Sept. 28, 2005) ............................................................................. 10

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ............................................................ 9

*Quantum Corp. v. Riverbed Tech., Inc.*, No. C 07-04161 WHA, 2008 WL
    314490 (N.D. Cal. Feb. 4, 2008) ..................................................................................... 2

*TM Patents, L.P. v. Int'l Bus. Machs. Corp.*, 121 F. Supp. 2d 349 (S.D.N.Y.
    2000) ............................................................................................................................... 12

**Federal Statutes**

11 U.S.C. § 1141 ....................................................................................................................... 2

35 U.S.C. § 261 ...................................................................................................................... 8, 9

35 U.S.C. § 281 ....................................................................................................................... 1

**Federal Rules**

Fed. R. Civ. Proc. 12(b)(1) ...................................................................................................... 1

**State Statutes**

Cal. Corp. Code § 1107(a) ................................................................................................... 5, 11

Del. Code tit. 8, § 259(a) ...................................................................................................... 5, 11

Del. Code tit. 8, § 271 ............................................................................................................ 2

Defendants Google Inc., Yahoo! Inc., IAC Search & Media, Inc., AOL LLC, and Lycos, Inc. (collectively, "Defendants") move the Court to dismiss this action for patent infringement for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1). Plaintiff Software Rights Archive, LLC ("SRA") brought this action alleging that Defendants infringe U.S. Patent Nos. 5,544,352 (the "'352 patent"), 5,832,494 (the "'494 patent"), and 6,233,571 (the "'571 patent") (collectively "the patents-in-suit"). However, contrary to the allegations made by SRA in its complaint, SRA is not the assignee of the patents-in-suit, and therefore lacks standing to bring this action.[1]

## I.     SUMMARY OF THE ARGUMENT

The right to sue for patent infringement is limited by statute and case law to the owner of the patent.[2] *See* 35 U.S.C. § 281 ("A patentee shall have remedy by civil action for infringement of his patent."); *Crown Die & Tool Co. v. Nye Tool & Mach. Works*, 261 U.S. 24, 40 (1923) ("[T]he plaintiff in an [infringement] action … must be the person or persons in whom the legal title to the patent resided at the time of the infringement."). If a party lacks ownership rights in the patent-in-suit at the time of filing its complaint, then there is no standing, and the case should be dismissed. Under Article III of the Constitution, a plaintiff must establish standing to sue before a federal court will consider the merits of its claims. As one court aptly noted:

> In light of the proliferation of patent-infringement actions, it is not too much to ask sophisticated patent litigants to be careful when it comes to the threshold issue of standing.… District judges cannot overlook a defect in the chain of title, for the entirety of massive litigation might wind up being vacated years later, for lack of threshold standing. As carpenters say, it is wise to "measure twice and cut once."

---

[1] Defendants have filed a complaint for declaratory judgment in the Northern District of California against Daniel Egger, SRA, and Site Technologies, Inc. Civil Action No. 3:08-cv-03172-MEJ. The Northern District of California is the proper venue and jurisdiction for resolving the controversies relating to Site Technologies, Inc. and its patents (Exhibit 1).

[2] While the Federal Circuit has made an exception to this standing rule for exclusive licensees with all substantial rights to a patent, *see Enzo APA & Son, Inc. v. Geapag AG*, 134 F.3d 1090, 1093-94 (Fed. Cir. 1998), nothing in Plaintiff's complaint alleges that SRA is an exclusive licensee with such rights.

*Quantum Corp. v. Riverbed Tech., Inc.*, No. C 07-04161 WHA, 2008 WL 314490, at *3 (N.D. Cal. Feb. 4, 2008) (citations omitted).

Here, SRA's complaint should be dismissed because it has never owned the patents-in-suit. SRA presumably will argue that its ownership arises from a February 22, 2005 assignment from Daniel Egger ("Egger"). Egger, however, had no patent rights to convey to SRA in February 2005. This is because neither of the two prior assignments that purported to convey rights to Egger actually conveyed any rights to the patents-in-suit:

1. The first assignment, the "1998 Assignment," was from Site Technologies, Inc., a California corporation, to Egger. However, Site Technologies, Inc. did not own the patents at that time, and the corporation's subsequent bankruptcy filing and confirmed Plan of Reorganization would have prevented Egger from obtaining the patents from the estate.

2. The second assignment, the "2005 Assignment," was from Site/Technologies/Inc., a Delaware corporation, to Egger for $1, via an instrument executed by Egger himself. However, by this time in 2005, Site/Technologies/Inc. did not even exist and Egger did not have authority to transfer its assets (much less to himself).[3] Moreover, applicable corporate and bankruptcy law would have required additional approvals for such an assignment to Egger, none of which were obtained.[4]

Thus, neither purported assignment granted Egger title to the patents-in-suit. And since Egger did not acquire the patents-in-suit, SRA did not acquire the patents-in-suit from him and thus has no standing to bring this action.

## II.   FACTS

### A.   The Inventors Assigned All Their Rights To Libertech

The '352 patent issued from Application Serial No. 08/076,658, which named Daniel Egger as its sole inventor. Pursuant to an assignment dated November 9, 1993 and recorded with

---

[3] These events are summarized in the timeline attached hereto as Exhibit 2.

[4] Under Delaware General Corporation Law § 271 and otherwise, the approval of shareholders and the board of directors of Site Technologies Inc. would have been required for such a transaction. No board then existed. Moreover, during bankruptcy, the sole shareholder/parent corporation could have acted only through a Responsible Person acting pursuant to the Chapter 11 Plan of Reorganization. *See* 11 U.S.C. § 1141.

the USPTO (Exhibit 3), Egger assigned all his rights in this application, and hence the '352 patent, to Libertech, Inc., a Delaware corporation that he founded in 1992.

On May 17, 1996, a continuation-in-part application to the '352 patent was filed. This application named Egger, as well as Shawn Cannon and Ronald D. Sauers, as inventors and later issued as the '494 patent. Pursuant to an assignment recorded with the USPTO (Exhibit 4), all three co-inventors assigned all their rights in the application that later issued as the '494 patent to Libertech, Inc. on June 18, 1996. A divisional application of the '494 patent later issued as the '571 patent.

As a result of these two assignments, all the rights to the patents-in-suit resided squarely with Libertech.

**B.     Libertech (a.k.a. Site/Technologies/Inc.) Never Assigned Its Rights To Egger**

On August 22, 1996, Libertech, Inc. changed its name to Site/Technologies/Inc. The name change was also recorded with the USPTO. (Exhibit 5). For ease of reference, we will continue to refer to both Libertech Inc. and Site/Technologies/Inc. as "Libertech" except where necessary to show correspondence to the documents.

On July 11, 1997, Deltapoint, Inc., a California corporation, purchased all the shares of Libertech pursuant to a Stock Exchange Agreement that Deltapoint publicly disclosed in an SEC filing (Exhibit 6). The Agreement was executed by Jeffrey Ait on behalf of Deltapoint and by Ron Sauers, on Libertech's behalf as its last President before the change of control. (See Exhibit 6 at p. 22). After being acquired as a subsidiary of Deltapoint, Libertech remained the sole holder of record title to the '352 patent and the applications that would issue as the '494 and '571 patents. Other Deltapoint filings and press releases confirmed Libertech's status as a wholly-owned subsidiary. See, e.g., Exhibits 7, 8 & 9.

