# EXHIBIT 8

Dockets.Justia.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

SOFTWARE RIGHTS ARCHIVE, LLC     §
      §
vs.       §     CIVIL ACTION NO. 2:07-CV-511
      §
GOOGLE INC., YAHOO! INC., IAC     §
SEARCH & MEDIA, INC., AOL, LLC,     §
AND LYCOS, INC.       §

**MEMORANDUM OPINION AND ORDER**

**I.      Introduction**

Pending before the court is the defendants' motion for certification of order for interlocutory appeal or, in the alternative, for reconsideration (Dkt. No. 147). For the reasons discussed below, the court denies the motion.

**II.     Factual and Procedural Background**

On March 31, 2009, the court entered an order (Dkt. No. 138), denying the defendants', Google Inc. ("Google"), Yahoo! Inc. ("Yahoo"), IAC Search & Media, Inc. ("IAC"), and Lycos, Inc. ("Lycos") (collectively, "the defendants"), motion to dismiss the action for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). The dispute regarding standing focused on the characterization of certain mergers and acquisitions; two assignments among the various entities associated with the plaintiff, Software Rights Archive, LLC ("SRA"); and a bankruptcy proceeding. SRA articulated a number of theories in support of standing. Ultimately, the court found standing pursuant to Delaware alter ego law.

In their motion, the defendants request certification to the Federal Circuit of a "controlling question of law as to which there is substantial ground for difference of opinion and

[] an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). The defendants assert that the order implicates the following controlling issue of law:

> [W]hether standing under the Patent Act is satisfied by an equitable transfer of patent rights under the Delaware alter ego doctrine absent a showing that the purpose of the corporate form was to perpetrate fraud, and that it did in fact perpetrate fraud or something like fraud. See Defendants' Mot. at 5.

The defendants, alternatively, seek reconsideration of the court's decision, on the grounds that it is based on manifest legal error.

The court incorporates by reference the factual and procedural background as discussed in its original March 31, 2009, order.

## III. Discussion

An order is appropriate for certification if (1) it involves a controlling question of law, (2) as to which there is substantial ground for difference of opinion, and (3) an immediate appeal may materially advance the ultimate termination of the litigation. 28 U.S.C. § 1292(b), (c)(1). *Litton Systems, Inc. v. Raytheon Co.*, 1992 WL 276681, *2 (Fed. Cir. 1992); *see also Clark-Dietz and Associates-Engineers, Inc. v. Basic Const. Co.*, 702 F.2d 67, 69 (5th Cir. 1983) ("Section 1292(b) appeals are exceptional. They are permitted only when there is a substantial difference of opinion about a controlling question of law and the resolution of that question will materially advance, not retard, ultimate termination of the litigation.") and *In re Flor*, 79 F.3d 281, 284 (2d. Cir. 1996) ("As we have repeatedly cautioned, however, use of this certification procedure should be strictly limited because only exceptional circumstances [will] justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment.").

A.    **Controlling Question of Law**

Certification is proper in circumstances involving a pure issue of law, i.e., a question the appellate court can efficiently rule on without making an intensive inquiry into the record. *See Pittway Corp. v. Fynetics, Inc.*, 9 F.3d 977 (Fed. Cir. 1993) ("§ 1292(b), (c) contemplates review of pure questions of law . . . . For proper certification, it is necessary 'that the order involve a clear-cut question of law against a background of determined and immutable facts.'" (citing 9 JAMES W. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 110.22[2] (2d ed. 1993))); *Raber v. Pittway Corp.*, 17 F.3d 1444 (Fed. Cir. 1993) ("The certified order here concerns the law as applied to the specific facts of this case.  There is no new question of law that would be of general interest or that would be applicable to a wide range of cases.  Given the limited applicability of the question and its connection with the facts of this case, we do not consider this order appropriate for immediate review . . . ."); *Ahrenholz v. Board of Trustees of Univ. of Illinois*, 219 F.3d 674, 676-77 (7th Cir.) ("because it was an abstract issue of law, it was suitable for determination by an appellate court without a trial record."); *McFarlin v. Conseco Servs., LLC*, 381 F.3d 1251, 1259 (11th Cir. 2004) ("To summarize, § 1292(b) appeals were intended, and should be reserved, for situations in which the court of appeals can rule on a pure, controlling question of law without having to delve beyond the surface of the record in order to determine the facts."); *Smith v. AET Inc., Ltd.*, 2007 WL 1644060, *6 (S.D. Tex. 2007) ("The arguments set forth in regard to both appealed orders are heavily fact-based and necessarily involve a review of the factual record.  Accordingly, these orders are not appropriate for interlocutory review under the standard set forth in 28 U.S.C. § 1292(b).").

The court's March 31, 2009, order applied Delaware law to determine whether the court should ignore the corporate distinction between Deltapoint and Site/Tech—specifically, the court

3

determined that, at the time of the 1998 assignment to Mr. Egger, Site/Tech and Deltapoint were operating as a single economic entity, and the interests of justice and the compelling equities favored giving title to Egger (and subsequently SRA).

The defendants argue that Delaware law requires a showing that the purpose of the corporate form was to perpetrate fraud, and that it did in fact perpetrate a fraud or something like fraud. Essentially, they assert that if the appellate court finds that Delaware law requires fraud in its analysis, then under the analysis of the March 31, 2009, order, SRA does not have standing because fraud was not present. The court rejects this argument. Standing under the alter ego doctrine is "heavily fact-specific" inquiry. *Insituform Techs., Inc. v. CAT Contracting, Inc.*, 385 F.3d 1360, 1380 (Fed. Cir. 2004) (applying Fifth Circuit Law); *Sprint Nextel Corp. v. iPCS, Inc.*, 2008 WL 2737409, *11 (Del. Ch. 2008) ("Disregard of the corporate entity . . . is a fact-intensive inquiry."). Assuming the appellate court requires a showing of fraud under Delaware law, the defendants make a tacit assumption that fraud (or a species thereof) would not be present under the facts of this case. As the March 31, 2009, order did not assess the merits of fraud, the appellate court would likely have to either remand the issue back to this court (see below) or review the record and determine whether the evidence might support a finding of fraud. Either avenue weighs against certifying the question for interlocutory appeal as it does not involve a clear issue of law.

Furthermore, in opposition to the original motion, SRA asserted a number of theories on which it could assert standing. That the court ultimately rested its opinion on Delaware alter ego law does not foreclose analysis under those separate theories—indeed, standing may potentially be found to exist under an additional, alternative ground. *See California Public Employees' Retirement Sys. v. Worldcom, Inc.*, 368 F.3d 86, 95 (2d Cir. 2004) ("Because at least one

4

alternative basis for 'related to' jurisdiction may exist . . . we are not convinced that the Bondholders have raised a 'controlling question' that should be reviewed on an interlocutory basis."); *Parcel Tankers, Inc. v. Formosa Plastics Corp.*, 764 F.2d 1153, 1155 (5th Cir. 1985). The defendants have not met this first requirement.