Thereafter, Deltapoint, Inc., the California corporation and parent of Libertech, changed its name to Site Technologies, Inc. (distinguishable from its subsidiary Libertech (a.k.a. Site/Technologies/Inc.) by the absence of slashes in its name). Since Deltapoint, Inc. and Site

Technologies, Inc. are merely two different names for the same company, we will generally refer to the company as "Deltapoint."

In September 1998, Deltapoint agreed to sell its technology pertaining to a product called "V-Search" to Egger. Deltapoint and Egger entered into a Bill of Sale, Assignment and License Agreement (Exhibit 10, pp. 1-4) pursuant to which Egger would pay $100,000 to obtain software, software copyrights, software licenses, trademarks, certain physical property, and rights to the '352 patent and certain related applications.[5] As recorded with the USPTO, this Bill of Sale was followed by an undated assignment (the "Undated Assignment," hereafter) (Exhibit 10, pp. 5-6) relating to the '352 patent (but not the then-pending continuation-in-part applications that later issued as the '494 and '571 patents). Numerous irregularities appear on the face of the Undated Assignment, among them: (i) its last sentence of text cuts off in mid-sentence followed by a blank line; (ii) no signature other than the initials of Daniel Egger, the purported assignee, appears on the same page as the document's text; and (iii) the lone signature of an attesting witness appears on a separate page from the document's text. Even apart from these and other defects, these documents did not transfer any patent rights to Egger because at this time Libertech, *not* its parent Deltapoint, held the rights to the patents-in-suit. Simply put, Deltapoint had no patent rights to convey.

After the purported assignment of the '352 patent to Egger by Deltapoint, on February 21, 1999, Deltapoint commenced Chapter 11 bankruptcy proceedings in the United States Bankruptcy Court for the Northern District of California.[6] In its February 18, 2000, Statement of Financial Affairs, Deltapoint identified Libertech as its subsidiary from "9/94– present." (Exhibit 9 at 7). On June 15, 2000, the bankruptcy court approved Deltapoint's First Amended Plan of Reorganization governing the estate's assets.

---

[5]  Deltapoint's official Statement of Financial Affairs in the bankruptcy proceedings, filed on February 18, 2000, reported that Eggers had paid only $80,000 of that $100,000, however. (Exhibit 9).

[6]  The bankruptcy case is *In re Site Technologies, Inc. dba Deltapoint, Inc.*; Case No. 99-50736-JRG-11 (Bankr. N.D. Cal.).

Subsequently, on December 21, 2000, Deltapoint (a.k.a. Site Technologies, Inc.), the

California corporation, filed certificates with the California and Delaware Secretaries of State

(Exhibits 11 & 12) stating that it merged itself and its subsidiary Libertech (a.k.a.

Site/Technologies/Inc.) together, leaving Deltapoint as the surviving corporation.[7]

As a consequence of the December 2000 merger documents, all the assets of Libertech –

including title to the patents-in-suit – would have become the property of the surviving entity,

Deltapoint (a.k.a. Site Technologies, Inc.). *See* Cal. Corp. Code § 1107(a) ("Upon merger... the

surviving corporation shall succeed, without other transfer, to all the rights and property of each

of the disappearing corporations."). Also as a second consequence of the merger documents,

Libertech (a.k.a. Site/Technologies/Inc.) would have ceased to exist. *See* Del. Code tit. 8, §

259(a) ("When any merger or consolidation shall have become effective under this chapter, …

the separate existence of all the constituent corporations … shall cease.").

The bankruptcy proceeding came to a close with the bankruptcy court's final decree on

January 6, 2004. Pursuant to ¶ 14.2 of the First Amended Plan of Reorganization, which was

approved by the bankruptcy court:

> All property of the Bankruptcy Estate shall vest in the Debtor
> subject to the terms and conditions of the Plan. All property of the
> Debtor, except as otherwise provided in the Plan, shall be free and
> clear of any liens, encumbrances, Claims of Creditors and Interests
> of Equity Security Holders.

Consequently, Deltapoint's property emerged free and clear of any liens and claims.

### C.    Egger's 2005 Assignment To Himself Was A Nullity And A Fraud

Egger formed Software Rights Archive, Inc. as a Delaware corporation in September

2004. Shortly before purporting to assign rights to the patents-in-suit to SRA, Egger executed a

February 11, 2005 Assignment (again, the "2005 Assignment") in which he purported to be the

President of the nonexistent Libertech (Site/Technologies/Inc.) and to assign Libertech's patent

---

[7]   Just prior to filing the merger certificates, Jeffrey Ait, Chief Executive Officer of Deltapoint,
also filed a document (Exhibit 13) with the Delaware Secretary of State purporting to revive
and renew Libertech's Certificate of Incorporation, which had expired on March 1, 1999.

rights over to himself.  A copy of the document that Egger executed and then recorded with the USPTO is attached as Exhibit 14.

The 2005 Assignment, however, is a fraud and of no effect.  First, at the time of the 2005 Assignment, Libertech was defunct and/or did not exist.  (Exhibits 11 & 12).  Therefore, it could not have owned the patents in 2005.  Second, even if, at the time the 2005 Assignment was executed, Libertech did exist and did own the patents, Egger was not the President of Libertech (a.k.a. Site/Technologies/Inc.).  Egger, therefore, had no authority to assign whatever rights Libertech could have possessed.  Thus, in the 2005 Assignment, Egger not only falsely stated that he was the President of a defunct and/or non-existent company that held title to the patents, but then proceeded to transfer those alleged rights to himself.  The 2005 Assignment is no more than a fraudulent instrument designed to deceive Defendants, the USPTO, and the Court.

**D.    SRA Acquired No Rights From Egger But Nonetheless Relied On The Void 2005 Assignment**

After executing the purported assignment of the '352 and '494 patents to himself as an alleged officer of a defunct and/or nonexistent company, on February 22, 2005, Egger promptly assigned the rights that he purportedly acquired by virtue of the 2005 Assignment to his holding company, SRA, so that it could sue Defendants.  (Exhibit 15).

The following table summarizes the various assignments and merger documents and their apparent legal effect:

|  | Title Holder Immediately before Transaction | Listed Assignor → Listed Assignee | | Legal Effect[#] |
|---|---|---|---|---|
| 1998 Bill of Sale and Undated Assignment of '352 patent (Exhibit 10) | Libertech (a.k.a. Site/Technologies/ Inc.) | Deltapoint (a.k.a. Site Technologies, Inc.) | Egger | None<br><br>Title remains with Libertech (a.k.a. Site/Technologies/ Inc.) |
| December 2000 Merger of Deltapoint and Libertech (Exhibits 11 & 12) | Libertech (a.k.a. Site/Technologies/ Inc.) | (not applicable) | (not applicable) | By merger, title would transfer to merged entity, Deltapoint (a.k.a. Site Technologies, Inc.) |
| February 11, 2005 Assign-ment of '352 and '494 patents (Exhibit 14) | Deltapoint (a.k.a. Site Technologies, Inc.) | *defunct and/or non-existent* entity Libertech (a.k.a. Site/Technologies/ Inc.) | Egger | None |
| February 22, 2005 Assignment of '352, '494 and '571 patents (Exhibit 15) | Deltapoint (a.k.a. Site Technologies, Inc.) | Egger | SRA | None |

[#]See Argument below.