### B.    Substantial Ground for Difference of Opinion

Section 1292(b) requires the question presented to be subject to a "substantial ground for difference of opinion." 28 U.S.C. § 1292(b). Questions that are raised for certification merely because "counsel disagrees on applicable precedent," or because a party "claim[s] that a district court has ruled incorrectly" do not qualify. *Halliburton Energy Servs., Inc. v. NL Indus.*, 2007 WL 268492, *11 (S.D. Tex. 2007); *DuPree v. Kaye*, 2008 WL 294532, *3 (N.D. Tex. 2008). Furthermore, courts have even found "a question of first impression, standing alone, [as] insufficient to demonstrate a substantial ground for difference of opinion." *In re Flor*, 79 F.3d at 284. The satisfaction of this requirement is reserved for "difficult and pivotal questions of law not settled by controlling authority." *Caraballo-Seda v. Municipality of Hormigueros*, 395 F.3d 7, 9 (1st Cir. 2005). Generally, substantial ground for difference of opinion is found where:

> a trial court rules in a manner which appears contrary to the rulings of all Courts of Appeals which have reached the issue, if the circuits are in dispute on the question and the Court of Appeals of the circuit has not spoken on the point, if complicated questions arise under foreign law, or if novel and difficult questions of first impression are presented. *DuPree*, 2008 WL 294532 at *3 (citing 24 AM. JUR. 2D APPELLATE REVIEW § 123 (2007)).

The present case does not meet this requirement. Here, the parties merely dispute the application of precedent. In the course of the court's analysis, it considered dozens of cases that applied various facts to pierce the corporate veil under the alter ego theory—indeed, any analysis depends on the facts of each case. *Insituform Techs.*, 385 F.3d at 1380 (applying Fifth Circuit

Law); *Sprint Nextel Corp. v. iPCS, Inc.*, 2008 WL 2737409, *11 (Del. Ch. 2008). The cases relied on have been consistently cited by a number of courts, and the court's analysis is consistent with such precedent. As such, the issue presented by the defendants does not meet this second requirement.

      **C.**    **Materially Advance the Ultimate Termination of the Litigation**

      Finally, certification requires that "an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). As discussed above, under either of the two general avenues that an appellate court may take, disposition would not materially advance the ultimate termination of the litigation. Were the appellate court to agree with the defendants and remand the case, the court would be faced with re-analyzing standing, first, under the fraud standard and, second, under the unaddressed, alternative theories. On the other hand, were the appellate court to agree with the defendants and conduct its own inquiry, there is no indication that this approach would advance the ultimate termination of the litigation given the alternative theories. For these reasons, the issue presented by the defendants does not meet this final requirement.

      **D.**    **Reconsideration**

      Finally, the court denies the defendants' alternative request for reconsideration. The court is not persuaded that its analysis contains a manifest error of law. Motions to reconsider serve a very limited purpose: "allowing a party to correct manifest errors of law or fact or to present newly discovered evidence." *Templet v. HydroChem Inc.*, 367 F.3d 473, 479 (5th Cir. 2004) (quoting *Waltman v. Int'l Paper Co.*, 875 F.2d 468, 473 (5th Cir. 1989)); *see Crouch v. J.C. Penney Corp., Inc.*, 564 F. Supp. 2d 636, 640 (E.D. Tex. 2008).

The court's reliance on *Pauley Petroleum, Inc. v. Continental Oil Co.*, 239 A.2d 629 (Del. 1968), is consistent with precedent. *See, e.g., Alberto v. Diversified Group, Inc.*, 55 F.3d 201, 206 (5th Cir. 1995); *EBG Holdings LLC v. Vredezicht's Gravehage*, 2008 WL 4057745, *11 (Del. Ch. 2008); *ASARCO LLC v. Ams. Mining Corp.*, 396 B.R. 278, 320 (S.D. Tex. 2008); *Bell Helicopter Textron, Inc. v. C&C Helicopter Sales, Inc.*, 295 F. Supp. 2d 400, 407-08 (D. Del. 2002). In their briefing, the defendants do not point to any case that negates the validity of *Pauley*, nor that negates the flexible approach adopted by the great weight of Delaware authority, allowing a court to pierce the corporate veil in instances of fraud *or* injustice. *See Mabon, Nugent & Co. v. Tex. Am. Energy Corp.*, 1988 WL 5492, *3 (Del. Ch. 1988); *Harco Nat'l Ins. Co.*, 1989 WL 110537 at *4; *Sprint*, 2008 WL 2737409; *Medi-Tec of Egypt Corp. v. Bausch & Lomb Surgical*, 2004 WL 415251, *7 (Del. Ch. 2004); *Fitzgerald v. Cantor*, 1998 WL 842316, *2 (De3l. Ch. 1998); *ASARCO*, 396 B.R. at 320. Furthermore, to the extent that the court did make a factual error in its original order, by inadvertently misstating the SEC filing, correction of this error does not alter the court's holding.

IV.    **Conclusion**

For all the foregoing reasons, the court denies the defendants' motion for certification of order for interlocutory appeal (Dkt. No. 147). The court is not persuaded that the issue presented for appeal meets the requirements of 28 U.S.C. § 1292(b)—it does not involve a controlling question of law to which there is substantial ground for difference of opinion, and an immediate appeal would not materially advance the ultimate termination of the litigation. Finally, the court denies the defendants' alternative request for reconsideration as there is no manifest error of law.

SIGNED this 24th day of June, 2009.


CHARLES EVERINGHAM IV
UNITED STATES MAGISTRATE JUDGE

# EXHIBIT 9

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| SOFTWARE RIGHTS ARCHIVE, LLC | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. 2:07-CV-511 |
| | § | |
| GOOGLE INC., YAHOO! INC., IAC | § | |
| SEARCH & MEDIA, INC., AOL, LLC, | § | |
| AND LYCOS, INC. | § | |

### MEMORANDUM OPINION AND ORDER

### I.      Introduction

Pending before the court is the defendants' motion to dismiss (Dkt. No. 66).  Google Inc. ("Google"), Yahoo! Inc. ("Yahoo"), IAC Search & Media, Inc. ("IAC"), and Lycos, Inc. ("Lycos") (collectively, "the defendants") seek to dismiss this action for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1).  The dispute regarding standing focuses on the characterization of certain mergers and acquisitions; two assignments among the various entities associated with the plaintiff, Software Rights Archive, LLC ("SRA"); and a bankruptcy proceeding.  For the reasons discussed below, the court denies the defendants' motion.