As demonstrated above, Egger never acquired the patents-in-suit and therefore had no

rights to transfer to SRA.  Nonetheless, Egger and SRA persist in relying on the 2005

Assignment to exploit the patents-in-suit and to attempt to wrongfully enforce them against

Defendants.

For example, when the '494 patent expired for failure to pay maintenance fees on

November 4, 2006, Egger, acting as President of SRA, submitted a Petition to Accept

Unintentionally Delayed Payment of Maintenance Fee in an Expired Patent (Exhibit 16).  In the

accompanying statement declaring ownership (titled "Statement Under 37 C.F.R. 3.73(b)")

(Exhibit 17), as required by USPTO regulations, Egger declared that SRA was "the assignee of

the entire right, title, and interest" to the '494 patent.  In this statement, SRA relied on the 2005

Assignment to establish ownership without disclosing that the assigning entity was defunct

and/or had ceased to exist and did not own the patents, and that Egger had no authority to execute it. Even more, SRA further misrepresented the chain of title by omitting the slashes in the name of Site/Technologies/Inc. (i.e., Libertech) so that it appeared to be the same entity as Site Technologies, Inc. (i.e., Deltapoint). SRA would not have been able to make the required showing of ownership without these misrepresentations and falsehoods.

On November 21, 2007, SRA filed this action against Defendants. In its complaint, SRA averred that it was "the assignee of all right, title, and interest in and to" the '352 patent, and "the assignee of the '494 patent."[8] As further explained below, SRA has no standing to bring this action, and consequently the Court lacks subject matter jurisdiction.

## III.   ARGUMENT

### A.   Applicable Law

It is a basic principle of patent law that a party who lacks legal ownership of or substantially all the rights to a patent is without standing to sue for infringement of that patent. *See Lans v. Digital Equip. Corp.*, 252 F.3d 1320, 1328 (Fed. Cir. 2001) ("If a party lacks title to a patent, that party 'has no standing to bring an infringement action' under that patent.") (citing *FilmTec Corp. v. Allied-Signal Inc.*, 939 F.2d 1568, 1571 (Fed. Cir. 1991)). By statute, the assignment of a patent from one party to another must be done in writing. 35 U.S.C. § 261 ("Application for patent, patents, or any interest therein, shall be assignable in law by an instrument in writing."); *see also Enzo APA & Son, Inc.*, 134 F.3d at 1093 (holding that a virtual assignment, just like actual assignments, must be in writing).

Without standing to bring an action for infringement, there is no subject matter jurisdiction over the claim, requiring the action to be dismissed. *Intellectual Prop. Dev., Inc. v. TCI Cablevision of CA, Inc.*, 248 F.3d 1333, 1345 (Fed. Cir. 2001), *cert. denied*, 534 U.S. 895 (2001). Once a defendant asserts lack of subject matter jurisdiction in a motion to dismiss, the

---

[8]   See ¶¶ 10, 15 and 20 of Plaintiff's Complaint. SRA did not aver that it had any rights to the '571 patent.

plaintiff bears the burden of establishing that the court has the requisite subject matter juris-

diction over the dispute. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Because

federal courts have limited jurisdiction, it is presumed that a suit lies outside these limits, and

accordingly the burden of establishing federal jurisdiction rests on the party seeking the federal

forum. *Howery v. Allstate Ins. Co.*, 243 F.3d 912, 916 (5th Cir. 2001).

**B.      SRA And Egger Never Acquired The Patents-In-Suit**

It is undisputed that SRA's alleged rights are entirely derivative of Egger's. It is also

undisputed that, as of June 1996, Libertech (a.k.a. Site/Technologies/Inc.) was the sole owner of

the patents-in-suit based on assignments from the named inventors. Thus, the only issue is what

rights, if any, Egger obtained from Libertech (a.k.a. Site/Technologies/Inc.) based on (1) the

1998 Assignment and (2) the 2005 Assignment.

**1.      The 1998 Assignment Did Not Transfer Title**

Plaintiff cannot establish standing based on the 1998 Assignment because the patents

were not owned by the transferor, Site Technologies, Inc. (referred to as Deltapoint herein).

Instead, the patents were owned by Libertech, a subsidiary of Deltapoint who was not even a

party to the 1998 Assignment. (See Exhibit 10). As a result, the 1998 Assignment could not

have transferred title to Egger.

Under the Patent Act, patent assignments must be in writing to be effective. 35 U.S.C.

§ 261. Although Deltapoint owned all the shares of Libertech in 1998, there is no written

assignment on record at the U.S. Patent Office that transfers title in the patents from Libertech to

Deltapoint. In the absence of such a written conveyance to Deltapoint prior to the 1998

Assignment, Libertech, and not its parent Deltapoint, remained the sole owner of the patents-in-

suit.[9]

---

[9]   Defendants are unaware of any assignment from Libertech to Deltapoint and have asked
Plaintiff's counsel to provide documents establishing chain of title. Rather than do so,
Plaintiff's counsel has pointed to statements in two of Deltapoint's SEC filings and alluded to
other unspecified documents. In the first SEC filing, Deltapoint suggested that its stock
purchase agreement (Exhibit 6) included "all outstanding assets of" Libertech. But, this

DEFENDANTS' MOTION TO DISMISS FOR LACK OF STANDING - Page 9

Moreover, Libertech's mere status as a subsidiary of Deltapoint also did not vest Deltapoint with ownership of the patents. To the contrary, the distinctiveness of each corporate entity must be respected. As the Supreme Court explained in *Dole Food Co. v. Patrickson,* "[a] corporate parent which owns the shares of a subsidiary does not, for that reason alone, own or have legal title to the assets of the subsidiary." 538 U.S. 468, 475 (2003).

Likewise, the Federal Circuit has held that the owner of a patentee does not itself have standing to sue for patent infringement. *Lans,* 252 F.3d at 1328. The plaintiff in *Lans* was the sole owner of a non-operational holding company which held legal title to the asserted patents. *Id.* at 1324-25. The Federal Circuit affirmed that there was no jurisdiction because the plaintiff lacked standing. *Id.* at 1328; *see also LDM Techs., Inc. v. Rowen-Waters Group, LLC,* No. 02-73520, 2005 WL 2449300, at *2 (E.D. Mich. Sept. 28, 2005) ("[T]here is no authority which confers standing on a parent company to file a patent suit on behalf of its subsidiary").

Because the sole owner of a patentee has no standing to sue for patent infringement, such a parent also cannot by assignment grant a third party sufficient title to do so. Thus, Deltapoint (a.k.a. Site Technologies, Inc.), despite being Libertech's (a.k.a. Site/Technologies/Inc.'s) parent by virtue of having acquired all of Libertech's shares (see Exhibit 6), could not, and did not, transfer any rights to the patents-in-suit to Egger by way of the 1998 Assignment.