### II.      Factual and Procedural Background

SRA filed its complaint against the defendants on November 21, 2007.  SRA accuses the defendants of infringing U.S. Patent Nos. 5,544,352 ("the '352 patent"), 5,832,494 ("the '494 patent"), and 6,233,571 ("the '571 patent").  Faced with an infringement action in the Eastern District of Texas, the defendants filed a declaratory judgment action in the Northern District of California against Daniel Egger ("Egger"), SRA, and Site Technologies, Inc. *See Google Inc., et*

*al. v. L. Daniel Egger, et al.*, Civil Action No. 5:08-CV-03172 (N.D. Cal. 2008) ("the declaratory judgment action"). In the declaratory judgment action, the defendants seek a declaration of non-infringement, invalidity, and lack of ownership of the patents-in-suit, as well as a declaration of expiration and unenforceability of the '494 patent.[1] In the present motion, the defendants allege that SRA is not the assignee of the patents-in-suit and, therefore, lacks standing to bring this action.

### A.    The Patents-in-Suit

The '352 patent issued from Application No. 08/076,658, which named Egger as the sole inventor; it was filed on June 14, 1993, and was issued on August 6, 1996. Pursuant to an assignment dated November 9, 1993, and recorded with the United States Patent and Trademark Office ("USPTO"), Egger assigned all his rights in this application, and hence the '352 patent, to Libertech, Inc. ("Libertech"), a Delaware corporation that Egger founded in 1992. On May 17, 1996, a continuation-in-part application to the '352 patent was filed, which named Egger, as well as Shawn Cannon and Ronald D. Sauers, as inventors, and later issued as the '494 patent on November 3, 1998. Pursuant to an assignment dated June 18, 1996, and recorded with the USPTO, all three co-inventors assigned their rights in the application and the later issued '494 patent to Libertech. A divisional application of the '494 patent later issued as the '571 patent on May 15, 2001.

### B.    Deltapoint (a/k/a Site Technologies, Inc.) Purchases Libertech (a/k/a Site/Technologies/Inc.)

On August 22, 1996, Libertech changed its named to Site/Technologies/Inc. ("Site/Tech"). This name change was also recorded with the USPTO. The court will refer to

---

[1] The defendants also claim laches and unclean hands in their declaratory judgment action.

Site/Tech and Libertech, collectively, as Site/Tech, unless necessary to distinguish between the two.

Subsequently, on July 11, 1997, Deltapoint, Inc. ("Deltapoint"), a California corporation, purchased all of the shares of Site/Tech pursuant to a stock exchange agreement that Deltapoint publicly disclosed in a Securities and Exchange Commission ("SEC") filing. *See* Ex. 6 to Defs.' Mot. at 22. Thereafter, Deltapoint changed its name to Site Technologies, Inc. ("Site Tech"). The court will refer to Deltapoint and Site Tech, collectively, as Deltapoint, unless necessary to distinguish between the two.

### C.     The 1998 Assignment

On September 16, 1998, Deltapoint allegedly agreed to sell its technology pertaining to a product called "V-Search" to Egger. Deltapoint and Egger entered into a bill of sale, assignment and license agreement ("the 1998 assignment") pursuant to which Egger would pay $100,000 to obtain software, software copyrights, software licenses, trademarks, certain physical property, and rights to the '352 patent and certain related applications. *See* Ex. 10 to Defs.' Mot. The first assignment was filed with the USPTO. It is the characterization of the purchase of Site/Tech by Deltapoint and the subsequent 1998 assignment that forms the basis of the standing dispute.

### D.     Deltapoint Files Chapter 11 Bankruptcy; Deltapoint Merges with Site/Tech

After the purported assignment of the '352 patent to Egger, Deltapoint commenced Chapter 11 bankruptcy proceedings in the United States Bankruptcy Court for the Northern District of California. *See In re Site Technologies, Inc. d/b/a Deltapoint, Inc.*, Case No. 99-50736 (Bankr. N.D. Cal. 1999) ("the bankruptcy proceeding"). On June 15, 2000, the bankruptcy court approved Deltapoint's first amended plan of reorganization governing the estate's assets. On December 21, 2000, Deltapoint filed certificates with the California and

3

Delaware Secretaries of State stating that it merged itself and its subsidiary Site/Tech. Thereafter, all the corporate entities and all their assets had been merged into one entity, Deltapoint. The bankruptcy court entered a final decree on January 6, 2004. The bankruptcy case was re-opened on December 2, 2008. The motion upon which the bankruptcy case was re-opened asserted, among other things, that the patents that are the subject of the above-captioned actions are assets of Deltapoint that were not administered in the bankruptcy proceedings.

     **E.**    **SRA and the 2005 Assignment**

Egger formed SRA as a Delaware corporation in September 2004. Egger executed an assignment on February 11, 2005, in which he purported to be the president of Site/Tech and assigned Site/Tech's patent rights over to himself. Thereafter, Egger assigned those patent rights to SRA by virtue of a 2005 assignment ("the 2005 assignment").

**III.**    **Discussion**

The defendants contend that SRA lacks standing. In particular, the defendants argue that there is a defect in SRA's chain of title because Deltapoint was not the record title owner of the patents when it made the assignment to Egger in 1998. SRA's argument sets forth a number of legal theories which arguably vest title of the patents-in-suit with SRA, thus conferring standing. SRA proceeds along two alternative avenues: (1) Deltapoint owned the patents in September 1998 via the stock exchange agreement, and Egger then acquired the patents through the subsequent assignment; or (2) even if the stock exchange agreement did not grant patent rights, Site/Tech as the subsidiary, would be bound by the assignment under equitable principles.

In support of SRA's argument that Deltapoint owned the patents via the stock exchange agreement, it argues the following theories: (1) the stock exchange agreement, by operation of law, vested title of the patents with Deltapoint; (2) the articles of incorporation operated as a

4

written conveyance, transferring ownership of the patents to Deltapoint; (3) Site/Tech ratified the assignment of the patent rights from Deltapoint to Egger; and (4) a de facto merger occurred as a result of the stock exchange agreement. In support of SRA's alternative argument that Site/Tech, as a subsidiary, was bound by the assignment, SRA argues the following: (1) Deltapoint was acting as the alter ego of Site/Tech; and (2) Deltapoint and/or Jeffrey Ait ("Ait"), the Chief Executive Officer of Deltapoint, had actual or apparent authority to bind Site/Tech or Site/Tech ratified the acts of its purported agent under agency law.

Under the applicable standards and evidence in support, the court finds that at the time of the 1998 assignment, Deltapoint and Site/Tech were alter egos of one another. Because the court finds in favor of SRA on the alter ego issue, the court will forgo analysis of standing under the remaining common law theories.