In fact, SRA and Egger conceded this point when Egger concocted the fraudulent 2005 Assignment, in which he declared that, as of that date, Site/Technologies/Inc. (i.e., Libertech) was "the owner of the patent(s) identified on Schedule A" namely the '352 and '494 patents and

---

statement did not even mention the patents-in-suit, and moreover mischaracterized the stock purchase agreement (Exhibit 6) as an asset purchase. In the second SEC filing, Deltapoint stated that, on September 30, 1998, it had "consummated the sale of its V-Search technology and related patents" for $100,000. This document, too, fails to establish a valid transfer of the patents from Libertech to Deltapoint. Deltapoint subsequently retreated from this representation, reporting to the bankruptcy court that it had received only $80,000 from Egger. (Exhibit 9). Regardless of the factual discrepancies in these documents, neither is a written conveyance establishing an unbroken chain of title from Libertech to Egger. Plaintiff cannot rely on inaccurate SEC filings to bridge a gap in the chain of title. (As discussed below, the absence of such a link motivated Egger to create such a document in February 2005, albeit a fraudulent one.)

then purported to transfer "the entire right, title, and interest in and to the Patents" to himself.
(Exhibit 14). In other words, despite the alleged 1998 sale of the "V-Search" technology to
Egger by the parent Deltapoint, its subsidiary Libertech (a.k.a. Site/Technologies/Inc.) retained
all rights to the patents at that time.

### 2.   The 2005 Assignment Transferred No Rights

Given that the 1998 Assignment did not convey the patents-in-suit to Egger, SRA must
rely on the 2005 Assignment (Exhibit 14). Egger executed this document himself on behalf of
Libertech as its supposed President and purported to assign the '352 and '494 patents (but not the
'571 patent) to himself as an individual. However, the 2005 Assignment failed to transfer any
rights to Egger for the simple reasons that, by February 11, 2005, Libertech was defunct and/or
did not exist, and even if it did, it no longer owned the patents and Egger was not its President.

Exhibits 11 and 12 to this motion indicate that this Delaware corporation (Libertech,
a.k.a. Site/Technologies/Inc.) merged into a California corporation (Deltapoint, a.k.a. Site
Technologies, Inc.) on December 21, 2000. By operation of Delaware law, Del. Code tit. 8,
§ 259(a), Libertech, the owner of the patents before the merger, would have then ceased to exist.
A purported assignment by a non-existent entity that cannot own any property is obviously null
and void. Furthermore, all of Libertech's property would have been subsumed by the entity
emerging from the merger, Deltapoint, a California corporation. *See* Cal. Corp. Code § 1107(a)
and at page 5 above. Thus, after the merger on December 21, 2000, Deltapoint (a.k.a. Site
Technologies, Inc.) would have owned the patents-in-suit.

On February 11, 2005, Egger also could not have been President of the defunct and/or
non-existent Libertech. Egger had previously transferred all his shares in Libertech to Deltapoint
pursuant to the 1997 Stock Exchange Agreement (*see* in particular § I.1.c of Exhibit 6 at 1-2). In
the merger documents (Exhibits 11 & 12), Deltapoint declared that, immediately prior to the
merger, Deltapoint owned all shares in Libertech. Nothing suggests that Egger was ever made
President of Libertech after Deltapoint acquired ownership of all stock in Libertech in 1997. In

any event, no President of Libertech could have so transferred the patents to himself without the approvals required by law, i.e., consent of the board of directors (then no longer existing) and pertinent approvals under bankruptcy law.[10]

Indeed, the 2005 Assignment appears to be nothing more than a fiction concocted by Egger to bridge the missing link in the chain of title.[11] Egger appears to have been fully aware that the purported 1998 Assignment was ineffective and resolved to take title instead by pretending to be President of the defunct and/or non-existent Libertech. But a party cannot take by assignment more rights than the assignor had. *TM Patents, L.P. v. Int'l Bus. Machs. Corp.*, 121 F. Supp. 2d 349, 365 (S.D.N.Y. 2000) ("[A]n assignee [cannot obtain] any title better than the assignor had."). Hence, SRA, like Egger, did not obtain any rights to the patents-in-suit by way of the 2005 Assignment. It was nothing more than a sham transaction perpetrated upon the USPTO, and ultimately Defendants and this Court.

### 3.   No Document Grants SRA Title

Because neither the 1998 Assignment nor the duplicitous 2005 Assignment conveyed the patents-in-suit to Egger, SRA did not acquire any rights to the patents from Egger and consequently has no standing to bring this action. Absent subject matter jurisdiction, this case must be dismissed. *Intellectual Prop. Dev., Inc.*, 248 F.3d at 1345.

## IV.   CONCLUSION

For the reasons stated, this Court lacks subject matter jurisdiction over this case. The case should be dismissed.

---

[10] See Footnote 4.

[11] Plaintiff's counsel has not provided any explanation for the 2005 Assignment.

DEFENDANTS' MOTION TO DISMISS FOR LACK OF STANDING - Page 12

Dated:  July 16, 2008

Respectfully submitted,

By: /s/Thomas B. Walsh, IV
    Juanita R. Brooks – Lead Attorney
    (CA Bar No. 75934)
    E-mail:  brooks@fr.com
    Fish & Richardson P.C.
    12390 El Camino Real
    San Diego, CA 92130
    Telephone:  (858) 678-5070
    Facsimile:  (858) 678-5099

    Thomas B. Walsh, IV
    Texas Bar No. 00785173
    Fish & Richardson P.C.
    5000 Bank One Center
    1717 Main Street
    Dallas, TX 75201
    Telephone:  (214) 747-5070
    Facsimile:  (214) 747-2091
    E-mail:  walsh@fr.com

    Harry L. Gillam, Jr.
    Texas Bar No. 07921800
    E-mail:  gil@gillamsmithlaw.com
    Melissa R. Smith
    Texas Bar No. 24001351
    E-mail:  melissa@gillamsmithlaw.com
    GILLAM & SMITH, L.L.P.
    303 South Washington Avenue
    Marshall, TX 75670
    Telephone:  (903) 934-8450
    Facsimile:  (903) 934-9257

    Attorneys for Defendants GOOGLE INC. and
    AOL LLC

By:  /s/Richard S. J. Hung (by permission)
     Michael A. Jacobs (CA Bar No. 111664)
     Richard S. J. Hung (CA Bar No. 197425)
     MORRISON & FOERSTER
     425 Market Street
     San Francisco, CA 94105
     Telephone: 415-268-7000
     Facsimile: 415-268-7522
     Email: mjacobs@mofo.com
     Email: rhung@mofo.com

     Michael E. Jones
     Texas Bar No. 10929400
     Potter Minton, A Professional Corporation
     110 North College, Suite 500
     Tyler, Texas 75702
     Telephone: (903) 597-8311
     Facsimile: (903) 593-0846
     Email: mikejones@potterminton.com

     Attorneys for Defendant YAHOO! INC.