### A.    Law

#### 1.    Standing

Federal Rule of Civil Procedure 12(b)(1) is the procedural mechanism for challenging a court's subject matter jurisdiction. *See Ramming v. U.S.*, 281 F.3d 158, 161 (5th Cir. 2001). "Lack of subject matter jurisdiction may be found in any one of three instances: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Id.* The party asserting jurisdiction bears the burden of proof. *Id.* "The burden of demonstrating standing falls to [the plaintiff], as '[i]t is well established . . . that before a federal court can consider the merits of a legal claim, the person seeking to invoke the jurisdiction of the court must establish the requisite standing to sue.'" *Ortho Pharm. Corp. v. Genetics Inst., Inc.*, 52 F.3d 1026 (Fed. Cir. 1995) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 154 (1990); citing

*Sicom Sys., Ltd. v. Agilent Tech., Inc.*, 427 F.3d 971, 975-76 (Fed. Cir. 2005)). "In examining a Rule 12(b)(1) motion, the court is empowered to consider matters of fact which may be in dispute." *Id.* at 161. Conversely, undisputed facts present in the record are accepted as true. *Id.* When jurisdiction rests on a disputed factual issue, however, the court reviews the parties' submitted evidentiary materials, and the plaintiff must prove that the facts supporting subject matter jurisdiction are true by a preponderance of the evidence. *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981).

A plaintiff seeking damages for infringement of a patent must hold legal title to that patent. *See, e.g., Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538 (Fed. Cir. 1995); *Speedplay, Inc. v. Bebop*, 211 F.3d 1245, 1249-50 (Fed. Cir. 2000) (citing 35 U.S.C. §§ 100(d), 261, 281). A party without title has no standing to bring suit. *Filmtec Corp. v. Allied-Signal Inc.*, 939 F.2d 1568 (Fed. Cir. 1991); *Abbott Labs. v. Diamedix Corp.*, 47 F.3d 1128, 1131 (Fed. Cir. 1995) ("The right to sue for infringement is ordinarily an incident of legal title to the patent."). "Where one co-owner possesses an undivided part of the entire patent, that joint owner must join all the other co-owners to establish standing." *Isreal Bio-Engineering Project v. Amgen, Inc.*, 475 F.3d 1256, 1264 (Fed. Cir. 2007). Legal title, which confers standing, must be held at the inception of the lawsuit. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 570 n. 5 (1992) (plurality opinion). Section 100(d) provides that a "'patentee' includes not only the patentee to whom the patent was issued but also the successor in title to the patentee." 35 U.S.C. § 100(d).

### 2.    Assignment of Patent Rights

Initial ownership of a patent vests in the inventor by operation of law. *See Regents of University of New Mexico v. Knight*, 321 F.3d 1111, 1118 (Fed. Cir. 2003); *Bellehumeur v. Bonnett*, 127 Fed. Appx. 480, 484 (Fed. Cir. 2005). Section 261 of the Patent Code, however,

provides that inventors can assign all or part of their interest in a patent and imposes minimal requirements for such assignment. *Id.* Under Section 261:

> Applications for patent, patents, or any interest therein, shall be assignable in law by an instrument in writing. The applicant, patentee, or his assigns or legal representatives may in like manner grant and convey an exclusive right under his application for patent, or patents, to the whole or any specified part of the United States. . . . 35 U.S.C. § 261.

When determining ownership of a patent in the context of a contract or agreement, state law governs. *Akazawa v. Link New Tech. Int'l, Inc.*, 520 F.3d 1354, 1357 (Fed. Cir. 2008); *Jim Arnold Corp. v. Hydrotech Systems, Inc.*, 109 F.3d 1567, 1578-79 (Fed. Cir. 1997). Moreover, "[c]onstruction of patent assignment agreements is a matter of state contract law." *Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 2008 WL 2229783, at *9 (Fed. Cir. 2008).

**B.     Application**

To determine whether a corporate identity should be disregarded, the court looks to the law of the state of incorporation. *See Davaco, Inc. v. AZ3, Inc.*, 2008 WL 2243382, *1 (N.D. Tex. 2008); RESTATEMENT (SECOND) OF CONFLICT OF LAWS §§ 307, 309 (1971).

**1.     Alter Ego**

Under the laws of Delaware, there are a number of factors that are pertinent to the alter ego analysis; however, "no single factor [can] justify a decision to disregard the corporate identity, but that some combination of them was required, and that an overall element of injustice or unfairness must always be present, as well." *Harco Nat'l Ins. Co. v. Green Farms, Inc.*, 1989 WL 110537, *5 (Del. Ch. 1989) (quoting *U.S. v. Golden Acres, Inc.*, 702 F.Supp. 1097, 1104 (D. Del. 1988)). Accordingly, under Delaware alter ego analysis, Site/Tech and Deltapoint (1) must have been operating as a single economic entity, and (2) an overall element of injustice or unfairness must have been present. "Simply phrased, the standard may be restated as: whether

7

[the two entities] operated as a single economic entity such that it would be inequitable for this

Court to uphold a legal distinction between them." *Harper v. Delaware Valley Broadcasters,*

*Inc.*, 743 F.Supp. 1076, 1085 (D. Del. 1990) (internal citations omitted).  Factors that tend to

show that the two entities are operating as a single economic unit are as follows:

> factors which reveal how the corporation operates and the particular [party's] relationship to that operation [, including] whether the corporation was adequately capitalized for the corporate undertaking; whether the corporation was solvent; whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; whether the dominant shareholder siphoned corporate funds; and whether, in general, the corporation simply functioned as a façade for the dominant shareholder. *Harco*, 1989 WL 110537 at *4.

The evidence presented by SRA strongly suggests that, at the time of the 1998

assignment, Site/Tech and Deltapoint were operating as a single economic entity. *See* Ex. 7, 11-

16 to Pl.'s Resp.  Uncontroverted testimony of Ait indicates the following:  Site/Tech and

Deltapoint had the same business department; Site/Tech did not have any employees or

operations of its own; Site/Tech and Deltapoint filed consolidated financial statements;

Deltapoint filed Site/Tech's tax returns; Deltapoint directly employed all of Site/Tech's former

employees and paid virtually all of its expenses; Site/Tech did not receive any independent

business; Site/Tech's sole source of revenue were royalties paid to it by Deltapoint; Site/Tech did

not design, produce, market, or sell anything; Deltapoint used and represented that it owned all

of Site/Tech's assets; Site/Tech had no independent daily operations; Site/Tech failed to observe

corporate formalities; Ait signed the 1998 assignment, as director and Chief Executive Officer of

both Deltapoint and Site/Tech; and Site/Tech and Deltapoint had the same bank account. *See*

Ex. 7 to Pl.'s Resp.  According to the stock exchange agreement, Site/Tech was wholly owned

by Deltapoint, and Site/Tech and Deltapoint had identical directors and officers. *See* Ex. 11.

8

Representations made to the SEC indicate that Deltapoint was liable for the debts of Site/Tech and assumed Site/Tech's liabilities in connection with the stock exchange. *See* Ex. 12-16 of Pl.'s Resp.

In response, the defendants point to the following evidence to controvert the assertion that Site/Tech and Deltapoint were a single economic unit: Site/Tech filed its own tax returns; Site/Tech retained offices and three employees in North Carolina; Site/Tech released a software product under its name; and testimony by Ait that Site/Tech was not a shell entity after its acquisition by Deltapoint.