By:  /s/ Claude M. Stern (by permission)
     Claude M. Stern (CA Bar No. 96737)
     Jennifer A. Kash (CA Bar No. 203679)
     QUINN EMANUEL URQUHART
     OLIVER & HEDGES, LLP
     555 Twin Dolphin Drive, Suite 560
     Redwood Shores, CA 94065
     Telephone: (650) 801-5000
     Facsimile: (650) 801-5100
     Email: claudestern@quinnemanuel.com
     Email:jenniferkash@quinnemanuel.com

     Otis Carroll
     Tex. Bar No. 03895700
     Collin Maloney
     Tex. Bar No. 00794219
     IRELAND, CARROLL & KELLEY, P.C.
     6101 S. Broadway, Suite 500
     Tyler, Texas 75703
     Tel: (903) 561-1600
     Fax: (903) 581-1071
     Email: Fedserv@icklaw.com


     Attorneys for Defendants IAC SEARCH &
     MEDIA, INC. and LYCOS, INC.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on July 16, 2008 on all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Local Rule CV-5(a)(3).

/s/Thomas B. Walsh, IV
Thomas B. Walsh, IV

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| **SOFTWARE RIGHTS ARCHIVE, LLC** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | **Civil Action No. 2:07-cv-511-TJW** |
| **GOOGLE INC., YAHOO! INC.,** | § | |
| **IAC SEARCH & MEDIA, INC., AOL LLC,** | § | |
| **and LYCOS, INC.** | § | |
| | § | **JURY TRIAL DEMANDED** |
| **Defendants.** | § | |

## DECLARATION OF J. CHRISTOPHER LYNCH

I, J. Christopher Lynch, under penalty of perjury, hereby make the following declaration. All facts set forth herein are true and correct, and I make this declaration based upon my personal knowledge and upon review of available records.

1.      I am a partner at Wyrick Robbins Yates & Ponton LLP and my practice is primarily outside general counsel representation of technology-based businesses. I assisted Daniel Egger in aspects of the 1998 acquisition of the V-Search Technology and patents from Site Technologies, Inc. (the "V-Search Acquisition") and in the subsequent filing of an assignment in 2005 (the "2005 Assignment"). A true and correct copy of the 2005 Assignment is attached hereto as Exhibit A.

2.      I understand that certain defendants in the *Software Rights Archive LLC v. Google, et al.,* case pending in the Eastern District of Texas have accused Daniel Egger of fraudulently filing the 2005 Assignment for the express purpose of correcting a defect with respect to the name of the party conveying the patents he acquired in the V-Search Acquisition. This allegation is based upon a number of factual inaccuracies.

16573.5-547719 v2

**EXHIBIT 21**

3.     I was the attorney who supervised my staff in the preparation of, and who advised Daniel Egger to file, the 2005 Assignment.  The purpose of filing the 2005 Assignment was not to correct any defect in the name of the party on the instrument.  I did not understand there to be any distinction between the entity from which Daniel Egger purchased the patents in question ("Site Technologies, Inc.") and "Site/Technologies/Inc. at the time of the 2005 assignment.  The first time I heard of this issue was after the filing of the Defendants' Motion to Dismiss.  Nor did Daniel Egger raise this issue with me in 2005 or anytime prior to the defendants' allegation. Daniel Egger never raised any issue with respect to the validity of the 1998 Bill of Sale or assignments with me and never questioned the validity of his chain of title.

4.     The 2005 Assignment was filed to replace the then-misplaced 1998 Bill of Sale and the 1998 Assignment used in the V-Search Acquisition.  In or prior to October 2004, Daniel Egger had asked me to assign the patents to an entity named Software Rights Archive, Inc. When my staff reviewed the records at the Patent and Trademark Office (the "PTO"), we discovered that no previous assignment had yet been filed.  I did not have a copy of the 1998 Bill of Sale or 1998 Assignment, so I asked Daniel Egger to locate them.  He told me that he could not locate them.  I advised him to file a replacement assignment reflecting the previous transaction.  I then supervised my staff in the preparation of the 2005 Assignment and Daniel Egger executed it without further revision.  I understand that Daniel Egger later found the missing 1998 Bill of Sale and the 1998 Assignment and filed them with the Patent and Trademark Office.

5.     My understanding is that the Defendants allege that Daniel Egger intentionally represented that he was a president of Site/Technologies/Inc. and filed the 2005 Assignment to mislead others as to his ownership rights.  I had advised Daniel Egger to sign as the president of

Site/Technologies/Inc. The basis for such advice was that, in 2005, the Site entities were no longer operating companies and a former officer or other agent needed to sign the 2005 Assignment. It was my belief that Daniel Egger retained a right to execute documents related to winding up past business transactions because he was a former president of Site/Technologies/Inc. Because we were merely attempting to replicate the lost 1998 Assignment that we understood had already been made, it was my understanding that these actions were fairly within the winding up authority of the companies, which were no longer operating.

6.    I was not aware of any issue with respect to whether the 1998 Assignment properly conveyed legal title to Daniel Egger. I understood it was a valid transfer. My recommendation to make Site/Technologies/Inc. a party to the 2005 Assignment was driven by Daniel Egger's status as a former officer and not an attempt to correct any error with respect to the name of the party on the 1998 Assignment.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

J. Christopher Lynch

Executed on _August 19_, 2008

1

Case 2:07-cv-00511-CE-MW Document 118-24 3  Filed 02/25/2008  Page 1 of 3

1

          IN THE UNITED STATES DISTRICT COURT
2              EASTERN DISTRICT OF TEXAS
                  MARSHALL DIVISION
3

4  SOFTWARE RIGHTS ARCHIVE, LLC    )
                                   )
5       v.                         ) Civil Case No.
                                   ) 2:07-cv-511(CE)
6  GOOGLE INC., YAHOO! INC., IAC   )
   SEARCH & MEDIA, INC., AOL,      )
7  LLC, AND LYCOS, INC.            )

8

9                              October 1, 2008
                               9:47 a.m.
10

11      The Videotaped Deposition of J. CHRISTOPHER

12  LYNCH, taken pursuant to notice on behalf of the

13  Defendants, at the Marriott Hotel at Research

14  Triangle Park, 4700 Guardian Drive, Durham, North

15  Carolina 27703, before Suzanne G. Patterson,

16  Registered Professional Reporter and Notary Public.

17

18

19

20

21

22

23

24

25                                    **EXHIBIT 22**

**114**

```
 1   name change with the U.S. Patent Office?
 2       A.  We -- I assume this is what you're interested
 3   in -- we also filed an assignment from Slash to Daniel
 4   Egger.
 5       Q.  And when did you do that?
 6       A.  In February 2005.
 7       Q.  I'm going to hand you what's been marked as
 8   Exhibit 42.
 9           (Lynch Exhibit 42 marked for identification.)
10   BY MR. BAKER:
11       Q.  Do you recognize that document?
12       A.  Yes, I do.
13       Q.  What is it?
14       A.  It is a patent assignment from Slash to Daniel
15   Egger with respect to the 494 and 352 patents.
16       Q.  Okay.  And what's the date of this assignment?
17       A.  Executed February 11, 2005.
18       Q.  If you look at the first page, it appears that
19   this assignment was filed by your colleague, Mr. Jones,
20   with the U.S. Patent Office assignment department; is
21   that right?
22       A.  That's correct.
23       Q.  Is it okay if I refer to this as the 2005 Slash
24   assignment?
25       A.  Yes.
```