The 2001 tax return on which the defendants rely reflect earnings from 1998 and 1999 and are seemingly the result of an internal royalty structure established as a result of the 1997 transaction—there is no indication that Site/Tech earned those funds through any independent business operation. *See* Ex. 11, 20 to Pl.'s Resp. Furthermore, the filing date of the tax return and the fact that the return reflects no further revenues suggest that Site/Tech did not have any independent operations in 1998 and 1999. *Id.*

In support of the retention of officers and employees in North Carolina, the defendants rely on Ait's deposition. *See* Ex. 2 to Defs.' Reply at 81, ll. 11-19; 82, ll. 8-21. The testimony, however, is pulled out of context. Further testimony indicates that Ait agreed to keep three employees in North Carolina as employees of Deltapoint. *See* Ex. 3 to Pl.'s Sur-Reply at 107, ll. 2-4.

As to the independent release of software by Site/Tech, this evidence does not indicate that Site/Tech and Deltapoint were distinct entities in 1998. The evidence, two press releases, were released a mere month after the 1997 transaction. Furthermore, the press releases contain a number of indications that Deltapoint and Site/Tech were in economic unity: the headline reads,

9

"Deltapoint and Site/technologies/inc. deliver SiteSweeper 2.0 . . ."; there are indications that Site/Tech employees had already integrated into Deltapoint; the press release states that, "Deltapoint plans to release SiteSweeper 2.0 on the company's Web site"; and, finally, the press release heavily discusses Deltapoint, with little to no discussion of Site/Tech as a separate entity. *See* Exs. 7-8 of Defs.' Mot.  Furthermore, SEC filings indicate that SiteSweeper 2.0 technology was actually a product of Deltapoint and not Site/Tech.

Finally, with respect to the Ait deposition testimony concerning whether Site/Tech was a shell entity, again, the defendants take his testimony out of context.  As explained in his deposition, Ait did not agree with the characterization by defense counsel of Site/Tech as a non-shell entity of Deltapoint. *See* Ait Depo. at 107-08 (Ex. 3 to Pl.'s Sur-Reply).  On balance, the evidence presented by the defendants does not sufficiently controvert the overwhelming evidence to the contrary suggesting that Site/Tech and Deltapoint were operating as a single economic entity in September of 1998.

As to the second prong, Delaware courts will not disregard the corporate form and treat two corporations as one unless equity so demands. S *ee Pauley Petroleum, Inc. v. Continental Oil Co.*, 239 A.2d 629, 633 (Del. 1968).  Although this equitable power is broad, "persuading a Delaware court to disregard the corporate entity is a difficult task." *Harco Nat. Ins. Co.*, 1989 WL 110537 at *4; *see also Sears, Roebuck & Co. v. Sears plc*, 744 F.Supp. 1297, 1305 (D. Del. 1990) (stating, "[i]t is only the exceptional case where a court will disregard the corporate form. . . ."). Accordingly, the second step of the analysis requires a strong showing that an overall element of injustice or unfairness is present.  This showing of injustice or unfairness does not require a showing of fraud per se—instead, the corporate veil may be pierced "in the interests of justice, when such matters as fraud, contravention of law or contract, public wrong, or where

10

equitable considerations among members of the corporation require it, are involved." *Pauley*

*Petroleum Inc. v. Continental Oil Co.*, 239 A.2d 629, 633 (Del. 1968). Furthermore, "the fraud

or similar injustice that must be demonstrated in order to pierce a corporate veil under Delaware

law must, in particular, 'be found in the [parties'] use of the corporate form.'" *In re Foxmeyer*

*Corp.*, 290 B.R. 229, 236 (Bkrtcy. D. Del. 2003).

In this case, the corporate distinction between Deltapoint and Site/Tech should be

disregarded for the purposes of vesting title to the patents-in-issue to Egger. Several facts

counsel the court to reach this result. First, the 1998 assignment contained a warranty, that

"[Deltapoint] hereby transfers good and marketable title to the Purchased Assets." *See* Ex. 10 to

Defs.' Mot. at ¶ 2. Second, it is undisputed that Egger paid at least $80,000 of the $100,000 due

under the assignment for the patents. Furthermore, Site/Tech affirmed to the SEC that it had sold

title to the patents to Egger. *See* Ex. 17 to Pls.' Resp. Finally, there is evidence that Ait, on

behalf of both Site/Tech and Deltapoint, ratified the 1998 assignment and disclaimed ownership

of the patents in Egger's favor. *See* Ex. 7 to Pl.'s Resp. Under these facts, the equities in favor

of preventing injustice and contravention of contract strongly demand a piercing of the corporate

veil. As indicated above, Site/Tech had no independent ownership, directors, officers,

employees, property, offices, business dealings, business departments, headquarters, products,

corporate records, bank accounts, director meetings, shareholder meetings, or operations in

September 1998. The factual record before the court strongly favors SRA.[2] It must be

remembered that it was the parent corporation which represented it owned the patent and could

convey title. From Egger's perspective, it would be inequitable to allow Deltapoint or Site/Tech

---

[2] The defendants further argue that SRA is not entitled to raise an alter ego claim in light of Deltapoint's bankruptcy. As the court finds that Deltapoint assigned the patents to Egger in September 1998, prior to the bankruptcy, such argument is irrelevant.

11

to hide behind the corporate fiction. Deltapoint's wholly-owned subsidiary, Site/Tech, is bound by the 1998 assignment, and Egger obtained title to the patents.

**2.      Bankruptcy Issues**

The parties dedicate a number of pages of their respective briefs to addressing bankruptcy-related issues. Because the court finds that Egger acquired title to the patents-in-suit by virtue of the 1998 assignment, and the assignment preceded the bankruptcy proceeding, the court concludes that the bankruptcy issues are not relevant for the purpose of assessing standing.

**IV.      Conclusion**

For all the foregoing reasons, the court finds that, regardless of whether the 1997 stock exchange agreement vested title to the patents-in-suit to Deltapoint, Site/Tech is bound by the 1998 assignment to Egger. At the time of the assignment to Egger, Site/Tech and Deltapoint were operating as a single economic entity. Furthermore, the interests of justice and the compelling equities in favor of SRA (claiming through Egger) compel the court's decision. Accordingly, the court denies the defendants' motion to dismiss (Dkt. No. 66).

SIGNED this 31st day of March, 2009.