**115**

```
 1       Q.  And, again, you were -- you supervised your
 2   staff in the preparation of this assignment; is that
 3   right?
 4       A.  That's correct.
 5       Q.  Now, this assignment lists two patents on the
 6   final page on schedule A; is that right?
 7       A.  That's correct.
 8       Q.  Do you know why it doesn't list the third
 9   patent that we were talking about earlier today, I
10   think it was the 571 patent?
11       A.  That patent was already listed as being in
12   Daniel Egger's name.
13       Q.  And why then did you not need to include it in
14   the 2005 Slash assignment?
15       A.  The assignments, the 2005 assignments were
16   filed for the purpose of recording record ownership of
17   these two patents in Daniel Egger's name.  Ultimately,
18   what the client had requested us to do was to transfer
19   three patents from Daniel Egger's name to SRA.  These
20   two patents reflected in the 2005 assignment were not
21   recorded as being in Daniel Egger's name.  So the
22   assignments were to cause the record to reflect the
23   ownership of those patents by Daniel Egger.
24       Q.  Now, if you'd take out your Declaration,
25   please.
```

**116**

```
 1       A.  Yes.
 2       Q.  And in paragraph 3 of your Declaration, you
 3   talk about the purpose of filing the 2005 Slash
 4   assignment; is that correct?
 5       A.  That's correct.
 6       Q.  And you state in part that the purpose of
 7   filing the 2005 Slash assignment was not to correct any
 8   defect in the name of the party on the instrument; is
 9   that correct?
10       A.  That's correct.
11       Q.  I guess, later in the Declaration, in paragraph
12   4, you state that your intention was to file a
13   replacement assignment reflecting the previous
14   transaction; is that right?
15       A.  That's right.
16       Q.  And the previous transaction you're referring
17   to there is the 1998 bill of sale and assignment that
18   we talked about earlier; is that right?
19       A.  That's right.
20       Q.  And earlier we also -- we can also agree that
21   you had tried to locate a copy of the 1998 bill of sale
22   and assignment both within your firm and from Mr. Egger
23   at this time in 2005; is that correct?
24       A.  That's correct.
25       Q.  And you could not locate a copy; is that right?
```

**117**

```
 1       A.  That's correct.
 2       Q.  So you decided to file the 2005 Slash
 3   assignment to replace the 1998 bill of sale and
 4   assignment; is that right?
 5       A.  Not exactly.  The purpose of the 2005
 6   assignment was to, not to replace the 1998 bill of sale
 7   and assignment but to bring the PTO ownership records
 8   current with what we believed to be the actual state of
 9   ownership, that is, ownership by Daniel Egger.  The
10   1998 assignment, in my opinion, reflected -- caused the
11   transfer of ownership of the patents to Daniel Egger,
12   the PTO assignment records did not reflect the
13   underlying ownership of the patents.  So the purpose of
14   the assignments was to correct the PTO records which we
15   believe to be an incorrect reflection of the true state
16   of ownership.
17       Q.  Again, why was it necessary to -- why did you
18   want the PTO records to be correct with respect to the
19   ownership of the asserted patents here?
20       A.  Ultimately, the original client's request was
21   to cause the transfer of ownership of the patents from
22   Daniel Egger to Software Rights Archive.  In effecting
23   that transfer of ownership, we wanted -- we felt it was
24   necessary to record an assignment from Daniel Egger to
25   SRA, but it would not have been possible for us to file
```

30 (Pages 114 to 117)

178

```
 1        ERRATA SHEET
 2
 3   PAGE/LINE        CHANGE TO:
 4        _____
 5        _____
 6        _____
 7        _____
 8        _____
 9        _____
10        _____
11        _____
12        _____
13        _____
14        _____
15        _____
16
17        _____
          Signature of Deponent
18
          Sworn to and subscribed before me
19
          This _____ day of _____,
20
          2008 in _____ County.
21
22        _____
          Notary Public
          My commission expires:
23        _____
24
25
```

179

```
 1        C E R T I F I C A T E
 2   STATE OF NORTH CAROLINA:
     COUNTY OF DURHAM:
 3
         I, Suzanne G. Patterson, do hereby certify that I
 4   placed under oath the deponent, Christopher Lynch, at
     the time and place herein designated.
 5
         Witness my hand this 6th day of October, 2008.
 6
 7
 8
         Suzanne G. Patterson, RPR
 9       Notary Public, County of Wake
         State of North Carolina
10       My Commission Expires: 9/5/2010
11
12       I, Suzanne G. Patterson, Registered Professional
     Reporter, certify that I was authorized to and did
13   stenographically report the foregoing proceedings at
     the time and place herein designated; and that the
14   foregoing pages constitute a true, complete and
     accurate transcription of my said stenotype notes.
15
         I further certify that I am not of counsel for,
16   related to, or employed by any party hereto or attorney
     involved herein, nor am I financially interested in the
17   outcome of this action.
18       Witness my hand this 6th day of October, 2008.
19
20       --------------------------
         Suzanne G. Patterson, RPR
21       Notary Public, Wake County
         State of North Carolina
22       My Commission Expires: 9/5/2010
23
24
25
```

46 (Pages 178 to 179)

46

**Lori F. West**

| | |
|---|---|
| **From:** | J. Christopher Lynch |
| **Sent:** | Wednesday, May 17, 2006 7:36 AM |
| **To:** | Lori F. West |
| **Subject:** | FW: I thought I might search one more time |

Please print and file Daniel Egger / V-Search (10144.03)

-----Original Message-----
From: Daniel Egger [mailto:degger@osriskmanagement.com]
Sent: Tuesday, May 16, 2006 10:41 PM
To: Stephen Whitt
Cc: J. Christopher Lynch
Subject: I thought I might search one more time

and so, after about four hours in my family storage unit, rummaging through many file
boxes of dusty papers from various defunct ventures, I FOUND my copy of the ORIGINAL
document transferring ownership of the V-Search patents and related intellectual property
back to me. I was very happy.

I don't even remember finally getting the original in the mail -- I must have thrown it
into a folder without looking at it, nearly seven years ago.
Its titled "Bill of Sale, Assignment, and License Agreement" and SIGNED AND DATED SEPT 15,
1998 by Jeff Ait, as CEO of Site Technologies, and Sept 16,
1998 by me. The "Purchased Assets" are defined to include "Patent No.
5,544,352 filed June 14, 1993...and any additions, continuations in part, divisions ...
[Etc]."

Three is also an attached Exhibit "Assignment of Patent" for 5,544,352, issued Aug. 6,
1996, signed by their Corporate Secretary.

The documents are NOTARIZED to the effect that Jeff Ait is the CEO, has the authority to
transfer title, and the Corporate Secretary witnessed his signing the documents.

I know we still have some cleanup to do, but this should save us all a great deal of time
and uncertainty. Good lawyering by Chris at the time should finally pay off now.

Thanks All,

Daniel



EXHIBIT
46

**EXHIBIT 23**

1

LYN_0000148
Confidential



A 1580619

# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME;

UNITED STATES DEPARTMENT OF COMMERCE

United States Patent and Trademark Office

March 02, 2007

THIS IS TO CERTIFY THAT ANNEXED IS A TRUE COPY FROM THE
RECORDS OF THIS OFFICE OF A DOCUMENT RECORDED ON
JULY 13, 2006.