_Charles Everingham_
CHARLES EVERINGHAM IV
UNITED STATES MAGISTRATE JUDGE

# EXHIBIT 10

1  Thomas F. Smegal, Jr. (Bar No. 34,819)
   One Sansome Street, 35th Floor
2  San Francisco, CA 94104
   Telephone: (415) 217-8383
3  Facsimile: (415) 399-5093
   Email: tomsmegal@smegallaw.com
4
   Lee L. Kaplan (Texas Bar No. 11094400)
5  Jeffrey A. Potts (Texas Bar No. 00784781)
   Raj Duvvuri (Texas Bar No. 24054185)
6  (admitted *pro hac vice*)
   700 Louisiana Street, Suite 2300
7  Houston, TX 77002
   Telephone: (713) 221-2300
8  Facsimile: (713) 221-2320
   Email: lkaplan@skv.com
9
   Jay D. Ellwanger (Texas Bar No. 24036522)
10 P.O. Box 201690
   Austin, Texas 78720
11 Telephone: (512) 681-4060
   Facsimile: (512) 628-3410
12 Email: jellwanger@dpelaw.com
13 Attorneys for Defendants L. Daniel Egger, Software
   Rights Archive, LLC, and Site Technologies, Inc.
14
15          **UNITED STATES DISTRICT COURT**
              **NORTHERN DISTRICT OF CALIFORNIA**
16                  **SAN JOSE DIVISION**
17
   **GOOGLE INC., AOL LLC, YAHOO!**          Case No. CV08-03172RMW
18 **INC., IAC SEARCH & MEDIA, INC., and**
   **LYCOS, INC.**                           **DECLARATION OF L. DANIEL EGGER**
19                                            **IN SUPPORT OF DEFENDANTS'**
              **Plaintiffs,**                 **MOTION TO DISMISS UNDER RULE**
20                                            **12(B)(2) FOR LACK OF PERSONAL**
   v.                                         **JURISDICTION**
21
   **L. DANIEL EGGER, SOFTWARE**
22 **RIGHTS ARCHIVE, LLC, and SITE**          Date of Hearing: January 23, 2009
   **TECHNOLOGIES, INC.**
23                                            Time of Hearing: 10:30 am
              **Defendants.**
24
25
26
27                                          
28

   EGGER DEC. IN SUPPORT OF MOTION TO DISMISS UNDER RULE 12(B)(2)
                    CASE NO. CV08-03172

1     I, Louis Daniel Egger, declare as follows:

2     1.    I was born in New Haven, Connecticut in 1962 and grew up in Connecticut, New

3 Jersey, and Massachusetts.  Following my 1980 graduation from a Massachusetts high school, I

4 attended Yale University in Connecticut.  From 1962 until 1981, I never lived, worked,

5 maintained an address, or used a bank account in California.

6     2.    During the summer and fall of 1981—that is, between my freshman and

7 sophomore year of college—I temporarily lived in San Francisco, California, and worked at the

8 Anchor Steam brewery there.  In connection with my stay, I temporarily opened a bank account

9 in California.  It was always my intention to stay in California for no more than a few months,

10 and that is in fact what happened, because I returned to Connecticut in January 1982.

11     3.    Other than during my roughly half-year stint in San Francisco in 1981, I have

12 never lived, worked, maintained an address, maintained a telephone number, paid taxes, or used

13 a bank account in California.  Other than in 1981, I have never stayed in California for more than

14 a few days at a time.

15     4.    I have never attended any educational institution in California.  I have never been

16 registered to vote in California.  I have never permanently stored personal property in California.

17 I have never purchased real property in California.  I have never brought a lawsuit in or in any

18 other way resorted to the courts of California.

19     5.    From 1992 to 1996, I was the President and CEO, as well as a shareholder and

20 director, of Libertech, Inc., a Delaware corporation headquartered first in Washington, D.C. and

21 then in North Carolina.  As an employee and officer of Libertech, I traveled to California from

22 time to time on company business; that included some efforts to market Libertech's V-Search

23 technology, as well as to try to sell Libertech.  In July 1997, Libertech and all its assets were

24 purchased by a California company called DeltaPoint, Inc.  However, I never traveled to

25 California in connection with that transaction.  In fact, I played no role in connection with that

26 transaction other than to sign and fax back deal documents from North Carolina in my capacity

27 as a director and shareholder.

28     6.    While I was its President and CEO, Libertech owned the rights to what would

ii

1   eventually issue as U.S. Patent Nos. 5,544,352, 5,832,494, and 6,233,571 ("the patents").

2   During that time, Libertech never employed patent lawyers in California. I never made contact

3   with California for purposes of prosecuting the patents or any other patents. I also never made

4   contact with California to try to sell or license the patents or any other patent.

5       7.   After leaving Libertech, I joined Eno River Capital, LLC, a North Carolina-based

6   venture capital fund that in turn managed interests in North Carolina-based portfolio companies.

7   I also was, at various times, an investor, director, and/or advisor to SciQuest, Inc., a North

8   Carolina-based software company. I am currently President and CEO of Open Source Risk

9   Management, Inc., a North Carolina-based risk management services company. In connection

10  with these various entities, I have traveled and continue to travel to California a few times a year

11  on company business.

12      8.   In September 1998, I purchased the rights to the patents from Site Technologies,

13  Inc. (formerly known as "DeltaPoint, Inc."). I called and emailed Site Technologies personnel in

14  connection with that purchase. I never traveled to California in connection with that purchase.

15      9.   I owned the patents directly from September 1998 until February 2005, when I

16  assigned them to Software Rights Archive, Inc., a wholly-owned Delaware corporation

17  headquartered in North Carolina. I converted Software Rights Archive, Inc. to Software Rights

18  Archive, LLC and sold it in May 2007. From September 1998 to May 2007, I never made

19  contact with the State of California or with any California entity to offer to sell or license the

20  patents, I never licensed the patents in California or to any California entity, and I never

21  collected patent-related royalties from any business activities connected with California.

22      10.  I have never at any time, either in an individual capacity or on behalf of any

23  entity, made contact with the State of California or with any California entity to allege that any

24  entity was infringing the patents. I have never at any time, either in an individual capacity or on

25  behalf of any entity, made contact with the State of California or with any California entity to try

26  to judicially or extra-judicially enforce the patents. I have never at any time, either in an

27  individual capacity or on behalf of any entity, made contact with the State of California or with

28  any California entity in connection with any exclusive license of any of the technologies

EGGER DEC. IN SUPPORT OF MOTION TO DISMISS UNDER RULE 12(B)(2)
CASE NO. CV08-03172

1    embodied in the patents.  I have never at any time, either in an individual capacity or on behalf of

2    any entity, hired a California patent lawyer to help prosecute or enforce the patent rights.  I have

3    never at any time, either in an individual capacity or on behalf of any entity, sold or licensed the

4    patented technology in California or to any California entity.

5         11.    In 2005, I took—and passed—the California bar exam.  To date, I have not

6    applied for admission to the California bar.

7         12.    My only further contacts with California have been family-related, such as

8    camping trips and a college visit with my daughter.

9

10         I declare under penalty of perjury under the laws of the United States of America that the

11    foregoing statements are true and correct.