By Authority of the

Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

W. MONTGOMERY

Certifying Officer



**EXHIBIT 24**

FORM PTO-1595 (Modified)
(Rev. 03-01)
OMB No. 0551-0027 (exp.5/31/2002)
P08A/REV03

07-18-2006

||||||| 103276118 |||||||

Docket No.: **EGG.999**

U.S. DEPARTMENT OF COMMERCE
Patent and Trademark Office

*(stamp)* OTPF JUL 1 3 2006 PATENT & TRADEMARK OFFICE

Tab settings ➔ ➔ ➔

To the Director of the United States Patent and Trademark Office: Please record the attached original documents or copy thereof.

**1. Name of conveying party(ies):**

Site Technologies, Inc.

*7-13-06*

Additional names(s) of conveying party(ies)  ☐ Yes  ☒ No

**2. Name and address of receiving party(ies):**

Name: **Daniel Egger**

Address: **2027 W. Club Boulevard**

City: **Durham**  State/Prov.: **NC**

Country: **USA**  ZIP: **27705**

Additional name(s) & address(es)  ☐ Yes  ☒ No

**3. Nature of conveyance:**

☒ Assignment  ☐ Merger

☐ Security Agreement  ☐ Change of Name

☒ Other  **Bill of Sale, Assignment & License Agreement**

Execution Date: **September 16, 1998, September 15, 1998**

**4. Application number(s) or patent numbers(s):**

If this document is being filed together with a new application, the execution date of the application is: _____

Patent Application No.  Filing date

B. Patent No.(s)

5,544,352
6,233,571
5,832,494

Additional numbers  ☐ Yes  ☒ No

**5. Name and address of party to whom correspondence concerning document should be mailed:**

Name: **STEPHEN R. WHITT**

Registration No. **34,753**

Address: **VOLENTINE FRANCOS & WHITT, PLLC**

**ONE FREEDOM SQUARE**

**11951 FREEDOM DRIVE, SUITE 1260**

City: **RESTON**  State/Prov.: **VA**

Country: **USA**  ZIP: **20190**

**6. Total number of applications and patents involved:**  **3**

**7. Total fee (37 CFR 3.41):**............$ **120.00**

☒  Any excess or insufficiency should be credited or debited to deposit account

☒  Authorized to be charged to deposit account

**8. Deposit account number:**

**50-0238**

(Attach duplicate copy of this page if paying by deposit account)

DO NOT USE THIS SPACE

**9. Statement and signature.**

*To the best of my knowledge and belief, the foregoing information is true and correct and any attached copy is a true copy of the original document.*

STEPHEN R. WHITT  *(signature)*  JULY 13, 2006

Name of Person Signing  Signature  Date

Total number of pages including cover sheet, attachments, and document:  **7**

Mail documents to be recorded with required cover sheet information to:
Mail Stop Assignment Recordation Services
Director of the United States Patent and Trademark Office
P.O. Box 1450, Alexandria, VA 22313-1450

**PATENT**
**REEL: 018160 FRAME: 0500**

EXHIBIT A

ASSIGNMENT OF PATENT

WHEREAS the undersigned SITE TECHNOLOGIES, INC., a California corporation ("Assignor"), is the sole owner of Patent number 5,544,352, issued August 6, 1996;

WHEREAS DANIEL EGGER, a resident of the State of North Carolina having his principal residence at 2027 W. Club Boulevard, Durham, NC 27705 ("Assignee"), is desirous of obtaining the entire right, title and interest in, to and under the said Patent;

NOW THEREFORE, in consideration of the sum of One Dollar ($1.00) to the undersigned in hand paid, and other good and valuable consideration, the receipt of which is hereby acknowledged, the undersigned, the said Assignor, has sold, assigned, transferred and set over, and by these presents does hereby sell, assign, transfer and set over, unto the said Assignee, its successors, legal representatives and assigns, the entire right, title and interest in, to and under the said Patent, and all divisions, renewals and continuations thereof, and all issues and extensions thereof, and all applications for industrial property protection, including, without limitation, all applications for patents, utility models, and designs which may hereafter be filed for the invention(s) claimed in such Patent in any country or countries foreign to the United States, together with the right to file such applications and the right to claim for the same the priority rights derived from said United States Patent under the Patent Laws of the United States, the International Convention for the Protection of Industrial Property, or any other international agreement or the domestic laws of the country in which any such application is filed, as may be applicable; and all forms of industrial property protection, including, without limitation, patents, utility models, inventors' certificates and designs which may be granted for said inventions in any country or countries foreign to the United States and all extensions, renewals and reissues thereof;

AND THE UNDERSIGNED HEREBY authorizes and requests the Commissioner of Patents and Trademarks of the United States, and any Official of any country or countries foreign to the United States, whose duty is to issue patents or other evidence or forms of industrial property protection on applications as aforesaid, to issue the same to the said Assignee, its successors, legal representatives and assigns, in accordance with the terms of this instrument;

AND THE UNDERSIGNED HEREBY covenants and agrees that it has full right to convey the entire interest herein assigned, and that it has not executed, and will not execute, any agreement in conflict herewith;

AND THE UNDERSIGNED HEREBY further covenants and agrees that it will com- _____ and assigns any facts known.

ATTEST:

**EXHIBIT 25**

**PATENT
REEL: 018160 FRAME: 0505**

_Sharon L Figitt_
_____ Secretary

CASC:\WINDOWS\TEMP\Sita Tech.assignment.doc          -2-

**PATENT**
**REEL: 018160 FRAME: 0506**

```
-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
 MFgwCgYEVQgBAQICAf8DSgAwRwJAW2sNKK9AVtBzYZmr6aGjlWyK3Xmv2v3dTINen
 TWSM7vrzLADbmYQaionwg5sDW3P6oaM5D3tdezXXm7zlT+B+twIDAQAB
MIC-Info: RSA-MD5,RSA,
 K4E01byrnbnq0XHqN1yEWiiG+MQWZRnnKQlbh3FaVOhzzCWrXwUHxUW+4EJpYIXi
 TB+I/U19chePpQsjvIgP4Q==

<SEC-DOCUMENT>0001047469-98-012723.txt : 19980401
<SEC-HEADER>0001047469-98-012723.hdr.sgml : 19980401
ACCESSION NUMBER:              0001047469-98-012723
CONFORMED SUBMISSION TYPE:     10KSB40
PUBLIC DOCUMENT COUNT:         3
CONFORMED PERIOD OF REPORT:    19971231
FILED AS OF DATE:              19980331
SROS:             NASD

FILER:

    COMPANY DATA:
        COMPANY CONFORMED NAME:                SITE TECHNOLOGIES INC
        CENTRAL INDEX KEY:                     0001003754
        STANDARD INDUSTRIAL CLASSIFICATION:    SERVICES-PREPACKAGED SOFTWARE [7372]
        IRS NUMBER:                            770216760
        STATE OF INCORPORATION:                CA
        FISCAL YEAR END:                       1231

    FILING VALUES:
        FORM TYPE:         10KSB40
        SEC ACT:
        SEC FILE NUMBER:   001-11741
        FILM NUMBER:       98580543

    BUSINESS ADDRESS:
        STREET 1:       380 EL PUEBLO DR
        STREET 2:       STE 100
        CITY:           SCOTTS VALLEY
        STATE:          CA
        ZIP:            95066-4212
        BUSINESS PHONE: 4086484000

    MAIL ADDRESS:
        STREET 1:       380 EL PUEBLO DRIVE
        STREET 2:       STE 100
        CITY:           SCOTTS VALLEY
        STATE:          CA
        ZIP:            95066-4212

</SEC-HEADER>
```

EXHIBIT 26

designed to work either with full client-side functionality, to free the site designer from costly server connection time during the site creation and testing process, or as a client/server environment supporting multi-authoring capabilities in a group development environment. Further, these products are designed to utilize an open architecture that provides Web browser and Web server independence.