12         Executed this 14th day of November, 2008, in Durham, North Carolina.

13

14         Louis Daniel Egger

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EGGER DEC. IN SUPPORT OF MOTION TO DISMISS UNDER RULE 12(B)(2)
CASE NO. CV08-03172

CERTIFICATE OF SERVICE

1 |
2 |      The undersigned hereby certifies that all counsel of record who are deemed to
3 | have consented to electronic service are being served with a copy of this document via the
4 | Court's CM/ECF system per Local Rule CV-5(a)(3) on November 18, 2008.

6

7 | Raj Duvvuri

# EXHIBIT 11

177

1   IN THE UNITED STATES DISTRICT COURT
        EASTERN DISTRICT OF TEXAS
2           MARSHALL DIVISION
    ------------------------------------X
3   SOFTWARE RIGHTS ARCHIVE, LLC,          :
                                           :
4              Plaintiff,                   :
                                           :    Civil Case No.:
5          -vs-                             :    2:07-CV-511(CE)
                                           :
6   GOOGLE, INC., YAHOO! INC.,             :
    IAC SEARCH & MEDIA, INC.,              :
7   AOL, LLC, AND LYCOS, INC.,             :
                                           :
8              Defendants.                  :
    ------------------------------------X
9     UNITED STATES DISTRICT COURT
      NORTHERN DISTRICT OF CALIFORNIA
10          SAN JOSE DIVISION
    ------------------------------------X
11  GOOGLE, INC., AOL, LLC, YAHOO! INC.,   :
    IAC SEARCH & MEDIA, INC., AND          :
12  LYCOS, INC.,                           :
                                           :
13             Plaintiffs,                  :
                                           :    Civil Case No.:
14         -vs-                             :    CV08-03172RMW
                                           :
15  L. DANIEL EGGER, SOFTWARE RIGHTS       :
    ARCHIVE, LLC, AND                      :
16  SITE TECHNOLOGIES, INC.,               :
                                           :
17             Defendants.                  :
    ------------------------------------X
18

19      VIDEOTAPED DEPOSITION OF LOUIS DANIEL EGGER

20              Volume II

21          Durham, North Carolina

22          January 27, 2009

23  Job No: 189203

24  Reported by:  Lisa A. DeGroat, RPR
                  Notary Public

25

269

1    A.    Yes.

2    Q.    Was Software Rights Archive, Inc. -- did it have

3  its own bank account?

4    A.    Yes.

5    Q.    Did it hold annual meetings?

6    A.    I -- I went through the papers annually.  We

7  didn't do formal board minutes.

8    Q.    Okay.  Did it carry on any business, other than

9  holding these patents?

10   A.    We had a Web site, but we ended up not using it.

11   Q.    It didn't make any revenues, did it?

12   A.    I think the only income it had was, you know, one

13  month's good faith payment under the license terms that we

14  were discussing, which we then dropped.

15   Q.    Do you remember how much that payment would have

16  been?

17   A.    Yeah.  It would have been about -- well, it would

18  have been $9,500.

19   Q.    And was anyone else an investor in Software Rights

20  Archive, Inc.?

21   A.    No.

22   Q.    Do you know how much money was used to capitalize

23  it?

24   A.    I don't remember, but it would be in -- no.  I

25  don't remember.

311

1

2   STATE OF NORTH CAROLINA

3   COUNTY OF PERSON

4

5                 CERTIFICATE OF TRANSCRIPT

6

7       I, Lisa A. DeGroat, a Court Reporter and Notary

8   Public in and for the aforesaid county and state, do hereby

9   certify that the foregoing deposition of LOUIS DANIEL EGGER,

10  was taken by me and reduced to typewriting under my direction;

11  and the transcript is a true record of the testimony given by

12  the witness.

13      I further certify that I am neither attorney or

14  counsel for, nor related to or employed by any attorney or

15  counsel employed by the parties hereto or financially

16  interested in the action.

17      This the 28th day of January, 2009.

18

19

20

21

22  _____

23  LISA A. DeGROAT
    Registered Professional Reporter
24  Notary Public #19952760001

25

# EXHIBIT 12

## ASSIGNMENT OF PATENTS AND PATENT APPLICATIONS

WHEREAS Daniel Egger, an individual (the "Assignor"), has formerly owned and may own rights to the patents identified on Schedule A attached hereto, and all related applications, continuations, continuations-in-part, divisions, reissues, utility model patents, laid-open applications and petty patents based on or claiming the priority of said patents or which may be granted therefrom, along with all extensions and renewals thereof, throughout the United States and all foreign countries throughout the world (collectively, the "Patents");

WHEREAS, Assignor previously assigned the Patents to Software Rights Archive, LLC, a Delaware limited liability company, f/k/a Software Rights Archive, Inc., a Delaware corporation (the "Assignee"), by way of that certain Assignment of Patent dated February 22, 2005, wherein it was the intent of Assignor to convey full, complete legal title and ownership to Assignee, and full, complete legal title and ownership into and under the Patents was conveyed thereby;

WHEREAS, certain parties have challenged the legal efficacy of the chain of title to the Patents to vest full legal title in Assignee;

WHEREAS, Assignor and Assignee are desirous of removing all doubt with respect to Assignee's holding full and complete legal title to and ownership of the Patents, and Assignor and the Assignee are desirous of Assignee obtaining any rights that the Assignor may have into or under the Patents;

NOW THEREFORE, in consideration of the sum of One Dollar ($1.00) and other good and valuable consideration, the receipt of which is hereby acknowledged, Assignor hereby sells, assigns and transfers to Assignee his entire right, title and interest in and to the Patents, the same to be held and enjoyed by Assignee for its own use and enjoyment, and for the use and enjoyment of its successors, assigns and legal representatives, to the end of the terms for which the Patents have been granted, as fully and entirely as the same would have been held and enjoyed by Assignor if this assignment had not been made; together with all claims by Assignor for damages by reason of past infringement of the Patents with the right to sue for, and collect the same for Assignee's own use and benefit, and for the use and benefit of its successors, assigns and other legal representatives.

Assignor hereby covenants and agrees that he has full right to convey the entire interest herein assigned, and that Assignor has not executed, and will not execute, any agreement in conflict herewith.

Assignor further covenants and agrees that he will without undue delay execute all such papers as may be necessary to perfect the title to said inventions or improvements and Patents in Assignee, or its successors, assigns, nominees or legal representatives, and agrees to communicate to Assignee, or its successors, assigns, nominees or legal representatives all known facts respecting said inventions or

EGG_0000668

improvements and Patents to testify in any legal proceedings, to sign all lawful papers, and generally to do all things necessary to aid Assignee or its successors, assigns, nominees or legal representatives to obtain and enforce for their own benefit patent protection for said inventions or improvements in any and all countries, all at the expense, however, of Assignee, or its successors, assigns, nominees or legal representatives.

IN TESTIMONY WHEREOF, the undersigned hereto sets his hand and seal this 26th day of September, 2008.