STRATEGY

The Company's objective is to be a leading provider of professional Web tools for the Web professional. The Company's strategy for achieving this objective includes the following elements:

BROADEN PRODUCT OFFERINGS. The Company continues to identify and develop, license and acquire technologies or products to extend product functionality and market position in Web site management and interoperability.

In the area of Web site management and interoperability, the Company expects to continue to update and enhance the development, interoperability and management features of its products to support a broader level of functionality. Towards that end, and to capitalize on the emerging opportunities in the SMB and enterprise department user markets for scalable Web tools for Web professionals, in November 1997 the Company has acquired from Inlet Divestiture Corp. ("Inlet") certain proprietary core technology which will serve as the basis for the Company's client/server, multi-authoring site, dynamic development and management products, the first being SiteMaster which was released in a preview format in February 1998. In July 1997, pursuant to the Site/technologies/inc. acquisition ("Site Tech Acquisition"), the Company acquired technology that serves as the basis for the Company's SiteSweeper 2.0 product, which is designed to enable Web development and management professionals to maintain the quality and integrity of mission critical Web based business environments.

EXPAND TARGET MARKETS. To date, the Company's Internet software products have been targeted at individuals and SOHO professionals. However, the scalable design of the Company's current and planned family of Web site development and management products should enable such products to be used by the individual or SOHO professional in a desktop environment that publishes the finished Web site on a remote Web server or outside hosting site, and by the SMB or enterprise department user that develops Intranet applications in a client/server, multi-authoring environment.

EXPAND CHANNELS OF DISTRIBUTION. The Company has historically marketed its Internet software products primarily through the retail distribution channel. The Company believes that in order to

<PAGE>
effectively market its new family of Web site development and management products to the SMB and enterprise department users, the Company must continue to implement a sales and marketing program focused on the development of VAR's

5

**PreAct, REOPENED**

# U.S. Bankruptcy Court
## Northern District of California (San Jose)
### Bankruptcy Petition #: 99-50736

*Assigned to:* Judge James R. Grube
Chapter 11
Voluntary
Asset

*Date Filed:* 02/02/1999
*Date Reopened:* 12/01/2008

*Debtor*
**Site Technologies, Inc.**
1120 Forest Ave. #301
Pacific Grove, CA 93950
( )
Tax id: 77-0216760
*dba*
**DeltaPoint, Inc.**

represented by **Craig M. Prim**
Law Offices of Murray and
Murray
19330 Stevens Creek Blvd.
#100
Cupertino, CA 95014-2526
(650) 852-9000

*Responsible Ind*
**Jeffrey F. Ait**
12702 Morehead
Chapel Hill, NC 27517

*U.S. Trustee*
**Office of the U.S. Trustee / SJ,**
U.S. Federal Bldg.
280 S 1st St. #268
San Jose, CA 95113-3004

| Filing Date | # | Docket Text |
|---|---|---|
| 02/02/1999 | 1 | Voluntary Petition missing documents: Summary of Schedules Schedules A-H Statement of Financial Affairs Equity Security Holders Due on 2/17/99 Order for Mtg of Creditors Due On 2/17/99 , Disclosure statement due 6/2/99 Chapter 11 Plan due 6/2/99 ( Filing Fee $ 830.00 Receipt # 5-9-001267). (femp) (Entered: 02/03/1999) |
| 02/02/1999 | 2 | Matrix. (femp) (Entered: 02/03/1999) |
| 02/02/1999 | 3 | Application for Order To Designate Responsible Individual: Jeffrey F. Ait filed by Debtor Site Technologies, Inc. (femp) (Entered: 02/03/1999) |
| 02/02/1999 | 4 | Application By Debtor Site Technologies, Inc. To Employ The Law |

**EXHIBIT 27**

| | | Inc. in Re: Service Of Chapter 11 Plan Solicitation Package by Site Technologies, Inc. . (sk) (Entered: 06/13/2000) |
|---|---|---|
| 06/09/2000 | 201 | Certificate Of Service By Debtor Site Technologies, Inc. of [199-1] Declaration Of Janice M. Murray filed by Debtor Site Technologies, Inc. in Re: Affidavit Of Mailing Received From ADP Investors Communications Services by Site Technologies, Inc., [198-1] Declaration Of Janice M Murray filed by Debtor Site Technologies, Inc. in Re: Service Of Chapter 11 Plan Solicitation Package by Site Technologies, Inc. . (sk) (Entered: 06/13/2000) |
| 06/12/2000 | | Hearing Held Re: [1-1] Voluntary Petition . status conference off calendar - plan confirmed. (femp) (Entered: 06/12/2000) |
| 06/12/2000 | | Hearing Held Re: [160-1] Chapter 11 Plan by Site Technologies, Inc. . plan confirmed (Final decree: 12/29/00) (femp) (Entered: 06/12/2000) |
| 06/15/2000 | 202 | Order Confirming First Amended Chapter 11 Plan of Reorganization. (Original EOD 6/19/00). (cg) (Entered: 07/05/2000) |
| 06/22/2000 | 203 | Notice of Change of Address of Attorney for Debtor. (cg) (Entered: 06/27/2000) |
| 06/22/2000 | 204 | Stipulation By and Between Debtor Site Technologies, Inc., Creditor Dell Financial Services, Inc. For Allowance of Claim . (cg) (Entered: 06/27/2000) |
| 06/22/2000 | 205 | Stipulation By and Between Debtor Site Technologies, Inc., Creditor Comerica Bank - California For Allowance of Claim . (cg) (Entered: 06/27/2000) |
| 06/22/2000 | 206 | Stipulation By and Between Debtor Site Technologies, Inc., Creditor Merrill Corporation For Allowance of Claim . (cg) (Entered: 06/27/2000) |
| 06/22/2000 | 207 | Stipulation By and Between Debtor Site Technologies, Inc., Creditor Owens Mortgage Investment Fund For Allowance of Claim . (cg) (Entered: 06/27/2000) |
| 06/22/2000 | 208 | Stipulation By and Between Debtor Site Technologies, Inc., Creditor Argo Partners, Assignee of Claim of Micro Warehouse, Inc. For Allowance of Claim . (cg) (Entered: 06/27/2000) |
| 06/22/2000 | 209 | Stipulation By and Between Debtor Site Technologies, Inc., Creditor Argo Partners, Assignee of The Claim of Level 3 Communication For Allowance of Claim . (cg) (Entered: 06/27/2000) |