Assignor: _____
              Daniel Egger

State of NORTH CAROLINA                    §
                                           §
County of DURHAM            )              §

I, the undersigned Notary Public, do hereby certify that DANIEL EGGER personally appeared before me this day and acknowledged the due execution of the instrument.

Witness my hand and official seal, this the 26th day of September, 2008.

_____
Pamela A. Artlip
              Notary Public

My Commission Expires:

11-04-08



2

EGG_0000669

## SCHEDULE A

U.S. Patent No. 5,544,352
U.S. Patent No. 5,832,494
U.S. Patent No. 6,233,571

CONFIDENTIAL

EGG_0000670

# EXHIBIT 13

disposition provided the Company with much needed liquidity.

V-Search Disposition. On September 30, 1998, the Company consummated the sale of its V-Search technology and related patents. This was technology that the Company acquired in the Site Tech Acquisition. The Company sold the assets relating to V-Search in cash to Daniel Edgar. The Company received a cash payment of $100,000.

Recent Acquisitions. On July 11, 1997, the Company consummated the "Site Tech Acquisition" pursuant to which the Company issued a total of 550,029 shares of Common Stock, made a cash payment of $60,000 and assumed liabilities of $73,000 for a total purchase price of $638,000 in exchange for all outstanding shares of Site. The Company recognized a charge to operations of $500,000 for the portion of the purchase price determined to be in-process research and development.

On November 19, 1997, the Company consummated the "Inlet Technology Acquisition" pursuant to which the Company acquired from Inlet certain Internet technologies. As consideration for the Inlet Technology Acquisition, the Company issued Notes payable of $825,000 in cash and 360,000 shares of the Company's Common Stock. The Company recognized a charge to operations of approximately $1.1 million for the portion of the purchase price determined to be in-process research and development

See Note 6 of Notes to Consolidated Financial Statements in the Company Form 10-KSB for the year ended December 31, 1997 for further discussion of the Site Tech and Inlet Acquisitions.

Revenues. The Company's revenues consist of license revenues from sales of software products to distributors, resellers and end users. In addition, the Company derives license revenues from royalty agreements with certain customers. Under these agreements, the Company typically receives a large percentage of the aggregate revenues in the form of a nonrefundable royalty paid upon shipment of the master copy of software, which allows the customer to license a specified number of copies of the Company's software. In addition, the Company recently introduced products targeted at the small to medium size businesses ("SMBs") and corporate department user markets for scalable Web site development and management solutions. In connection with the introduction of these products, the Company increased its use of non-retail distribution channels including value added resellers ("VARs"), original equipment manufacturers ("OEMs") and Internet Service Providers ("ISPs").

Software product sales are recognized upon shipment of the product, net of appropriate allowances for estimated returns. Revenues from software royalty agreements are recognized upon shipment of a master copy of the software product if no significant vendor obligations remain under the term of the license agreements and any amounts to be paid are nonrefundable. Payments received in

# EXHIBIT 14

## ASSIGNMENT OF PATENTS

WHEREAS, I, Jeffrey Ait, acted as and remains Chief Executive Officer of Site Technologies, Inc., a California corporation ("Site"), and acted as President and Chief Executive Officer of its then-wholly owned subsidiary, Site/technologies/inc., a Delaware corporation ("Site/") (collectively, the "Site Entities"), as well as acted as the designated Responsible Person in the bankruptcy of Site;

WHEREAS, Site acquired patents and patent applications resulting in patents listed on Schedule A, along with all foreign patents and applications, and all foreign and U.S. additions, continuations, continuations in part, divisions, extensions, reissues, renewals, or substitutions of such patents (collectively, the "Patents");

WHEREAS, Site assigned to Daniel Egger and his successors and assigns ("Egger" or "Assignee") by way of a Bill of Sale, Assignment and License Agreement dated September 16, 1998 (the "Bill of Sale") and by Assignment of Patent (the "Assignment") the Patents, among other things, for a purchase price of $100,000, which was paid by Egger and received by Site;

WHEREAS, on December 21, 2000, Site/ merged into Site;

WHEREAS, it was the intent of the Site Entities to convey full, complete legal title and ownership to Egger by way of the Bill of Sale and the Assignment and both Site Entities ratified, and hereby further ratify, the obligations of the Bill of Sale and Assignment, and full, complete legal title and ownership into and under the Patents was conveyed thereby;

WHEREAS, the Site Entities have ratified and hereby ratify the 2005 Assignment executed by Daniel Egger conveying the Patents.

WHEREAS, certain parties have challenged the legal effect of the 1998 Bill of Sale and Assignment notwithstanding the fact that the Bill of Sale and the Assignment were valid and effective to transfer full complete legal title and ownership into and under the Patents to Egger;

WHEREAS, Egger and the Site Entities are desirous of removing all doubt with respect to Egger's holding full and complete legal title to and ownership of the Patents and Egger and the Site Entities are also desirous of Egger obtaining any rights that the Site Entities may have into or under the Patents;

NOW THEREFORE, in consideration of the sum of One Thousand Dollars ($1000) and other good and valuable consideration, the sufficiency of which is hereby acknowledged, each of the Site Entities, separately and together, hereby sells, assigns and transfers to Assignee the entire right, title and interest into and under the Patents to the extent that now held by the Site Entities, including all related future-acquired patents and patent applications, the same to be held and enjoyed by Assignee for its own use and

STI_0011611

enjoyment, and for the use and enjoyment of its successors, assigns and legal representatives, to the end of the terms for which the Patents have been granted, as fully and entirely as the same would have been held and enjoyed by Site if this assignment had not been made; together with all claims for damages by reason of past infringement of the Patents with the right to sue for, and collect the same for Assignee's own use and benefit, and for the use and- benefit of its successors, assigns and other legal representatives.

FURTHERMORE, the Site Entities hereby further ratify the 2005 Assignment executed by Daniel Egger conveying the Patents.

AND THE UNDERSIGN HEREBY authorizes and requests the Commissioner of Patents of the United States, and any Official of any country or countries foreign to the United States, whose duty it is to issue patents or other evidence or forms of industrial property protection on applications as aforesaid, to issue the same to the said ASSIGNEE, its successors, legal representatives and assigns, in accordance with the terms of this instrument.

AND THE UNDERSIGN HEREBY represents, warranties and covenants that Site or Site/ has not executed, and will not execute, any agreement in conflict herewith. If any further documentation is necessary to transfer to the Patents to Daniel Egger, I further agree to complete and execute that documentation.

IN TESTIMONY WHEREOF, the undersigned hereto sets his hand this 13th day of August, 2008.


Jeffrey Alt
Chief Executive Officer of Site Technologies, Inc.


Jeffrey Alt
President and Chief Executive Officer of Site/technologies/inc.

2

STI_0011612

## Schedule A

- U.S. Patent No. 5,544,352
- U.S. Patent No. 5,832,494
- U.S. Patent No. 6,233,571
- all related continuations, divisional, future issued patents and foreign patents

3

STI_0011613